# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

**Docket Number(s)**: 16-345, 16-361    **Caption** [use short title]

**Motion for**: Unopposed Joint Motion to Extend Briefing Schedule by 60 days

Catskill Mountainkeeper v. FERC

Set forth below precise, complete statement of relief sought:

Parties move to extend the briefing schedule by 60 days.

**MOVING PARTY**: Catskill Mountainkeeper, et al., Stop the Pipeline, and FERC    **OPPOSING PARTY**:

☐ Plaintiff  ☐ Defendant
☑ Appellant/Petitioner  ☑ Appellee/Respondent

**MOVING ATTORNEY**: Moneen Nasmith, Earthjustice, 212-845-7384, mnasmith@earthjustice.org    **OPPOSING ATTORNEY**:
[name of attorney, with firm, address, phone number and e-mail]

Karin Larson, FERC, 202-502-8236, karin.larson@ferc.gov

Todd Ommen, Pace Envt'l Legal Clinic, 914-422-4343

tommen@law.pace.edu

**Court-Judge/Agency appealed from**: Federal Energy Regulatory Commission

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain):

Opposing counsel's position on motion:
☑ Unopposed  ☐ Opposed  ☐ Don't Know

Does opposing counsel intend to file a response:
☐ Yes  ☑ No  ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**
Has request for relief been made below?  ☐ Yes  ☐ No
Has this relief been previously sought in this Court?  ☐ Yes  ☐ No
Requested return date and explanation of emergency:

Is oral argument on motion requested?  ☐ Yes  ☑ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes  ☑ No  If yes, enter date:

**Signature of Moving Attorney:**
Karin L. Larson, FERC    **Date**: 04/29/2016    **Service by**: ☑ CM/ECF  ☐ Other [Attach proof of service]

---

**Form T-1080** (rev. 12-13)

**Oral Argument Not Yet Scheduled**

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | |
|---|---|
| CATSKILL MOUNTAINKEEPER, INC.; CLEAN AIR COUNCIL; DELAWARE-OTSEGO AUDUBON SOCIETY, INC.; RIVERKEEPER, INC.; AND SIERRA CLUB, | |
| Petitioners, | Nos. 16-345(L) 16-361 (Con) |
| STOP THE PIPELINE, INC. | |
| Petitioner, | |
| v. | |
| FEDERAL ENERGY REGULATORY COMMISSION, | |
| Respondent, | |
| CONSTITUTION PIPELINE CO., LLC, IROQUOIS GAS TRANSMISSION SYSTEM, L.P., NATURAL GAS SUPPLY ASSOCIATION, | |
| Intervenors. | |

**UNOPPOSED JOINT MOTION TO EXTEND BRIEFING SCHEDULE**

Pursuant to Rule 27 of the Federal Rules of Appellate Procedure and Circuit Rule 27, Petitioners Catskill Mountainkeeper, Inc.; Clean Air Council; Delaware-Otsego Audubon Society, Inc.; Riverkeeper, Inc.; and Sierra Club ("Catskill Mountainkeeper et al."), jointly with Petitioner Stop the Pipeline; and Respondent

-1-

Federal Energy Regulatory Commission ("Commission") (together "Movants") respectfully move this Court for an unopposed 60 day extension of the briefing schedule to determine whether a recent decision by the New York Department of Environmental Conservation ("NYSDEC") will be challenged.

The above-captioned consolidated case concerns challenges to three orders issued by the Commission approving Constitution Pipeline Co., LLC's ("Constitution") proposed 124-mile natural gas pipeline through Pennsylvania and New York (the "Project"). The Project requires other permits and authorizations in addition to the Commission's certificate granted in the challenged orders. On April 22, 2016, NYSDEC denied Constitution's application for a Water Quality Certification under Section 401 of the Clean Water Act for the same pipeline project.[1] NYSDEC's denial may be challenged or, alternatively, Constitution may renew its application. As of the date of this motion Constitution has taken no action with respect to the NYSDEC's April 22, 2016 decision.

There is significant overlap between the issues Petitioners may raise in their challenge to the Commission's Orders and the issues that could arise from a potential challenge to the NYSDEC's denial of the Water Quality Certification. The current schedule in the consolidated cases would require parties to prematurely

---

[1] Letter from John Ferguson, Chief Permit Administrator, NYSDEC to Lynda Schubring, Environmental Project Manager, Constitution (Apr. 22, 2016) (attached hereto as Attachment A).

-2-

brief issues that may be rendered moot or otherwise affected by whether an appeal is taken of the denial of the Water Quality Certification. A 60-day extension to the briefing schedule would provide parties with the additional time necessary to know the procedural posture of any challenge to the NYSDEC denial of the Water Quality Certification and to move the Court for the appropriate relief.

Movants have contacted Intervenors Constitution Pipeline Company, Iroquois Gas Transmission System, L.P., and Natural Gas Supply Association and are authorized to state that they do not oppose the motion to extend the briefing schedule.

The revised briefing schedule would be as follows:

| | |
|---|---|
| Petitioners' Opening Briefs | July 12, 2016 |
| Respondent's Brief | Sept. 12, 2016 |
| Intervenors' Briefs | Sept. 12, 2016 |
| Petitioners' Reply Briefs | Sept. 26, 2016 |
| Deferred Appendix | Oct. 10, 2016 |
| Final Briefs | Oct. 17, 2016 |

For the foregoing reasons, the Movants jointly request that the Court grant a 60-day extension of the entire briefing schedule established by the Court's March 11, 2016 scheduling order. As the deadline for Petitioners' opening briefs is approaching (due May 13th), expeditious action on this unopposed motion is requested.

Respectfully submitted,

/s/ Karin L. Larson
Karin L. Larson
Attorney
Federal Energy Regulatory
 Commission
Washington, D.C. 20426
(202) 502-8236
Karin.Larson@ferc.gov

*Counsel for Respondent Federal Energy Regulatory Commission*

/s/ Moneen Nasmith_____
Moneen Nasmith
Christine Ernst
Deborah Goldberg
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
(212) 845-7384
mnasmith@earthjustice.org

*Counsel for Petitioners Catskill Mountainkeeper, et al.*

/s/ Todd Ommen_____
Todd Ommen
Anne Marie Garti
Karl Coplan
Pace Environmental Legal Clinic
Pace University School of Law
78 North Broadway
White Plains, NY 10603
(914) 422-4343
tommen@law.pace.edu

*Counsel for Petitioner Stop the Pipeline*

Dated: April 29, 2016

# Attachment A

New York State Department of Environmental Conservation's
Notice of Denial of Water Quality Certification

NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

Division of Environmental Permits & Pollution Prevention
625 Broadway, 4th Floor, Albany, New York 12233-1750
P: (518) 402-9167 | F: (518) 402-9168 | deppermitting@dec.ny.gov
www.dec.ny.gov

April 22, 2016

Lynda Schubring, PMP
Environmental Project Manager
Constitution Pipeline Company, LLC
2800 Post Oak Boulevard
P.O. Box 1396
Houston, Texas 77251-1396

Re: Joint Application: DEC Permit # 0-9999-00181/00024 Water Quality Certification/Notice of Denial

Dear Ms. Schubring,

On April 27, 2015, Constitution Pipeline Company, LLC (Constitution) submitted to the New York State Department of Environmental Conservation (NYSDEC or Department) a Joint Application (Application)[1] to obtain a Clean Water Act[2] Section 401 Water Quality Certification (WQC) for the proposed Project and New York State Environmental Conservation Law (ECL) Article 15, Title 5 (Protection of Waters) and Article 24, Title 23 Freshwater Wetlands permits. Based on a thorough evaluation of the Application as well as supplemental submissions, the Department hereby provides notice to Constitution that in accordance with Title 6 New York Codes Rules and Regulation (NYCRR) Part 621, the Application fails in a meaningful way to address the significant water resource impacts that could occur from this Project and has failed to provide sufficient information to demonstrate compliance with New York State water quality standards. Constitution's failure to adequately address these concerns limited the Department's ability to assess the impacts and conclude that the Project will comply water quality standards. Accordingly, Constitution's request for a WQC is denied.[3] As required by 6 NYCRR §621.10, a statement of the NYSDEC's rationale for denial is provided below.

## BACKGROUND

The Federal Energy Regulatory Commission (FERC) issued a certificate approving construction and operation of the pipeline on December 2, 2014, conditioning

---

[1] New York State and U.S. Army Corps of Engineers Joint Application, Constitution Pipeline, August, 2013. Constitution initially submitted its WQC application on August 28, 2013. With the Department's concurrence Constitution subsequently withdrew and re-submitted the WQC application on May 9, 2014 and April 27, 2015, each time extending the period for the Department to review the application by up to one year.

[2] *See* 33 U.S.C.A. Section 1341.

[3] The other permits sought by Constitution in the Joint Application remain pending before the Department and are not the subject of this letter.

NEW YORK STATE OF OPPORTUNITY | Department of Environmental Conservation

its approval on Constitution first obtaining all other necessary approvals. Accordingly, Constitution's Application for a WQC pending with the Department must be approved before construction may commence. Constitution's Application was reviewed by NYSDEC in accordance with ECL Article 70 (Uniform Procedures Act or UPA) and its implementing regulations at 6 NYCRR Part 621, which provide a review process for applications received by NYSDEC.

Despite FERC conditioning its approval on Constitution's need to obtain a WQC, the Department has received reports that tree felling has already occurred in New York on the Project's right of way. This tree cutting, both clear cutting and selective cutting, has occurred notwithstanding the fact that Constitution has right-of-way agreements with the property owners where this cutting has occurred. The tree felling was conducted near streams and directly on the banks of some streams, and in one instance has resulted in trees and brush being deposited directly in a stream, partially damming it. As described below, this type of activity, if not properly controlled, can severely impact the best usages of the water resource.

Concurrent with its review, the Department received a Clean Air Act Title V application[4] for the Wright Compressor Station (Wright Compressor Station) from Iroquois Gas Transmission System, Inc. Additionally, Constitution is obligated to obtain coverage from NYSDEC under the SPDES Stormwater General Permit for Construction Activities (GP-0-15-002) and prepare a Stormwater Pollution Prevention Plan (SWPPP) prior to Project construction.

**Proposed Project Description and Environmental Impacts**

Constitution proposes construction of approximately 124.14 miles of new interstate natural gas transmission originating in northeastern Pennsylvania, proceeding into New York State through Broome, Chenango, Delaware, and Schoharie Counties, terminating at the existing Wright Compressor Station in Schoharie County. In New York State, the Project, rather than co-locating a significant portion of the pipeline on an existing New York State Department of Transportation (NYSDOT) Interstate I-88 access area[5], proposes to include new right-of-way (ROW) construction of approximately 99

---

[4] Minor Source Air Permit Modification, Wright Compressor Station, Town of Wright, Schoharie County, NY, Iroquois Gas Transmission System, July 26, 2013.

[5] On September 25, 2013, NYSDEC provided FERC with comments on Constitution's Environmental Report dated June 13, 2013, supplemented in July, 2013 that concurred with the United States Army Corps of Engineers' (ACOE) comments and supported ACOE's request to FERC for additional details and documentation to support the reasons why all or some of the Project route could not be routed with the New York State Department of Transportation (NYSDOT) Interstate I-88 control of access area. On April 7, 2014, the Department provided FERC with preliminary comments on the DEIS which extensively analyzed the environmental benefits of utilizing Interstate I-88 (also referred to as Alternative "M") regarding stream, wetland, and interior forest habitats.

In June 2014, Constitution provided information about Alternative M which Department Staff found did not contain sufficient analysis to determine whether Alternative M would generate fewer impacts than Constitution's preferred route. However, using Constitution's information, as well as publicly available information, Department Staff

2

miles of new 30-inch diameter pipeline, temporary and permanent access roads and additional ancillary facilities.

Although the Department repeatedly asked Constitution to analyze alternative routes that could have avoided or minimized impacts to an extensive group of water resources, as well as to address other potential impacts to these resources, Constitution failed to substantively address these concerns. Constitution's failure to adequately address these concerns limited the Department's ability to assess the impacts and conclude that the Project will comply with water quality standards. Project construction would impact a total of 251 streams, 87 of which support trout or trout spawning. Cumulatively, construction would include disturbance to 3,161 linear feet of streams resulting in a total of 5.09 acres of stream disturbance impacts. Furthermore, proposed Project construction would cumulatively impact 85.5 acres of freshwater wetlands and result in impacts to regulated wetland adjacent areas totaling 4,768 feet for crossings, 9.70 acres for construction and 4.08 for acres for Project operation. Due to the large amount of new ROW construction, the Project would also directly impact almost 500 acres of valuable interior forest. Cumulatively, within such areas, as well as the ROW generally, impacts to both small and large streams from the construction and operation of the Project can be profound and could include loss of available water body habitat, changes in thermal conditions, increased erosion, and creation of stream instability and turbidity.

The individual quality and integrity of streams form the primary trophic levels that support many aquatic organisms and enable the provision of stream ecosystems at large. Under the Project's proposal, many of the streams to be crossed present unique and sensitive ecological conditions that may be significantly impacted by construction and jeopardize best usages. For a number of reasons, streams that support trout and other cold water aquatic species are typically the most sensitive. The physical features of these streams include dense riparian vegetation often composed of old-growth trees which are free of invasive species and that shade and cool streams while also maintaining the integrity of adjacent banks or hillslopes. Undisturbed spring seeps provide clean, cold water and stable yet sensitive channel forms maintain the integrity of the stream itself and further preserve water quality. Biologically, these streams are vital in providing complex habitat for foraging, spawning and nursery protection by wild reproducing trout.

Impacts to these streams are exacerbated as the cumulative negative effects of multiple crossings are added. Demonstrating this, the trout stream Clapper Hollow Creek and its tributaries would be crossed 11 times by the project. Likewise, Ouleout Creek and its tributaries will be crossed 28 times. Many of these streams are part of tributary networks that are dependent upon the contributing quality of connected streams to supply and support the physical and biological needs of a system. This is especially true in supporting the viability of wild trout populations.

---

conducted a review that found that Alternative M could reduce overall impacts to water bodies and wetlands when compared to Constitution's preferred route.

3

Initially, 100 per cent loss of stream and riparian habitat will occur within the ROW as it is cleared and the pipeline trenched across streams. The trenching of streams will destroy all in-stream habitat in the shorter term and in some cases could destroy and degrade specific habitat areas for years following active construction. For example, highly sensitive groundwater discharge areas within streams could be disturbed, resulting in loss or degradation to critical spawning and nursery habitat. In addition, physical barriers will temporarily prevent the movement of aquatic species during active construction and changes to the stream channel will persist beyond the active construction period, creating physical and behavioral barriers to aquatic organism passage.

Changes to thermal conditions will also likely occur due to clearing of riparian vegetation. Because of the need to maintain an accessible ROW, subsequent revegetation will take considerable time to replace what was lost, notably long-lived, slow growing forest trees. Loss of riparian vegetation that shades streams from the warming effects of the sun will likely increase water temperatures, further limiting habitat suitability for cold-water aquatic species such as brook trout. The loss of shade provided by mature riparian vegetation may be exacerbated in the long term by climate change and thus be more significant since small changes in the thermal loading of cold water trout streams could result in the long term loss of trout populations.

NYSDEC Staff's extensive experience and technical reviews have shown that destabilization of steep hillslopes and stream banks will likely occur and may result in erosion and failure of banks, causing turbid inputs to waterbodies. Specifically, Project construction would include approximately 24 miles of steep slope or side slope construction. Cumulatively, this would amount to roughly 24 per cent of the new cleared right-of-way. Exposed hillslopes can become less stable and, when appropriate stormwater controls are not properly implemented, erosion can result in increased sediment inputs to streams and wetlands. If these events occur they can affect the water quality and habitat quality of these streams.

Trenching of streams can also destabilize the stream bed and such conditions can temporarily cause an exceedance of water quality standards, notably turbidity. Turbidity and sediment transport caused as a result of construction can negatively impact immediate and downstream habitat, can smother or kill sensitive aquatic life stages and reduce feeding potential of all aquatic organisms. More specifically, visual predators such as brook trout find food using visual cues. Thus, reductions in clear water conditions may reduce feeding success that can ultimately result in impacts on aquatic species' propagation and survival and corresponding reductions in the attainment of the waters' best usages.

As a result of chronic erosion from disturbed stream banks and hill slopes, consistent degradation of water quality may occur. Changes in rain runoff along ROW may change flooding intensity and alter stream channel morphology. Disturbed stream channels are at much greater risk of future instability, even if the actual work is conducted under dry conditions; long ranging stream erosion may occur up and

4

downstream of disturbed stream crossings well beyond the time of active construction. This longer term instability and erosion can result in the degradation of spawning beds and a decrease in egg development. The loss of spawning potential in some cold headwater streams may significantly reduce the long-term viability of these streams to support trout. Constitution proposes to cross 50 known trout spawning streams which will likely result in cumulative impacts on the trout populations in these streams. More specifically, and by way of an example of cumulative impacts to a water body, Constitution proposes to cross Ouleout Creek and its tributaries a total of 28 times with 15 of these crossings occurring in trout spawning areas.

Finally, at the landscape level, impacts to streams from the ROW construction are analogous to the cumulative impacts from roads. There is an established negative correlation between road miles per watershed area and stream quality. Thus, increases in the crossings of streams by linear features such as roads and the pipeline ROW can have cumulative impacts beyond the individual crossings. In the case of the 1 mile corridor surrounding the proposed Constitution pipeline, the pre-construction crossing/area ratio for the New York section is 2.28 crossings/square mile. However, the post-construction ratio will increase 44 per cent to 3.29 crossings/square mile. In specific basins this ratio will be higher and may cause a permanent degradation in stream habitat quality and likewise affect associated natural resources, including aquatic species' propagation and survival.

## NYSDEC Application Reviews

On August 21, 2013, Constitution submitted the Application to obtain a CWA §401 WQC and NYSECL Article 15 and Article 24 permits to the Department. Due to insufficient information, NYSDEC issued a Notice of Incomplete Application on September 12, 2013, indicating that the Application was not complete for commencing review. On May 9, 2014, Constitution simultaneously withdrew and resubmitted its WQC request to the NYSDEC. Constitution supplemented the Application a number of times in 2014. A Notice of Complete Application for public review was published by NYSDEC in the Environmental Notice Bulletin (ENB) and local newspapers on December 24, 2014.

This notice commenced a public comment period ending on January 30, 2015 which was subsequently extended to February 27, 2015. To afford the Applicant time to respond to NYSDEC's requests for information based on thousands of public comments, and to extend the time period by which NYSDEC was required to issue the WQC and associated permits, Constitution submitted its second request to withdraw and resubmit the WQC on April 27, 2015. This resubmission initiated an additional UPA comment period until May 21, 2015. A total of 15,035 individual comments were received during the two comment periods. Most of these comments related to issues surrounding the Project applications; a relative handful were related to issues specific to the Compressor Station application.

5

Since August 21, 2013, Constitution supplemented its Application numerous times in response to additional information requests by the Department; Table 1 below provides an easy reference of the requests and submittals associated with the Application over the past several years.

|  | Table 1 |
|---|---|---|
| Prepared by | Date | Summary |
| DEC | June 21, 2012 | Summary of Pre-Application Meeting |
| DEC | May 30, 2013 | Sample Matrix for Linear Projects |
| Constitution | August 28, 2013 | 401 WQC and related NYS Joint Permit application/documentation received by DEC |
| DEC | September 12, 2013 | Notice of Incomplete Application |
| Constitution | November 27, 2013 | Joint Permit Application - Supplemental Information |
| Constitution | May 9, 2014 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | July 3, 2014 | DEC Recommendations for Revised Joint Application |
| Constitution | August 13, 2014 | Joint Permit Application - Supplemental Information # 2 |
| Constitution | November 17, 2014 | Additional Information Submittal |
| Constitution | November 17, 2014 | Responses to Wetland Mitigation Plan Deficiencies |
| Constitution | November 24, 2014 | Updated and Revised Information |
| Constitution | December 1, 2014 | Response to Request for Additional Clarification of Wetland Impacts |
| DEC | December 24, 2014 | Notice of Complete Application |
| DEC | December 31, 2014 | NY Stream Crossing Feasibility Analysis Information Request |
| Constitution | January 22, 2015 | Summary of Changes Trenchless Locations |
| Constitution | February 2, 2015 | Revised Wetland Mitigation Plan |
| Constitution | February 6, 2015 | Phase I Stream Analysis/Open Cut |
| DEC | February 19, 2015 | DEC Proposed Wetland Re-route |
| Constitution | March 27, 2015 | Joint Permit Application - Supplemental Information |
| Constitution | April 24, 2015 | Response to DEC Preferred List of Trenchless Stream Crossings |
| Constitution | April 27, 2015 | 401 WQC Application Withdrawal and Re-submittal |
| DEC | April 27, 2015 | Notice of Complete Application - WQC Withdrawal and Re-submittal |

6

| | | |
|---|---|---|
| Constitution | May 13, 2015 | Wetland Mitigation Area - Application for Pesticide Permit |
| Constitution | May 20, 2015 | Supplemental Information - Trenchless Crossings |
| DEC | June 1, 2015 | Notice of Incomplete Application - Pesticide Permit |
| Constitution | June 19, 2015 | Canadarago Lake Mitigation Area Update |
| Constitution | June 30, 2015 | Updated Trenchless Crossing Matrix |
| Constitution | July 8, 2015 | Joint Permit Application - Supplemental Information - Wetland Re-route |
| Constitution | July 14, 2015 | Additional Information Submittal - Wetland Impacts and Mitigation |
| Constitution | August 5, 2015 | Response to Notice of Incomplete Application - Pesticide Permit |
| Constitution | September 15, 2015 | Joint Permit Application - Supplemental Information |
| DEC | October 2, 2015 | Acknowledgement of NOI - SPDES MS GP - Contractor Yard 5B |
| Constitution | January 6, 2016 | Wetland Mitigation Area - Application for Pesticide Permit - Betty Brook |
| DEC | February 26, 2016 | Acknowledgement of NOT - SPDES MS GP - Contractor Yard 5B |

## STATEMENT OF REASONS FOR DENIAL

The Department, in accordance with CWA §401, is required to certify that a facility meets State water quality standards prior to a federal agency issuing a federal license or permit in conjunction with its proposed operation. An applicant for a water quality certification must provide the Department sufficient information to demonstrate compliance with the water quality regulations found at 6 *NYCRR Section 608.9 (Water Quality Certifications)*. Pursuant to this regulation, the Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701, 702, 703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[6] Denial of a WQC may occur when an application fails to contain sufficient information to determine whether the application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations due to insufficient information. The Department is guided by statute to take into account the cumulative impact upon all resources in making a determination in connection with any license, order, permit or certification, which in this case includes being able to evaluate the cumulative water quality impacts of ROW construction and operation on the numerous water bodies mentioned in this letter.[7]

---

[6] 6 NYCRR §608.9 (2) and (6).
[7] ECL 3-0301(1)(b).

7

As noted above, Constitution supplemented its Application in response to information requests issued to it by the Department but has not supplied sufficient information for the Department to be reasonably assured that the State's water quality standards would be met during construction and operation of the proposed pipeline. As a result the Department cannot be assured that the aforementioned adverse impacts to water quality and associated resources will be avoided or adequately minimized and mitigated so as not to materially interfere with or jeopardize the best usages of affected water bodies. The following are the Department's reasons for denial of Constitution's Application based on applicable sections of the New York State environmental laws, regulations or standards related to water quality.

### Stream Crossings

Project construction would disturb a total of 251 streams under New York State's jurisdiction, 87 of which support trout or trout spawning. Cumulatively, construction would disturb a total of 3,161 linear feet of streams and result in a combined total of 5.09 acres of temporary stream disturbance impacts. From inception of its review of the Application, NYSDEC directed Constitution to demonstrate compliance with State water quality standards and required site-specific information for each of the 251 streams impacted by the Project. NYSDEC informed Constitution that *all* 251 stream crossings must be evaluated for environmental impacts and that trenchless technology was the preferred method for stream crossing. This information was conveyed to Constitution and FERC on numerous occasions since November 2012; however, Constitution has not supplied the Department with the necessary information for decision making.

#### Deficient Trenchless Stream Crossings Information and Lack of Specific Stream Crossings Details

Staff's review of the Application includes an analysis of adverse stream crossing impacts, specifically the suitability of open trenching versus trenchless techniques or subsurface boring methods. Open trenching is a highly impactful construction technique involving significant disturbance of the existing stream bed and potential long-term stream flow disruption, destruction of riparian vegetation and establishment of a permanently cleared corridor. Comparatively, trenchless methods present significantly fewer environmental impacts to the regulated resource. Because alternative trenchless techniques exist for this Project, the Department requested additional information from Constitution to evaluate their feasibility and to determine if the Application provides enough information to demonstrate compliance with water quality standards.

Since NYSDEC's most protective method for stream crossings is some form of a trenchless technology, NYSDEC directed Constitution to determine whether a trenchless technology was constructible for each stream crossing.[8] On a number of occasions NYSDEC identified the need to provide information so that it could evaluate trenchless stream installation methods (see Table 2, below); however, Constitution has not provided sufficient information to enable the Department to determine if the

---

[8] NYSDEC Comments to FERC, November 7, 2012.

8

Application demonstrates compliance with 6 NYCRR Part 703, including, but not limited to, standards for turbidity and thermal impacts (6 NYCRR §703.2), and 6 NYCRR Part 701 (best usages).

|  | Table 2 |  |
|---|---|---|
| Prepared by | Date | Summary |
| NYSDEC | June 21, 2012 | In a summary of the initial pre-application meeting with Constitution, which took place on June 7, 2012, NYSDEC stated in a letter to Constitution that for protected streams and wetlands, trenchless technology is the preferred method for crossing and should be considered for *all* such crossings (emphasis added). |
| NYSDEC | November 7, 2012 | In comments to FERC, NYSDEC stated that for streams and wetlands the preferred method for crossing is trenchless technology. The draft EIS should evaluate cases where other methods are proposed and Constitution should explain why trenchless crossing technology will not work or is not practical for that specific crossing. |
| FERC | April 9, 2013 | FERC's Environmental Information Request (EIR) directed Constitution to address all of the comments filed in the public record by other agencies regarding the draft Resource Reports including all comments from the NYSDEC. |
| NYSDEC | May 28, 2013 | Meeting with Constitution and NYSDEC staff at the DEC Region 4 office to review stream crossings. NYSDEC reiterates that acceptable trenchless technology was the preferred installation method and that stream crossings should be reviewed for feasibility of using those technologies. |
| NYSDEC | July 17, 2013 | NYSDEC comments to FERC reiterates that trenchless technology is preferred method for stream crossings. The DEIS should evaluate cases where other methods are proposed and the Project Sponsor should explain why trenchless technology will not work or is not practical for that specific crossing. |
| NYSDEC and Constitution staff | July - August 2013 | Field visits of proposed stream crossings prior to permit applications to the Department. At each crossing, NYSDEC emphasized to |

9

| | | |
|---|---|---|
| | | Constitution staff that trenchless technology is preferred/most protective. |
| Constitution | November 2013 | Trenchless Feasibility Study provided by Constitution that described its choices of stream crossing techniques. Upon review, document and justifications found insufficient and all streams less than 30' wide were arbitrarily eliminated from any consideration for trenchless crossing methods. |
| NYSDEC and Constitution staff | December 31, 2014 | Meeting conducted with Constitution staff in which NYSDEC indicated that the Trenchless Feasibility Study was inadequate, e.g. provided insufficient justification and removed all streams less than 30 feet in width from analysis. |
| NYSDEC | December 31, 2014 | To aid in an appropriate review of stream crossing techniques and compliance with water quality standards, an informational request table including required technical information was developed by NYSDEC and provided to Constitution. |
| US Army Corps of Engineers | January 13, 2015 | U.S. Army Corps of Engineers letter reiterates a request for a feasibility analysis of trenchless crossings. |
| Constitution and NYSDEC | January 23, 2015 | Meeting between Constitution and NYSDEC staff wherein Constitution stated it was unable to complete the table (described above on December 31, 2014). NYSDEC staff indicated that the justification for stream crossing methods was insufficient and that appropriate site specific information must be provided. |
| Constitution and NYSDEC | January 28, 2015 | Conference call: NYSDEC reiterated its request for a site specific analysis of trenchless stream crossings for all streams including those under 30 feet wide. |
| Constitution | February 5, 2015 | Constitution provided an updated example of a trenchless feasibility study but that example continued to exclude streams up to 30 feet wide from analysis and did not provide detailed information of the majority of streams. |

Constitution submitted a Trenchless Feasibility Study (Study) to FERC in November of 2013 which the Department has analyzed for the purpose of reviewing Constitution's WQC application. This Study did not include the information that FERC directed Constitution to supply to NYSDEC (and others) in its April 9, 2013 EIR, which incorporated NYSDEC's information requests, including NYSDEC's request to

10

Constitution dated November 7, 2012. Moreover, the Study did not include information that NYSDEC specifically requested in meetings and site visits with Constitution throughout 2013 and did not provide a reasoned analysis to enable the Department to determine if the Project demonstrates compliance with water quality standards.

Of the 251 streams to be impacted by the Project, Constitution's Study evaluated only 87 streams, in addition to the Schoharie Creek, as part of the Phase I desktop analysis[9] which Constitution used to determine if surface installation methods warranted consideration for a trenchless design. Of the 87 streams reviewed, Constitution automatically eliminated 41 streams from consideration for trenchless crossing because those streams were 30 feet wide or less. Constitution further eliminated 10 more streams from the Study because although they were in the proposed ROW, they would not be crossed by the Project. Accordingly, a total of 24 streams were subsequently analyzed in the Study's Phase II analysis which evaluated construction limiting factors including available workspace, construction schedules and finances. Using its review criteria, Constitution's Study finally concluded that only 11 stream crossings of the 251 displayed preliminary evidence in support of a potentially successful trenchless design and were chosen for the Phase III geotechnical field analysis. Department staff consistently told Constitution that its November 2013 Trenchless Feasibility Study was incomplete and inadequate (See Table 2).

Constitution's continued unwillingness to provide a complete and thorough, Trenchless Feasibility Study required Department staff to engage in a dialogue with Constitution on potential trenchless crossings for a limited number of streams. On April 24, 2015, Constitution's consultant produced a revised draft list of 29 trenchless stream crossings and an example of plans that would be provided for each crossing on the proposed list. Subsequently, in May 2015, Constitution provided detailed project plans for 25 potential trenchless crossings, but only two of those plans were based on full geotechnical borings that are necessary to evaluate the potential success of a trenchless design. Detailed project plans including full geotechnical borings for the remaining stream crossings have not been provided to the Department. From May through August 2015, NYSDEC engaged in a dialogue with Constitution on potential trenchless methods for 19 streams, although NYSDEC did not form a conclusion on a crossing method for the remaining streams, including the vast majority of trout and trout spawning streams. Furthermore, as noted above, Constitution's unwillingness to adequately explore the Alternative M route alternative, with the prospect of potentially fewer overall impacts to water bodies and wetlands when compared to Constitution's preferred route, means that the Department is unable to determine whether an alternative route is actually more protective of water quality standards. The Department therefore does not have adequate information to assure that sufficient impact avoidance, minimization or mitigation measures were considered as to each of the more than 200 streams proposed for trenched crossings.

---

[9] Constitution described the Phase I analysis as "a general evaluation of Project locations meeting the basic criteria for trenchless construction methods such as crossing distances, feature classifications and potential associated impacts."

11

Due to the lack of detailed project plans, including geotechnical borings, the Department has determined to deny Constitution's WQC Application because the supporting materials supplied by Constitution do not provide sufficient information for each stream crossing to demonstrate compliance with applicable narrative water quality standards for turbidity and preservation of best usages of affected water bodies. Specifically, the Application lacks sufficient information to demonstrate that the Project will result in no increase that will cause a substantial visible contrast to natural conditions.[10]

Furthermore, the Application remains deficient in that it does not contain sufficient information to demonstrate compliance with 6 NYCRR Part 701 setting forth conditions applying to best usages of all water classifications. Specifically, "the discharge of sewage, industrial waste or other wastes shall not cause impairment of the best usages of the receiving water as specified by the water classifications at the location of the discharge and at other locations that may be affected by such discharge."[11]

Cumulatively, impacts to both small and large streams from the construction and operation of the Project can be profound and include loss of available habitat, changes in thermal conditions, increased erosion, creation of stream instability and turbidity, impairment of best usages, as well as watershed-wide impacts resulting from placement of the pipeline across water bodies in remote and rural areas (See Project Description and Environmental Impacts Section, above). Because the Department's review concludes that Constitution did not provide sufficient detailed information including site specific project plans regarding stream crossings (*e.g.* geotechnical borings) the Department has determined to deny Constitution's WQC Application for failure to provide reasonable assurance that each stream crossing will be conducted in compliance with 6 NYCRR §608.9.

In addition, the Application lacks required site-specific information for each of the 251 stream crossings including, but not limited to the specific location of access roads, definite location of temporary stream crossing bridges, details of temporary bridges including depth of abutments in stream banks, details of proposed blasting and the location of temporary coffer dams for stream crossings. Absent this information and the information described above, the Department cannot determine whether additional water quality impact avoidance, minimization or mitigation measures must be taken to ensure compliance with water quality standards in water bodies associated with this infrastructure.

<u>Insufficient Site-Specific Information on Depth of Pipe</u>

NYSDEC received numerous public comments regarding the necessary depth for pipeline burial in stream beds that would prevent inadvertent exposure of the pipe. Historically, Department staff has observed numerous and extensive vertical

---

[10] 6 NYCRR §703.2.
[11] 6 NYCRR §701.1.

12

movements of streams in New York State that have led to pipe exposure and subsequent remedial projects to rebury the pipe and armor the stream channel. These subsequent corrective actions caused severe negative impacts on water quality and seriously impacted the stability and ecology of the stream that could have been avoided with a deeper pipe. Department staff requested that Constitution provide a comprehensive and site-specific analysis of depth for pipeline burial, but Constitution provided only a limited analysis of burial depth for 21 of the 251 New York streams.[12] Without a site-specific analysis of the potential for vertical movement of each steam crossing to justify a burial depth, NYSDEC is unable to determine whether the depth of pipe is protective of State water quality standards and applicable State statutes and standards.

In addition to impacts to water quality described above and without proper site-specific evaluations, future high flow events could expose the pipeline, resulting in risks to the health, safety, and welfare of the people of New York State. Pipe exposure would require more extensive stabilization measures and in stream disturbances resulting in addition degradation to environmental quality. We note that flooding conditions from extreme precipitation events are projected to increase on the operational span of the pipeline due to climate change.

### Deficient Blasting Information

Constitution's Blasting Plan, dated August, 2014, outlines the procedures and safety measures to which Constitution would adhere in the event that blasting is required for Project installation. The Blasting Plan does not provide site-specific information where blasting will occur but instead provides a list of potential blasting locations based on the presence of shallow bedrock. In New York alone, Constitution identifies 42.77 total miles where shallow bedrock occurs, or approximately 44 per cent of the route, involving 84 wetlands crossings and 27 waterbody crossings. Constitution indicates that a final determination on the need for blasting will be made at the time of construction in waterbodies and wetlands. Due to the lack of specific blasting information needed for review with respect to associated water bodies, NYSDEC is unable to determine whether this Plan is protective of State water quality standards and in compliance with applicable State statutes and standards.

## Wetlands Crossings

Wetlands provide valuable water quality protection by retaining and cleansing surface runoff to water bodies. Constitution's Application does not demonstrate that wetland crossings will be performed in a manner that will avoid or minimize discharges to navigable waters that would violate water quality standards, including turbidity. Absent detailed information for each wetland crossing that demonstrates Constitution properly avoided, minimized and mitigated impacts to wetland and adjacent areas, the Application does not supply the Department with adequate information to assure that

---

[12] See, Trout Stream Restoration Report, dated August 2014.

13

streams and water bodies will not be subject to discharges that do not comply with applicable water quality standards.

### NYSDEC Denial

Constitution was required to submit an Application providing sufficient information to demonstrate compliance with the regulations found at 6 NYCRR §608.9, Water Quality Certifications. Pursuant to this regulation, an Applicant must demonstrate compliance with §§301, 302, 303, 306 and 307 of the Federal Water Pollution Control Act, as implemented, by applicable water quality standards and thermal discharge criteria set forth in 6 NYCRR Parts 701, 702, 703, 704 and 750, and State statutes, regulations and criteria otherwise applicable to such activities.[13] The Department must also take into account the cumulative impact to water quality of the full complement of affected water resources in making any determination in connection with any license, order, permit or certification.[14] For the reasons articulated above, the Department hereby denies Constitution's WQC Application because it does not supply adequate information to determine whether the Application demonstrates compliance with the above stated State water quality standards and other applicable State statutes and regulations.

This notice of denial serves as the Department's final determination. Should Constitution wish to address the above deficiencies, a new WQC application must be submitted pursuant to 6 NYCRR §608.9 and 6 NYCRR Part 621. Uniform Procedures Regulations, 6 NYCRR §621.10 provide that that an applicant has a right to a public hearing on the denial of a permit, including a §401 WQC. A request for hearing must be made in writing to me within 30 days of the date of this letter.

Sincerely,

John Ferguson
Chief Permit Administrator

Cc:
T. Berkman
W. Little
P. Desnoyers
S. Tomasik
D. Merz
F. Bifera
Y. Hennessey
K. Bowman

---

[13] 6 NYCRR §608.9 (2) and (6).
[14] ECL 3-0301 (1)(b).

14