# 16-0345-ag(L), 16-0361-ag(CON)

# United States Court of Appeals
## *for the*
## Second Circuit

CATSKILL MOUNTAINKEEPER, INC., CLEAN AIR COUNCIL,
DELAWARE-OTSEGO AUDUBON SOCIETY, INC., RIVERKEEPER, INC.,
SIERRA CLUB, STOP THE PIPELINE,

*Petitioners,*

– v. –

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

CONSTITUTION PIPELINE COMPANY, LLC., IROQUOIS GAS
TRANSMISSION SYSTEM, L.P., NATURAL GAS SUPPLY ASSOCIATION,

*Intervenors.*

———————————————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

## PAGE PROOF BRIEF FOR INTERVENOR
## IROQUOIS GAS TRANSMISSION SYSTEM, L.P.

M. Lisanne Crowley
Kurt H. Jacobs
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2950
*Attorneys for Intervenor Iroquois
Gas Transmission System, L.P.*

## CORPORATE DISCLOSURE STATEMENT
## OF IROQUOIS GAS TRANSMISSION SYSTEM, L.P.

Iroquois Gas Transmission System, L.P. ("Iroquois"), is a limited partnership existing under the laws of the State of Delaware. Iroquois' partnership interests are held by affiliates of the following three energy companies: (1) TransCanada Pipelines Limited; (2) Dominion Resources, Inc.; and (3) Dominion Midstream Partners, L.P., as follows:

TransCanada Pipelines Limited: Through its affiliates TransCanada Iroquois Ltd. and TCPL Northeast Ltd., which directly hold partnership interests in Iroquois, TransCanada Pipelines Limited indirectly owns and controls 50 percent of the partnership interests in Iroquois. TransCanada Pipelines Limited is a direct, wholly-owned subsidiary of TransCanada Corporation, a Canadian corporation, which is publicly traded on the New York Stock Exchange and Toronto Stock Exchange.

Dominion Resources, Inc.: Dominion Iroquois, Inc. directly owns 24.07 percent of the partnership interests in Iroquois. Dominion Iroquois, Inc. is a direct, wholly-owned subsidiary of Dominion Gas Holdings, LLC. Dominion Gas Holdings, LLC is a direct, wholly-owned subsidiary of Dominion Resources, Inc. (the ultimate parent company), a Virginia corporation, which is publicly traded on the New York Stock Exchange.

<u>Dominion Midstream Partners, L.P.</u>: Through its wholly-owned subsidiary, Iroquois GP Holding Company, LLC, Dominion Midstream Partners, L.P. ("DMPLP") indirectly owns and controls 25.93 percent of the partnership interests in Iroquois. DMPLP is a master limited partnership publicly traded on the New York Stock Exchange. Dominion MLP Holding Company, LLC holds 68.5 percent of the limited partnership interests in DMPLP, while public investors hold the remaining 31.5 percent of the limited partnership interests in DMPLP. Dominion Midstream GP, LLC holds 100 percent of the non-economic general partner interests in DMPLP. Each of Dominion MLP Holding Company, LLC and Dominion Midstream GP, LLC is a direct, wholly-owned subsidiary of Dominion Cove Point, Inc., which is a direct, wholly-owned subsidiary of Dominion Resources, Inc. (the ultimate parent company), a Virginia corporation, which is publicly traded on the New York Stock Exchange.

Other than as described above, no publicly held corporation directly or indirectly owns ten percent or more of the stock or partnership interests of Iroquois.

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE ...............................................................4

I.     STATUTORY BACKGROUND ....................................................5

II.    IROQUOIS' PIPELINE AND INVOLVEMENT TO REDUCE THE
       CONSTITUTION PIPELINE PROJECT'S ENVIRONMENTAL
       IMPACT AND COST ................................................................6

III.   PROCEEDINGS AND RULINGS BELOW ...............................10

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ......................................................................................20

I.     STANDARD OF REVIEW ........................................................20

II.    FERC'S GHG EMISSIONS ANALYSIS AND ITS FINDING OF NO
       SIGNIFICANT IMPACT COMPLY WITH NEPA ......................22

       A.    The GHG Emissions Calculations Were Sound ................22

       B.    FERC's Climate Change Impact Analysis Fully Complies with
             NEPA........................................................................28

       C.    Contrary to Catskill's Arguments, the Draft CEQ Climate
             Guidance Does Not Require Anything More from FERC in
             This Proceeding ..........................................................34

III.   FERC CORRECTLY FOUND THAT THERE IS A NEED FOR THE
       CONSTITUTION PIPELINE AND IROQUOIS INTERCONNECT
       PROJECTS .............................................................................37

       A.    The Executed, Binding Precedent Agreements in these
             Proceedings Are Significant Evidence of Market Need ....38

       B.    Stop the Pipeline Fundamentally Misconstrues How Natural
             Gas Pipelines Operate; No "Bottlenecks" or "Constraints" Exist
             Such That Constitution-Transported Gas Could Not Reach the
             New York and New England Markets on Iroquois' and
             Tennessee's Existing Pipeline Systems ...........................43

# TABLE OF CONTENTS
### (continued)

**Page**

C. Stop the Pipeline Incorrectly Claims that the Stated Benefits of the Projects Have Changed or Do Not Exist ...................................... 46

IV. FERC DID NOT ILLEGALLY SEGMENT IROQUOIS' POTENTIAL, FUTURE SOUTH-TO-NORTH PROJECT ....................... 48

A. FERC Correctly Concluded that Iroquois' SoNo Project Was Not a Connected Action with the Projects ......................................... 49

B. Iroquois' SoNo Project Has Not Been Proposed and Therefore Is Not a Connected Action with the Proposed Projects .................... 51

CONCLUSION ...................................................................................... 53

# TABLE OF AUTHORITIES

**Page(s)**

COURT CASES

*Cent. Hudson Gas & Elec. Corp. v. FERC,*
    783 F.3d 92 (2d Cir. 2015) ................................................................20, 21

*CIR v. Soliman*,
    506 U.S. 168 (1993)...........................................................................36

*Coalition on Sensible Transp., Inc. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987)..............................................................49

*DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*,
    112 F.3d 61 (2d Cir. 1997) .................................................................52

*Del. Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014)................................................... 48-50

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004)..............................................................21, 28, 33

*Green Island Power Auth. v. FERC*,
    577 F.3d 148 (2d Cir. 2009) ...............................................................20

*Helping Hand Tools v. EPA,*
    2016 U.S. App. LEXIS 16262 (9th Cir. 2016) ...................................26

*High Country Conservation Advocates v. U.S. Forest Serv.*,
    52 F. Supp. 3d 1174 (D. Colo. 2014)........................................... 30-31

*La. Ass'n of Indep. Producers and Royalty Owners v. FERC*,
    958 F.2d 1101 (D.C. Cir. 1992)............................................................6

*LeCroy Research Sys. Corp. v. Comm'r,*
    751 F.2d 123 (2d Cir. 1984) ...............................................................36

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989)..............................................................20, 21

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Minisink Residents for Envtl. Pres. and Safety v. FERC,*
762 F.3d 97 (D.C. Cir. 2014) .................................................. 41, 49, 50

*Motor Vehicle Mfrs. Ass'n Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................. 20, 21, 31

*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
783 F.3d 1301 (D.C. Cir. 2015) ........................................................ 41

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) .................................................... 26, 28

*Natural Res. Def. Council, Inc. v. Hodel,*
865 F.2d 288 (D.C. Cir. 1988) ........................................................ 22

*O'Reilly v. Army Corps of Eng'rs,*
477 F.3d 225 (5th Cir. 2007) ........................................................ 49, 51

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)........................................... 5-6, 21-23, 27-28, 33

*Suffolk Cty. v. Sec'y of Interior,*
562 F.2d 1368 (2d Cir. 1977) ........................................................ 28

*Sweet v. Sheahan,*
235 F.3d 80 (2d Cir. 2000) ............................................................ 35

*Weinberger v. Catholic Action of Haw.,*
454 U.S. 139 (1981).................................................................. 49-51

**ADMINISTRATIVE CASES**

*Certification of New Interstate Natural Gas Pipeline Facilities,*
88 FERC ¶ 61,227 (1999), *clarified,* 90 FERC ¶ 61,128, *further clarified,*
92 FERC ¶ 61,094 (2000) ("*Certificate Policy Statement*") ...................... 37-40

*Constitution Pipeline Co. LLC & Iroquois Gas Transmission Sys., L.P.,*
149 FERC ¶ 61,199 (2014) ("Certificate Order") ......................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Constitution Pipeline Co., LLC & Iroquois Gas Transmission Sys., L.P.,*
154 FERC ¶ 61,046 (2016) ("Rehearing Order")........................................*passim*

*Dominion Transmission, Inc.,*
141 FERC ¶ 61,240 (2012) ................................................................ 40

*Fla. Southeast Connection, LLC,*
154 FERC ¶ 61,080 (2016) ................................................................41

*Iroquois Gas Transmission Sys., L.P.,*
122 FERC ¶ 61,242 (2008) ..................................................................7

*Midwestern Gas Transmission Co.,*
114 FERC ¶ 61,527 (2006) ................................................................ 40

*Millennium Pipeline Co., L.L.C.,*
117 FERC ¶ 61,319 (2006) ..................................................................7

*Millennium Pipeline Co., L.P.,*
100 FERC ¶ 61,277 (2002) ........................................................... 40, 41

*Pipeline Service Obligations and Revisions to Regulations Governing Self-*
*Implementing Transportation Under Part 284 of the Commission's*
*Regulations; and Regulation of Natural Gas Pipelines After Partial*
*Wellhead Decontrol,* Order No. 636, FERC Stats. & Regs. [Regs.
Preambles 1991-1996] ¶ 30,939 (1992) ...........................................45

*Pre-Filing Procedures for Review of LNG Terminals and Other Natural Gas*
*Facilities*, 113 FERC ¶ 61,015 (2005)................................................8

*S. Natural Gas Co.,*
76 FERC ¶ 61,122 (1996) ................................................................ 40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

STATUTES

National Environmental Policy Act

42 U.S.C. §§ 4321–4347 (2012) ...............................................................5

Natural Gas Act

15 U.S.C. § 717f (2012) ...........................................................................1

15 U.S.C. § 717f(e) (2012) ..................................................................5, 37

15 U.S.C. § 717r(a) (2012) ..................................................................1, 2

15 U.S.C. § 717r(b) (2012) .......................................................................2

OTHER AUTHORITIES

18 C.F.R. § 284.13(c)(1) (2016) ..............................................................7

40 C.F.R. § 1508.25(a)(1)–(3) (2015) ............................................. 48-49, 51

Final Guidance for Federal Departments and Agencies on Consideration of
Greenhouse Gas Emissions and the Effects of Climate Change in
National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug.
2, 2016) ("Final CEQ Climate Guidance") ...........................................36

Iroquois Gas Transmission System, L.P., FERC Gas Tariff, Second Revised
Volume No. 1, General Terms & Conditions, § 7.1 ...............................45

Memorandum for Heads of Federal Departments and Agencies, Final
Guidance for Federal Departments and Agencies on Consideration of
Greenhouse Gas Emissions and the Effects of Climate Change in
National Environmental Policy Act Reviews, Council on Environmental
Quality (Aug. 1, 2016) ...........................................................................36

Revised Draft Guidance for Federal Departments and Agencies on
Consideration of Greenhouse Gas Emissions and the Effects of Climate
Change in NEPA Reviews, 79 Fed. Reg. 77,802 (Dec. 24, 2014) ("Draft
CEQ Climate Guidance") .................................................................. 34-35

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

**Page(s)**

Tennessee Gas Pipeline Company, L.L.C., FERC NGA Gas Tariff, Sixth
  Revised Volume No. 1, General Terms & Conditions, § IV.2.j........................45

# JURISDICTIONAL STATEMENT

Petitioners in these consolidated proceedings – Catskill Mountainkeeper, Inc.; Clean Air Council; Delaware-Otsego Audubon Society, Inc.; Riverkeeper, Inc.; and Sierra Club (collectively, "Catskill") and Stop the Pipeline, Inc. ("Stop the Pipeline") seek review of two final orders issued by the Federal Energy Regulatory Commission ("FERC" or the "Commission"). The first, issued on December 2, 2014 under section 7 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f (2012), granted a Certificate of Public Convenience and Necessity ("Certificate") to Constitution Pipeline Co., LLC ("Constitution") to construct, own, and operate a 124-mile natural gas pipeline and related facilities (the "Constitution Pipeline Project") and further granted a Certificate to Iroquois Gas Transmission System, L.P. ("Iroquois") to construct, own, and operate a compressor unit and backup generator on the same site as Iroquois' existing compressor station in Schoharie County, New York (the "Iroquois Interconnect Project" and, together with the Constitution Pipeline Project, the "Projects").[1] The second FERC order, issued on January 28, 2016 under the NGA, 15 U.S.C. § 717r(a) (2012), denied Catskill's and Stop the Pipeline's requests for rehearing of

---

[1] Order Issuing Certificates and Approving Abandonment, *Constitution Pipeline Co. LLC & Iroquois Gas Transmission Sys., L.P.*, 149 FERC ¶ 61,199 (2014) ("Certificate Order"), JA__-__. "JA" refers to pages of the deferred Joint Appendix.

the Certificate Order, which they timely filed on December 30, 2014 and January 2, 2015, respectively.[2]

On February 5 and 8, 2016, respectively, Catskill and Stop the Pipeline timely filed their petitions for judicial review with this Court. *See* 15 U.S.C. § 717r(b) (requiring filing of petition for review within 60 days of final order). This Court has jurisdiction pursuant to 15 U.S.C. § 717r(a) and (b) for the foregoing reasons and because Iroquois is headquartered in Connecticut and located in New York and Connecticut.

On February 24, 2016, Iroquois filed a timely unopposed motion to intervene as a party in Case No. 16-345. The Court granted this request by order issued February 26, 2016. On March 1, 2016, Iroquois filed a timely unopposed motion to intervene as a party in Case No. 16-361. The Court granted this request and added Iroquois as a party on March 2, 2016. The Court granted consolidation of Case Nos. 16-345 and 16-361 on March 7, 2016.

## STATEMENT OF THE ISSUES

Iroquois is not addressing in this brief every issue raised by Catskill or Stop the Pipeline. Issues not addressed by Iroquois are addressed by Respondent FERC and/or Intervenors Constitution and the Natural Gas Supply Association ("NGSA")

---

[2]     Order Denying Rehearing and Approving Variance, *Constitution Pipeline Co., LLC & Iroquois Gas Transmission Sys., L.P.*, 154 FERC ¶ 61,046 (2016) ("Rehearing Order").

in their response briefs contemporaneously filed in these consolidated proceedings. Iroquois supports their responses on issues not addressed here by Iroquois. The issues Iroquois addresses here are:

1.   Whether FERC's evaluation of the greenhouse gas ("GHG") effects and climate change impacts of the Projects was reasonable and met FERC's review obligations under the National Environmental Policy Act ("NEPA"), or alternatively, as Catskill contends (Pet. Catskill Br., Part II), was arbitrary, capricious, or otherwise not in accordance with law.

2.   Whether FERC's determination that there was a need for the Projects was reasonable, and supported by the record, or alternatively, as Stop the Pipeline contends (Pet. Stop Br., Part III), was arbitrary, capricious, or otherwise not in accordance with law.

3.   Whether FERC's determination that the Projects had a significant purpose separate from, and could physically function without, a future, possible south-to-north expansion of Iroquois' system was reasonable and supported by the record, or alternatively, as Stop the Pipeline contends (Pet. Stop Br., Part IV), was arbitrary, capricious, and not in accordance with law.

## STATEMENT OF THE CASE

This case concerns FERC's grant of two Certificates pursuant to section 7 of the NGA.  FERC issued one Certificate to Constitution to construct, own, and operate the Constitution Pipeline Project, a 124-mile interstate natural gas pipeline project extending from a prolific natural gas production area in Susquehanna County, Pennsylvania to a proposed interconnection with Iroquois' existing interstate natural gas pipeline in Schoharie County, New York.[3]  FERC issued the second Certificate to Iroquois to construct, own, and operate the Iroquois Interconnect Project, which consists of compression and associated facilities at the interconnection of Iroquois' pipeline system with the new Constitution pipeline in the vicinity of Iroquois' existing Wright Compressor Station in the Town of Wright, Schoharie County, New York.  Iroquois' facilities are necessary to enable Constitution to deliver natural gas into Iroquois' existing pipeline system and, through Iroquois, to the existing interstate pipeline system of Tennessee Gas Pipeline Co., L.L.C. ("Tennessee").[4]  The Projects are designed to enable Pennsylvania-produced natural gas to be delivered, via Constitution and the two downstream pipelines, to gas utilities, electric generators, and other gas

---

[3]    Certificate Order ¶ 1, JA __.

[4]    *Id.* ¶¶ 1-2, JA __.  For the Court's convenience, Iroquois' project is referred to here as the Iroquois Interconnect Project, but at FERC it was called the Wright Interconnect Project or "WIP," reflecting the name of the town in which the new facilities are to be located.

consumption markets in the Northeastern United States. Petitioners Catskill and Stop the Pipeline object to FERC's issuance of the Certificates.

## I. STATUTORY BACKGROUND

Pursuant to NGA section 7(c), FERC was required to issue the Certificates to Constitution and Iroquois if it found that the Projects "[are] or will be required by the present or future public convenience and necessity" and that the applicants otherwise met the applicable statutory and regulatory requirements. Moreover, FERC could attach "to the issuance of the certificate[s] and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C. § 717f(e).

As part of its review of the Projects, FERC conducted an environmental review of these proposed new gas pipeline facilities and operations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347 (2012). NEPA sets out procedures to be followed by federal agencies to ensure that the environmental effects of proposed actions are "adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Notably, NEPA is a procedural statute; it "does not mandate particular results in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to

undertake analyses of the environmental impact of their proposals and actions."

*Id.*, 490 U.S. at 349–50.

## II.  IROQUOIS' PIPELINE AND INVOLVEMENT TO REDUCE THE CONSTITUTION PIPELINE PROJECT'S ENVIRONMENTAL IMPACT AND COST

Iroquois owns and operates an interstate natural gas pipeline that extends from the U.S./Canada border at Iroquois, Ontario and Waddington, New York southward through New York State, then eastward into western Connecticut, under Long Island Sound, to South Commack, New York, and then back under the Sound to a terminus at Hunts Point in the Bronx.  Certificate Order ¶ 5, JA __.  Iroquois was originally built in the early 1990s to bring gas produced in western Canada and transported thousands of miles across Canada to natural gas markets in the Northeastern United States.[5]

Iroquois' customers - the shippers that hold transportation contracts to ship their gas on Iroquois on a "firm" or reserved basis - are primarily New York and New England gas utilities, electric generators, and other entities that deliver gas to New York and New England gas consumers.[6]

---

[5]     *See La. Ass'n of Indep. Producers and Royalty Owners v. FERC*, 958 F.2d 1101, 1106 (D.C. Cir. 1992) ("The Iroquois/Tennessee Project is part of a billion dollar plan to ship natural gas from Alberta across the Canadian prairie to the Northeastern United States.").

[6]     An interstate natural gas pipeline's customers are a matter of public record. The Commission's regulations require that each interstate pipeline "file with the Commission an index of all its firm transportation and storage customers under

In recent years, Iroquois' customers have sought to diversify their access to gas supplies and, in particular, gain access to the abundant supplies of eastern U.S.-produced natural gas. To meet these needs, Iroquois first built, and then later expanded, a compressor station in Brookfield, Connecticut so that it could receive domestic gas from an interconnect with another U.S. interstate gas pipeline.[7] This new source of gas has been extremely important, both in terms of cost and supply

---

contract as of the first day of the calendar quarter . . . . The index of customers must also [be] posted on the pipeline's Internet web[site] . . . ." 18 C.F.R. § 284.13(c)(1) (2016). Iroquois' quarterly customer index for the quarter commencing July 1, 2016 is available at www.iroquois.com and shows among its customers Bay State Gas Company d/b/a Columbia Gas of Massachusetts, Boston Gas Company d/b/a National Grid, Brooklyn Navy Yard Cogen. Partners, LP, Central Hudson Gas & Electric Corp., Colonial Gas Company d/b/a National Grid, Connecticut Natural Gas Corp., Consolidated Edison Company of New York, Inc., Empire Generating Company, KeySpan Gas East Corp. d/b/a National Grid, Milford Power Co., LLC, New Athens Generating Co., LLC, New Jersey Natural Gas Company, New York State Electric & Gas Corp., Niagara Mohawk Power Corp. d/b/a National Grid, St. Lawrence Gas Company, Inc., The Brooklyn Union Gas Company d/b/a National Grid, The Southern Connecticut Gas Company, and Yankee Gas Services Company. These shippers provide a substantial portion of the gas service, or substantial gas-fired electric generation, to retail markets in New York and New England.

[7]     *Millennium Pipeline Co., L.L.C., et al*., 117 FERC ¶ 61,319 (2006) (certifying Iroquois' construction and operation of the Brookfield compressor station as part of a large, multi-pipeline expansion project, and Iroquois' provision of additional firm transportation service to Consolidated Edison Company of New York, Inc.); *Iroquois Gas Transmission Sys., L.P*., 122 FERC ¶ 61,242 (2008) (certifying Iroquois' expansion of the Brookfield compressor station and limited additional facilities in order to provide additional firm transportation service to KeySpan Gas East Corp. d/b/a National Grid, the gas utility serving Long Island).

security, for Iroquois' customers, but its availability is constrained by limits on capacity at that interconnect.

The Constitution Pipeline Project and Iroquois Interconnect Project are designed to bring a new point of access to eastern U.S.-produced gas for customers of Iroquois as well as Tennessee. As FERC held below, customers currently holding transportation contracts on Iroquois and Tennessee will have access to gas transported on Constitution and delivered into Iroquois at Wright, New York, for further delivery of such eastern U.S.-produced gas into New York and New England. Certificate Order ¶ 115 (Constitution-transported "gas can be transported . . . to downstream markets by any shipper holding capacity on Iroquois and/or Tennessee."), JA __; Rehearing Order ¶ 95 (same), JA __.

When Constitution initially proposed its project in 2012 by initiating a "pre-filing" process[8] at FERC in Docket No. PF12-9-000, Constitution planned to construct, own, and operate its own compressor facilities to move gas from

---

[8]     FERC's "pre-filing" process was a voluntary procedure undertaken by Constitution "to get early stakeholder involvement," Rehearing Order ¶ 30, JA ___, and to commence and receive feedback on the environmental review aspects of its proposal. *See generally* FERC Order No. 665, *Regulations Implementing Energy Policy Act of 2005; Pre-Filing Procedures for Review of LNG Terminals and Other Natural Gas Facilities*, 113 FERC ¶ 61,015 at ¶ 3 (2005) (pre-filing process serves "to maximize early public involvement[,] to promote the wide-spread dissemination of information about proposed projects and to reduce the amount of time required to issue an environmental impact statement (EIS) . . . once an application is filed").

Constitution's proposed pipeline into Iroquois' and Tennessee's systems.

Compression of the gas being delivered by Constitution into Iroquois was

necessary in order to increase its pressure to penetrate Iroquois' high-pressure

pipeline system. During the pre-filing proceeding, however, Constitution and

Iroquois determined that more modest compressor facilities could be built on

Iroquois' system at its existing Wright, New York compressor station that would

transfer gas from Constitution into Iroquois' and then Tennessee's systems thereby

reducing both costs and environmental impacts.[9] Constitution and Iroquois thus

negotiated an arrangement whereby Iroquois would undertake the compressor

build, thus reducing the amount of new compression needed and eliminating the

need for a "greenfield" compressor station by putting the new compressor facility

at the site of Iroquois' existing compressor station. Iroquois would partner with

Constitution in pursuing the necessary certificate for the Iroquois Interconnect

Project and other authorizations, constructing the compressor facility, and then

---

[9]     *See* Certificate Order ¶ 12, JA ___ (Iroquois will "construct a new transfer compressor station . . . including two natural gas-fired turbine compressors of approximately 10,900 hp [horsepower] each" – *i.e.*, a total of approx. 21,800 horsepower); *id.* ¶ 41, JA ___ (having Iroquois build the compression and lease it to Constitution "provides a cost-effective means of acquiring the compression needed to make deliveries to interconnections with Iroquois and Tennessee in Schoharie County. As noted above, the lease arrangement allows Constitution to acquire the necessary 21,800 hp of compression to interconnect with Iroquois and Tennessee. If Constitution had to construct its own facilities, it would require 32,000 hp.").

leasing the capacity at that new point of interconnection on its system to Constitution.

## III.    PROCEEDINGS AND RULINGS BELOW

Consideration of the Projects at FERC began with Constitution's filing on April 5, 2012, in FERC Docket PF12-9-000, a request to use FERC's "pre-filing" process.  Constitution held meetings and outreach events with stakeholders, and developed and filed draft resource reports analyzing the environmental impacts of its proposed project.  On September 7, 2012, the staff of FERC's Office of Energy Projects ("Staff") issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Constitution Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* in Docket No. PF12-9-000, giving notice of their intent to prepare a NEPA environmental impact statement ("EIS") for the Constitution Pipeline Project, and requesting comments from the public regarding the project.

On June 13, 2013, Constitution and Iroquois filed applications requesting issuance by FERC of Certificates to construct, own and operate their respective facilities.   FERC assigned Docket Nos. CP13-499 and CP13-502, respectively, to the Constitution and Iroquois applications.

Staff issued a Draft Environmental Impact Statement (the "Draft EIS" or "DEIS") on February 12, 2014, in the two dockets, that totaled 400 pages and

reflected the Staff's views and analysis of the environmental impacts of the proposed Projects based on the data and public comments received.  Notice of the Draft EIS was published in the Federal Register on February 20, 2014, establishing a 45-day public comment period.  *See* 79 Fed. Reg. 9735 (Feb. 20, 2014); Certificate Order ¶ 70, JA-__.

Approximately eight months after issuance of the Draft EIS, on October 24, 2014, Staff issued a Final Environmental Impact Statement ("Final EIS" or "FEIS").  The Final EIS totaled over 450 pages.  The Final EIS set forth the Staff's analysis and conclusions regarding the environmental impacts of the proposed Projects and also the Staff's recommendations for mitigation and conditions on the applicants' actions that would reduce or eliminate environmental impacts.  Based on the Staff's own analysis and its review of additional data obtained from the applicants and from the over 800 comments received in response to the Draft EIS, the Staff concluded that the environmental impacts of the Projects would be reduced to less-than-significant levels with the implementation of Constitution's and Iroquois' proposed mitigation and Staff's recommended mitigation measures,[10]

---

[10]  *See* Final EIS at 5-1, § 5.1, JA __ (concluding that "adverse environmental impacts" from construction and operation "would be reduced to less than significant levels"); *see also* Final EIS at 5-1to 5-17, JA __-__ (containing all of Staff's conclusions); *id.* at 5-17 to 5-24, JA __-___ (presenting all of Staff's "recommended mitigation").

which measures FERC ultimately adopted as conditions of the Certificates it

subsequently issued.  *See* Certificate Order ¶ 73, JA ___.

FERC issued its Certificate Order on December 2, 2014.  The

"Environmental Analysis" section of the Certificate Order totals 25 pages (pages

21 through 45 in the slip opinion version), *see* R. 2628 at 21–45, JA at __-__.  It

concludes with the following:

> We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the Constitution Pipeline and Wright Interconnect Projects.  Based on our consideration of this information and the discussion above [in the preceding twenty-five pages of the order], we agree with the conclusions presented in the final EIS and find that the projects, if constructed and operated as described in the final EIS, are environmentally acceptable actions.  We are accepting the environmental recommendations in the final EIS and are including them as conditions in the appendix to this order.

Certificate Order ¶ 146, JA _____.

The appendix to the Certificate Order is entitled "Appendix Environmental

Conditions" and contains forty-three (43) numbered paragraphs of conditions.  *See*

Certificate Order at 48-57, JA-__-___.

Not only did the Final EIS analyze the environmental impacts of the

Projects, it also considered "cumulative impacts" from planned projects that were

proposed to be built in geographic proximity to the proposed facilities.  The

Certificate Order noted that, in response to the Draft EIS, the majority of

comments discussing a need to include other projects in the cumulative impacts

analysis section focused on two projects, the Leatherstocking Project and the

Tennessee Northeast Energy Direct Project. *Id.* ¶ 102; JA-___. The

Leatherstocking Project "involves constructing four interconnections with the

[proposed] Constitution pipeline in order to bring a new source of gas supply to

communities in northern Pennsylvania and [southeastern] New York." *Id.* ¶ 104;

JA- ___. The Northeast Energy Direct Project involved "upgrading Tennessee's

existing pipeline system in the northeast in order to deliver up to 2,200,000 Dth per

day to the New England area." *Id.* The Certificate Order notes that in response to

these comments, Staff included in the Final EIS a detailed cumulative impacts

analysis of these two proposed projects, as well as other planned or existing

facilities within so many miles of the Constitution Pipeline Project. *Id.* ¶¶ 103–

107. The Commission agreed with and adopted the Final EIS's finding "that by

implementing staff's recommended mitigation measures . . . the cumulative

impacts would be minimized below a significant level." *Id.* ¶ 106.

Notwithstanding the fact that Petitioner Stop the Pipeline filed comments on

the EIS out of time, FERC's Certificate Order directly addressed those late-filed

comments. Certificate Order ¶¶ 113–117, JA __-___. First, Stop the Pipeline

argued that a cumulative impacts analysis of the Northeast Energy Direct Project

should be included in a revised draft EIS. The Commission noted that such a

cumulative impacts analysis had already been done and was incorporated in the Final EIS, rendering this request moot. *Id.* ¶ 114, JA __.

Similar to the arguments it makes before this Court, Stop the Pipeline argued that certain other projects were necessary for the Constitution Pipeline Project physically to operate, and thus should have been the subject of the entire EIS analysis along with the Projects, and had been unlawfully excluded or "segmented." Stop the Pipeline contended that "because the [existing] Tennessee and Iroquois pipelines are capacity constrained," the Northeast Energy Direct Project "is needed to move gas from Wright, New York, the terminus of the [proposed] Constitution Pipeline Project, to markets in New York City and Boston." Certificate Order ¶ 115, JA __; *see* Rehearing Request at 7, JA __ (alleging "other projects . . . would be required to move the gas to the purported markets."). Because these projects are interdependent, claimed Stop the Pipeline, they are "connected actions" and must be "evaluated in a single NEPA environmental review." Certificate Order ¶ 116, JA __.

FERC rejected these claims on numerous grounds in its Certificate Order. *Id.* at ¶¶ 115–116. In particular, the Commission found that Iroquois' and Tennessee's existing pipeline systems are not constrained in any manner that prevents them from receiving natural gas from the proposed Constitution Pipeline and transporting it to the New York and New England markets. The Commission

stated that "[n]atural gas can be transported from the terminus of the Constitution Pipeline Project to downstream markets *by any shipper holding capacity on Iroquois and/or Tennessee*." *Id.* at ¶ 115 (emphasis added), JA-___.

On December 30, 2014 and January 2, 2015, respectively, Catskill and Stop the Pipeline filed requests for rehearing of the Commission's Certificate Order. *See* JA __-___ and __-__.  Pertinent to the issues raised by Catskill on appeal and addressed in this brief, Catskill's rehearing request attacked the Staff calculation of GHG emissions in the Final EIS as well as the FEIS and Certificate Order discussions regarding "climate change impact."  Among other things, Catskill contended that FERC or its Staff understated the potential range of social cost figures and, further, instead of finding such social cost figures to be speculative and unhelpful, should have used and relied upon them in FERC's analysis.  FERC responded in detail to Catskill's criticisms in its Rehearing Order, and rejected them.  *See* Rehearing Order at ¶¶ 113-118, JA __-__ (emissions claims), ¶¶ 125-132, JA __-__ (climate change claims); ¶¶ 133-172, JA __-__ (indirect impacts and cumulative impacts claims).

Stop the Pipeline argued in its request for rehearing, JA __-__, that both Tennessee's planned Northeast Energy Direct Project and Iroquois' "SoNo Project" – a proposal aired publicly by Iroquois, but not yet filed in any form with FERC, to facilitate the reversal of flow on Iroquois' pipeline system from south to

north and thereby enable it to transport U.S.-produced gas to Canada – were

indispensable to the Projects.  Stop the Pipeline argued, again, that both Iroquois'

existing pipeline system and Tennessee's existing pipeline system are physically

constrained or bottlenecked such that no gas flowing north to Iroquois' and

Tennessee's pipeline systems on the proposed Constitution Pipeline could be

transported to New York or New England, or elsewhere, without a further new

pipeline being built and infrastructure changes to Iroquois' system being made to

flow gas northward.  Thus, according to Stop the Pipeline, the proposed

Constitution Pipeline would be a bridge to nowhere and serve no public purpose

without the Tennessee Northeast Energy Direct Project and the Iroquois SoNo

Project.  It was, therefore, unlawful "segmentation," according to Stop the

Pipeline, for FERC to fail to make the Northeast Energy Direct Project and the

SoNo Project the subject of its entire EIS analysis, along with the proposed

Constitution Pipeline Project and Iroquois Interconnect Project.

In its Rehearing Order, FERC considered and rejected Stop the Pipeline's

claims.  *See* Rehearing Order at ¶¶ 15–23 (discussing the "need" for the Projects),

¶¶ 88–98 (rejecting Stop the Pipeline's claim of improper segmentation of a

unitary project).  In particular, as it had in the Certificate Order, FERC observed

that the existing Iroquois and Tennessee pipeline systems are not physically

constrained in the manner Stop the Pipeline claims, and that any present

transportation customer on these systems will be able to take gas delivered by Constitution and flow that gas to New York or New England on their existing capacity entitlements, rendering the Projects stand-alone projects not dependent on any other projects being built.

Before this Court, Stop the Pipeline has abandoned its illegal segmentation argument with respect to the Northeast Energy Direct Project, *see* Stop Br. at 14 (referring only to the SoNo Project), perhaps because the Northeast Energy Direct Project has been cancelled by its sponsor, Tennessee.[11]  Stop the Pipeline continues to argue in this proceeding that the existing Iroquois and Tennessee pipeline systems could not flow Constitution Pipeline gas eastward, that Constitution Pipeline would be a bridge to nowhere without some other project being built, that the missing piece is now Iroquois' SoNo Project proposal, by itself, and that FERC therefore engaged in unlawful segmentation by not making Iroquois' SoNo Project, along with the Constitution Pipeline Project and Iroquois Interconnect Project, the subject of the Draft and Final EIS.  As discussed below, these claims are baseless and should be rejected for the numerous reasons discussed in detail in FERC's Certificate and Rehearing Orders.

---

[11]    *See* Notice of Withdrawal of Certificate Application, filed May 23, 2016 in *Tennessee Gas Pipeline Company, L.L.C.*, FERC Docket No. CP16-21-000 (explaining that the company's parent company had determined to suspend work on the project as a result of inadequate capacity commitments from prospective customers and a determination that the project was uneconomic).

## SUMMARY OF THE ARGUMENT

FERC satisfied all of its statutory responsibilities in approving the Projects. As addressed in this brief, that includes FERC's GHG emissions analysis, FERC's demonstration of need for the Projects, and FERC's determination that the Projects were not so connected to any other, future projects that its environmental analysis should have been expanded.

First, FERC's evaluation of the GHG effects and climate change impacts of the Projects was reasonable and met FERC's review obligations under NEPA. Included within this analysis was a thorough, reasonable, and fully-supported calculation estimating GHG emissions from the Projects. Notably, these calculations did not omit any sources of GHG that should have been included to produce a thorough, well-reasoned, and sufficient analysis. Furthermore, the record shows that FERC identified and evaluated each aspect of the NEPA-required climate change impact analysis. If any tools considered for this analysis were found to be unreliable, an articulated reason connecting the facts found and the choice made was provided by FERC in the record. NEPA does not require anything more and Catskill's claims arguing otherwise lack both record and legal support.

Second, FERC's determination that there was a need for the Projects was well-supported and reasonable. First and foremost, FERC reasoned that, consistent with long-standing precedent, the need for these Projects is demonstrated by the existence of binding precedent agreements for the entirety of the Projects' capacity. This reasonable conclusion is reinforced by multiple statements in the record from third parties noting the many benefits of the Projects for gas and electricity consumers in the Northeastern United States. Stop the Pipeline's claimed lack of need is based on its fundamental misunderstanding of how pipelines such as Iroquois and Tennessee function, and ignores the fact that these pipelines' existing customers will have access to, and benefit from, the ability to substitute abundant, eastern-U.S. produced gas for western Canadian and other more remote gas supplies they have traditionally relied upon.

Finally, it was reasonable for FERC to conclude that it was not necessary to examine the potential environmental effects of a future, entirely speculative south-to-north expansion of Iroquois' system. First, FERC concluded that the Projects are stand-alone projects that can go forward regardless of any other project being authorized. Second, FERC explained that illegal segmentation only occurs if the "connected actions" are actually proposed projects. Because the SoNo Project has not been proposed at FERC, FERC correctly concluded that it cannot be considered a connected action.

At bottom, Petitioners' claims disputing FERC's decisions on these issues fail to show that any of FERC's analyses or actions were unreasonable or unsupported by the record, or departed in any way from established precedent and FERC policy. Petitioners' claims should, therefore, be rejected.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court's standard of review for FERC's actions is established by the Administrative Procedure Act ("APA"). *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 108 (2d Cir. 2015). Under the APA, FERC's orders can only be overturned if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Green Island Power Auth. v. FERC*, 577 F.3d 148, 158 (2d Cir. 2009) (quoting 5 U.S.C. § 706(2)(A) (2012)) (internal quotation marks omitted).

In evaluating whether an agency decision is arbitrary or capricious, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a 'clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). *See also Motor Vehicle Mfrs. Ass'n Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (an agency's decision should be upheld so long as the agency articulated a satisfactory explanation for its action and a rational connection between the facts found and the choice made).

This Court has previously stated that FERC "must examine the relevant data and articulate a satisfactory explanation for its action[s] including a 'rational connection between the facts found and the choice[s] made.'" *Cent. Hudson Gas & Elec. Corp.*, 783 F.3d at 108 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962))).

This narrow standard of review also applies to actions of administrative agencies, such as FERC, taken pursuant to NEPA. *Marsh*, 490 U.S. at 377–78 (1989). NEPA itself sets out procedures to be followed by federal agencies to ensure that the environmental effects of proposed actions are "adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); s*ee also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004). Notably, NEPA is a procedural statute; it "does not mandate particular results in order to accomplish these ends. Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp.*, 541 U.S. at 756–57 (quoting *Robertson*, 490 U.S. at 349–50).

For purposes of this appeal, "[a]s long as the [FERC's NEPA analysis] is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting *N. Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980); *see also Robertson,* 490 U.S. at 350–51.

## II. FERC'S GHG EMISSIONS ANALYSIS AND ITS FINDING OF NO SIGNIFICANT IMPACT COMPLY WITH NEPA

Catskill claims that FERC's GHG emissions calculations were hard to follow and that FERC arbitrarily refused to consider the full volume of GHG emissions associated with the Projects, including the costs associated with alleged loss of "carbon sinks" caused by the Project's tree-clearing activities.[12]  Catskill also argues that FERC "unlawfully dismissed" the impact of the calculated GHG emissions by comparing those totals to GHG emissions from the total U.S. Greenhouse Gas Inventory.  Finally, Catskill argues that FERC refused to consider the potential climate change impacts from the Projects' GHG emissions.  Each of these arguments is without merit for the reasons discussed below.

### A. The GHG Emissions Calculations Were Sound.

By any reasonable standard, the GHG emissions calculations used to evaluate the Constitution Pipeline Project and Iroquois Interconnect Project were

---

[12]    Catskill Brief at 29–30.

thorough and fully supported by evidence developed in the record. Those

calculations, thus, ensured that the environmental effects of FERC's proposed

actions in certificating the Projects were "adequately identified and evaluated."

*Robertson*, 490 U.S. at 350.

First, the record shows that the GHG emissions analysis adopted by FERC

from the Final EIS made clear where each source of GHG used in the analysis

originated and explained how the GHG emissions calculations were completed.

Rehearing Order ¶ 127, JA _____. Specifically, the GHG emissions that would

result from the construction and operation of the Projects were calculated based on

a combination of manufacturer data, emission factors obtained from the EPA's

Compilation of Air Pollutant Emission Factors, EPA emissions models for

gasoline- and diesel-fueled on-road vehicles and non-road construction equipment,

and widely accepted engineering mass balance calculations. FEIS at 4-182, JA

___. It was certainly reasonable for the Final EIS to use, and FERC to rely on,

such generally accepted and EPA-generated data.[13] This data was then converted

to carbon dioxide-equivalent metric tons ("CO2e"), and each individual source of

potential GHG emissions was itemized in summary tables included in both the

---

[13]     As FERC noted, "[t]he regulatory standards set by the EPA for the Clean Air
Act were established through extensive modeling and research for the purpose of
protecting the public health and welfare." Rehearing Order ¶ 116, JA ___.

Draft EIS and the Final EIS.[14]  Catskill's claim that this data was hard to follow, without any other supporting evidence or reasoning, is baseless.

Second, the method used to estimate GHG emissions during operation of the Projects was conservative.  As noted in the Final EIS, FERC Staff relied on conservative assumptions that the Constitution Pipeline and Iroquois Interconnect Project facilities would operate under maximum load conditions and worst-case ambient conditions.[15]  Thus, it was careful to avoid any risk of understating the anticipated emissions during operations and, if anything, relied on what were likely to be overstated numbers.

Finally, the analysis relied upon by FERC made sure that no sources of GHG emissions were ignored or miscalculated.  For example, the analysis completed in the Final EIS made adjustments from the Draft EIS in response to various comments submitted in the proceedings, all of which led to significant increases in the estimated GHG emissions total.  Specifically, the Final EIS incorporated additional sources of GHG emissions, including (1) the operation of Iroquois' existing compressor station facilities in Wright, New York and (2) the addition of GHG emissions due to venting (*i.e.,* blowdowns for maintenance and emergencies) and fugitive GHG emissions *(i.e.,* gas leakage that occurs during

---

[14]　　*See* Draft EIS at 4-169, JA ____; Final EIS at 4-183, JA ____.

[15]　　*See* Final EIS at 4-182, JA ____.

normal operations from wet seals and, to a lesser degree, dry seals, which are the kind proposed here).[16]

In its attack on FERC's GHG analysis, Catskill claims that FERC unlawfully failed to consider indirect effects regarding project-induced natural gas production[17] and "lost carbon sinks" resulting from tree-removal during construction.[18]  Catskill also alleges, without any supporting evidence or precedent, that FERC was required to calculate the total GHG emissions over the life of the Projects, instead of on a per year basis.[19]

This brief does not address Catskill's allegations that FERC unlawfully failed to consider indirect effects regarding project-induced natural gas production, as that claim is comprehensively addressed by Respondent FERC and Intervenor Natural Gas Supply Association in their response briefs.  With regard to lost carbon sinks, FERC directly addressed the issue, explaining that it had considered the available data on sink capacity of forests, found that data inadequate and unreliable, and reasonably concluded that it should not be included in FERC's

---

[16]     Final EIS at 4-182, JA ____.  The GHG emissions analysis was also revised to reflect more accurate data relating to projected GHG emissions for the construction of the Constitution Pipeline.  *See* Rehearing Order ¶ 118, JA ____.

[17]     Catskill Brief at 18–28.

[18]     *Id.* at 30–33.

[19]     *Id.* at 29–30.

calculation of direct GHG effects from the Projects.[20]  FERC explained that the

two governmental sources Catskill highlighted as methods to calculate GHG

emissions from the loss of carbon sinks – a 2014 report from the Intergovernmental

Panel on Climate Change ("2014 IPCC Report") and the U.S. Department of

Agriculture's COMET-Farm Tool – are unreliable because they are either (1)

limited to studying carbon sinks at a global, regional, or country-wide scale (2014

IPCC Report), or (2) contain so much uncertainty that even for an evaluation at a

large scale (e.g., state-level), the power to detect significant changes in forest

carbon stocks is limited to major disturbances (COMET-Farm Tool).[21]

        As it explained, FERC is neither required nor expected to conduct an

analysis given the lack of a reliable method to do so.[22]  *See N. Plains Res. Council,*

*Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011) (stating that

NEPA does not require an agency to "engage in speculative analysis" or "to do the

impractical, if not enough information is available to permit meaningful

consideration.").  Moreover, where, as in the case of alleged loss of carbon sinks

due to tree removal, FERC is acting on the frontiers of developing science, the

Court's deference is at its highest level.  *See Helping Hand Tools v. EPA,* 2016

U.S. App. LEXIS 16262, 11-12 (9th Cir. 2016) (citing *Baltimore Gas & Elec. Co.*

---

[20]     Rehearing Order ¶ 128, n.198, JA __.

[21]     *Id.*

[22]     *Id*.

*v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 103 (1983)) (describing the current inability of science to quantify the difference in environmental impacts between a carbon dioxide absorbing fuel source and a non-carbon dioxide absorbing fuel source). Accordingly, Catskill's claim that FERC arbitrarily decided not to consider carbon sinks in its analysis is unfounded and should be dismissed.

With regard to Catskill's assertion that FERC was required to calculate the total GHG emissions over the life of the Projects, there is simply no basis for Catskill's claim. There is no law, rule, or precedent that requires FERC to make GHG calculations based on an estimated or assumed "life of the project" basis rather than on an annual basis. Calculating the increase in GHG emissions from the Projects on an annual basis allowed FERC to undertake an overall impact analysis that satisfies FERC's NEPA requirements, *i.e*., to identify and evaluate the environmental effects of the proposed projects, and allows FERC to compare the proposed Projects against other reasonable alternatives. *See Robertson*, 490 U.S. at 350 (NEPA requires federal agencies to ensure that the environmental effects of proposed actions are "adequately identified and evaluated").

Analysis of annual estimates allows both FERC and the public to compare the annual emissions total in the Final EIS against the cumulative GHG inventory estimate prepared by EPA – which is done on an annual, retrospective basis, and fluctuates from year to year. Requiring FERC to carry out estimated calculations

-27-

into the future would not only result in an "apples to oranges" comparison, it would not lead to a more informed or productive analysis because there is no hard data beyond the cumulative GHG inventory estimate to use as a comparison. Catskill fails to provide any evidence to the contrary. Thus, any such analysis would be speculative and is not required by NEPA. *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1378 (2d Cir. 1977) ("NEPA does not require a 'crystal ball' inquiry . . . . An EIS is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible.") (internal citations omitted). *See also N. Plains Res. Council, Inc.*, 668 F.3d at 1078 (stating that NEPA does not require an agency to "engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration.").

**B.    FERC's Climate Change Impact Analysis Fully Complies with NEPA.**

As noted above, FERC's NEPA analysis should ensure that the environmental effects of the proposed Constitution Pipeline Project and Iroquois Interconnect Project are "adequately identified and evaluated." *Robertson*, 490 U.S. at 350. *See also Dep't of Transp.*, 541 U.S. at 768. To that end, the air quality analysis developed in these proceedings, including the estimated level of

-28-

GHG emissions discussed above, serves as a reasonable framework for assessing potential climate change impacts.

In its brief, Catskill makes the conflicting claims that FERC failed to evaluate the potential climate change impacts from the Projects' GHG emissions because FERC (1) completely ignored the Social Cost of Carbon tool and yet (2) deployed the tool in an arbitrary fashion by using it over a single year of operations.[23] As demonstrated below, the former is patently false, while the latter argument ignores FERC's (and EPA's) explanation of the shortcomings of the Social Cost of Carbon tool.

With regard to physical impacts, the Draft EIS explained that no standard methodology presently exists to determine how any project's GHG emissions would result in physical effects on the global environment.[24] Based on this reasoning, it did not perform any further analysis to try to determine how the small incremental contribution of GHG emissions from the Projects would specifically translate into physical impacts due to climate change.[25]

This same fact was again reiterated in the Final EIS.[26] However, notwithstanding these concerns, and in direct response to comments raised on the

---

[23]    Catskill Brief at 35–36.

[24]    *See* Draft EIS at 4-231, JA ___.

[25]    *Id*.

[26]    *See* Final EIS at 4-256, JA ___.

Draft EIS (including those specifically raised by Catskill), the Final EIS included a detailed discussion of EPA's "Social Cost of Carbon" protocol.[27] Specifically, the Final EIS analysis explained that EPA's "Social Cost of Carbon" protocol is used as a tool that monetizes the value of addressing the climate change impacts on a global level from each metric ton of $CO_2$ emitted in a given year.[28] The Final EIS contained a calculation of the Projects' operation-related $CO_2$ emissions based on three discount rates in 2015, in accordance with EPA's Social Cost of Carbon protocol, resulting in a Social Cost of Carbon for 2015 ranging from approximately $1.6 million to $8.3 million.[29] Thus, Catskill's claims that the Social Cost of Carbon tool was ignored ring hollow.

While the Final EIS did utilize the Social Cost of Carbon tool to estimate the Projects' social cost of carbon for 2015, FERC also (1) took NEPA's requisite hard look at whether the Social Cost of Carbon tool would assist FERC in its decision making process, (2) explicitly agreed with EPA's previously-stated caveat that the Social Cost of Carbon protocol's results have no scientifically reliable meaning, and (3) concluded, reasonably, that the protocol's results as a comparative tool should not be the sole basis for any decision.[30] *See High Country Conservation*

---

[27] *Id.*, JA ___.

[28] *Id.*, JA ___; Rehearing Order ¶ 131, JA ____.

[29] *See* Final EIS at 4-256, JA ___.

[30] Rehearing Order ¶ 131, JA ___.

*Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1193 (D. Colo. 2014) ("[A] 'hard look' has to include a 'hard look' at whether [the social cost of carbon protocol], however imprecise it may be, might contribute to a more informed assessment of the impacts than if it were simply ignored.").

Given that FERC reasonably agreed with EPA's conclusion that the Social Cost of Carbon's results have no scientifically reliable meaning, FERC explained that a comparison of the social costs of carbon resulting from those emissions on a one-year, ten-year, or longer time span would not contribute to a more informative NEPA assessment.[31] If the resulting calculations from the Social Cost of Carbon method were unreliable for 2015, there is absolutely no reason to expect that multiplying those results by a factor of ten or fifteen improves their accuracy. FERC fully explained this in the record below. Thus, FERC fulfilled its NEPA responsibility with respect to examining the Social Cost of Carbon and explaining its conclusions as to the shortcomings of the Social Cost of Carbon tool. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (an agency's decision should be upheld so long as the agency articulated a satisfactory explanation for its action and a rational connection between the facts found and the choice made).

Unsatisfied with FERC's findings regarding EPA's Social Cost of Carbon – which again, are based on similar conclusions previously made by EPA – Catskill

---

[31]    *Id*.

argues that an alternative tool should have been used by FERC in place of the Social Cost of Carbon.[32]  However, Catskill fails to identify any other specific method that FERC could have used, nor did it identify any alternative methodology advocated for during the proceeding before FERC that the agency unfairly or unreasonably rejected.  Hence, Catskill provides no reason to doubt the reasonableness of FERC's conclusion.

Finally, although it reasonably concluded that the Social Cost of Carbon calculations were unreliable, FERC did not conclude that the Projects' GHG emissions would have no impact.  To the contrary, FERC identified and discussed the issue at length.  In addition to FERC's analysis discussed in Section II.A above, FERC's analysis included a discussion of GHG emissions' effect on climate change,[33] related environmental effects in the Projects' Northeast region resulting from overall GHG emissions,[34] and why it was reasonable for FERC to conclude that the emissions resulting from the operation of the Constitution Pipeline and Iroquois Interconnect facilities would not be expected to significantly impact local or regional air quality.[35]

---

[32]    Catskill Brief at 38.

[33]    Rehearing Order ¶¶ 127, 129, JA ___, ____; *see also* Final EIS at 4-171, 4-255 to 4-256, JA ___, _____, _____.

[34]    Rehearing Order ¶ 129, JA _____; *see also* Final EIS at 4-255, JA _____.

[35]    Final EIS at 4-186, JA _____ (explaining, in part, that the proposed Iroquois facilities – which will contribute most of the total GHG emissions from the

Catskill's claim that FERC did not consider the GHG emissions when it considered project alternatives[36] is also baseless. As FERC explained, the Final EIS eliminated alternatives on other grounds than the GHG emissions of various alternatives.[37] It would have been an unnecessary and wasteful exercise to calculate comparative GHG emissions associated with alternatives that were already eliminated from further consideration.

In conclusion, the record in this proceeding demonstrates that FERC adequately identified and evaluated the climate change impacts associated with the proposed Projects. *Robertson*, 490 U.S. at 350 (1989); *see also Dep't of Transp.*, 541 U.S. at 768. The EIS process included a detailed, extensive analysis, was responsive to the extensive comments received on this issue, refined and sharpened that analysis in the Final EIS, and based on that analysis, FERC reasonably concluded that the Constitution Pipeline Project and Iroquois Interconnect Project are not expected to have a significant impact on climate change. NEPA does not require anything more, and Catskill has failed to demonstrate otherwise.

---

proposed Projects – emit less pollution than the Clean Air Act's Best Available Control Technology standards permit). *See also* Certificate Order ¶ 41 (explaining that the proposed Projects reduce the amount of air emissions otherwise needed for Constitution to deliver natural gas to downstream pipelines Iroquois and Tennessee).

[36]    Catskill Brief at 37.

[37]    Rehearing Order at ¶ 132.

**C.    Contrary to Catskill's Arguments, the Draft CEQ Climate Guidance Does Not Require Anything More from FERC in This Proceeding.**

Although Catskill's challenges to FERC's climate change impact analysis are unfounded for the reasons discussed above, they are also fatally flawed for a separate reason.  Every one of Catskill's assertions is based on the Council on Environmental Quality ("CEQ") Revised Draft Guidance for Greenhouse Gas Emissions and Climate Change (the "Draft CEQ Climate Guidance") released December 18, 2014,[38] and the "requirements" Catskill believes FERC needed to follow in these proceedings to comply with those draft guidelines.  Indeed, Catskill not only cites the Draft CEQ Climate Guidance to frame the general importance of analyzing climate change impacts,[39] but also relies on the applicability of the Draft CEQ Climate Guidance for its claims that FERC ignored significant GHG emissions (discussed above in Section II.A),[40] improperly compared GHG emissions to national and global emissions (discussed above in Section II.A),[41] and

---

[38]    Revised Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews, 79 Fed. Reg. 77,802 (Dec. 24, 2014) ("Draft CEQ Climate Guidance").

[39]    Catskill Brief at 28.

[40]    Catskill Brief at 31 (citing Rehearing Request that merely cites Draft CEQ Climate Guidance).

[41]    Catskill Brief at 34.

-34-

failed to evaluate potential climate change impacts (discussed above in Section II.B).[42]  Such assertions are all without merit.

First, Catskill omits the fact that the Draft CEQ Climate Guidance – issued on December 18, 2014 – was released *after* FERC's Certificate Order (December 2, 2014), which in turn was months after the Draft EIS (February 12, 2014) and Final EIS (October 24, 2014) were completed.  On this basis alone, the Draft CEQ Climate Guidance has no bearing on FERC's NEPA requirements in these proceedings.  Neither the Draft EIS, Final EIS, nor FERC's Certificate Order could, or was required to, comply with guidance, draft or otherwise, that did not exist at the time of their issuance.  *See*, *e.g., Sweet v. Sheahan*, 235 F.3d 80, 88–89 (2d Cir. 2000) (administrative rules do not have retroactive effect unless the originating statute requires this result).

Second, even assuming *arguendo* that the Draft CEQ Climate Guidance had been issued before the NEPA analysis in these proceedings had concluded, the Draft CEQ Climate Guidance was still only in *draft* form.  In fact, the Draft CEQ Climate Guidance specifically announces its request for public comments before it even begins to discuss the actual, draft guidance.[43]  Given that it was still subject to change, there is no reason – and indeed Catskill fails to cite to any supporting

---

42      Catskill Brief at 35.

43      Draft CEQ Climate Guidance, 79 Fed. Reg. at 77,802.

precedent – for FERC to follow draft guidelines that are not yet final.[44]  Therefore, there would be no reasonable expectation for FERC to follow such indeterminate and unfinished guidance.  *See CIR v. Soliman*, 506 U.S. 168, 171 (1993) (noting that proposed regulations are not binding law); *LeCroy Research Sys. Corp. v. Comm'r*, 751 F.2d 123, 127 (2d Cir. 1984) (noting that proposed regulations are not binding).

Third, even after the Draft CEQ Climate Guidance was eventually finalized in August 2016,[45] CEQ left no doubt that the Final CEQ Climate Guidance "is not a rule nor regulation, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances."[46] Furthermore, by their own terms, the guidelines are not a "change or substitute for any law, regulation, or other legally binding requirement, *and is not legally*

---

[44]    Indeed, the Draft CEQ Climate Guidance received well over 300 public comments after it was released in December 2014.  *See* https://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/comments.

[45]    Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 2, 2016) ("Final CEQ Climate Guidance").

[46]    *See* Memorandum for Heads of Federal Departments and Agencies, Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews at 1, n.3, Council on Environmental Quality (Aug. 1, 2016), *available at*: https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf.

*enforceable*."[47]  In fact, the guidelines consistently stress the importance of the "rule of reason" inherent in the NEPA review process that allows individual agencies to draw on their own experience and expertise to determine the appropriate level and the extent of quantitative or qualitative analysis required to comply with NEPA.[48]

For all of these reasons, the Court should determine that the Draft CEQ Climate Guidance does not apply to FERC's NEPA analysis in the present proceeding, and thus dismiss each of the claims Catskill makes in reliance on that draft document.

## III.  FERC CORRECTLY FOUND THAT THERE IS A NEED FOR THE CONSTITUTION PIPELINE AND IROQUOIS INTERCONNECT PROJECTS.

Under Natural Gas Act section 7(e), FERC is granted the exclusive authority to determine whether a proposed natural gas pipeline facility "is or will be required by the present or future public convenience and necessity."  15 U.S.C. § 717f(e) (2012).  In doing so, FERC evaluates and balances relevant factors under its established *Certificate Policy Statement* for determining whether there is a need for the Project and whether it will serve the public interest.  *See Certification of New Interstate Natural Gas Pipeline Facilities*, 88

---

[47]     *Id*. (emphasis added).

[48]     *Id*. at 5–6.

FERC ¶ 61,227 at ¶ 16 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) ("*Certificate Policy Statement*").

### A. The Executed, Binding Precedent Agreements in these Proceedings Are Significant Evidence of Market Need.

In the proceedings below, FERC explained that the Constitution Pipeline "will increase transportation capacity from supply sources in Pennsylvania to interconnections with Iroquois and Tennessee."[49] Furthermore, FERC noted that after Constitution conducted an open season to determine if any potential customers were interested in the transportation service offered by Constitution, 100% of the proposed capacity on the Constitution Pipeline was subscribed under two binding precedent agreements for long-term firm transportation service.[50]

---

[49] Certificate Order ¶ 27, JA __.

[50] *Id*. A precedent agreement is a commonly-used contract supporting interstate gas pipeline infrastructure projects that obligates a prospective shipper to enter into a long-term firm transportation service agreement upon the fulfillment or waiver of certain conditions precedent, such as the receipt of necessary regulatory approvals. In this case, Constitution submitted copies of its executed precedent agreements on a confidential basis with its certificate application. Iroquois also had a precedent agreement with Constitution as its counterparty, pursuant to which the pipelines, upon fulfillment of certain conditions precedent, would enter into a capacity lease. Under that proposed capacity lease, which was publicly filed and approved by FERC in the Certificate Order, Constitution would be obligated to pay Iroquois a fixed amount equal to $1,083,333 per month ($12,999,996 per year) for a term of 15 years for the capacity that would enable it to deliver its customers' (i.e., shippers') gas into Iroquois' mainline. *See* Iroquois Certificate Application, Exhibit I, Capacity Lease Agreement, JA ___-___.

As a result, FERC concluded that no market study or other additional evidence was necessary to demonstrate a need for the project where, as here, market need is already demonstrated by binding precedent agreements for 100 percent of the Projects' capacity.[51]  FERC flatly rejected Stop the Pipeline's argument that FERC was departing from its own policy – *i.e.*, that FERC's policy or prior orders required a market study or other additional evidence.[52]

Stop the Pipeline argues that the binding precedent agreements filed in these proceedings are not evidence of market need.  It claims, without any corresponding support, that FERC was  required to provide *additional* evidence of market need, such as a market study, and questions the reliability of the project subscriptions here because the Projects' majority shipper, Cabot Oil & Gas Corporation ("Cabot"), is affiliated with Constitution.  These claims fail for several reasons.

First, Stop the Pipeline's claim ignores long-standing FERC precedent holding that signed precedent agreements adequately demonstrate a need for the

---

[51]    Certificate Order ¶ 28, JA ___; *see also* Rehearing Order ¶ 21 ("No market study or other additional evidence is necessary where, as here, market need is demonstrated by contracts for 100 percent of the project's capacity."), JA __.

[52]    Rehearing Order ¶ 21 and n.29, JA ___ ("Although the Certificate Policy Statement broadened the types of evidence certificate applicants may present to show the public benefits of a project, it did not compel an additional showing."), citing Certificate Policy Statement, 88 FERC ¶ 61,227 at pp. 61,744, 61,748-49, as explaining merely that the Commission is open to considering evidence other than contracts for capacity to support market need.

project.[53] *See, e.g., Certificate Policy Statement*, 88 FERC at 61,748; *Dominion Transmission, Inc.*, 141 FERC ¶ 61,240, at ¶ 23 (2012); *Midwestern Gas Transmission Co.*, 114 FERC ¶ 61,527, at 61,816 (2006) ("[FERC] does not look behind the contracts to determine whether the customer commitments represent genuine growth in market demand.").  This long-standing policy is founded on the principle that FERC puts weight on the business judgment of the shippers, who enter into financial commitments involving hundreds of millions of dollars of fixed financial obligations over terms of many years to the pipeline.  *See Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277 at ¶ 67 (2002) (refusing to question the business judgment of marketers that subscribed capacity on the proposed pipeline); *S. Natural Gas Co.*, 76 FERC ¶ 61,122, at  p. 61,634 (1996) (noting that the shippers made a business decision to enter into transportation service agreements).  Stop the Pipeline has failed to distinguish the present proceedings from the many other cases in which FERC has followed this policy, or to provide a reasoned explanation as to why FERC's long-standing precedent of reliance on binding precedent agreements should be reversed.

---

[53]     *See* Certificate Order ¶ 28, JA __(identifying the facts in the present case that make Constitution's executed precedent agreements convincing evidence of "a need for the project"); Rehearing Order ¶ 19 (explaining that pursuant to the Commission's 1999 Certificate Policy Statement, "precedent agreements will always be important, significant evidence of demand for a project" ); *Certificate Policy Statement*, 88 FERC 61,227 at 61,748 (stating that precedent agreements "constitute significant evidence of demand").

Second, FERC's policy was recently affirmed by the United States Court of Appeals for the District of Columbia Circuit in two cases: *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015) (affirming FERC's finding of market need where there was record evidence that the project company had binding precedent agreements with customers for the project's capacity) and *Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 111 n.10 (D.C. Cir. 2014) (holding that FERC may find market need based on an applicant's existing contracts with shippers). The D.C. Circuit specifically ruled that there is nothing in the Natural Gas Act to suggest that FERC is required to "assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers." *Minisink*, 762 F.3d at 111 n.10.

Finally, Stop the Pipeline alleges that precedent agreements are insufficient evidence of market need when they involve affiliated entities. This conflicts with well-established FERC precedent in numerous prior orders.[54] Stop

---

[54] *See Fla. Southeast Connection, LLC*, 154 FERC ¶ 61,080 at ¶ 84 (2016) ("affiliation between project shippers and the owners of the pipelines is not, by itself, evidence of self-dealing which might call into question the need for the projects"); *id.*("execute[d] firm contracts for the capacity" place shippers at risk for the subscribed capacity, and pipelines are financially "at risk for any unsubscribed capacity"); *E. Shore Natural Gas Co.*, 132 FERC ¶ 61,204 at ¶¶ 27–31 (2010) ("the Commission gives equal weight to contracts between affiliates and non-affiliates"); *Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277 at ¶ 57 (fact that customers are affiliated with the project sponsor does not lessen the customers'

the Pipeline fails to support its claim with any factual evidence or policy basis to support its theory that precedent agreements involving affiliates are insufficient evidence of market need. An affiliated customer's binding contractual commitment to pay hundreds of millions of dollars in transportation reservation fees over multiple years (which must be paid whether or not the customer actually takes service on the pipeline),[55] under a service agreement subject to FERC's NGA jurisdiction, is no less of a commitment – and no less substantial evidence of market need for the new pipeline capacity – than it would be if the pipeline service provider was not its corporate affiliate. As FERC noted, there is no evidence in the record of self-dealing between Cabot and Constitution.[56] Moreover, as a fully FERC-regulated interstate gas pipeline, Constitution will be subject to extensive, ongoing regulation by FERC that will police against self-dealing or favoritism toward affiliated customers.

Thus, Stop the Pipeline has failed to provide any reason to doubt the sufficiency or reasonableness of FERC's reliance on the binding precedent

---

need for the new capacity or their obligation to pay for it under the terms of their precedent agreements and subsequently executed contracts).

[55] As FERC explained, under a firm transportation service agreement "the shipper is guaranteed, *and therefore must pay reservation charges associated with its contract quantity"* regardless of whether the shipper "uses its full contracted capacity every day of the year." Rehearing Order ¶ 20 (emphasis added), JA __.

[56] Rehearing Order ¶ 19, JA __; Certificate Order ¶ 28, JA __.

agreements as a demonstration of market need, which accords with established

precedent at both FERC and the D.C. Circuit.

**B.** **Stop the Pipeline Fundamentally Misconstrues How Natural Gas Pipelines Operate; No "Bottlenecks" or "Constraints" Exist Such That Constitution-Transported Gas Could Not Reach the New York and New England Markets on Iroquois' and Tennessee's Existing Pipeline Systems.**

Stop the Pipeline claims that there was a lack of need for the Projects

because they do not increase capacity on the interstate pipelines downstream of the

Projects (the existing Iroquois and Tennessee pipeline systems), that the Iroquois

and Tennessee pipelines are already "full" and "constrained," that the Projects

merely add gas upstream of existing "bottlenecks" on the Iroquois and Tennessee

Pipelines, and that the Projects are thus unnecessary.[57]

In its January 10, 2015 request for rehearing of FERC's Certificate Order,

Stop the Pipeline based its argument about a lack of evidence of "need" for the

Constitution Pipeline on its claim that there were "known constraints in the

Iroquois and Tennessee Gas Pipelines *that inhibit the flow of gas* between Wright,

NY and *the purported target markets* in New York City and New England[.]"

Rehearing Request at 6, JA ___ (emphasis added); *id.* at 14 (same), JA ___.  In the

same vein, Stop the Pipeline argued on rehearing that "[t]he Commission states

---

[57]     Stop the Pipeline Brief at 47–50.

that there is a market need . . . without showing how the gas will get to the purported markets[.]"  *Id.* at 22, JA __ .

Similarly, Stop the Pipeline's assertion that the Constitution Pipeline-transported gas cannot physically get to those markets underlies its related unlawful "segmentation" assertion (addressed below in Part IV) –*i.e.*, its claim that an additional project must be built to "move" Constitution Pipeline-transported gas either eastward to the "target markets" or northward to Canada.  Thus, Stop the Pipeline framed its rehearing request on this related issue as whether the Commission erred by "segmenting the proposed project from other projects *that would be required to move the gas to the purported markets."*  Rehearing Request at 7, JA __ (emphasis added).  Underlying both Stop the Pipeline's arguments about "need" and about "other projects" being necessary was its assertion that gas on the proposed Constitution Pipeline could not physically get to the target markets without new infrastructure.

FERC properly gave this argument short shrift.  Stop the Pipeline's claim that the Iroquois or Tennessee pipelines are "bottlenecked," "constrained" or "already full" such that no gas on Constitution's pipeline could be transported to New England or New York markets on them is misleading and, as FERC explained in both the Certificate Order and Rehearing Order, inaccurate.  The fact that the

*capacity* in both Iroquois' and Tennessee' pipeline systems may have been fully subscribed has no bearing on where those pipelines' shippers source their *gas*.

As FERC explained, once the Projects are built, any shipper holding transportation contracts (*i.e.*, capacity) on the Iroquois or Tennessee pipelines could elect to receive gas from Constitution and ship that gas on the Iroquois or Tennessee pipeline to markets in New York and New England.[58] FERC law and policy specifically permit pipeline shippers to change their points of receipt under existing contracts and to use alternate or "secondary" points of receipt if they choose, consistent with the pipelines' tariff protocols and FERC regulations.[59]

---

[58] Certificate Order ¶ 115, JA ___; Rehearing Order ¶¶ 19, 19 n.26, and 95, JA __, __, ___.

[59] *See Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* Order No. 636, FERC Stats. & Regs. [Regs. Preambles 1991-1996] ¶ 30,939 at 30,429 (1992) ("the Commission will expand firm shippers' rights to receipt and delivery points to include the right to receive gas from any person at any place on the system . . . on a firm basis with the flexibility to change firm receipt and delivery points. . . .Of course, receipt and delivery points must be within the firm transportation capacity [path] to which the shipper is entitled, and for which it pays."), *on reh'g*, Order No. 636-A, FERC Stats. & Regs., ¶ 30,950 (1992), *on reh'g*, Order No. 636-B, 61 FERC ¶ 61,272 (1992) (subsequent history omitted). *See also* Iroquois Gas Transmission System, L.P., FERC Gas Tariff, Second Revised Volume No. 1, General Terms & Conditions § 7.1 (Appendix attached hereto ("App.") at A-3) ("Subject to the availability of capacity, all other receipt points within the same Zone/Lateral or any other Zone shall be available as Alternate Receipt Points(s) for Shippers receiving service pursuant to Gas Transportation Contracts for Firm Reserved Service"); Tennessee Gas Pipeline Company, L.L.C., FERC NGA Gas Tariff, Sixth Revised Volume No. 1, General Terms & Conditions § IV.2.j (App. at A-13) ("A Shipper under rate schedule FT-A

With Constitution in place, Iroquois' shippers will have the ability to shift their reliance on western Canadian gas supplies to locally-produced gas. FERC reasonably found this to be beneficial, and to support its conclusion that Constitution and Iroquois had amply demonstrated need for their Projects.

Further evidence of Stop the Pipeline's lack of understanding of natural gas pipeline systems is its perverse and inaccurate claim that Constitution and its investor-shipper "are just selling gas to themselves."[60] The shippers on Constitution (and other federally-regulated interstate gas pipelines) do not sell the gas they ship to the pipelines; rather, Constitution sells transportation service to them so that they can move their gas to markets for resale to entities like the transportation customers of Iroquois and Tennessee. *See* note 6, *supra* (listing Iroquois' transportation customers).

### C. Stop the Pipeline Incorrectly Claims that the Stated Benefits of the Projects have Changed or Do Not Exist.

In addition to its inaccurate claim that the Iroquois and Tennessee pipelines are unable to transport gas from the proposed Constitution Pipeline to New York or New England, Stop the Pipeline incorrectly alleges that the stated benefits for the Projects amount to marketing materials, have changed during the course of the

---

or FT-G may nominate segments between a Primary Receipt and Primary Delivery Point or between two points in a zone for which Shipper is paying demand charges under its transportation agreement . . . ").

[60]     Stop the Pipeline Brief at 14.

FERC proceedings, and are otherwise non-existent.  These assertions ignore substantial record evidence and should be rejected.

As was the case when Constitution and Iroquois filed their respective certificate applications at FERC, the primary benefit of the proposed Projects is to link abundant, competitively priced natural gas sourced from Pennsylvania with markets in the Northeastern United States.[61]  The record in this proceeding contains evidence that the Projects will expand access to multiple new sources of natural gas supply and lower gas prices for markets and consumers in New York and New England versus what they otherwise would have; improve operational performance, system flexibility, and reliability in the New York and New England market areas; optimize existing pipeline systems for the benefit of both current and new customers; and provide future opportunities for new natural gas service for areas currently without access to natural gas.[62]

---

[61]    *See* Certificate Order ¶ 25, JA _____.

[62]    National Grid Gas Delivery Companies, Comments, Docket No. CP13-499-000 (filed July 16, 2013), JA ___-____ (stating that the Projects will provide access to new natural gas supply sources, will enhance the reliability and diversity of energy infrastructure in the Northeast, and will keep gas prices reasonable for consumers in the Northeast); New York Independent Power Producers, Comments, Docket  No. CP13-499-000 (filed Mar. 25, 2014), JA ___-____ (explaining that the Projects will provide access to new supplies of natural gas to power producers and industrial, commercial, and residential customers in the New York and New England markets, and that the Projects' supplies are more abundant and economic than those from other areas, including Canada); Business Council of New York State, Comments, Docket No. CP13-499-000 (filed Apr. 4, 2014), JA ___-____

As the record demonstrates, these benefits have been consistently articulated throughout the proceeding before FERC. For example, the Attorney General for the State of Connecticut (which has the highest electricity costs in New England) noted that the proposed Constitution Pipeline "would significantly increase Connecticut's and New England's access to less expensive domestically produced natural gas at a time when dependable, less costly, and cleaner energy is sorely needed to heat homes, run businesses, and generate electricity in the region."[63]

## IV. FERC DID NOT ILLEGALLY SEGMENT IROQUOIS' POTENTIAL, FUTURE SOUTH-TO-NORTH PROJECT.

Pursuant to NEPA, CEQ regulations require FERC to include "connected actions," "cumulative actions," and potentially "similar actions" in its NEPA analysis of a proposed new pipeline construction project. 40 C.F.R. § 1508.25(a)(1)–(3) (2015). Additionally, "[a]n agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC,* 753 F.3d 1304, 1313 (D.C. Cir. 2014). In evaluating whether connected actions are improperly segmented, courts apply a "substantial independent utility" test.

---

(stating that the Projects will connect Pennsylvania supply to Iroquois and Tennessee, which are critical to customers in New York and New England).

[63] State of Connecticut, Comments, Docket No. CP13-499-000 (filed Dec. 17, 2014), JA \_\_\_-\_\_\_, at 2, JA \_\_\_.

The test asks "whether one project will serve a significant purpose even if a second related project is not built." *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987); *see also O'Reilly v. Army Corps of Eng'rs*, 477 F.3d 225, 237 (5th Cir. 2007) (defining independent utility as whether one project "can stand alone without requiring construction of the other [projects] either in terms of the facilities required or of profitability").

In order to qualify as a "connected action," the project at issue must be reasonably foreseeable. 40 C.F.R. § 1508.25(a)(1)–(3) (2015). For gas pipeline projects in particular, a potential pipeline does not become a reasonably foreseeable proposal for NEPA purposes until the applicant files the corresponding project application with FERC. *Minisink*, 762 F.3d at 113 n.11; *Del. Riverkeeper Network v.*, 753 F.3d at 1317–18 (citing *Weinberger v. Catholic Action of Haw.*, 454 U.S. 139, 146 (1981)).

### A. FERC Correctly Concluded that Iroquois' SoNo Project Was Not a Connected Action with the Projects.

FERC adequately explained in these proceedings that Iroquois' SoNo Project is not a connected action that must be analyzed with the Projects in a single, combined NEPA document.[64] In doing so, FERC explained that the Constitution Pipeline and Iroquois Interconnect Projects are, together, a stand-alone project designed to meet the market needs of the shippers who signed

---

[64]    Rehearing Order ¶ 95, JA ___.

binding precedent agreements and that the Projects can go forward regardless of any other project to expand the downstream pipeline systems that may in the future be undertaken, including the SoNo project.[65]  Moreover, FERC explained that "connected actions" under CEQ regulations must be actually proposed projects. Because the SoNo Project has not even been proposed at FERC, it is not considered a connected action.[66]

Stop the Pipeline has disputed FERC's findings, alleging that FERC illegally segmented the SoNo Project from the Constitution Pipeline Project and Iroquois Interconnect Project.  First, Stop the Pipeline argues that the Projects lack a significant purpose, substantial independent utility, and a logical terminus.  This argument is based on Stop the Pipeline's related claim that the Projects do not provide any benefits because there are physical "constraints" on the existing Iroquois and Tennessee pipelines that will block any gas on the Constitution Pipeline from flowing eastward on the Iroquois or Tennessee pipelines to the New York area and New England.[67]  That argument was refuted above in Section III.B.

Second, Stop the Pipeline claims, notwithstanding the fact that no certificate application has been filed at FERC for the SoNo Project, that the SoNo Project is

---

[65]     *Id*.; Certificate Order ¶ 116, JA __.

[66]     Rehearing Order ¶ 96, JA ___ (citing *Minisink*, 762 F.3d at 113 n.11; *Del. Riverkeeper*, 753 F.3d at 1317–18; *Weinberger*, 454 U.S. at 146).

[67]     Stop the Pipeline Brief at 54–56.

"reasonably foreseeable" and "connected" to the Projects.[68]  For the reasons

discussed below, this argument also is unavailing and should be rejected.

### B.  Iroquois' SoNo Project Has Not Been Proposed and Therefore Is Not a Connected Action with the Proposed Projects.

The precedent on this issue is clear.  Connected actions must have reached

the proposal stage at the time the agency is conducting the environmental review of

the allegedly "connected" project.  *O'Reilly v. U.S. Army Corps of Eng'rs*, 477

F.3d 225, 236–37 (5th Cir. 2007) (citing 40 C.F.R. § 1508.23 to define NEPA

"projects" as proposals in which action is imminent).  *See also Weinberger*, 454

U.S. at 146 (holding that mere contemplation of an action is insufficient to support

segmentation claim).  That is, a project must be "proposed" rather than just

"contemplated" before an agency is required to consider it in an EIS.  *Id.* at 145–

46.  In accordance with this precedent, FERC correctly stated that it does not have

to consider a project for NEPA analysis if the project has not been proposed.[69]

Here, there is absolutely no evidence in the record that would suggest the

SoNo project is imminent.[70]   Iroquois has not commenced the pre-filing process

---

[68]     Stop the Pipeline Brief at 58.

[69]     Rehearing Order ¶ 96, JA __.

[70]     While it does not change the outcome of this issue, Iroquois notes Stop the Pipeline's use of evidence outside the record in these proceedings as further support for its claims without requesting, nor providing any good cause, to allow the admission of such evidence.  Stop the Pipeline Brief at 57, n.10.  Such evidence should be disregarded.  *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d

for the SoNo project, much less filed a certificate application at FERC or requested any other authorization to construct facilities. At bottom, Iroquois' early-stage planning and development of the SoNo project, which may or may not be proposed at FERC, does not amount to a reasonably foreseeable and connected action. Therefore, Stop the Pipeline's claims should be rejected.

---

61, 66 (2d Cir. 1997) (holding that whether to admit additional evidence requires a showing of good cause). Alternatively, if the Court were to entertain such information, it should also know that to this day there is still no SoNo project application on file or any present activity on Iroquois' part to bring the SoNo Project to FERC for review. Furthermore, if Iroquois ever did in the future file an application at FERC seeking approval of the SoNo project, FERC would have the responsibility to review its environmental effects under applicable NGA and NEPA requirements at that time. *See* Rehearing Order ¶ 97, JA ___.

## CONCLUSION

For the foregoing reasons, and those set forth in the concurrently filed response briefs of FERC and Constitution, Iroquois respectfully requests that the Court deny the Catskill and Stop the Pipeline petitions for review.

Respectfully submitted,

_M. Lisanne Crowley_
M. Lisanne Crowley
Kurt H. Jacobs
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2950

*Attorneys for Intervenor Iroquois Gas Transmission System, L.P.*

Dated:  September 12, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,397 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  September 12, 2016

*M. Lisanne Crowley*
M. Lisanne Crowley
Kurt H. Jacobs
TROUTMAN SANDERS LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 274-2950

*Counsel for Intervenor Iroquois Gas Transmission System, L.P.*

29088969v9

# Addendum

## ADDENDUM TABLE OF CONTENTS

**Addendum Pages**

I. **Iroquois Gas Transmission System, L.P., FERC Gas Tariff, Second Revised Volume No. 1, General Terms & Conditions, Section 7: "Delivery and Receipt Points,"** on file with and available at FERC at www.ferc.gov in FERC's eTariff system, and available on Iroquois' website at**:** https://iol1.iroquois.com/infopost/Pages/PDF.php?parentId=700&childID=709 ..............................................................................A-1 to A-5

II. **Tennessee Gas Pipeline Company, L.L.C. FERC NGA Gas Tariff, Sixth Revised Volume No. 1, General Terms & Conditions, Section IV: "Scheduling of Receipts and Deliveries,"** on file with and available at FERC at www.ferc.gov in FERC's eTariff system, and available on Tennesse Gas Pipeline Company's corporate parent's website at: http://pipeline2.kindermorgan.com/Tariff/SubIndex.aspx?code=TGP&category=CER ........................................................... A-6 to A-20

**Iroquois Gas Transmission System, L.P.**
**Second Revised Volume No. 1**

# Table of Contents

Second Revised Volume No. 1

1    Table of Contents

2    Preliminary Statement

3    System Map

4    Current Effective Rates

8    Non-Conforming Service Agreements

9    Rate Schedule RTS

26    Rate Schedule ITS

32    Rate Schedule PAL

39    Rate Schedule HUB

41    General Terms and Conditions - TOC

141    Service Agreements - RTS

181    Service Request Form

188    Shipper Nomination Form

Iroquois Gas Transmission System, L.P.
FERC Gas Tariff
Second Revised Volume No. 1

FERC GAS TARIFF


Second Revised Volume No. 1

of

IROQUOIS GAS TRANSMISSION SYSTEM, L.P.




Filed With The

FEDERAL ENERGY REGULATORY COMMISSION




Communications Concerning This Tariff

Should Be Addressed To:

Scott E. Rupff
Vice President, Marketing Development
and Commercial Operations


Iroquois Gas Transmission System, L.P.
One Corporate Drive
Suite 600
Shelton, Connecticut  06484

Email Address:    scott_rupff@iroquois.com
Telephone:        (203) 925-7200
Facsimile:        (203) 929-9501


Issued On: April 8, 2015

Effective On: May 8, 2015

Iroquois Gas Transmission System, L.P.
FERC Gas Tariff
Second Revised Volume No. 1

Substitute First Revised Sheet No. 66A
Superseding
First Revised Sheet No. 66A

7.0   DELIVERY AND RECEIPT POINTS

7.1  Receipt Points.  Transporter shall make available to
each Shipper one or more Primary Receipt Points, the exact
number and location to be determined by mutual agreement
between Transporter and Shipper. The Primary Receipt Point(s)
at which Transporter will accept gas from Shipper or for
Shipper's account shall be those set forth on Schedule 1
appended to the Gas Transportation Contract(s) between
Transporter and Shipper, or other mutually agreeable points.
Such Schedule 1 shall also set forth the Maximum Input Quantity
and minimum receipt pressures applicable to each such Primary
Receipt Point.  Subject to the availability of capacity, all
other receipt points within the same Zone/Lateral or any other
Zone shall be available as Alternate Receipt Point(s) for
Shippers receiving service pursuant to Gas Transportation
Contracts for Firm Reserved Service under Part 284 of the
Commissions Regulation up to the Shipper's Maximum Input Quantity
at its Primary Receipt Point(s), except as otherwise provided in
Section 28.20 with respect to segmented capacity releases.

7.1.1  Extended Receipts.  Shipper may use receipt
points in a zone other than the one of its Primary Receipt
Point. To the extent Shipper uses alternate Receipt Points
that are on Transporter's mainline (other than the
interconnection between the mainline and Lateral) and beyond
the path of a Lateral Service contract, such Shipper shall
be restricted to Extended Receipt service only. In
order to use such extended receipt point, Shipper must request
such Extended Receipt by nominating the following information
in Iroquois' EBB with: (1) the point at which Shipper desires to
receive gas and (2) the requested quantity to be received at
that point.

7.2  Additions and Deletions of Primary Receipt Points.
Effective Schedule 1 appended to each Gas Transportation
Contract between Transporter and Shipper under Part 284 of the
Commission's Regulation may be revised from time-to-time in
order to reflect additions or deletions of Primary Receipt Points
or changes in the Maximum Input Quantities or minimum receipt
pressures applicable to such Primary Receipt Points.  Additions
or deletions of Primary Receipt Points and/or changes in the
Maximum Input Quantities or receipt pressures applicable to
Primary Receipt Points hereunder shall be subject to the
provisions contained in Section 3 of the RTS rate schedule.
Transporter shall not be required to accept an amendment if
there is inadequate capacity available to render the new service
or if the change would reduce the reservation charges applicable
to the agreement.  A Shipper requesting a change to its Primary
Receipt Point, which requires no additional mainline capacity,
shall not be required to participate in an Open Season.

Issued On: November 16, 2010          Effective On: July 15, 2010

Iroquois Gas Transmission System, L.P.
FERC Gas Tariff
Second Revised Volume No. 1

Substitute First Revised Sheet No. 67
Superseding
First Revised Sheet No. 67

GENERAL TERMS AND CONDITIONS (continued)

7.3  Delivery Points.  Transporter shall make available to
each Shipper one or more Primary Delivery Points, the exact
number and location to be determined by mutual agreement between
Transporter and Shipper. The Primary Delivery Point(s) at which
Transporter will make gas available to or on behalf of Shipper
shall be those set forth on Schedule 2 appended to the Gas
Transportation Contract (s) between Transporter and Shipper, or
other mutually agreeable points.  Such Schedule 2 shall also set
forth the Maximum Equivalent Quantity and maximum and minimum
delivery pressures applicable to each such Primary Delivery
Point.  Subject to the availability of capacity, all other
delivery points within the same Zone/Lateral or any other Zone
shall be available as Alternate Delivery Point (s) for Shippers
receiving service pursuant to Gas Transportation Contracts, for
Firm Reserved Service under Part 284 of the Commissions
Regulations up to the Shippers Maximum Equivalent Quantity
at its Primary Delivery Point(s).

7.3.1  Extended Deliveries.  Shipper may use delivery points
in a zone other than the zone of its Primary Delivery Point. To
the extent Shipper uses alternate Delivery Points that are on
Transporter's mainline (other than the interconnection between
the mainline and Lateral)and beyond the path of a Lateral Service
contract, such Shipper shall be restricted to Extended Delivery
Point service only. In order to use such extended delivery point,
shipper must request such Extended Delivery by nominating the
following information in Iroquois' EBB with the following information:

(1)  the point at which Shipper desires to deliver gas and

(2)  the requested quantity to be delivered at that point.

7.4  Additions and Deletions of Primary Delivery Points.
Effective Schedule 2 appended to each Gas Transportation Contract
between Transporter and Shipper under Part 284 of the Commissions
Regulations may be revised from time-to-time in order to reflect
additions or deletions of Primary Delivery Points or changes in the
Maximum Equivalent Quantities or minimum delivery pressures applicable
to such Primary Delivery Points.  Additions or deletions of Primary
Delivery Points and/or changes in the Maximum Equivalent Quantities or
delivery pressures applicable to Primary Delivery Points hereunder
shall be subject to the provisions contained in Section 3 of the RTS
rate schedule.  Transporter shall not be required to accept an amendment
if there is inadequate capacity available to render the new service
or if the change would reduce the reservation charges applicable
to the agreement.  A Shipper requesting a change to its Primary
Delivery Point, which requires no additional mainline capacity,
shall not be required to participate in an Open Season.

Issued On: November 16, 2010

Effective On: July 15, 2010

Iroquois Gas Transmission System, L.P.
FERC Gas Tariff
Second Revised Volume No. 1

Substitute First Revised Sheet No. 68
Superseding
First Revised Sheet No. 68

7.5  [RESERVED FOR FUTURE USE.]

7.6  [RESERVED FOR FUTURE USE.]

7.7  Parking and Loan Points.  Subject to the availability of capacity, Shippers receiving park and loan services under Rate Schedule PAL may nominate any Receipt or Delivery Point on Transporter's system as a Parking Point or Loan Point. Subject to the availability of capacity, Shippers receiving loan services under Rate Schedule HUB may only nominate the Waddington Receipt/Delivery Point on Transporter's system as a Loan Point.

8.  UNIFORM PRESSURE AND QUANTITY

8.1  Delivery Pressure To Receipt Point or Parking Point. The delivery pressure of natural gas delivered to a Receipt Point or Parking Point shall not be less than the minimum pressure set forth for the Receipt Point or Parking Point on the effective Schedule 1 appended to the Gas Transportation Contract or Park and Loan Service Contract between Transporter and Shipper.

8.2  Delivery Pressure To Delivery Point or Loan Point. The delivery pressure of natural gas made available by Transporter to or on behalf of Shipper at a Delivery Point or Loan Point shall not be less than the minimum pressure set forth for each Delivery Point or Loan Point on the effective Schedule 2 appended to the Gas Transportation Contract, Hub Service Contract or Park and Loan Service Contract between Transporter and Shipper, nor shall Transporter be obligated to make deliveries at pressures greater than those set forth in Schedule 2.

8.3  Uniform Quantities.  Shipper shall deliver and receive gas in uniform daily quantities during any month and in uniform hourly quantities during any day as nearly as possible at uniform hourly rates, provided, however, that Transporter shall permit Shippers to take delivery of gas at 120 percent of the uniform hourly quantity for up to three (3) consecutive hours twice in any twenty four (24) hour period; provided, however, that the second three (3) hour period shall not begin less than eight (8) hours after the end of the first three (3) hour period. Any other departure from uniform hourly quantities shall be allowed on a best efforts basis only.

9.  QUALITY

9.1  Freedom from Objectionable Matter.  The natural gas to be delivered to Transporter at the Receipt Point(s) and made available to or on behalf of Shipper at the Delivery Point(s)

Issued On: November 16, 2010                    Effective On: July 15, 2010

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

FERC NGA GAS TARIFF

SIXTH REVISED VOLUME NO. 1

OF

TENNESSEE GAS PIPELINE COMPANY, L.L.C.

FILED WITH THE

FEDERAL ENERGY REGULATORY COMMISSION

COMMUNICATIONS CONCERNING THIS TARIFF

SHOULD BE ADDRESSED TO:

MILTON PALMER, JR.
VICE PRESIDENT, RATES AND REGULATORY AFFAIRS
Milton_Palmer@kindermorgan.com
(713) 420-3297 (Phone)

TENNESSEE GAS PIPELINE COMPANY, L.L.C.
1001 Louisiana Street, Suite 1000
Houston, Texas 77002

Issued: August 3, 2015
Effective: September 1, 2015

Docket No. RP15-1177-000
Accepted: August 25, 2015

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Sixth Revised Sheet No. 310
Superseding
Fifth Revised Sheet No. 310

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES

    1.     Determination of Receipts and Deliveries:

        (a)     NAESB Standard 2.3.16 states: List of allocation methodology types agreed upon: Ranked, Pro Rata, Percentage, Swing, and Operator Provided Value. NAESB Standard 2.3.17 states: The same standard allocation methodologies should be available for use at all points. In addition, NAESB Standard 2.3.18 states: The types of allocation methodologies is a list from which two parties may agree. If the two parties cannot agree upon an allocation methodology, pro rata based upon confirmed nominations should be used as the default method. The party responsible for custody transfer (the party performing the measurement function) should provide the allocation. NAESB Standard 2.3.4 states: Only one PDA allocation methodology should be applied per allocation period. NAESB Standard 2.3.5 states: The upstream or downstream party providing the point confirmation should submit the pre-determined allocation to the allocating party after or during confirmation and before start of Gas Day. Further, NAESB Standard 2.3.19 states: The transportation service providers should accept NAESB WGQ-approved allocation methodology types from the upstream or downstream custody transfer party who is providing the point confirmation. In addition, NAESB Standard 2.3.3 states: There is no need to submit pre-determined allocations if a transportation service provider has an OBA in effect for a point. In this Section 3, the term "Party" shall include producer, shipper, operator, supply aggregator and market aggregator, and the term "Up/Down Party" shall include any upstream or downstream connected party.

        (b)     Allocation of Receipts - Unless prohibited by applicable law or regulation, the quantities received by Transporter at any receipt point shall be allocated among Parties and services as follows:

            (1)     Transporter shall allocate actual deliveries into its system in accordance with allocation procedures specifically agreed to by Transporter and the operator of a point and/or Up/Down Party(ies) ("UDP") at a point as provided for in the Balancing Agreement(s) (Operational, Pipeline or Aggregator) governing the point.

            (2)     In the absence of a methodology set forth in Section 1(b)(1):

                (a)     The operator at the receipt point shall advise Transporter via Transporter's Interactive Website, EDI or e-mail prior to the commencement of the Gas Day of an agreeable PDA to be utilized in determining actual receipts among all UDP(s) scheduled to receive service at the point, provided that such PDA must allocate receipts based upon scheduled quantities. Confirmation of receipt of PDAs transmitted via EDI shall be Transporter's PDA quick response via EDI. Transporter shall confirm receipt of the PDA within fifteen (15) minutes.

                (b)     UDP(s) at the receipt point shall advise Transporter via Transporter's Interactive Website, EDI or e-mail prior to the commencement of the Gas Day of an agreeable PDA utilized in determining actual receipts among all Shippers scheduled to receive service from that UDP at that point, provided that such PDA must allocate receipts based upon scheduled quantities. Confirmation of receipt of PDAs transmitted via EDI shall be Transporter's quick response via EDI. Transporter shall confirm receipt of the PDA within fifteen (15) minutes.

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted: March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Sixth Revised Sheet No. 311
Superseding
Fifth Revised Sheet No. 311

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        1.(b)(2)    Determination of Receipts and Deliveries:
        (continued)

    (c)     Shipper shall advise Transporter via Transporter's Interactive Website, EDI or e-mail prior to commencement of the Gas Day of an agreeable PDA to be utilized in determining actual receipts among their service packages at that point, provided that such PDA must allocate receipts based upon scheduled quantities. Confirmation of receipt of PDAs transmitted via EDI shall be Transporter's quick response via EDI. Transporter shall confirm receipt of PDA within fifteen (15) minutes.

    (d)     Allocation of Deliveries - Unless prohibited by applicable law or regulation, the quantities delivered by Transporter at any delivery point shall be allocated among Parties and services in accordance with any allocation procedures specifically agreed to by Transporter and an interconnecting pipeline pursuant to a Pipeline Balancing Agreement or agreed to by Transporter and the operator of delivery point(s) pursuant to a Balancing Agreement; provided, however, Transporter will not be required to enter into arrangements with such operators or interconnecting pipelines if they are not creditworthy in accordance with the provisions set forth in Article XXVI of these General Terms and Conditions.

    (e)     Notification of Allocation Methodology - Upon receipt of a request from Party, Transporter will promptly notify Party of the applicable rules governing the allocation of Party's gas at Party's Receipt and Delivery Points.

    (f)     Correction of Allocations - NAESB Standard 2.3.26 states: The time limitation for disputes of allocations should be 6 months from the date of the initial month-end allocation with a 3-month rebuttal period. This standard shall not apply in the case of deliberate omission or misrepresentation or mutual mistake of fact. Parties' other statutory or contractual rights shall not otherwise be diminished by this standard. Mutual agreement between parties, legal decisions, and regulatory guidance may be necessary to determine if the event qualifies for an extension of the above time periods.

2.      Scheduling

    (a)     Initial Service: Upon execution of a transportation or storage service agreement with Transporter, Shipper shall send its nomination(s) to Transporter via Transporter's Interactive Website, with all necessary nomination information as set forth in the applicable NAESB Standards and as designated in Transporter's Interactive Website ("Nomination Information"), no later than 1:00 p.m. CCT on the day prior to the proposed commencement of any transportation or storage service. A copy of all Nomination Information provided Transporter shall also be provided by Shipper to the applicable upstream/downstream connected party(s) at the receipt and delivery points through which Shipper desires to receive service.

    Transporter shall receive the nomination(s) via Transporter's Interactive Website no later than 1:15 p.m. CCT (1:30 p.m. CCT for an Electronic Data Interchange quick response from Transporter) on the day prior to the proposed commencement of service. No transportation or storage service will commence unless or until (1) Transporter has received the nomination(s) from Shipper, including a specification of the routing of the nominated volumes, and (2) all applicable upstream/downstream connected parties have submitted to Transporter the information required by Rate Schedule LMS-MA, LMS-PA or Pipeline Balancing Agreement as applicable, including a specification of the quantities to flow, and with respect to receipt points not governed by Receipt Point Balancing Agreements, a predetermined Allocation Methodology for the allocation of the flows at the Receipt Point. The upstream and/or downstream connected party will provide final, completed confirmation no later than 4:30 p.m. CCT on the day prior to the commencement of the nominated service.

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted: March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Sixth Revised Sheet No. 312
Superseding
Fifth Revised Sheet No. 312

GENERAL TERMS AND CONDITIONS (continued)

IV.    SCHEDULING OF RECEIPTS AND DELIVERIES
    2.  Scheduling
    (continued)

(b)    Change in Service:  For purposes of scheduling any change in any transportation or storage service, Shipper will send its nomination(s) via Transporter's Interactive Website, no later than 1:00 p.m. CCT on the day prior to the requested commencement of the revised service, indicating the changes to be made to the service and the date the revised service is to commence.    A copy of all Nomination Information provided Transporter shall also be provided by Shipper to the upstream/downstream connected party at the receipt and delivery points through which Shipper receives service pursuant to procedures established by Shipper and such upstream/downstream connected party. Transporter shall receive the nomination(s) by no later than 1:15 p.m. CCT (1:30 p.m. CCT for an Electronic Data Interchange quick response by Transporter) on the day prior to the requested commencement of the revised service.    The upstream and/or downstream connected party at the applicable receipt and delivery points will confirm with Transporter through Transporter's Interactive Website that Shipper's nominated quantities will be received or delivered by providing Transporter all necessary confirmation information as set forth in the applicable NAESB Standards and as designated in Transporter's Interactive Website ("Confirmation Information").    The upstream and/or downstream connected party will provide final, completed confirmation no later than 4:30 p.m. CCT on the day prior to the commencement of the nominated service.

(c)    Scheduling Duration:  NAESB Standard 1.3.5 states: All nominations should include shipper defined begin dates and end dates.  All nominations excluding intraday nominations should have roll-over options.  Specifically, shippers should have the ability to nominate for several days, months, or years, provided the nomination begin and end dates are within the term of shipper's contract.

(d)    NAESB Standard 1.2.4 states:  An intraday nomination is a nomination submitted after the nomination deadline whose effective time is no earlier than the beginning of Gas Day and runs through the end of that Gas Day.

NAESB Standard 1.3.2 states:  All Transportation Service Providers  (TSPs) should support the following standard nomination cycles (all times are CCT pursuant to NAESB WGQ Standard No. 0.3.17):

(i)  The Timely Nomination Cycle
    On the day prior to gas flow:
- 1:00 p.m.    Nominations leave control of the Service Requester (SR);
- 1:15 p.m.    Nominations are received by the TSP (including from Title Transfer Tracking Service Providers (TTTSPs));
- 1:30 p.m.    TSP sends the Quick Response to the SR;
- 4:30 p.m.    TSP receives completed confirmations from Confirming Parties;
- 5:00 p.m.    SR and Point Operator receive scheduled quantities from the TSP.

Scheduled quantities resulting from Timely Nominations should be effective at the start of the next Gas Day.

(ii)  The Evening Nomination Cycle
    On the day prior to gas flow:
- 6:00 p.m.    Nominations leave control of the SR;
- 6:15 p.m.    Nominations are received by the TSP (including from TTTSPs);
- 6:30 p.m.    TSP sends the Quick Response to the SR;
- 8:30 p.m.    TSP receives completed confirmations from Confirming Parties;
- 9:00 p.m.    TSP provides scheduled quantities to the affected SR and Point Operator, including bumped parties (notice to bumped parties).

Scheduled quantities resulting from  Evening Nominations should be effective at the start of the next Gas Day.

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted:  March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Seventh Revised Sheet No. 313
Superseding
Sixth Revised Sheet No. 313

GENERAL TERMS AND CONDITIONS (continued)

IV.    SCHEDULING OF RECEIPTS AND DELIVERIES
       2.(d)  Scheduling
       (continued)

(iii)   The Intraday 1 Nomination Cycle
        On the current Gas Day:
        - 10:00 a.m.   Nominations leave control of the SR;
        - 10:15 a.m.   Nominations are received by the TSP (including from TTTSPs);
        - 10:30 a.m.   TSP sends the Quick Response to the SR;
        - 12:30 p.m.   TSP receives completed confirmations from Confirming Parties;
        - 1:00 p.m.    TSP provides scheduled quantities to the affected SR and Point Operator, including bumped parties (notice to bumped parties).

        Scheduled quantities resulting from Intraday 1 Nominations should be effective at 2:00 p.m. on the current Gas Day.

(iv)    The Intraday 2 Nomination Cycle
        On the current Gas Day:
        - 2:30 p.m.    Nominations leave control of the SR;
        - 2:45 p.m.    Nominations are received by the TSP (including from TTTSPs);
        - 3:00 p.m.    TSP sends the Quick Response to the SR;
        - 5:00 p.m.    TSP receives completed confirmations from Confirming Parties;
        - 5:30 p.m.    TSP provides scheduled quantities to the affected SR and Point Operator, including bumped parties (notice to bumped parties).

        Scheduled quantities resulting from Intraday 2 Nominations should be effective at 6:00 p.m. on the current Gas Day.

(v)     The Intraday 3 Nomination Cycle
        On the current Gas Day:
        - 7:00 p.m.    Nominations leave control of the SR;
        - 7:15 p.m.    Nominations are received by the TSP (including from TTTSPs);
        - 7:30 p.m.    TSP sends the Quick Response to the SR;
        - 9:30 p.m.    TSP receives completed confirmations from Confirming Parties;
        - 10:00 p.m.   TSP provides scheduled quantities to the affected SR and Point Operator.

        Scheduled quantities resulting from Intraday 3 Nominations should be effective at 10:00 p.m. on the current Gas Day.  Bumping is not allowed during the Intraday 3 Nomination Cycle.

(vi)    For purposes of NAESB WGQ Standard 1.3.2 (ii), (iii), (iv), and (v), the word "provides" shall mean, for transmittals pursuant to NAESB WGQ Standards 1.4.x, receipt at the designated site, and for purposes of other forms of transmittal, it shall mean send or post.

Transporter shall schedule Intraday Nomination Changes subject to subsections (f), (g), (h), (i) and (j) below.  Upon receipt of the Intraday Nomination, Transporter agrees to adjust gas flow (1) within sixty minutes of the time that Transporter receives the nomination; (2) schedule the nomination at the next intraday effective time, or the next hourly scheduling opportunity if the nomination is received after 7:00 p.m. CCT; and (3) adjust the nomination so that the increase and decrease in quantities, as identified in subsection (h) below, are based on the time when the adjustment to gas flow was made by Transporter rather than the effective time when the nomination was scheduled. Adjustment in gas flow under this provision shall mean that a Shipper may increase gas

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted:  March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

First Revised Sheet No. 313A
Superseding
Substitute Original Sheet No. 313A

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        2.(d)  Scheduling
        (continued)

flow by a volume up to 1/24 of their contractual Maximum Daily Quantity multiplied by the number of hours remaining in the day, or decrease gas flow down to a volume equal to 1/24 of the Shipper's scheduled volumes multiplied by the number of hours of gas flow for that day. Any adjustment in gas flow under this provision is subject to subsections (f), (g), (h), (i), and (j) below, as well as the mutual agreement of Transporter, Shipper and the upstream/downstream connected parties in advance of the adjusted gas flow.

(e)     Hourly Nomination Changes:  A Shipper under Rate Schedule FT-A, FT-G, FT-GS, FT-BH, FT-IL, IT, LMS-MA, LMS-PA, PTR, IS, or SA or a storage customer under any firm storage rate schedule may change its nomination sixty minutes in advance to be effective on any hour of the day between 11:00 p.m. CCT and 8:00 a.m. CCT by making a nomination in Transporter's Interactive Website. For Electronic Data Interchange, Transporter shall receive such nominations no later than forty-five minutes in advance of the effective time. However, for the 8:00 a.m. CCT hourly nomination cycle, Shipper may change its nomination no later than 8:00 a.m. CCT to be effective at 8:00 a.m. CCT.

Upon receipt of nomination, Transporter agrees to adjust gas flow in advance of the next hourly effective time subject to subsections (f), (g), (h), (i) and (j) below, provided that Transporter, Shipper and the upstream/downstream connected parties mutually agree in advance to the adjusted gas flow.

Issued: April 7, 2016
Effective: May 7, 2016

Docket No. RP16-829-000
Accepted:  May 3, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Sixth Revised Sheet No. 314
Superseding
Fifth Revised Sheet No. 314

GENERAL TERMS AND CONDITIONS (continued)

IV. SCHEDULING OF RECEIPTS AND DELIVERIES
2.(e) Scheduling
(continued)

NAESB Standard 1.3.4 states: All parties should support a seven-days-a-week, twenty-four-hours-a-day nominations process. It is recognized that the success of seven-days-a-week, twenty-four-hours-a-day nominations process is dependent on the availability of affected parties' scheduling personnel on a similar basis. Party contacts need not be at their ordinary work sites but should be available by telephone or other electronic means.

Hourly Nomination Changes requested between the hours of 11:00 p.m. CCT and 8:00 a.m. CCT must be nominated and confirmed by all affected parties via telephone to Transporter's Gas Control Center as well as through its Interactive Website. Transporter shall schedule Hourly Nomination Changes subject to the restrictions set forth in Sections (f), (g), and (h) hereof.

(f) Bump Protection for Firm Primary and Secondary Services: With the exception of an Intraday Nomination Change received from a firm storage customer at the Intraday 1 or the Intraday 2 Nomination Cycle, Transporter shall not schedule an Intraday Nomination Change or an Hourly Nomination Change, if the result of scheduling such nomination would be to bump flowing and/or scheduled transportation under any firm primary or secondary service. With regards to an Intraday Nomination Change received from a firm storage customer at the Intraday 1 or the Intraday 2 Nomination Cycle, Transporter shall not schedule such Intraday Nomination Change if the result of scheduling such nomination would be to bump flowing and/or scheduled transportation under any firm primary service. Transporter shall give such Intraday Nomination Change priority over nominated and scheduled volumes for shippers flowing volumes with a priority below primary. Protected firm services do not include Authorized Overrun service or Extended Receipt/Delivery Service.

(g) Bump Protection for Other Services: Transporter shall give an intraday nomination submitted by a firm shipper priority over nominated and scheduled volumes for shippers flowing volumes with a priority below that in Article IV, Section 3(e). Transporter shall provide bump notice to bumped shippers by 1:00 p.m. as to intraday nominations submitted at the Intraday 1 Nomination Cycle, by 5:30 p.m. as to intraday nominations submitted at the Intraday 2 Nomination Cycle, and by 9:00 p.m. as to intraday nominations submitted at the Evening Nomination Cycle. Transporter shall provide bump notice to the bumped shippers by the notice procedures set forth in Article X, Section 2.3 of the General Terms and Conditions. Transporter will not permit bumping of intraday nominations submitted at the Intraday 3 Nomination Cycle.

(h) All nominations, including intraday and hourly nominations, shall be stated in terms of a daily transportation quantity; provided, however, that Transporter shall not be required to schedule any such nomination where the nominated quantity exceeds the maximum daily quantity permitted under the service agreement pursuant to which service is requested or which would require Transporter to provide an unreasonably excessive change in the hourly flow rate contrary to Article III, Section 1(a); provided further that Transporter shall not be required to schedule any intraday or hourly nomination for a quantity that is less than the quantity of gas that has been scheduled to flow on such day prior to the effective time of such intraday or hourly nomination; and provided further that the last intraday or hourly nomination received with respect to a day shall be deemed to be the valid nomination for such day and shall supersede any previous nomination for such day. An intraday or hourly nomination shall terminate at the end of the day for which it was submitted and the nomination in effect prior to the submission of any intraday or hourly nomination for such day shall continue in effect for the time period stated in the nomination.

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted: March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Fourth Revised Sheet No. 315
Superseding
Third Revised Sheet No. 315

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        2.  Scheduling
        (continued)

(i)     Any nomination, including intraday and hourly nominations, received by Transporter after the nomination deadlines provided in subsections (a), (b), (d) and (e) above shall be scheduled by Transporter provided that i) Transporter and all affected parties mutually agree to schedule the late nomination and ii) the scheduling of such late nomination does not bump a nomination received prior to the nomination deadlines referenced above.

(j)     A Shipper under rate schedule FT-A or FT-G may nominate segments between a Primary Receipt and Primary Delivery Point or between two points in a zone for which Shipper is paying demand charges under its transportation agreement, provided that for Shippers with Primary Receipt and Primary Delivery Points solely on an Incremental Lateral as defined in Article XX, Section 2 of the General Terms and Conditions, such Shippers may nominate a segment only on the Incremental Lateral and Shippers without Primary Receipt and Primary Delivery Points on the Incremental Lateral shall not nominate any segment containing points on the Incremental Lateral. Notwithstanding the foregoing, a Shipper under Rate Schedule FT-A may nominate a segment containing a point on an Incremental Lateral in accordance with Sections 4.8 and 4.9 of Rate Schedule FT-A. Shipper may overlap nominations on Transporter's system provided that these overlaps do not exceed capacity entitlements in any segment (or portion) of Transporter's system.  Shipper may exceed capacity entitlements at a point provided that any resulting overlap of contract quantities at a point consists only of a forwardhaul(s) up to capacity entitlement and a backhaul(s) up to capacity entitlement to the same point.

(k)     Notwithstanding any other provision of this Section 2, Transporter shall have the right to refuse any nomination change hereunder in the event that, in Transporter's sole discretion, scheduling such nomination change threatens the operational integrity of Transporter's system.

(l)     Notification of Scheduling - The upstream and/or downstream connected party at the applicable receipt and delivery points will confirm with Transporter through Transporter's Interactive Website that Shipper's nominated quantities will be received or delivered. Nominations other than intraday or hourly nominations must be confirmed by the upstream and/or downstream connected party in accordance with subsections (a) and (b) above.  Intraday and hourly nominations must be confirmed by the upstream and/or downstream connected party in accordance with subsections (d) through (i) above. Shipper and applicable upstream and/or downstream connected party will receive notice from Transporter no later than 5:00 p.m. CCT on the day prior to the commencement of the nominated service via Transporter's Interactive Website of scheduled quantities, any nomination made by Shipper that is not scheduled for delivery, or if any scheduled nomination is amended or changed by Transporter.  Transporter shall also make available at the end of the day information on scheduled quantities, any intraday or hourly nomination made by Shipper that is not scheduled for delivery, or if any scheduled nomination is amended or changed by Transporter.

(m)     Routing of Gas - Scheduling and billing for transportation services will be determined by the information that Shipper provides Transporter specifying the daily point-to-point routing of its receipts and deliveries; provided, however, that unless the parties mutually agree otherwise the routing for months prior to September 1, 1992 will be based upon the route reflected on the last invoice for such months.  If actual deliveries are greater than actual receipts, excess deliveries will be deemed to have been received from Zone 1 for purpose of the billing for such excess deliveries; provided further that for months prior to September 1, 1992, the rate for excess deliveries will be based upon the rate reflected on the last invoice for such months.  At points where Transporter does not measure the quantities delivered, Shipper shall provide, or cause its supplier or other designee to provide, Transporter each month a meter statement or reading indicating the quantities delivered at the point by the fourth working day after each month of service.  These statements shall be provided to:

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted:  March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Ninth Revised Sheet No. 316
Superseding
Eighth Revised Sheet No. 316

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        2.(m)  Scheduling
        (continued)

>           Tennessee Gas Pipeline Company, L.L.C.
>           1001 Louisiana Street, Suite 1000
>           Houston, Texas 77002
>           Attention:  Gas Measurement Department

At Receipt Points where the gas is processed downstream, Shipper shall provide, or cause the operator of the processing plant to provide, a monthly plant allocation statement reflecting the actual plant thermal reductions from those Receipt Points within 15 days after each month of service.

NAESB Standard 2.3.26 states:  The time limitation for disputes of allocations should be 6 months from the date of the initial month-end allocation with a 3-month rebuttal period.   This standard shall not apply in the case of deliberate omission or misrepresentation or mutual mistake of fact.   Parties' other statutory or contractual rights shall not otherwise be diminished by this standard.  Mutual agreement between parties, legal decisions, and regulatory guidance may be necessary to determine if the event qualifies for an extension of the above time periods.

These allocation statements shall be provided to:

>           Tennessee Gas Pipeline Company, L.L.C.
>           1001 Louisiana Street, Suite 1000
>           Houston, Texas  77002
>           Attention:  Gas Accounting Department

3.      Scheduling Priorities:  Transporter shall schedule receipts and deliveries of gas in the following priority categories specified below (listed in highest to lowest priority order), such that any capacity allocations will result in allocations of available capacity to higher priority services before lower priority services.

NAESB Standard 1.3.23 states:   Ranking should be included in the list of data elements. Transportation Service Providers should use service requestor provided rankings when making reductions during the scheduling process when this does not conflict with tariff-based rules. Therefore, unless otherwise specified, scheduling priority within a category shall be pro rata or in accordance with the supply/market rankings provided pursuant to a Shipper's Nomination Information.

For allocation of services on the mainline system and receipt and delivery points:

(a)     Firm transportation services utilizing Primary Receipt Points and Primary Delivery Points, to the extent that nominations to such points are not in excess of the TQ under Shipper's Transportation Agreement, provided that for purposes of this Subsection (a) Shipper's nomination through a segment that Shipper released is outside Shipper's capacity path, and all firm storage services;

(b)     Firm transportation services utilizing Secondary Receipt Points to Primary Delivery Points where there is limited firm capacity being allocated within the segment of the Shipper's capacity path covered by the nomination, to the extent that nominations to or from such point(s) in this Subsection (b) are in the same direction as the capacity path on Shipper's Transportation Agreement and are not in excess of the TQ under Shipper's Transportation Agreement;

(c)     Firm transportation services utilizing Primary Receipt Points to Secondary Delivery Points where there is limited firm capacity being allocated within the segment of the Shipper's capacity path covered by the nomination, to the extent that nominations to or from such point(s) in this Subsection (c) are in the same direction as the capacity path on Shipper's Transportation Agreement and are not in excess of the TQ under Shipper's Transportation Agreement;

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted:  March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Sixth Revised Sheet No. 317
Superseding
Fifth Revised Sheet No. 317

GENERAL TERMS AND CONDITIONS (continued)

IV.  SCHEDULING OF RECEIPTS AND DELIVERIES
     3.  Scheduling Priorities
     (continued)

(d)  Firm transportation services not described in Subsections (a) through (c) above, utilizing a Secondary Receipt Point to a Secondary Delivery Point where there is limited firm capacity being allocated within the segment of the Shipper's capacity path covered by the nomination, to the extent that nominations to or from such point(s) in this Subsection (d) are in the same direction as the capacity path on Shipper's Transportation Agreement and are not in excess of the TQ under Shipper's Transportation Agreement;

(e)  Any other firm transportation services not described in Subsections (a) through (d) above, utilizing a Secondary Receipt Point or Secondary Delivery Point outside of the Shipper's capacity path where there is limited firm capacity being allocated outside of the Shipper's capacity path covered by the nomination, to the extent that nominations to or from such point(s) in this Subsection (e) are not in excess of the TQ under Shippers Transportation Agreement;

(f)  Rate Schedule PAL – Term Rate PAL on the basis of Confirmed Price applicable to the point of transaction such that Shippers who pay higher rates are allocated capacity before those who pay lower rates;

(g)  Mid-month make up quantities to correct Daily Variances or imbalances under balancing and transportation agreements;

(h)  Authorized Overrun quantities under firm storage services in excess of Shipper's MDIQ, but below Shipper's MDWQ, according to the rates applicable to the service point for which quantities are scheduled under the applicable firm storage agreement(s), such that Shippers who pay higher rates are allocated capacity before those who pay lower rates at the storage service point;

(i)  Extended Deliveries and Extended Receipts under Rate Schedule FT-A, Authorized Overrun under firm storage not described in Subsection (h) and Authorized Overrun under firm transportation agreements, Interruptible Transportation (including PTR make-up quantities nominated as IT), Interruptible Storage, and Rate Schedule PAL – Daily Rate PAL, on the basis of Confirmed Price applicable to the route, service point or point of transaction such that Shippers who pay higher rates are allocated capacity before those who pay lower rates; and

(j)  Authorized Overrun under Rate Schedule PAL on the basis of Confirmed Price applicable to the point of transaction such that Shippers who pay higher rates are allocated capacity before those who pay lower rates.

Issued: August 3, 2015
Effective: September 1, 2015

Docket No. RP15-1177-000
Accepted:  August 25, 2015

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Fifth Revised Sheet No. 318
Superseding
Fourth Revised Sheet No. 318

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        3.  Scheduling Priorities
        (continued)

PTR Transportation Agreements with suppliers which provide for the transportation of PTR quantities shall be accorded the same priority for purposes of this Section 3 as the Transportation Agreement which provides the transportation of gas that is commingled with such PTR quantities.

For services within each of the Subsections (f) through (j) above, agreements will be allocated capacity according to the transportation rate inclusive of all applicable fees and surcharges agreed upon by Transporter and Shipper ("Confirmed Price") to the route being scheduled such that higher rates are allocated capacity before those paying lower rates. Provided, however, agreements will be allocated capacity on a pro-rata basis among Shippers paying the same rate. For purposes of applying the above priorities, any shipper paying a rate above the maximum applicable rate for the Shipper's service shall be deemed to be paying the maximum applicable rate.

        4.      Curtailment of Scheduled Quantities

                If, on any day, Transporter determines that the capacity of its system, or any portion thereof, including the points at which gas is tendered for transportation, is insufficient to serve all service requirements which are otherwise scheduled to receive service on such day, then any capacity which requires curtailment, Transporter shall curtail capacity, to zero if necessary, and then sequentially in reverse order of Subsections (a) through (j) above, in Section 3 of this Article IV. For services within each of the Subsections (f) through (j) above, agreements will be curtailed on a pro-rata basis among Shippers paying the same rate. If capacity must be allocated within the services included in (a) through  (e) of Section 3, Transporter's firm transportation customers will be curtailed on a pro rata basis based upon the quantities of gas scheduled by such customers and/or in accordance with the supply/market rankings provided pursuant to Shipper's Nomination Information.

        5.      Supply Deficiencies

                If Transporter experiences a supply shortfall due to the undelivery of supplies to Transporter's pipeline, then (a) if the deficient source is known, Transporter will curtail the corresponding FT/IT market; or (b) if the deficient sources are indeterminable, then Transporter will localize the smallest affected area and, at the corresponding delivery point, will curtail interruptible service first in reverse scheduling order and then firm services will be curtailed pro rata. Provided that Transporter has sufficient capacity to accommodate such supplies, verifiable receipt point volumes will not be subject to supply short fall curtailment. To the extent that information concerning the deficient source is, or becomes available, Transporter will provide such information to all curtailed Shippers.

Issued: May 16, 2014
Effective: June 17, 2014

Docket No. RP14-939-000
Accepted:  June 12, 2014

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Fourth Revised Sheet No. 319
Superseding
Third Revised Sheet No. 319

GENERAL TERMS AND CONDITIONS (continued)

IV.   SCHEDULING OF RECEIPTS AND DELIVERIES (continued)

6.   Shipper Scheduling and Imbalances

6.1   Shipper Duty to Control Imbalances - A Shipper receiving any transportation or storage service from Transporter will use, or will cause any party receiving or delivering Shipper's gas to use, all reasonable efforts to ensure that receipts and deliveries of gas are equal to the quantities scheduled by Transporter. A Shipper receiving service from Transporter at receipt and/or delivery points not covered by a Balancing Agreement shall also be subject to Daily Imbalance charges and monthly balancing penalties contained in Rate Schedule LMS-MA and/or Rate Schedule LMS-PA, as applicable.

6.2   Unscheduled flow - Unscheduled flow is gas flow at receipt point(s) where a nomination has not been made or where no nomination has been scheduled by Transporter, as provided in Section 2 of this Article IV. Transporter shall notify the party responsible for unscheduled flow. A responsible party is defined as the point operator for receipt point(s) not covered by a Balancing Agreement. The responsible party shall take corrective action by making a nomination on Transporter's Interactive Website for the unscheduled flow by the day following receipt of notice from Transporter in accordance with Transporter's nomination deadlines for flow on the next Gas Day. If upon notification by Transporter, the responsible party fails to take corrective action within the prescribed time frame, the responsible party will be deemed to have executed a fifteen (15) day Master Park and Loan Service Agreement and a fifteen (15) day PAL Agreement pursuant to Rate Schedule PAL, and any unscheduled flow and uncorrected volumes will be assigned to that PAL Agreement and subject to all applicable charges and penalties under Rate Schedule PAL.

6.3   Balancing at Contract Termination - Following the termination of the Transportation Contract, Shipper shall be required to correct any remaining imbalance in receipts and deliveries in cash in accordance with the procedures established in the applicable LMS Rate Schedule, unless the parties mutually agree otherwise.

6.4   PTR Imbalances - Transporter will provide estimates of the Plant Thermal reduction (PTR) quantities associated with receipts at receipt points on its system. Estimated PTR quantities will be adjusted to actual as soon as available. The difference between estimated and actual PTR quantities will be cashed out at the 0-5% tolerance level, as specified for the applicable receipt point(s) in Transporter's LMS-PA Rate Schedule. To the extent that Transporter's estimated PTR quantities result in Shipper incurring imbalances related to other components of the gas stream, such imbalances will also be cashed out at the 0-5% tolerance level as set forth in the LMS-PA Rate Schedule. In the event Shipper has PTR extracted for its account and has failed to nominate PTR transportation, then all unnominated PTR quantities will be cashed out at the 10-15% tolerance level, as specified for the applicable receipt point(s) in Transporter's LMS-PA Rate Schedule.

7.   Pooling of Gas Supplies

7.1   Supply Area and Market Area Pooling Areas - Supply Aggregation

Any Party may aggregate nominations for certain Receipt Points within Supply Area or Market Area Pooling Area(s) for delivery to confirmed transportation or other supply aggregation service(s) pursuant to the terms and conditions of Transporter's Rate Schedule SA. Shippers who choose to receive supplies from a supply aggregator may elect to return to nominating point-to-point transportation service at the next applicable nomination deadline.

Issued: February 1, 2016
Effective: April 1, 2016

Docket No. RP16-567-000
Accepted: March 29, 2016

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Second Revised Sheet No. 320
Superseding
First Revised Sheet No. 320

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        (continued)

8.      Agency Arrangements

        A Shipper may delegate to a third party (Shipper's Agent) authority to exercise certain or all rights and perform certain or all obligations set forth in one or more of the agreements entered into between Shipper and Transporter ("Delegated Agreements"), subject to the following conditions. A Shipper may delegate to as many third parties as it deems necessary, the specific rights and obligations set forth above, pursuant to the terms and conditions of the respective Agency Agreement and the terms and conditions of the underlying Delegated Agreements. A Shipper may not delegate to more than one third party the same rights and/or obligations for a Delegated Agreement(s), pursuant to the terms and conditions of the applicable Agency Agreement.

        (a)     Shipper and Shipper's Agent to whom Shipper is delegating its responsibilities must enter into an Agency Agreement, the form of which is set forth in this Tariff.. Such Agency Agreement must be executed in accordance with its terms contained therein. Shipper's Agent shall have all rights and obligations under the Delegated Agreements as set forth in the Agency Agreement. Shipper's delegation to its Agent(s) pursuant to this Section 8 shall not confer to either Shipper or Shipper's Agent(s) rights outside of or in contravention of the Terms and Conditions of the Delegated Agreements.

                As of the effective date of Transporter's conversion from the PASSKEY System to the DART System, Parties (Shipper and Shipper's Agent) that had previously executed an Agency Authorization Agreement that otherwise would have been in effect shall be deemed to have executed an Agency Agreement, in the form set forth in the Tariff, as of the conversion date.

        (b)     Transporter may rely on communications and actions of Shipper's Agent that are within the scope of the applicable Agency Agreement. Such communications with, and actions by, the Shipper's Agent shall be deemed communications with or actions by Shipper. Shipper shall indemnify and hold Transporter harmless from suits, actions, costs, losses and expenses (including, without limitation, attorney's fees) arising from claims associated with Transporter's reliance on such communications and actions of Shipper's Agent. If Shipper's Agent fails to meet such obligations under the Delegated Agreements, then, without Transporter being obligated to proceed against Shipper's Agent, Shipper shall be liable for all obligations under the Delegated Agreements.

        (c)     A third party may administer and aggregate rights under multiple Delegated Agreements as the designated agent for one or more Shippers; provided however, that such agent (1) shall separately administer and account for each such Delegated Agreement, including without limitation submitting nominations and calculating any imbalances, (2) shall utilize such Delegated Agreements for the transportation, storage, supply aggregation, or balancing of gas for only those Shippers that have delegated the rights and obligations under their Delegated Agreements, and (3) shall utilize a Transportation Contract authorized under Rate Schedule FT-GS for the transportation of gas solely for the delegating FT-GS Shipper.

Issued: August 29, 2013
Effective: October 1, 2013

Docket No. RP13-545-001
Accepted:  September 30, 2013

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

Original Sheet No. 320A

GENERAL TERMS AND CONDITIONS (continued)

IV.  SCHEDULING OF RECEIPTS AND DELIVERIES
     (continued)

9.   Central Delivery Points

    (a)   Available for nomination are point(s) which Transporter has designated as a "Central Delivery Point" (CDP). A CDP may be established by mutual agreement between Transporter and point operator, and is composed of the delivery points between Transporter and an individual local distribution company (LDC) or an individual pipeline on Transporter's system covered by a Delivery Point Balancing Agreement – LMS-MA Rate Schedule or a Pipeline Balancing Agreement. Such delivery points must be within close geographical proximity as determined by Transporter with regard to the operational constraints of its system or other operational considerations. CDPs may also be developed for other entities or groups on a case-by-case basis. Once a CDP has been established, Shippers must nominate deliveries under both firm and interruptible agreements to the CDP in lieu of the individual delivery points that make up the CDP. The location of the CDP will be used to determine capacity allocations, and the location of the CDP may be modified or terminated based on operating conditions as determined by Transporter. Except as described in subsection (b) hereof, all physical deliveries to the individual delivery points which make up the CDP and all scheduled deliveries to the CDP will be aggregated for purposes of determining the Daily and Monthly Imbalance pursuant to the LMS-MA Rate Schedule and the Operational Imbalance pursuant to a Pipeline Balancing Agreement. Nothing herein shall exempt a Balancing Party from compliance with all other provisions of the LMS-MA Rate Schedule or provisions within the Pipeline Balancing Agreement.

    (b)   A CDP may not be designated as a Primary Delivery Point on a Transportation Service Agreement, and the establishment of a CDP shall not alter the individual delivery point(s) and corresponding individual MDQ(s) at such point(s) as specified in any Transportation Service Agreement. Unless such deliveries are nominated by Shipper and confirmed and scheduled by Transporter, Transporter has no obligation to deliver on any day under any such agreement any quantities in excess of the individual MDQ specified in that firm agreement at a given point. Whenever Transporter determines that operating conditions only permit deliveries at any individual point(s) equal to Transporter's obligations, Transporter shall notify the affected Shippers under such firm agreements.

Issued: August 29, 2013
Effective: October 1, 2013

Docket No. RP13-545-001
Accepted: September 30, 2013

Tennessee Gas Pipeline Company, L.L.C.
FERC NGA Gas Tariff
Sixth Revised Volume No. 1

First Revised Sheet No. 320B
Superseding
Original Sheet No. 320B

GENERAL TERMS AND CONDITIONS (continued)

IV.     SCHEDULING OF RECEIPTS AND DELIVERIES
        (continued)

        10. TRANSFER NOMINATIONS

                (a)     Whenever gas is purchased and/or sold at a Receipt Point (including a storage or pooling point) on Transporter's system by an entity that is not going to nominate that gas for receipt by Transporter under any Agreement, that entity must submit a transfer nomination to Transporter through Transporter's Interactive Website identifying the quantities (in Dth) and the entities from whom the gas is being bought and the entities to whom the gas is being sold.  Such transfer nominations are needed in order to be able to confirm the nominated receipts at that point and thus such transfer nominations are due by the deadlines applicable to Shipper nominations subject to Article IV, Section 2.

                (b)     A Third Party Account Administrator may provide title tracking services on Transporter's system as follows:

                        (1)     The entity seeking to provide such a service (Third Party Account Administrator) shall so notify Transporter in writing, in which event Transporter shall establish an identification number for nominations involving the Third Party Account Administrator;

                        (2)     Transfer nominations consistent with this Section 10 must be made by the Shipper tendering gas for delivery to the Third Party Account Administrator, where subsequent title to such gas is to be tracked by the Third Party Account Administrator; and

                        (3)     The Third Party Account Administrator shall maintain records of any title transfers after delivery of gas to it and shall submit a nomination consistent with this Section 10 for delivery of gas to the last party in the chain of title, which party shall also submit a nomination for receipt of the gas consistent with this Section 10.

                (c)     NAESB Standard 1.2.15 states:  Title Transfer Tracking is the process of accounting for the progression of title changes from party to party that does not affect a physical transfer of the gas.

Issued: May 1, 2014
Effective: June 1, 2014

Docket No. RP14-835-000
Accepted:  May 22, 2014