# 16-345(L)

**16-361 (Consolidated)**

## In the

## United States Court of Appeals

### For the Second Circuit



CATSKILL MOUNTAINKEEPER, INC., CLEAN AIR
COUNCIL, DELAWARE-OTSEGO AUDUBON SOCIETY, INC.,
RIVERKEEPER, INC., SIERRA CLUB and STOP THE PIPELINE,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

CONSTITUTION PIPELINE COMPANY, LLC.,
IROQUOIS GAS TRANSMISSION SYSTEM, L.P. and
NATURAL GAS SUPPLY ASSOCIATION,

*Intervenors.*

_____

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

## PAGE-PROOF BRIEF FOR RESPONDENT INTERVENOR
## NATURAL GAS SUPPLY ASSOCIATION

JOHN LONGSTRETH
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 661-6271

*Counsel for Natural Gas Supply
Association*

Dated: September 12, 2016

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Natural Gas Supply Association (NGSA) states that it is a not-for-profit trade association based in Washington, D.C., charged with promoting the interests of its members in the United States. NGSA is not a publicly held corporation, has no parent companies, and no companies have a ten percent or greater ownership in NGSA.

*/s/ John Longstreth*

JOHN LONGSTRETH

K&L GATES LLP

1601 K Street, N.W.

Washington, D.C. 20006

(202) 661-6271

September 12, 2016

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT……………………………………..i

TABLE OF AUTHORITIES ...................................................................... iv

GLOSSARY ............................................................................................ vii

INTRODUCTION ..................................................................................... 1

ISSUE PRESENTED ................................................................................ 3

STATEMENT OF FACTS ......................................................................... 3

STANDARD OF REVIEW ........................................................................ 6

SUMMARY OF ARGUMENT ................................................................... 8

ARGUMENT ............................................................................................ 9

I.     NEPA Does Not Require FERC To Speculate About The Location And Quantity Of Incremental Upstream Production As "Indirect Effects" Of The Constitution Pipeline Project. ...................................................................... 9

   A.     Development of natural gas infrastructure projects is the result of increases in natural gas production across the Marcellus Shale region, not the cause of natural gas production .................................................... 10

      1.     Constitution Pipeline will not be the cause in fact of any identifiable natural gas production. ............................................... 10

      2.     The Constitution Pipeline is not the relevant legal cause of additional natural gas production under NEPA. ............................. 12

   B.     Any incremental natural gas production would not be "reasonably foreseeable."........................................................................................ 13

   C.     Upstream natural gas production also is not a cognizable "cumulative impact" of the Constitution Pipeline.................................................... 14

II.     FERC's Decision Leaves No Gap In Upstream Regulation Because State Agencies and BLM Actively and Pervasively Regulate Natural Gas Production Activities. .................................................................................... 14

III.     This Court Has Previously Approved FERC's Approach To Indirect

Effects In The Context Of Natural Gas Infrastructure Projects. ............................ 16

IV.      Petitioners' Arguments Only Make Sense In The Context Of A
Broader Effort To Limit Or Eliminate Domestic Natural Gas Production. ............. 18

CONCLUSION ................................................................................................. 20

CERTIFICATE OF COMPLIANCE .......................................................... 21

CERTIFICATE OF SERVICE ................................................................... 22

# TABLE OF AUTHORITIES

**CASES:**

*Amoco Production Co. v. Sea Robin Pipeline Co.*,
844 F.2d 1202, (5th Cir. 1988)……………………………………………………...5

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*,
354 F. Supp. 2d 284 (S.D.N.Y. 2004)……………………………………………4

*Coal. for Responsible Growth and Res. Conservation v. FERC*,
485 Fed. App'x 472 (2d Cir. 2012)…………………………………………...6, 16, 17

*Conopco, Inc. v. Roll, Int'l*, 231 F.3d 82 (2d Cir. 2000)………………………………4

*Department of Transp. v. Public Citizen*, 541 U.S. 752 (2004)……………………...12

*Dodd v. TVA*, 770 F.2d 1038 (Fed. Cir. 1985)…………………………………………4

*Environmental Defense v. U.S. E.P.A.,* 369 F.3d 193 (2d Cir. 2004)…………………7

*Fitchburg Gas & Elec. Light Co. v. Dep't of Public Utilities*,
460 Mass. 800 (2011)………………………………………………………………5

*Fund for Animals v. Babbitt*, 89 F.3d 128 (2d Cir. 1996)……………………………19

*Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010)…………………………...……19

*Hope v. Peltzer*, 536 U.S. 730 (2002)………………………………………………4

*Islander East Pipeline Co., LLC v. McCarthy*,
525 F.3d 141 (2d Cir. 2008)…………………………………………………...7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)……………………………………………………………..7

*Natural Resources Defense Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988)………………………………………………7

*Park & Tilford v. Schulte*, 160 F.2d 984 (2d Cir. 1947)……………………………..5

iv

*Patterson v. Caterpillar, Inc.*, 70 F.3d 503 (7th Cir.1995)……………………………7

*Sierra Club v. FERC*, No. 14-1275
2016 WL 3524262 (D.C. Cir. 2016)…………………………………………………….12

*Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245 (1934)………………………….4

**STATUTES AND RULES:**

5 U.S.C. § 706(2)(A)……………………………………………………….6

15 U.S.C. § 717(b)…………………………………………………..12, 15

42 U.S.C. § 4332(C)……………………………………………...9

58 Pa. Cons. Stat. § 3211(b.1)……………………………………………..15

N.Y. Environmental Conservation Law § 23-0501…………………………………..15

Fed. R. Evid. 201(f)……………………………………………………………4

**REGULATIONS:**

40 C.F.R. § 1500.1(c)…………………………………………………...19

40 C.F.R. § 1508.7………………………………………………………9, 14

40 C.F.R. § 1508.8………………………………………………………9, 10

**OTHER AUTHORITIES:**

Annalee Grant, "As Gas Tops Coal for Carbon Emissions,
Sierra Club Sees Next Climate Fight,"
SNL Daily Gas Report (Aug. 18, 2016),
https://www.snl.com/InteractiveX/article.aspx?ID=37443136…………………………18

Cong. Research Serv., An Overview Of Unconventional Oil And Natural Gas:
Resources And Federal Actions (Apr. 22, 2015)………………………………..........15

E. Russell Braziel, The Domino Effect 140-41 (2016)………………………………11

Kinder Morgan, "Tennessee Gas Pipeline,"

http://www.kindermorgan.com/business/gas_pipelines/east/TGP/.............................18

Platts, "Baker Hughes Rig Count," http://phx.corporate-ir.net/phoenix.zhtml?c=79687&p=irol-reportsother.......................................................5

Platts Gas Daily, "Daily Price Survey," https://pmc.platts.com/Dashboard.aspx?nl=Gas%20Daily&nl2=Home........................5

Resources for the Future, The State of State Shale Gas Regulation (2013), *available at* http://www.rff.org/research/publications/state-state-shale-gas-regulation...............................................................................................................15

Sierra Club, "100% Clean Energy: A Global Movement" http://www.sierraclub.org/one-hundred-percent..........................................................1

Sierra Club, "Moving Beyond Fossil Fuels," http://www.sierraclub.org/beyond-fossil-fuels............................................................1

The Williams Cos., "Transcontinental Gas Pipe Line," http://co.williams.com/operations/atlanticgulf-operations/transco/..............................18

U.S. Energy Information Administration, Carbon Dioxide Emissions from Electricity Generation in 2015 Were Lowest Since 1993, Today in Energy (May 13, 2016), http://www.eia.gov/todayinenergy/detail.cfm?id=26232...............................................20

U.S. Energy Information Admin., Drilling Productivity Report (Aug. 2009), http://www.eia.gov/petroleum/drilling/pdf/dpr-full.pdf..................................................4

Well History: Susquehanna County, PA, https://www.marcellusgas.org/history/PA-Susquehanna................................................4

# GLOSSARY

| | |
|---|---|
| Authorizing Order | Order Issuing Certificates and Approving Abandonment, *Constitution Pipeline Co., LLC*, 149 FERC ¶ 61,199 (2014). |
| BLM | U.S. Department of the Interior, Bureau of Land Management |
| Constitution Pipeline | Constitution Pipeline Co., LLC |
| CEQ | Council on Environmental Quality |
| EIS | FERC, Final Environmental Impact Statement for the Constitution Pipeline and Wright Interconnect Projects, Docket Nos. CP13-499, *et al.* (Oct. 2014). |
| FERC or the Commission | Federal Energy Regulatory Commission |
| FERC Br. | Brief of Respondent FERC |
| JA | Joint Appendix |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NGSA | Natural Gas Supply Association |
| Petitioners | Catskill Mountainkeeper, Inc., Clean Air Council, Delaware-Otsego Audubon Society, Inc., Riverkeeper, Inc., Sierra Club, and Stop the Pipeline |
| Pet. Br. | Brief of Petitioners Catskill Mountainkeeper, Inc., *et al.* |
| Rehearing Order | Order Denying Rehearing and Approving Variance, *Constitution Pipeline Co., LLC*, 154 FERC ¶ 61,046 (2016). |

## INTRODUCTION

NGSA is a trade association that represents integrated and independent companies that produce and market natural gas.  Established in 1965, NGSA encourages the use of natural gas within a balanced national energy policy and promotes the benefits of competitive markets to ensure reliable and efficient supply, transportation, and delivery of natural gas to U.S. customers.  NGSA's members account for approximately 30 percent of domestic natural gas production and are shippers on interstate pipelines.  NGSA is the only Washington, D.C.-based trade association that focuses solely on producer/marketer issues related to the downstream natural gas industry.

Petitioners frame their Petition for Review as a challenge to FERC's environmental review of the Constitution Pipeline, but the true aim of the petition is to advance Sierra Club's tri-partite campaign ("Beyond Natural Gas," "Beyond Coal," and "Beyond Oil") to eliminate the production and use of fossil fuels.[1] Sierra Club has confirmed this goal in a recent statement that "we must now commit to switch away from dirty fuels to clean energy."[2]  This broad strategy seeks ultimately to eliminate the natural gas industry in which NGSA's members participate.  As part of this strategy, the Petitioners seek to block construction of

---

[1] SIERRA CLUB, "Moving Beyond Fossil Fuels," http://www.sierraclub.org/beyond-fossil-fuels (last visited Aug. 26, 2016).
[2] SIERRA CLUB, "100% Clean Energy: A Global Movement" http://www.sierraclub.org/one-hundred-percent (last visited Aug. 26, 2016).

the Constitution Pipeline (as they have other natural gas infrastructure projects), which would deprive the region's businesses and consumers of the benefits of abundant and accessible clean natural gas supplies.

This proceeding is not, however, the proper forum to consider and adopt a broad national energy policy. The question before the Court is simply the environmental impacts of the pipeline approval itself. Attempting to force the broader issue onto this Court's agenda, Petitioners incorrectly argue that authorization of the Constitution Pipeline itself will cause cognizable increases in domestic natural gas production that FERC was required to assess. Petitioners attempt to do so by incorrectly reversing the causal connection between natural gas production and the infrastructure necessary to transport natural gas.

As FERC has recognized, and as NGSA discusses in this brief, the proposed pipeline is *the result of* substantial increases in natural gas production, not the *cause of* that production. The environmental consequences of natural gas production are properly considered within the context of state agency and Bureau of Land Management (BLM) licensing decisions concerning that production itself, and not piggybacked onto decisions to authorize downstream infrastructure made by a federal agency with no jurisdiction over natural gas production.

This Court has addressed these issues in a prior similar case, and concluded that upstream production activities have a too uncertain and indefinite connection

2

with a natural gas infrastructure project to meaningfully inform FERC's environmental analyses of the project under NEPA. Petitioners' attempt to distinguish that prior case from this one is unconvincing.

This Court should deny Petitioners' Petition for Review because the upstream production activities they seek to challenge here are not causally connected to the infrastructure project FERC actually approved; nor are they reasonably foreseeable within the meaning of NEPA.

## ISSUE PRESENTED

NGSA focuses this brief on Petitioners' contention in No. 16-345 that FERC was required under NEPA to undertake an analysis of potential indirect and cumulative environmental impacts of increases in natural gas production that these Petitioners assert would be induced by approval and construction of the Constitution Pipeline.

## STATEMENT OF FACTS

In addition to the facts stated in FERC and its other supporting intervenors' briefs, NGSA provides the following facts relevant to the issues it addresses in this brief.

Natural gas production in Pennsylvania has increased from less than 0.5

billion cubic feet per day (Bcf/d) before 2005 to more than 7.5 Bcf/d in 2015 and is

projected to reach 13.4 Bcf/d by 2020.  EIS at 4-232.  This dramatic increase has,

of course, occurred entirely independently of the transportation capability of the

Constitution Pipeline, which has not yet been built.    By June 2013, when

Constitution filed its application with FERC for a Certificate of Public

Convenience and Necessity for the pipeline, natural gas production across the

Marcellus Shale region already had increased to approximately 10 Bcf/d.[3]  Natural

gas production in Susquehanna County likewise has increased from virtually zero

in 2007, to 1.9 Bcf/d in 2013, and 3.1 Bcf/d in 2015.[4]  Reflecting this significant

production increase, all of Constitution Pipeline's transportation capacity was

---

[3] U.S. ENERGY INFORMATION ADMIN., Drilling Productivity Report (Aug.
2009), *available at* http://www.eia.gov/petroleum/drilling/pdf/dpr-full.pdf
(last visited Aug. 17, 2016).  This Court may take judicial notice of data
contained in a U.S. government report whose accuracy is not subject to
reasonable question.  *See* Fed. R. Evid. 201(f) (notice may be taken at any
stage of a proceeding); *Conopco, Inc. v. Roll, Int'l*, 231 F.3d 82, 86 (2d Cir.
2000) (same).  *See also Hope v. Peltzer*, 536 U.S. 730, 737 n. 7 (2002)
(approving appeals court's judicial notice of a DOJ report); *Texas & Pac.
Ry. Co. v. Pottorff*, 291 U.S. 245, 254 (1934) (taking judicial notice of
reports of the Comptroller of the Currency as to the number of national bank
failures over a period of time); *Dodd v. TVA*, 770 F.2d 1038, 1039-40 (Fed.
Cir. 1985) (judicial notice of federal agency report); *B.T. Produce Co. v.
Robert A. Johnson Sales, Inc*., 354 F. Supp. 2d 284, 285-86 (S.D.N.Y. 2004)
(judicial notice of USDA report).
[4] WELL HISTORY: SUSQUEHANNA COUNTY, PA,
https://www.marcellusgas.org/history/PA-Susquehanna (last visited Aug. 17,
2016).

contracted for following a 2012 open season, demonstrating a market need for the project.  Authorizing Order at P. 8 and 28. JA at ___.

Just as the very substantial production increases in Pennsylvania, and Susquehanna County in particular, from 2007 to 2015 were driven by factors other than the Constitution Pipeline project, the region has seen very substantial declines in natural gas prices in the past year, which have led to corresponding significant declines in development activity.  The average price of natural gas declined nationally by approximately 24% between January 2015 and July 2016.[5]  Over the same time period, natural gas rig counts fell by approximately 66% across the Marcellus and Utica Shale regions.[6]  This shows that producer decisions are highly market-driven responses.  Petitioners presented no evidence to FERC, and the record contains none, that would have allowed FERC to assess the proportion and location of natural gas production in the Marcellus Shale region, Susquehanna

---

[5] PLATTS GAS DAILY, "Daily Price Survey," https://pmc.platts.com/Dashboard.aspx?nl=Gas%20Daily&nl2=Home (last visited Aug. 26, 2016).  *See Park & Tilford v. Schulte*, 160 F.2d 984, 990 (2d Cir. 1947) (recognizing that a court may take judicial notice of market quotations).  *See also Fitchburg Gas & Elec. Light Co. v. Dep't of Public Utilities*, 460 Mass. 800, 809 n. 16 (2011) (noting that agency had, without objection, taken official notice of daily prices published in Platt's Gas Daily); *Amoco Production Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1209 (5th Cir. 1988) (taking "judicial notice of certain operating conditions unique to oil and gas wells").

[6] PLATTS, "Baker Hughes Rig Count," http://phx.corporate-ir.net/phoenix.zhtml?c=79687&p=irol-reportsother (last visited Aug. 26, 2016).

County, or in any other area attributable to the Constitution pipeline.  Nor did Petitioners present any evidence that would demonstrate with any degree of assurance that new drilling is driven by this pipeline project rather than overarching supply, demand, and economic factors.

Petitioners have instead simply asserted that producers can experience steep drop-offs in production from wells accessed via means such as hydraulic fracturing and speculate that these producers might seek in such a case to drill new wells. Pet. Br. at 23.  Even if this were true, Petitioners have not shown that producers' motivation to continue development activity is dependent on this pipeline project. Moreover, the rate of decline of individual wells can vary and can change dramatically over time as technology advances.  This is yet one more reason why any assessment of "induced" production would be entirely too speculative to be appropriate in the context of FERC's NEPA analysis of an individual pipeline project.

## STANDARD OF REVIEW

A reviewing court must uphold FERC's decisions under the Natural Gas Act (NGA) unless such decisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  *See also Coal. for Responsible Growth and Res. Conservation v. FERC*, 485 Fed. App'x 472, 474 (2d Cir. 2012) (court reviews FERC's decision as to whether it should issue an

6

Environmental Impact Statement under the "arbitrary or capricious" standard).

"The arbitrary and capricious standard of review is narrow and particularly

deferential." *Environmental Defense v. U.S. E.P.A.,* 369 F.3d 193, 201 (2d Cir.

2004). A reviewing court "may not itself weigh the evidence or substitute its

judgment for that of the agency." *Islander East Pipeline Co., LLC v. McCarthy*,

525 F.3d 141, 150-51 (2d Cir. 2008).

In applying the "narrow and particularly deferential" arbitrary and capricious

standard of review, the courts must consider whether the agency "relied on factors

which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Id.* (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983)). While this review must be "searching and careful," the court "will

not lightly reach a conclusion that an agency has not examined all relevant data or

satisfactorily demonstrated a rational connection between the facts it has found and

its final decision." *Islander East*, 525 F.3d at 151 (citing *Patterson v. Caterpillar,

Inc.*, 70 F.3d 503, 505 (7th Cir.1995) (court "must be very confident that the

decisionmaker overlooked something important or seriously erred in appreciating

the significance of the evidence.") (internal citation omitted)). *See also Natural*

7

*Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (if the agency's NEPA analysis is "fully informed and well considered, it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment.").

## SUMMARY OF ARGUMENT

In their attempt to use this proceeding as a referendum on national energy policy, Petitioners have reversed the causal connection between natural gas production and construction of natural gas infrastructure. Substantial increases in natural gas production across the Marcellus Shale region have encouraged natural gas infrastructure development, including the Constitution Pipeline, not the other way around. Substantial sums of capital to develop large pipeline projects are not invested simply on the hope that production increases will follow. As FERC reasoned in rejecting Petitioner's backwards assertion of causation, "the opposite causal relationship is more likely" because "once production begins in an area, shippers or end users will support the development of a pipeline to move the produced gas." Rehearing Order at P. 138, JA at ___.

Petitioners' argument that FERC was required to assess the environmental impacts of production activities in the Marcellus Shale region and Susquehanna County also ignores that state agencies and BLM are responsible for overseeing natural gas production activities, not FERC. Even assuming that the Plaintiffs had

8

been able to establish a meaningful causal connection between the pipeline project and increased production, the authority that these state agencies and BLM have over upstream production would sever any causal connection with these upstream natural gas production activities.  Petitioners' attempts to distinguish this proceeding from this Court's prior holding on this score are unavailing.

Petitioners' arguments make sense only in the context of a broader effort to limit or eliminate natural gas production.  This proceeding is not the proper forum for such a debate.  Requiring FERC to consider production activities that are outside its statutory authority and beyond NEPA's requirements might advance Petitioners' overarching goal of a national energy policy that stifles natural gas development, but it does not advance NEPA's goals of environmentally informed decision-making and upends Congress's directives under the NGA that exclude upstream production from FERC's oversight.

## ARGUMENT

I.     **NEPA Does Not Require FERC To Speculate About The Location And Quantity Of Incremental Upstream Production As "Indirect Effects" Of The Constitution Pipeline Project.**

Congress passed NEPA to ensure that Federal actors analyze the effects of decisions that "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(C).  Council on Environmental Quality (CEQ) regulations implementing NEPA describe these effects as direct effects, indirect effects, and

9

cumulative impacts.  40 C.F.R. §§ 1508.7 and 1508.8.  CEQ explains that indirect

effects "are caused by the action and are later in time or farther removed in

distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  As

demonstrated below, Petitioners' characterization of the impacts of upstream

natural gas production does not satisfy the tests for indirect or cumulative effects as

they have been recognized by this Court and others.

A. **Development of natural gas infrastructure projects is the result of increases in natural gas production across the Marcellus Shale region, not the cause of natural gas production**

The Constitution Pipeline will not be the actual or legal cause of additional

identifiable natural gas production.  Rather, it is the result of significant natural gas

production increases across the Marcellus Shale region and Northeast

Pennsylvania.

1. **Constitution Pipeline will not be the cause in fact of any identifiable natural gas production.**

As set out above, significant natural gas production increases across

Pennsylvania began at least five years before Constitution Pipeline proposed its

project, and significant production increases in Susquehanna County,

Pennsylvania, predate Constitution Pipeline's application to FERC by

approximately four years.[7]  Petitioners' suggestion that the Constitution Pipeline

---

[7] *See* nn. 3 and 4 *supra* (describing significant increases in natural gas
production in Pennsylvania broadly and in Susquehanna County,

10

project will be the cause of significant natural gas production ignores this timeline of events. Natural gas producers necessarily make decisions regarding gas production based on price dynamics and other supply and demand considerations and not on any single infrastructure project.[8] Moreover, as also explained above, recent declines in regional gas development activity have matched the recent trend of declining natural gas prices across the United States.[9] Petitioners do not, and cannot, offer any reliable method to measure meaningfully the incremental increase in production that any particular additional pipeline capacity might induce, or to show that producers make decisions based on a particular infrastructure project rather than on the market's supply, demand, and price dynamics. Absent that connection, FERC could not engage in a meaningful environmental analysis of the effects of the project on allegedly "induced" production.

---

Pennsylvania, respectively). Constitution Pipeline filed its application with FERC on June 13, 2013. Application for Certificates of Public Convenience and Necessity, FERC Docket No. CP13-499 (June 13, 2013), JA ___.

[8] *See Rehearing Order* at P 138 ("It would make little economic sense to undertake construction of a pipeline in the hope that production might later be determined to be economically feasible and that the producers will choose the previously constructed pipeline as best suited for moving their gas to market."). *See also* E. RUSSELL BRAZIEL, THE DOMINO EFFECT 140-41 (2016) (noting that natural gas producers make drilling decisions using a complex formula involving drilling and completion costs, operating expenses, production taxes, royalty rates, initial well production rates, production decline curves, and commodity prices and pricing.).

[9] *See* nn. 5-6 *supra*.

**2.    The Constitution Pipeline is not the relevant legal cause of additional natural gas production under NEPA.**

FERC's approval of Constitution Pipeline's application also cannot serve as the relevant legal cause of any additional natural gas production.  As the Supreme Court has explained, a NEPA causation analysis requires a "reasonably close causal connection" between the federal action and the purported effect analogous to the "familiar doctrine of proximate cause from tort law."  *Department of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004).  Applying this standard, the. Court of Appeals for the District of Columbia Circuit recently explained that an agency need not "examine everything for which the [project] could conceivably be a but-for cause."  *Sierra Club v. FERC*, No. 14-1275 slip op. at 16, 2016 WL 3524262 at *6 (D.C. Cir. 2016).  Moreover where, as in this case, an agency's limited statutory authority does not permit the agency to prevent a certain effect, the agency's action is not the legally relevant cause of the effect.  *Public Citizen*, 541 U.S. at 771.  *See Sierra Club, et al. v. FERC,* slip op. at 16 (where "an agency 'has no ability to prevent a certain effect due to' that agency's 'limited statutory authority over the relevant action[],' then that action 'cannot be considered a legally relevant 'cause' of the effect' for NEPA purposes.") (quoting *Public Citizen*, 541 U.S. at 771.).

The NGA expressly excludes natural gas production from FERC's jurisdiction.  15 U.S.C. § 717(b).  Due to this statutory limitation, FERC has no authority to regulate or prevent any upstream production, or any resulting

12

environmental effects. FERC's approval of the Constitution Pipeline is not the legally relevant cause of any incremental increases in natural gas production and FERC therefore could not have violated any NEPA obligations by determining that it was inappropriate to take such effects into account.

## B. Any incremental natural gas production would not be "reasonably foreseeable."

Any increase in natural gas production would also not be a reasonably foreseeable indirect effect of the Constitution Pipeline project. It is not known where, when, and what volume of natural gas might be produced across the Marcellus Shale region, or even in Northeast Pennsylvania, over the life of the Constitution Pipeline, much less what proportion of that production would be "induced" by the pipeline itself. FERC thus properly rejected Petitioners' demand that it speculate as to the location, timing, and volume of any additional natural gas production. Rehearing Order at P. 139, JA at ___.

In addition, FERC's lack of jurisdiction over natural gas development and production activities (as opposed to pipeline matters that it does control) again suggests that state agencies and BLM, not FERC, are best positioned to address the effects of production because those agencies have the best information as to drilling activities and trends in the industry. *Id.* To be reasonably foreseeable for purposes of a meaningful NEPA analysis, such production would have to be identified with specificity as to time, place, and volume, as otherwise FERC could

13

engage in only a very generalized and imprecise examination of the unsupported and highly speculative effects.

### C. Upstream natural gas production also is not a cognizable "cumulative impact" of the Constitution Pipeline

Just as any additional upstream production would not be an indirect effect of the Constitution Pipeline under NEPA, future upstream production also would not be a cumulative impact under the statute. CEQ defines "cumulative impact" as the impact that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. FERC analyzed the reasonably foreseeable cumulative impacts of the Constitution Pipeline as part of its environmental review, including permitted natural gas wells in Susquehanna and Wayne Counties, Pennsylvania, and several counties in New York. EIS at 4-218 to 4-231, JA at ___. Because the exact locations and timing of future development is not known and numerous other market factors will affect future production activities across the region, these future activities are not reasonably foreseeable for either a cumulative impacts analysis or an indirect effects analysis under NEPA. Rehearing Order at P 152 n. 245, JA at ___.

## II. FERC's Decision Leaves No Gap In Upstream Regulation Because State Agencies and BLM Actively and Pervasively Regulate Natural Gas Production Activities.

State agencies and BLM, not FERC, regulate upstream natural gas

14

production activities.[10]  As noted above, Congress expressly excluded

natural gas production from FERC's jurisdiction under the NGA.  15 U.S.C.

§ 717(b).  In Pennsylvania, the Department of Environmental Protection

exercises oversight authority over natural gas production on state land.  *See*

58 Pa. Cons. Stat. § 3211(b.1).  Likewise, the New York State Department

of Environmental Conservation oversees natural gas production on state land

in New York.[11]  *See* N.Y. Environmental Conservation Law § 23-0501.  In

addition to general oversight of natural gas production, well operators must

comply with a myriad of state regulatory programs, for example, water

quality standards, waste water management, programs mandating disclosure

of the chemicals that operators use in hydraulic fracturing, regulations for

emissions of excess gas through venting or flaring, and standards for well

abandonment.[12]

---

[10] *See* CONG. RESEARCH SERV., AN OVERVIEW OF UNCONVENTIONAL OIL
AND NATURAL GAS: RESOURCES AND FEDERAL ACTIONS at 10 (Apr. 22,
2015) ("States are the principal regulators of oil and gas production activities
on state and private lands …The federal government … has responsibility
for overseeing oil and gas development on federally managed lands").

[11] As FERC explained in its order approving the Constitution Pipeline, there
is no reason to expect that there will be any significant natural gas
production in New York State because the state restricts advanced natural
gas drilling techniques like hydraulic fracturing.  Authorizing Order at P. 99,
JA at ___.

[12] RESOURCES FOR THE FUTURE, THE STATE OF STATE SHALE GAS
REGULATION (2013), *available at*
http://www.rff.org/research/publications/state-state-shale-gas-regulation (last

Thus, while FERC has jurisdiction over pipeline construction, and analyzed the environmental effects of its authorizations under that authority, its lack of jurisdiction over natural gas development and production leaves no gap in the environmental regulation of natural gas production. This provides yet another reason not to force FERC outside its jurisdiction to address uncertain upstream production effects.

III.  **This Court Has Previously Approved FERC's Approach To Indirect Effects In The Context Of Natural Gas Infrastructure Projects.**

This Court previously considered and approved FERC's approach to indirect effects in the context of natural gas infrastructure in *Coalition for Responsible Growth and Resource Conservation v. FERC*, which determined that FERC had taken the required "hard look" at the possible effects of the MARC I Hub Line Project natural gas pipeline. The Court explained that, after considering the potential for Marcellus Shale development, "FERC reasonably concluded that the impacts of that development are not sufficiently causally-related to the project to warrant a more in-depth analysis." 485 Fed. App'x at 474.

Petitioners suggest that this past holding does not govern the present case because the MARC I project was intended to connect existing pipelines and not to provide market access for additional gas supplies. Pet. Br. at 22. However, the Constitution Pipeline will serve a similar role in promoting market efficiency by

visited Aug. 29, 2016).

16

connecting pipeline segments (in Constitution Pipeline's case, non-FERC jurisdictional tie-in pipelines owned by Constitution's customers) with other pipeline segments. EIS at 2-5, JA at ___. This case thus matches *Coalition for Responsible Growth* closely. And Petitioners' attempt to distinguish it based on the design characteristics of the MARC I project is misguided in any event since there is no evidence in the court's opinion that it based its decision on the design of the projects. *See* 485 Fed. App'x at 474.

Petitioners also imply, without foundation, that the Constitution Pipeline is the only option for transporting and monetizing natural gas produced in this area of Northeastern Pennsylvania. As noted above, Susquehanna County's natural gas production rose dramatically long before the Constitution Pipeline began development and production has continued, demonstrating that there are existing options to transport the natural gas to market.

FERC's cumulative impacts analysis in fact identifies several pipeline projects that provide market access for the region's production, including the Laser Northeast Susquehanna Gathering System I that connects with the Millennium Pipeline, the Laser Northeast Susquehanna Gathering System II that interconnects with the Tennessee Gas Pipeline, and the Williams Springville Gathering project that connects Susquehanna County with the Transcontinental Gas Pipe Line (Transco) pipeline. EIS at 4-220 to 4-221, JA at ___. Millennium Pipeline,

17

Tennessee Gas Pipeline, and Transco are all integral parts of the interstate pipeline grid and Tennessee Gas Pipeline and Transco are two of the largest pipeline systems in the United States.[13]  Therefore, this Court should follow its past analysis and reject Petitioners' arguments demanding FERC to expand its NEPA review beyond Congress's clear intent.

### IV.   Petitioners' Arguments Only Make Sense In The Context Of A Broader Effort To Limit Or Eliminate Domestic Natural Gas Production.

The best way to make sense of Petitioners' argument, which is not supported factually or legally, is to place it in the broader context of Petitioner Sierra Club's goal of limiting and then eliminating domestic natural gas production.  A Sierra Club official recently noted that, with coal production declining, "the next climate fight is going to be … with gas."[14]  Compelling a federal agency to conduct speculative and duplicative environmental reviews of a project already found to be

---

[13] Tennessee Gas Pipeline consists of approximately 11,800 miles of pipeline that transports natural gas from Louisiana to markets in the U.S. Northeast, including New York City and Boston, Mass.  KINDER MORGAN, "Tennessee Gas Pipeline," http://www.kindermorgan.com/business/gas_pipelines/east/TGP/ (last visited Aug. 25, 2016).  The Transco system has 10,200 miles of pipeline to transport natural gas from the U.S. Southeast to consumer markets in the Northeast.  THE WILLIAMS COS., "Transcontinental Gas Pipe Line," http://co.williams.com/operations/atlanticgulf-operations/transco/ (last visited Aug. 25, 2016).

[14] Annalee Grant, "As Gas Tops Coal for Carbon Emissions, Sierra Club Sees Next Climate Fight," SNL DAILY GAS REPORT (Aug. 18, 2016), https://www.snl.com/InteractiveX/article.aspx?ID=37443136 (last visited Aug. 25, 2016).

in the public interest would further Petitioners' policy goal of reducing and ultimately eliminating reliance on natural gas, but it would not further NEPA's goal of environmentally informed decision-making.  40 C.F.R. § 1500.1(c). Considering the potential environmental impacts of activities that are neither reasonably foreseeable nor causally related to the Constitution Pipeline frustrates the purposes of NEPA[15] and the NGA while depriving natural gas customers of the benefits of a reliable and more efficient natural gas pipeline system.

If this were the proper forum for an energy policy debate, NGSA would point out the many significant benefits of domestic natural gas production, including the economic benefits, from job creation and growth in manufacturing to lower energy prices, heating homes in winter with the cleanest fossil fuel available, maintaining the reliability of the power grid, increased competition across the energy sector, and the strategic and security benefits of reducing our dependence on energy imports from volatile parts of the world.  Additionally, growing demand from the power sector has significantly reduced carbon dioxide emissions with 2015 emissions of carbon dioxide at their lowest levels since 1993.[16]

---

[15] This Court has recognized that NEPA's purpose is to improve agency decision-making when taking actions to protect, restore, and enhance the environment.  *Fund for Animals v. Babbitt*, 89 F.3d 128, 130 (2d Cir. 1996). *See also Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010) ("NEPA is a purely procedural statute, intended to protect the environment by fostering informed agency decision-making.").

[16] U.S. ENERGY INFORMATION ADMINISTRATION, Carbon Dioxide Emissions

Countenancing Petitioners' misplaced debate would also create unnecessary regulatory uncertainty for infrastructure investors, discouraging investment in needed natural gas infrastructure projects, especially when states are diligently working to comply with regional clean energy initiatives and the currently stayed Clean Power Plan. The environmental review of a single infrastructure project is not the proper place for the overall energy debate that Petitioners seek, and their attempt to improperly expand the scope of a NEPA review to try to make it one should be rejected.

## CONCLUSION

For the foregoing reasons, this Court should deny Petitioners' petitions for review.

Respectfully submitted,

*/s/ John Longstreth*
JOHN LONGSTRETH
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 661-6271

September 12, 2016

_____

from Electricity Generation in 2015 Were Lowest Since 1993, TODAY IN ENERGY (May 13, 2016),
http://www.eia.gov/todayinenergy/detail.cfm?id=26232.

20

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that the foregoing brief was produced using the Times New Roman 14-point typeface and contains 4,568 words.

/s/ John Longstreth

JOHN LONGSTRETH
K&L GATES LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 661-6271

Counsel for Natural Gas Supply Association

September 12, 2016

**CERTIFICATE OF SERVICE**

I certify that on September 12, 2016, the foregoing Brief for Intervenor

Natural Gas Supply Association was electronically filed through this Court's

CM/ECF system, which will send a notice of filing to all registered users.


*/s/ John Longstreth*

JOHN LONGSTRETH

K&L GATES LLP

1601 K Street, N.W.

Washington, D.C. 20006

(202) 661-6271

*Counsel for Natural Gas Supply Association*

22