# 16-345 (L)

**16-361 (consolidated)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

CATSKILL MOUNTAINKEEPER, INC.; CLEAN AIR COUNCIL;
DELAWARE-OTSEGO AUDUBON SOCIETY, INC.; RIVERKEEPER, INC.;
SIERRA CLUB; and STOP THE PIPELINE,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent,

CONSTITUTION PIPELINE COMPANY, LLC; IROQUOIS GAS
TRANSMISSION SYSTEM, L.P.; and NATURAL GAS SUPPLY
ASSOCIATION,

Intervenors.

On Petition for Review of Orders of the Federal Energy Regulatory Commission

## PAGE PROOF BRIEF OF INTERVENOR
## CONSTITUTION PIPELINE COMPANY, LLC

Pamela S. Goodwin
Saul Ewing LLP
650 College Road East, Suite 4000
Princeton, NJ 08540-6603
Phone: (609) 452-3109
Fax: (609) 452-3129
pgoodwin@saul.com

John F. Stoviak
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Phone: (215) 972-1095
Fax: (215) 972-1921
jstoviak@saul.com

Elizabeth U. Witmer
Saul Ewing LLP
1200 Liberty Ridge Dr., Suite 200
Wayne, PA 19087-5569
Phone: (610) 251-5062
Fax: (610) 408-4400
ewitmer@saul.com

## CORPORATE DISCLOSURE STATEMENT
## OF CONSTITUTION PIPELINE COMPANY, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Constitution Pipeline Company, LLC ("Constitution") makes the following disclosures:

Constitution Pipeline Company, LLC is a limited liability natural gas pipeline company organized and existing under the laws of the State of Delaware. The members of Constitution include Williams Partners Operating LLC (41 percent), Cabot Pipeline Holdings, LLC (25 percent), Piedmont Constitution Pipeline Company, LLC (24 percent), and WGL Midstream CP, LLC (10 percent). Its parent corporations are Williams Partners Operating LLC, Piedmont Constitution Pipeline Company, LLC, WGL Midstream, Inc., Washington Gas Resources Corp., Williams Partners L.P., The Williams Companies, Inc., Piedmont Natural Gas Company, Inc., and WGL Holdings, Inc. The following publicly-held corporations own 10% or more of Constitution Pipeline Company, LLC's stock: Williams Partners L.P., The Williams Companies, Inc., Piedmont Natural Gas Company, Inc., and WGL Holdings, Inc. Cabot Oil & Gas Corporation is an indirect, beneficial owner of a 25% membership interest through its wholly-owned subsidiary, Cabot Pipeline Holdings, LLC. In addition, The Williams Companies Inc. owns 10% or more of the publicly-held limited partner interest in Williams Partners, L.P.

Respectfully submitted this 12th day of September, 2016.

By:    */s/ John F. Stoviak*

Pamela S. Goodwin
Saul Ewing LLP
650 College Road East, Suite 4000
Princeton, NJ  08540-6603
Phone:  (609) 452-3109
Fax:  (609) 452-3129
pgoodwin@saul.com

John F. Stoviak
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
Phone:  (215) 972-1095
Fax:  (215) 972-1921
jstoviak@saul.com

Elizabeth U. Witmer
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA  19087-5569
Phone:  (610) 251-5062
Fax:  (610) 408-4400
ewitmer@saul.com

*Counsel for Intervenor Constitution Pipeline Company, LLC*

# **TABLE OF CONTENTS**

PAGE

STATEMENT OF THE CASE.................................................................1

    I.    The Constitution Pipeline Project .........................................1

    II.   Prior Unsuccessful Efforts to Stop the Project.....................2

    III.  FERC's Orders and Review Process...................................3

SUMMARY OF THE ARGUMENT .......................................................4

ARGUMENT ........................................................................................8

POINT I - Standard of Review ..............................................................9

    I.    Review of Final Environmental Impact Statement Under NEPA ........9

    II.   Review of Issuance of Certificate Order Prior to Section 401 Certification Under the CWA ...........................................11

    III.  Review of Due Process Claims Under the Fifth Amendment ...........12

POINT II - FERC's Hard Look and Preparation of Environmental Impact Statement ..................................................................14

    I.    FERC Appropriately Determined that Induced Natural Gas Production is Not a Reasonably Foreseeable Effect of the Project.....................................................................15

    II.   FERC Adequately Considered the Project's Impacts on Water Quality in Compliance with NEPA..................................17

         A.    The Lack of Complete, Site-Specific Data Does Not Render FERC's NEPA Analysis Unlawful .............................17

               1.    FERC's Analysis of Stream Crossing Methods Was Adequate ...............................................20

iii

2.    FERC Adequately Considered Cumulative Impacts of Multiple Crossings on a Single Waterbody ...............22

3.    FERC Adequately Considered the Impacts of Potential In-Stream Blasting............................................23

4.    The Catskill Petitioners Waived their Right to Challenge FERC's Evaluation of Pipe Burial Depths ..........................................................................24

B.    FERC Adequately Considered Constitution's Construction and Mitigation Measures in Determining that the Environmental Impact of the Project would be Reduced to Less Than Significant Levels.................................25

POINT III - FERC Appropriately Determined that the Public Convenience and Necessity Requires Approval of the Project............................................28

POINT IV - FERC Did Not Violate the CWA By Issuing the Certificate Order Prior to Constitution's Receipt of a Section 401 Certification from New York...........................................................................................33

I.    Petitioners' Proposed Framework Contravenes Congress' Intent to Federalize Regulation of Interstate Natural Gas Facilities under the NGA ..................................................................34

II.    The Certificate Order is Not an Authorization for Construction Activities That Results in a Discharge Into Navigable Waters...........35

III.    The Certificate Order is Not a License or Permit Under the CWA...........................................................................................39

IV.    Petitioners Failed to Demonstrate That They Suffered Any Harm As a Result of the Issuance of the Certificate Order Prior to Constitution's Receipt of a Section 401 Certification from New York .......................................................................................43

A.    Lawful Use of Eminent Domain to Guarantee Survey Access ......................................................................44

    B.    Pre-Construction Tree Felling in Pennsylvania and Allegations of Tree Removal in New York by Landowners and Third Parties ................................................45

POINT V - FERC Did Not Violate the Due Process Clause of the Fifth Amendment by Issuing the Tolling Order ....................................................49

    I.    STP and Its Members Were Provided More Than Adequate Due Process and Opportunity to be Heard as to the Validity of the Certificate Order ................................................................50

        A.    STP and Its Members Were Provided Sufficient Due Process in the FERC Proceedings ..............................................51

        B.    The NGA, Due Process, and Eminent Domain ........................56

            1.    Pre-Deprivation Review is Not Required Because the Takings Clause of the Fifth Amendment Provides Adequate Procedural Safeguards ....................58

            2.    Congress Has Determined that Interstate Natural Gas Pipeline Projects Serve a Public Purpose ...............64

    II.    STP and Its Members Were Not Deprived of Any Protected Property Interest by Issuance of the Tolling Order ............................67

        A.    The Tolling Order Did Not Dismiss STP's Appeal or Prevent the Appeal from Being Heard on the Merits ..............67

        B.    STP and Its Members Do Not Have a Property Right in the Procedures for Review of a Certificate Order ...................69

CONCLUSION ....................................................................................72

# TABLE OF AUTHORITIES

### CASES

*Alcoa Power Generating Inc. v. FERC*,
    643 F.3d 963 (D.C. Cir. 2011).........................................................................40

*Am. Rivers, Inc. v. F.E.R.C.*,
    129 F.3d 99 (2d Cir. 1997) ................................................................11, 12, 40

*Am. Pub. Gas Ass'n v. Fed. Power Comm'n*,
    567 F.2d 1016 (D.C. Cir. 1977).......................................................................33

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
    480 U.S. 531 (1987)..........................................................................................35

*Bailey v. Anderson*,
    326 U.S. 203 (1945)..........................................................................................58

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
    462 U.S. 87 (1983)............................................................................................10

*Bragg v. Weaver*,
    251 U.S. 57 (1919)......................................................................................59, 60

*Brody v. Vill. of Port Chester*,
    434 F.3d 121 (2d Cir. 2005) ..................................................12, 13, 60, 61, 62

*Cascade Natural Gas Corp. v. FERC*,
    955 F.2d 1412 (10th Cir. 1992) .......................................................................55

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991).................................................................... 9-10

*City of New York v. U.S. Dep't of Transp.*,
    715 F.2d 732 (2d Cir. 1983) .....................................................................16, 17

*Cleveland Bd. of Educ. v. Loudermill*,
    470 U.S. 532 (1985)..........................................................................................71

*CNG Transmission Corp. v. FERC*,
    40 F.3d 1289 (D.C. Cir. 1994).........................................................................55

*Coal. for Responsible Growth and Res. Conservation v. FERC*,
   485 F. App'x 472 (2d Cir. 2012) (Summary Order) .........................................10

*Coal. for Responsible Growth and Res. Conservation v. FERC*,
   No. 12-566 (2d Cir. Feb. 28, 2012) ....................................................................48

*Colo. Envtl. Coal. v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) .........................................................................17

*Columbia Gas Transmission, LLC v. 1.01 Acres*,
   768 F.3d 300 (3d Cir. 2014) ..............................................................................59

*Concerned About Trident v. Rumsfeld*,
   555 F.2d 817 (D.C. Cir. 1977).....................................................................22, 27

*Constitution Pipeline Co. v. A Permanent Easement for 1.23 Acres
   and Temporary Easements for 1.52 Acres*,
   No. 3:14-CV-2036, 2015 WL 1637976 (N.D.N.Y. Feb. 21, 2015) ..................63

*Constitution Pipeline Co. v. A Permanent Easement for 1.80 Acres
   and Temporary Easement for 2.09 Acres*,
   No. 3:14-CV-2049, 2015 WL 1638250 (N.D.N.Y. Feb. 23, 2015) ..................63

*Cordiano v. Metacon Gun Club, Inc.*,
   575 F.3d 199 (2d Cir. 2009) ..............................................................................41

*Defenders of Wildlife v. FERC*,
   No. 10-1407 (D.C. Cir. Feb. 22, 2011)...............................................................48

*Del. Dep't of Nat. Res. and Envtl. Control v. FERC*,
   558 F.3d 575 (D.C. Cir. 2009)............................................................................37

*Del. Riverkeeper Network v. FERC*,
   No. 13-1015 (D.C. Cir. Feb. 6, 2013)..................................................................48

*Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*,
   No. 15-2122, 2016 WL 4174045 (3d Cir. Aug. 8, 2016) ........... 34-36, 44, 46, 47

*Envtl. Def. v. U.S. Envtl. Prot. Agency*,
   369 F.3d 193 (2d Cir. 2004) ..............................................................................10

*Equitrans, L.P. v. 0.56 Acres*,
   145 F. Supp. 3d 622 (N.D.W.V. 2015).........................................................50, 65

*ExxonMobil Gas Mktg. Co. v. FERC*,
  297 F.3d 1071 (D.C. Cir. 2002) ..........................................................33

*Fed. Power Comm'n v. Colo. Interstate Gas Co.*,
  348 U.S. 492 (1955) .............................................................20, 22, 24

*Feighner v. FERC*,
  No. 13-1016 (D.C. Cir. Feb. 8, 2013) .............................................48

*Fuel Safe Wash. v. FERC*,
  389 F.3d 1313 (10th Cir. 2004) ........................................... 17, 21-22

*Fulcher v. United States*,
  604 F.2d 295 (4th Cir. 1979), *on reh'g*, 632 F.2d 278
  (4th Cir. 1980) ...............................................................................59, 60

*Georgia v. City of Chattanooga*,
  264 U.S. 472 (1924) ..........................................................................58

*Griffith v. Fed. Labor Relations Auth.*,
  842 F.2d 487 (D.C. Cir. 1988) ....................................................69, 70

*Gunpowder Riverkeeper v. FERC*,
  807 F.3d 267 (D.C. Cir. 2015) ..................................................7, 36, 40

*Hammond v. Norton*,
  370 F. Supp. 2d 226 (D.D.C. 2005) ............................................11, 27

*In re Minisink Residents for Envtl. Preservation and Safety*,
  No. 12-1390 (D.C. Cir. Oct. 11, 2012) ...........................................48

*In Re The Delaware Riverkeeper Network*,
  No. 15-1052 (D.C. Cir. Mar. 19, 2015) ..........................................48

*Iselin v. United States*,
  270 U.S. 245 (1926) ..........................................................................41

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*,
  482 F.3d 79 (2d Cir. 2006) ...........................................................35, 44

*Islander East Pipeline Co., LLC v. McCarthy*,
  525 F.3d 141 (2d Cir. 2008) .........................................................10, 11

viii

*Joslin Mfg. Co. v. City of Providence*,
    262 U.S. 668 (1923)................................................................. 58-59

*Kelo v. City of New London*,
    545 U.S. 469 (2005)...................................................................13, 61

*Klemic v. Dominion Transmission, Inc.*,
    138 F. Supp. 3d 673 (W.D. Va. 2015)..............................................65

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976).............................................................10, 11, 23

*Logan v. Zimmerman Brush Co.*,
    455 U.S. 422 (1982)................................................................ 12, 67-71

*Mfrs. Hanover Trust Co. v. C. I. R.*,
    431 F.2d 664 (2d Cir. 1970) ...........................................................42

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)......................................................................10, 11

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)...........................................................13, 60, 61, 64

*Michigan Consol. Gas Co. v. FERC*,
    883 F.2d 117 (D.C. Cir. 1989)........................................................29

*Minisink Residents for Envtl. Pres. and Safety v. FERC*,
    762 F.3d 97 (D.C. Cir. 2014)......................................9, 10, 29, 33, 55

*Minisink Residents for Envtl. Preservation and Safety v. FERC*,
    No. 12-1481 (D.C. Cir. Mar. 5, 2013) .............................................48

*Mobil Oil Expl. & Prod. Serv. v. United Dist. Cos.*,
    498 U.S. 211 (1991).........................................................................55

*Montgomery v. Carter Cty.*,
    226 F.3d 758 (6th Cir. 2000) .........................................................59

*Moreau v. FERC*,
    982 F.2d 556 (D.C. Cir. 1993).........................................................55

ix

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
   783 F.3d 1301 (D.C. Cir. 2015) ..........................................................................29

*Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*,
   894 F.2d 571 (2d Cir. 1990) .............................................................................34

*Nat'l Parks Conservation Ass'n v. Jewell*,
   965 F. Supp. 2d 67 (D.D.C. 2013)...........................................................19, 22, 24

*Nat'l Wildlife Fed'n v. FERC*,
   912 F.2d 1471 (D.C. Cir. 1990)..........................................................................27

*N. Laramie Land Co. v. Hoffman*,
   268 U.S. 276 (1925)............................................................................................58

*NRDC v. Fed. Aviation Admin.*,
   564 F.3d 549 (2d Cir. 2009) .......................................................................17, 27

*N.Y. State Nat'l Org. for Women v. Pataki*,
   261 F.3d 156 (2d Cir. 2001) ..............................................................................67

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) .............................................................................11

*Olim v. Wakinekona*,
   461 U.S. 238 (1983)............................................................................................71

*Oneok, Inc. v. Learjet, Inc.*,
   135 S. Ct. 1591 (2015)........................................................................................35

*Pechatsko v. Comm'r of Soc. Sec.*,
   369 F. Supp. 2d 909 (N.D. Ohio 2004) ..............................................................40

*Polk v. Kramarsky*,
   711 F.2d 505 (2d Cir. 1983) ...................................................................67, 69, 70

*Presley v. City of Charlottesville*,
   464 F.3d 480 (4th Cir. 2006) .......................................................................59, 62

*PUD No. 1 of Jefferson Cty. v. Wash.Dep't of Ecology*,
   511 U.S. 700 (1994).................................................................................... 42-43

*Rex Realty Co. v. City of Cedar Rapids*,
    322 F.3d 526 (8th Cir. 2003) ...............................................................62

*Rex Realty Co. v. City of Cedar Rapids*,
    No. C99-103 MJM, 2000 WL 34031483
    (N.D. Iowa Feb. 16, 2000) ..................................................................59

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)..............................................................9, 16, 17

*Rosu v. City of N.Y.*,
    742 F.3d 523 (2d Cir. 2014) .............................................................67

*Schneidewind v. ANR Pipeline Co.*,
    485 U.S. 293 (1988)........................................................................ 34-35

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*,
    547 U.S. 370 (2006)......................................................................42, 43

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)..............................................................................40

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)............................................................................40

*Shvartsman v. Apfel*,
    138 F.3d 1196 (7th Cir. 1998) ..................................................69, 70, 71

*Sierra Club v. Clinton*,
    746 F. Supp. 2d 1025 (D. Minn. 2010)........................................16, 29

*Summit Lake Paiute Indian Tribe v. FERC*,
    No. 10-1389 (D.C. Cir. Jan. 28, 2011) .............................................48

*Thatcher v. Tenn. Gas Transmission Co.*,
    180 F.2d 644 (5th Cir. 1950) ............................................................66

*Town of Huntington v. Marsh*,
    859 F.2d 1134 (2d Cir. 1988) .........................................................17

*Transmission Access Policy Study Grp. v. FERC*,
    225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*,
    535 U.S. 1 (2002)................................................................................22

*United States v. 131.68 Acres of Land*,
   695 F.2d 872 (5th Cir. 1983) ...............................................................59

*United States v. Puerto Rico*,
   721 F.2d 832 (1st Cir. 1983).........................................................39, 40

*United States ex rel. TVA v. Welch*,
   327 U.S. 546 (1946)...............................................................................65

*Whittaker v. Cty. of Lawrence*,
   674 F. Supp. 2d 668 (W.D. Pa. 2009).................................................59

*Wilderness Soc. v. Salazar*,
   603 F. Supp. 2d 52 (D.D.C. 2009).................................................16, 19

*Wilderness Workshop v. U.S. Bureau of Land Mgmt.*,
   531 F.3d 1220 (10th Cir. 2008) ...........................................................16

*Zervos v. Verizon N.Y., Inc.*,
   252 F.3d 163 (2d Cir. 2001) .........................................................12, 40

**STATUTES**

15 U.S.C. § 717(a) ...............................................................................50, 65

15 U.S.C. § 717f(c) .......................................................................40, 64, 66

15 U.S.C. § 717f(e) ...................................................................18, 28, 31, 66

15 U.S.C. §§ 717f(h) .....................................................................18, 65, 66

15 U.S.C. § 717r(a) ...................................................................................56

15 U.S.C. § 717r(b)....................................... 13, 20, 22, 24, 28, 46, 56, 58

15 U.S.C. § 717r(c) ...............................................................................56, 57

16 U.S.C. § 797(e) ......................................................................................40

33 U.S.C. § 1251(d) ..............................................................................11, 41

33 U.S.C. § 1341(a)(1)........................................................................37, 39

33 U.S.C. § 1341(d) ....................................................................................39

42 U.S.C. § 4370m-6 ................................................................24

OTHER AUTHORITIES

U.S. Const. Amend. V............................................................12, 13

18 C.F.R. § 157.10 ................................................................32

18 C.F.R. § 157.22 ................................................................45

18 C.F.R. § 380.12 ................................................................26

40 C.F.R. § 121.1(a) ..............................................................41

40 C.F.R. § 1502.7 ................................................................16

40 C.F.R. § 1508.25(c) ............................................................15

6 NYCRR 633.2 ....................................................................45

52 Fed. Reg. 5446-01 (Feb. 23, 1987) ..............................................42

77 Fed. Reg. 56835 (Sept. 14, 2012) ...............................................14

Fed. R. Evid. 201 ................................................................57

*Constitution Pipeline Company, LLC*,
   154 FERC ¶ 61,092 (2016) ......................................................47

*Constitution Pipeline Company, LLC*
   156 FERC ¶ 61,035 (2016) ......................................................49

*Dominion Cove Point LNG, LP, et al.*,
   118 FERC ¶ 61,007 (2007) (order vacated in part by *Wash. Gas
   Light Co. v. FERC*, 532 F.3d 928 (D.C. Cir. 2008)) ............................55

*E. Tenn. Natural Gas Co.*
   71 FERC ¶ 61,007 (1995) .......................................................55

*Millennium Pipeline Company, L.L.C.*,
   141 FERC ¶ 61,022 (2012) ......................................................47

*Ruby Pipeline, L.L.C.*,
   134 FERC ¶ 61,103 (2011) ......................................................47

*Ruby Pipeline, L.L.C.*,
    134 FERC ¶ 61,020 (2011) ...............................................................47

*Transcontinental Gas Pipe Line Company, LLC*,
    150 FERC ¶ 61,183 (2015) ...............................................................47

FERC's Certificate Policy Statement, *Certification of New Interstate
    Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 1999 WL
    718975 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further
    certified*, 92 FERC ¶ 61,094 (2000)....................................... 50-51, 66

# <u>GLOSSARY</u>

| | |
|---|---|
| Army Corps | United States Army Corps of Engineers |
| Catskill Petitioners | Petitioners Catskill Mountainkeeper, Clean Air Council, Delaware-Otsego Audubon Society, Riverkeeper, Inc. and Sierra Club |
| Certificate Order | *Constitution Pipeline Co., LLC*, 149 FERC ¶ 61,199 (2014) |
| Constitution | Intervenor Constitution Pipeline Company, LLC |
| CWA | Clean Water Act |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FERC | Respondent Federal Energy Regulatory Commission |
| IPPNY | Independent Power Producers of New York |
| JA | Joint Appendix |
| NEPA | National Environmental Policy Act |
| NGA | Natural Gas Act |
| NYSDEC | New York State Department of Environmental Conservation |
| P | Paragraph |

xv

| | |
|---|---|
| PADEP | Pennsylvania Department of Environmental Protection |
| Project | Constitution Pipeline Project |
| R. | Record |
| Rehearing Order | *Constitution Pipeline Company, LLC*, 154 FERC ¶ 61,046 (2016) |
| Section 401 Certification | Water Quality Certification under Section 401 of the Clean Water Act |
| STP | Petitioner Stop the Pipeline |
| USDOT | United States Department of Transportation |

## STATEMENT OF THE CASE

### I.  The Constitution Pipeline Project

The Constitution Pipeline Project (the "Project") is an interstate natural gas pipeline which involves the construction and operation of approximately 124 miles of new 30-inch-diameter pipeline and associated equipment and facilities extending from Susquehanna County, Pennsylvania, through Broome, Chenango, Delaware, and Schoharie Counties, New York.  R.2628, *Constitution Pipeline Co., LLC*, 149 FERC ¶ 61,199 (2014) ("Certificate Order"), P 6, JA___.  Constitution Pipeline Company, LLC ("Constitution") has executed binding agreements with customers for 100 percent of the Project's capacity, up to 650,000 dekatherms per day of natural gas transportation service.  R.2628, Certificate Order, PP 1, 8, JA___, ___.  The Project will make available to markets in New York and New England inexpensive, clean-burning natural gas produced from the Marcellus Shale region in Pennsylvania.  R.2628, Certificate Order, P 25, JA___.  The Project also will provide natural gas service to homes and businesses in Pennsylvania and New York that currently do not have access to natural gas.  R.2609, Final Environmental Impact Statement, at 1-2, JA___.

## II.    Prior Unsuccessful Efforts to Stop the Project

Petitioners[1] pursued a number of unsuccessful challenges to stop the Project.

Petitioner Stop the Pipeline ("STP") sought to stop the Project by filing a motion for

stay pending rehearing with the Federal Energy Regulatory Commission ("FERC")

on January 12, 2016.  R.2822, STP's Motion, JA___.  STP also requested a stay of

tree felling to the extent FERC later authorized such activity to proceed.  R.2822,

STP's Motion, at 1, JA___.  Petitioners Catskill Mountainkeeper, Clean Air Council,

Delaware-Otsego Audubon Society, Riverkeeper, Inc. and Sierra Club (the "Catskill

Petitioners") also sought a stay pending rehearing before FERC.  R.2832, Catskill

Petitioners' Motion, JA___.  FERC issued its Order Denying Rehearing on January

28, 2016, dismissing the requests for stay pending rehearing as moot, and dismissing

STP's request for stay of tree felling activity as premature.  R.2851, *Constitution

Pipeline Company, LLC*, 154 FERC ¶ 61,046 (2016) ("Rehearing Order"), PP 13-

14, JA___.  Thereafter, on February 5, 2016, Petitioners Clean Air Council and

Sierra Club filed with this Court an emergency motion for a stay of pre-construction

tree felling activities in Pennsylvania, (Case 16-345, Docket No. 10), which was

denied on February 24, 2016.  (Case 16-345, Docket No. 62.)  Petitioners now seek

---

[1]    Constitution uses the term "Petitioners" to refer collectively to all Petitioners
in this consolidated proceeding.

to set aside two final orders issued by FERC authorizing the Project.  R.2628, Certificate Order, JA___; R.2851, Rehearing Order, JA___.

## III.    FERC's Orders and Review Process

Over the course of two and a half years, FERC conducted a comprehensive evaluation of the Project's potential impacts on environmental, historic, cultural, and other resources.  FERC prepared a 400-page Draft Environmental Impact Statement ("DEIS"), solicited comments on the DEIS, and issued a 450-page Final Environmental Impact Statement ("FEIS").  R.1560, DEIS, JA___; R.2609, FEIS, JA___.  The FEIS addressed the Project's impacts on:  geology; soils; water resources; wetlands; vegetation; wildlife and fisheries; special status species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; cumulative impacts; and alternatives.  R.2628, Certificate Order, P 72, JA___.  The FEIS also addressed comments submitted by various parties, including Petitioners, in a 2,900-page annotated appendix.  R.2609, FEIS, Appendix S.  FERC determined that although the Project would have some adverse environmental impacts, those impacts would be reduced to less-than-significant levels with implementation of numerous mandatory mitigation measures.  R.2628, Certificate Order, PP 3, 73, JA___, ___.

Ultimately, FERC found a "strong showing of public benefit" and need for the Project and determined that this public benefit outweighs any adverse effects on

landowners and surrounding communities.  R.2628, Certificate Order, PP 22-23, 26,

29, JA___, ___, ___; R.2851, Rehearing Order, PP 18-19, JA___.  On December 2,

2014, FERC issued a 57-page certificate of public convenience and necessity for the

Project.  R.2628, Certificate Order, JA___.  FERC's January 28, 2016 Rehearing

Order affirms the findings and conclusions in the Certificate Order and addresses

specific arguments raised by Petitioners.  R.2851, Rehearing Order, JA___.

## SUMMARY OF THE ARGUMENT

FERC satisfied its responsibilities under the National Environmental Policy

Act ("NEPA") by developing a thorough and complete record on potential Project

impacts to all impacted resources, including water and wetland resources.  This

comprehensive process fulfilled NEPA's goals of informed decision-making and

informed public participation.  As part of its careful analysis, FERC determined that

environmental effects from natural gas production are generally neither caused by a

proposed pipeline nor are they reasonably foreseeable consequences of FERC's

approval of a pipeline.  Where there is no causal relationship between an agency

action and an alleged effect, the alleged effect does not require consideration under

NEPA.  While FERC discussed the impacts of natural gas production in the area of

the Project, it found that a more specific analysis of Marcellus Shale upstream

facilities is beyond the scope of its analysis because of the lack of a causal

4

connection, particularly because the exact location, scale, and timing of future facilities are unknown. FERC fully satisfied its statutory responsibilities.

FERC thoroughly considered the Project's potential impacts on water quality by identifying and discussing potential stream and wetland impacts and imposing 43 separate environmental conditions in the Certificate Order. The Petitioner's proposed outcome – requiring complete site-specific data in advance of an environmental impact statement – would inappropriately morph NEPA into a substantive permitting statute. It also would contradict Supreme Court precedent, which does not require a "fully developed plan" prior to agency action. The extensive record here enabled FERC to take a "hard look" at potential impacts, fashion adequate mitigation measures, and appropriately inject environmental considerations into the decision-making process.

The Catskill Petitioners' implication that Constitution did not submit to FERC the method it would use to cross each stream is directly contradicted by the record. The FEIS lists the 289 waterbodies that would be crossed and the methods by which Constitution proposes to cross them. The FEIS provides a discussion of each of the crossing methods and the associated waterbody impacts that would occur. The FEIS also discusses mitigation measures to reduce any adverse environmental impacts associated with the Project. FERC's analysis and consideration of potential water quality impacts more than exceeds the requirement for agencies to adequately

5

discuss potential impacts in order to make an informed decision. Petitioners' disagreement with the outcome of FERC's fully informed and well-considered decision does not make FERC's comprehensive process arbitrary and capricious.

STP's argument that FERC did not support its issuance of the Certificate Order with substantial evidence fails, given that FERC found that the execution of precedent agreements for 100 percent of the Project's capacity demonstrates the market need for the Project. The D.C. Circuit Court of Appeals recently twice affirmed similar determinations based upon the existence of precedent agreements. The fact that Project capacity is met through two shippers does not diminish the demonstrated need for the Project.

STP speculates that the Project is driven by excess supply of natural gas from Pennsylvania, not market demand. However, STP ignores FERC's reasoned findings that document an increased demand for natural gas in New York and New England and the lack of adequate pipeline capacity to deliver required volumes of natural gas. STP's argument that the Project would not alleviate alleged system constraints ignores FERC's determination that the Project will allow shippers to transport inexpensive natural gas from Pennsylvania, as opposed to relying on gas transported from other areas of the country. While STP disagrees with FERC's determination that the public convenience and necessity requires the Project, simple disagreement does not demonstrate that FERC's thoughtful and reasoned

6

conclusions were arbitrary and capricious, particularly with respect to an issue on which FERC's specialized expertise is entitled to considerable weight.

FERC fully complied with the Clean Water Act ("CWA") when it issued conditional approval of the Project. Petitioners' arguments to the contrary ignore FERC's fundamental right to condition the issuance of its certificates of public convenience and necessity on the applicant later obtaining a CWA Section 401 Water Quality Certification. *See Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 279-80 (D.C. Cir. 2015) (Rogers, J., concurring in relevant part) (explaining that "[t]he plain text of the Clean Water Act does not appear to prohibit the kind of conditional certificate the Commission issued here" and that "[t]his court has upheld conditional permitting in similar circumstances"). As part of a political strategy to stop natural gas development, Petitioners seek to circumvent Congress' mandate to federalize regulation of interstate natural gas transmission by giving states the ultimate decision-making power over whether a pipeline would be permitted.

The Certificate Order is neither a "license" nor "permit" under Section 401 of the CWA. Thus, the CWA's prohibition on issuance of a "license" or "permit" does not apply to the issuance of certificates of public convenience and necessity because such certificates do not authorize any construction activities that result in a discharge into navigable waters in the absence of a Section 401 water quality certification or

waiver thereof.  Petitioners also failed to demonstrate that they have suffered any harm resulting from the sequence and timing of the Certificate Order's issuance.

The due process rights of STP and its members were not violated in the FERC proceedings because they were provided more than adequate notice and opportunity to be heard prior to the Certificate Order's issuance.  Given (a) the narrow scope of this Court's review of public use determinations, (b) the broad deference shown to such determinations, (c) the low risk of an erroneous deprivation of property, and (d) the substantial government interest in the timely completion of the Project, due process does not require that this Court review the validity of the Certificate Order prior to Constitution's initiation of eminent domain.  The review procedures set forth in the Natural Gas Act ("NGA") do not preclude the initiation of eminent domain proceedings prior to this Court's review of the Certificate Order.  Additionally, FERC's issuance of the Tolling Order did not violate due process because it did not extinguish STP's cause of action for challenging the validity of the Certificate Order. STP and its members have a protectable property interest in their cause of action, but not in the review procedures set forth in the NGA to protect that interest.

## ARGUMENT

Catskill Petitioners and STP raise multiple issues in their petitions for review of FERC's Orders.  Constitution addresses some of the issues raised by Petitioners, and has endeavored not to repeat likely arguments that FERC and other intervenors

8

may make, but rather to supplement those arguments from the perspective of the Project applicant and holder of the Certificate Order.

## POINT I

## STANDARD OF REVIEW

I.    **Review of Final Environmental Impact Statement Under NEPA**

NEPA sets forth procedures for federal agencies to follow to ensure that the environmental effects of proposed actions are "adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA's primary purpose is to make certain "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts[.]" *Id.* at 349.

"NEPA is a procedural statute; it 'does not mandate particular results, but simply prescribes the necessary process.'"  *Minisink Residents for Envtl. Pres. and Safety v. FERC*, 762 F.3d 97, 111 (D.C. Cir. 2014) (quoting *Robertson*, 490 U.S. at 350).  "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350. "Congress enacted NEPA 'to ensure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals … would have reached had they been members of the decisionmaking unit of the agency.'" *Citizens Against*

9

*Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).

An agency must take a "hard look" at "the environmental impact of its action[]." *Minisink*, 762 F.3d at 111; *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (same). Challenges to agency action under NEPA are reviewed using the arbitrary and capricious standard and are entitled to a high degree of deference. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375, 377-78 (1989); *Coal. for Responsible Growth and Res. Conservation v. FERC*, 485 F. App'x 472, 474 (2d Cir. 2012) (Summary Order). "The arbitrary and capricious standard of review is narrow and particularly deferential." *Envtl. Def. v. U.S. Envtl. Prot. Agency*, 369 F.3d 193, 201 (2d Cir. 2004). "A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency," but instead must consider whether the agency "'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Islander East Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150-51 (2d Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Although this review must be

10

"searching and careful," a court should "not lightly reach a conclusion that an agency has not examined all relevant data or satisfactorily demonstrated a rational connection between the facts it has found and its final decision." *Islander East*, 525 F.2d at 151. Courts must make a "pragmatic judgment" on whether an environmental impact statement's "form, content and preparation foster both informed decision-making and informed public participation." *Marsh*, 490 U.S. at 368 (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)). An agency's NEPA determination is entitled to judicial deference as long as it is "fully informed" and "well-considered," even if challengers disagree with the ultimate decision. *Hammond v. Norton*, 370 F. Supp. 2d 226, 242 (D.D.C. 2005) (internal quotations omitted).

## II. Review of Issuance of Certificate Order Prior to Section 401 Certification Under the CWA

Challenges to agency action brought under the CWA are reviewed using the arbitrary and capricious standard. *See Kleppe*, 427 U.S. at 412; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) ("Claims challenging federal agency action under the CWA and NEPA are subject to judicial review under the [Administrative Procedure Act]."). FERC's interpretation of the CWA, however, is not entitled to deference because FERC is not charged with administering the statute. *See* 33 U.S.C. § 1251(d); *Am. Rivers, Inc. v. F.E.R.C.*, 129 F.3d 99, 107 (2d Cir. 1997) ("FERC's interpretation of § 401, or any other provision

11

of the CWA, receives no judicial deference . . . because the Commission is not Congressionally authorized to administer the CWA.").  The Court exercises *de novo* review over FERC's interpretation of the  CWA.  *See Am. Rivers, Inc.*, 129 F.3d at 107; *see also Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) ("When we review a . . . decision *de novo,* we take note of it, and study the reasoning on which it is based.  However, our review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though it had come to the courts for the first time.").

## III.    Review of Due Process Claims Under the Fifth Amendment

The Due Process Clause of the Fifth Amendment prohibits the deprivation of life, liberty or property without due process of law.  U.S. Const. Amend. V.  Due process claims require a two-part inquiry:  whether there has been a deprivation of a protectable interest, and if so, what process is due.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

Although some form of hearing is required before a person is finally deprived of a protectable property interest, "due process is flexible and calls for such procedural protections as the particular situation demands," and the timing and nature of the required hearing will depend on the competing interests involved. *Brody v. Vill. of Port Chester*, 434 F.3d 121, 134 (2d Cir. 2005) (internal quotations omitted); *see also Logan*, 455 U.S. at 433-34.

12

The determination of how much process is due requires a balancing of three factors: (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value, if any, of additional safeguards; and (3) the Government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Mathews* is the test for both when a hearing is required (pre- or post-deprivation) and what kind of procedure is due. *Brody*, 434 F.3d at 135.

The Fifth Amendment likewise imposes two limitations on the right to exercise eminent domain: the taking must be for public use, and the owner must receive just compensation. U.S. Const. Amend. V. While there is a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, that role is extremely narrow. *Brody*, 434 F.3d at 127-28, 135. The Supreme Court has defined the concept of public use broadly, reflecting its longstanding policy of deference to legislative judgments in this field. *Id.* at 135 (quoting *Kelo v. City of New London*, 545 U.S. 469, 480 (2005)). Accordingly, "the role of the courts in enforcing the constitutional limitations on eminent domain is one of patrolling the borders." *Brody*, 434 F.3d at 135.

This Court may "affirm, modify, or set aside" the Certificate Order, 15 U.S.C. § 717r(b), but the relief that STP seeks – to rescind easement agreements and nullify certain orders entered by federal district courts in eminent domain actions – is not available here.

13

POINT II

**FERC's Hard Look and Preparation of Environmental Impact Statement**

FERC took a "hard look" at the Project's effects as demonstrated by the record, which spans more than four years and includes a thorough investigation into potential environmental impacts in fulfillment of NEPA's goals of informed decision-making and informed public participation.

On September 7, 2012, FERC issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Constitution Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings*, which was published in the Federal Register and mailed to more than 2,100 interested parties, including federal and state government representatives and environmental and public interest groups. R.2609, FEIS, at ES-2, JA___; 77 Fed. Reg. 56835 (Sept. 14, 2012). FERC held four public scoping meetings in the Project area to provide an opportunity for agencies, stakeholders, and the general public to learn more about the Project. R.2609, FEIS, at ES-2, JA___.

FERC issued a 400-page DEIS on February 12, 2014. *Id.* The U.S. Environmental Protection Agency ("EPA"), the Federal Highway Administration, and the New York State Department of Agriculture and Markets participated as cooperating agencies in the participation of the DEIS. *Id.* at 1-1 to 1-2, JA___. Public comment on the DEIS was open through April 7, 2014, during which time

14

FERC held four public comment meetings for the DEIS. R.2609, FEIS, at ES-2, JA___.

The Catskill Petitioners, STP, and the New York State Department of Environmental Conservation ("NYSDEC") submitted extensive comments on the DEIS. FERC issued the 461-page FEIS on October 24, 2014, along with a 2,900-page annotated appendix responding to public comments. FERC includes a discussion of the FEIS and its response to comments in its 57-page Certificate Order and 78-page Rehearing Order.

## I.    FERC Appropriately Determined that Induced Natural Gas Production is Not a Reasonably Foreseeable Effect of the Project

The Catskill Petitioners argue that FERC "refused" to consider indirect effects of upstream natural gas development "that would be induced by the pipeline." This argument is misguided and not supported by the record. FERC complied with the requirements of NEPA by, among other things, carefully examining the Project's potential indirect impacts. 40 C.F.R. § 1508.25(c); *see* R.2628, Certificate Order, PP 98-101, JA___; R.2609, FEIS, at § 4.13.1, JA___. FERC explained that environmental effects from natural gas production are generally neither caused by a proposed pipeline nor are they reasonably foreseeable consequences of FERC's approval of a pipeline. FERC has yet to be "presented with a proposed pipeline project that the record shows will cause the predictable development of gas reserves." R.2851, Rehearing Order, PP 133-153 (quoting P 138), JA___; R.2609,

15

FEIS at 4-232, JA___; R.2628, Certificate Order, PP 99-101, JA___. FERC found that "*existing and ongoing production could support the* [*Project*] *for many years, if not* [*its*] *entire useful life*." R.2851, Rehearing Order, P 148, JA___ (emphasis added).

Courts have recognized that there is not a reasonably close causal relationship between pipeline permitting and hydrocarbon development. *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1231 (10th Cir. 2008) (development of additional natural gas wells is entirely speculative); *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1044 (D. Minn. 2010) (oil sands will be extracted regardless of pipeline); *see also Wilderness Soc. v. Salazar*, 603 F. Supp. 2d 52, 62 (D.D.C. 2009).

Here, the FEIS included a discussion spanning 26 pages that addresses the development of the Marcellus Shale and potential cumulative impacts associated with it and the Project. *See* R.2609, FEIS, at 4-232 through 4-258, JA___. Such a particularized discussion and consideration of impacts to the environment in a 461-page FEIS is more than adequate under NEPA. *See City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 748 (2d Cir. 1983); 40 C.F.R. § 1502.7 (requiring an EIS to be concise and less than 300 pages). Catskill Petitioners' call for FERC to develop a "worst-case scenario" is the type of speculative analysis that the Supreme Court specifically rejected in overruling the case upon which Catskill Petitioners rely. *Robertson*, 490 U.S. at 354-56.

16

Once an agency has taken a "hard look" at the environmental factors involved, courts "do not take issue with particular conclusions reached by an agency." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1143 (2d Cir. 1988) (citing *City of New York*, 715 F.2d at 748). If the "environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. FERC appropriately discharged its duty under NEPA by making "'a reasonable, good faith, objective presentation of [] impacts sufficient to foster public participation and informed decision making.'" *Fuel Safe Wash. v. FERC*, 389 F.3d 1313, 1331 (10th Cir. 2004) (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999)); *see NRDC v. Fed. Aviation Admin.*, 564 F.3d 549, 560-61 (2d Cir. 2009).

## II. FERC Adequately Considered the Project's Impacts on Water Quality in Compliance with NEPA

For the reasons discussed below, the Catskill Petitioners failed to establish that FERC did not adequately consider the Project's impacts on water quality.

### A. The Lack of Complete, Site-Specific Data Does Not Render FERC's NEPA Analysis Unlawful

The Catskill Petitioners argue that the FEIS is deficient because it does not contain site-specific plans for how Constitution intends to conduct stream crossings.

17

They wrongly assert that in the absence of site-specific information, FERC could not properly evaluate crossing impacts.

Catskill Petitioners' argument fails to account for the practicalities of interstate pipeline development. Until a Certificate Order is issued, a project proponent frequently is unable to obtain survey access to all parcels crossed by the project, as was the case for Constitution. *See* R.2851, Rehearing Order, P 49, JA___. For that reason, FERC "typically authorize[s] natural gas projects … subject to conditions that must be satisfied by an applicant or others before the authorizations can be effectuated by constructing and operating the projects." *Id.* at P 43, JA___; 15 U.S.C. § 717f(e) (granting FERC "power to attach to the issuance of the certificate and to the exercise of rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require"). Catskill Petitioner's proposed outcome – requiring complete site-specific data in advance of an environmental impact statement – would inappropriately morph NEPA into a substantive permitting statute while at the same time prohibiting pipeline development since most projects require some use of eminent domain, which may only be exercised upon issuance of a Certificate Order. *See* 15 U.S.C. § 717f(h).

Catskill Petitioners' assertion that the absence of site-specific data ought to prevent FERC from acting is exactly the point that the Supreme Court rejected in *Robertson v. Methow Valley Citizens Council*:

> [I]t would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

490 U.S. at 353.

NEPA's goal is to inject environmental considerations into the planning process to improve the decision-making process. Here, FERC's issuance of a DEIS, its consideration of more than 4,000 comments, and its issuance of the 450-plus page FEIS evaluating in considerable depth the potential impacts and making recommendations for specific mitigation requirements exceeds the "hard look" requirement under NEPA. *See Wilderness Soc.*, 603 F. Supp. 2d at 64. The extensive record enabled FERC "to fashion adequate mitigation measures and support a determination that Constitution's project will result in some environmental impacts, but that these impacts will be reduced to less-than-significant levels upon compliance with the mitigation measures adopted as conditions of the" Certificate Order. R.2851, Rehearing Order, P 53, JA___. An Environmental Impact Statement ("EIS") is not required to contain "detailed, unchangeable" plans, and the Court should reject the Catskill Petitioners' effort to impose such a requirement under NEPA. *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 75 (D.D.C. 2013) (internal quotations omitted).

19

Such site-specific information is required later in the process for the Section 404 CWA Permit from the U.S. Army Corps of Engineers ("Army Corps"), and the Project cannot move forward without receipt of that permit.  R.2628, Certificate Order, Environmental Condition P 8, JA___.

### 1. FERC's Analysis of Stream Crossing Methods Was Adequate

Catskill Petitioners incorrectly imply that Constitution did not submit to FERC the method Constitution would use to cross each stream.  However, the FEIS clearly lists the 289 waterbodies that would be crossed and the methods proposed to cross them.  R.2609, FEIS, Appendix K, JA___.

Catskill Petitioners quote multiple times from NYSDEC's April 2016 letter denying Constitution's application for a water quality certification under Section 401 of the CWA, arguing that FERC "uncritically accepted" Constitution's finding that trenchless crossing methods are not practicable for waterbody crossings less than 30 feet in length, and that FERC "allowed Constitution to avoid analyzing the feasibility of performing trenchless crossings at 268 locations."  Catskill Petitioners failed to raise either of these issues on rehearing.  They are therefore waived.  15 U.S.C. § 717r(b); *Fed. Power Comm'n v. Colo. Interstate Gas Co*., 348 U.S. 492, 496-97 (1955).

Even so, the FEIS provided a full discussion of each of the crossing methods and the associated waterbody impacts that would occur as a result.  R.2609, FEIS,

20

at §§ 2.3.2.2 and 4.3.3.4, JA___, ___. FERC's requirement that geotechnical studies be completed before construction is an appropriate condition, and in the event that a trenchless crossing method is not feasible, an alternative method would be selected and approved. In short, each of the alternative crossing methods and their associated impacts were examined in the FEIS. R.2609, FEIS, at 4-51 to 4-57, JA___.

With respect to waterbody crossings less than thirty feet, the FEIS notes that trenchless crossing methods would be impractical and cause more ground disturbance due to minimum length requirements, depth of pipeline considerations, and workplace requirements. As explained in the FEIS:

> [C]onventional boring typically requires a crossing length of about 50 feet (minimum) to 400 feet (maximum) and two staging areas, typically 50 feet by 100 feet. HDD crossings typically require larger staging areas (typically 200 feet by 250 feet) on either side of the feature(s) crossed and a crossing distance not longer than 7,000 feet (for a 30-inch-diameter pipe). Direct Pipe crossings for a 30-inch-diameter pipe are typically less than 900 feet long. Because each HDD would generally require approximately 2.5 acres of workspace in order to complete the technique, it is rarely used to cross minor waterbodies, as dry crossings can often be implemented with less long-term impacts from staging workspaces. Additionally, shorter HDDs must be located closer to the ground surface (and resource) which may increase the risk of inadvertent releases of drilling fluid.

R.2609, FEIS, at 4-50, JA___.

Courts have upheld similar NEPA analyses that involve the removal of certain alternatives based on technical or engineering constraints. *E.g.*, *Fuel Safe Wash.*,

389 F.3d at 1325-27 (NEPA analysis upheld where certain routes were removed from consideration based on engineering difficulties).

Further, the later submission of site-specific plans does not violate NEPA's mandate to discuss possible mitigation measures. *Nat'l Parks Conservation Ass'n*, 965 F. Supp. 2d at 76. "NEPA does not mandate that every conceivable possibility which someone might dream up must be explored in an EIS." *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 829 (D.C. Cir. 1977).

## 2. FERC Adequately Considered Cumulative Impacts of Multiple Crossings on a Single Waterbody

Without identifying any particular instance or stream name, the Catskill Petitioners argue that FERC failed to adequately consider the cumulative impacts on "any of the waterbodies" that would be crossed multiple times. Catskill Petitioners failed to raise this issue on rehearing; thus, it is waived. *See* 15 U.S.C. § 717r(b); *Fed. Power Comm'n*, 348 U.S. at 496-97.

Even if the Court were to address this objection, however, the adequacy of an agency's discussion of cumulative impacts turns on a fact-based analysis and is subject to the "rule of reason" test to determine whether the discussion of cumulative impacts is reasonably thorough and would allow an agency to make an informed decision. *See Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 736 (D.C. Cir. 2000), *aff'd sub nom., New York v. FERC*, 535 U.S. 1 (2002). Here, FERC's comprehensive FEIS identifies every single crossing, together with the

waterbody type, crossing length, water quality standard, and crossing method, among other relevant details. R.2609, FEIS, Appendix K, JA___. The Catskill Petitioners fail to articulate how FERC's detailed consideration of these individual crossings together with the cumulative impacts of other projects in the area, which notably, "is a task assigned to the special competency" of FERC as the lead agency, can result in an invalid NEPA analysis, particularly given the 43 environmental conditions set forth in the Certificate Order. *Kleppe*, 427 U.S. at 414.

### 3. FERC Adequately Considered the Impacts of Potential In-Stream Blasting

Despite acknowledging that no in-stream blasting is anticipated (R.2609, FEIS, at 4-97, JA___), Catskill Petitioners argue that FERC cannot claim to have adequately assessed potential impacts from in-stream blasting without having any site-specific environmental or engineering information regarding in-stream blasting.

To the extent it is required, Constitution developed a blasting plan to address potential issues and impacts related to blasting and to minimize potential adverse impacts on the environment, nearby water sources, structures, or utilities. R.2609, FEIS, at § 4.1.3.8, JA___. Any required blasting would be conducted in accordance with applicable regulations. R.2609, FEIS, at 4-16, JA___. Contrary to Catskill Petitioners' assertion, the FEIS sets forth the framework under which Constitution would conduct blasting if it were required. R.2609, FEIS, at 4-16, 4-42, and 4-55, JA___, ___, and ___.

23

Catskill Petitioners' argument fails to acknowledge that FERC directly considered, and addressed in a condition, the requirement for site-specific blasting plans prior to any in-stream blasting. R.2628, Certificate Order, Environmental Condition 27, JA___. This specific consideration by FERC is sufficient to discharge its obligations under NEPA. *Nat'l Parks Conservation Ass'n*, 965 F. Supp. 2d at 76.

### 4. The Catskill Petitioners Waived their Right to Challenge FERC's Evaluation of Pipe Burial Depths

Catskill Petitioners assert that FERC employed an impermissible one-size-fits-all proposal for pipe depth without examining any site-specific information. Catskill Petitioners, however, failed to raise this issue in either its comments on the DEIS or in its rehearing request, so FERC did not have an opportunity to substantively respond. *See* R.2355, Catskill Petitioners' Comments on DEIS (Apr. 7, 2014), JA___; R.2643, Catskill Petitioners' Request for Rehearing (Dec. 30, 2014), JA___. They have thus waived this objection under both NEPA and the NGA. 42 U.S.C. § 4370m-6; 15 U.S.C. § 717r(b); *Fed. Power Comm'n*, 348 U.S. at 496-97. Even if the Court were to address the Catskill Petitioners' argument, FERC appropriately determined that Constitution will meet or exceed the burial depths required by the U.S. Department of Transportation ("USDOT") regulations at 49 CFR Part 192, "Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards." R.2628, Certificate Order, P 97, JA___. FERC found that "through compliance with the USDOT's construction, inspection, and

24

maintenance requirements and Constitution's additionally proposed measures, the projects can be safely constructed and operated." *Id.*

**B.    FERC Adequately Considered Constitution's Construction and Mitigation Measures in Determining that the Environmental Impact of the Project would be Reduced to Less Than Significant Levels**

Catskill Petitioners argue that FERC's evaluation of trenchless crossings was flawed because FERC's evaluation did not include any site-specific analysis, and that because crossing methods could be revised based on eventual site-specific analysis, FERC "had no idea to what extent the impacts to those waterbodies would be mitigated."   Catskill Petitioners also argue that while the FEIS stated that Constitution would use a dry crossing method for all other waterbodies, they assert that there is nothing in the Certificate Order that required Constitution to use dry crossing methods.

These arguments are factually erroneous and without merit.  In addition to the reasons set forth in Point II, Section II.A.1. (above), the Certificate Order articulates that Constitution has proposed certain trenchless and dry crossing methods.  R.2628, Certificate Order, P 77, JA___.  The crossing methodology for each and every stream is listed in Appendix K to the FEIS, a fact that Catskill Petitioners overlook.  R.2609, FEIS, Appendix K, JA___.   The Certificate Order mandates Constitution's compliance with the environmental conditions listed in the appendix to the Certificate Order, and Environmental Condition 1 requires Constitution to "follow

25

the construction procedures and mitigation measures" described in its application and supplements, "including responses to staff data requests and as identified in the EIS, unless modified by the Order." R.2628, Certificate Order, Environmental Condition P 1, JA___. Modifications may only be made upon a showing that the modification provides an equal or greater level of environmental protection from the original measure following written approval from the Director of the Office of Energy Projects. R.2628, Certificate Order, Environmental Condition P 1, JA___.

The mitigation measures, which are imposed to reduce any adverse environmental impacts associated with the Project, were discussed in the FEIS and were based on the detailed record, including public comments, and developed in accordance with the Project's likely impacts on specific resources. They also reflect FERC's expertise. R.2851, Rehearing Order, P 170, JA___. Constitution's construction and mitigation measures are based on FERC's NEPA regulations, which are specifically tailored to wetland and waterbody crossings. *See* 18 C.F.R. § 380.12. The information and data submitted by Constitution conforms to these regulations, including FERC's Wetland and Waterbody Construction and Mitigation Procedures. Catskill Petitioners' argument effectively asserts that FERC's regulations are invalid, which is a high hurdle to overcome.

Catskill Petitioners' effort to engage in a battle of experts regarding the viability of particular crossing methods is inappropriate since the Court's role under

NEPA is not to resolve scientific disputes.  *See NRDC*, 564 F.3d at 561.  Rather, the focus is "whether the EIS adequately discussed mitigation efforts as required by NEPA."  *Id*.  Catskill Petitioners wrongly assert that FERC relies on "unsubstantiated assumptions about mitigation measures," but they fail to articulate *why* they believe FERC did not adequately consider the mitigation measures proposed by Constitution.  FERC's reliance on information submitted by applicants is inherent in the regulatory process, and here, FERC's use of the information is reasonable where the Certificate Order requires compliance with multiple environmental conditions and written approvals from FERC before construction may proceed.  *See Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485-86 (D.C. Cir. 1990).  An agency need not explore every conceivable possibility in an EIS.  *Concerned About Trident*, 555 F.2d at 829.  Here, FERC examined each of the alternative crossing methods and their requisite impacts.  R.2609, FEIS, at 4-51 through 4-57, JA___.  An agency's NEPA determination is entitled to judicial deference as long as it is "fully informed" and "well-considered."  *Hammond*, 370 F. Supp. 2d at 242 (internal quotations omitted).  That the Catskill Petitioners' disagree with the outcome of FERC's decision does not render its conduct arbitrary or capricious.  *Id.*

## POINT III

## FERC Appropriately Determined that the Public Convenience and Necessity Requires Approval of the Project

STP argues that FERC violated the NGA by failing to provide substantial evidence regarding the need for the Project, asserting that statements in the record "resemble a sales pitch" and that there is no "substantiating evidence and analysis" in support of the public need for the Project. This pejorative argument ignores FERC's analysis of a robust record on the public need for the Project.

FERC may grant a certificate of public convenience and necessity to an applicant if it finds that a proposed project "is or will be required by the present or future public convenience and necessity." 15 U.S.C. § 717f(e). "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b).

FERC determined that the Project will help consumers in the New York and New England markets, who currently rely on more expensive sources of energy and natural gas from Canada and elsewhere, to replace those existing supplies with inexpensive, clean-burning natural gas from Pennsylvania. R.2628, Certificate Order, PP 25, 27, JA___, ___; R.2851, Rehearing Order, P 19, JA___.

FERC appropriately determined that Constitution's precedent agreements with Cabot Oil and Gas Corporation and Southwestern Energy Services Company

28

demonstrate a need for the Project.[2]  R.2628, Certificate Order, P 28, JA___; R.2851, Rehearing Order, PP 19, 21, JA___, ___.  The D.C. Circuit Court of Appeals has recently twice affirmed this point.  *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1311 (D.C. Cir. 2015); *Minisink*, 762 F.3d at 111 n. 10.

That Project capacity can be met through two shippers does not diminish the demonstrated need for the Project.  *See Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 123-24 (D.C. Cir. 1989) (finding FERC authorization supported by substantial evidence despite claim that the sole evidence in support of project was direct testimony from project proponent); *see also Sierra Club*, 746 F. Supp. 2d at 1035-36 (FEIS supported by evidence demonstrating need for pipeline project to secure a reliable source of oil and to meet shipper interest in increased pipeline capacity).

STP speculates that the Project is driven by excess supply of natural gas from Pennsylvania, not market demand, relying on a series of self-serving letters and unsubstantiated reports written mostly by Anne Marie Garti, STP's own attorney. STP, however, fails to address the significant and varied record documents that

---

[2]     "A precedent agreement is a binding contract under which one or both parties has the ability to terminate the agreement if certain conditions, such as receipt of regulatory approvals, are not met."  R.2609, FEIS, at 1-3 n.5, JA___.

support a demonstrated need for the Project,[3] in addition to the reports cited by FERC that have "documented increased demand for natural gas in New York and New England and the lack of adequate pipeline capacity to deliver required volumes of natural gas." R.2609, FEIS, at 3-3, JA___.

The New York State Public Service Commission commented that the Project has "the potential to provide gas to unserved municipalities" and "industrial areas not presently served by natural gas utilities," and that there are also potential "economic benefits in the nature of lower prices for heating or industrial process fuels by switching from oil to gas."[4] Leatherstocking Gas Company identified a dozen towns in New York and Pennsylvania that it is authorized to serve through an interconnection with Constitution. R.170, Motion to Intervene by Leatherstocking Gas Company LLC, at 2, JA___. However, STP argues that FERC should discount these points because of the rural nature of these communities and their "insignificant" potential use of natural gas.

---

[3]   R.2639, Letter from Connecticut Attorney General to FERC, JA___; R.678, Letter from Independent Power Producers of New York ("IPPNY") to FERC, JA___; R.1787, Letter from IPPNY to FERC, JA___; R.844, Letter from New York Affordable Reliable Electricity Alliance to FERC, JA___; R.2281, Letter from The Business Council of New York State, Inc. to FERC, JA___; R.1829, Letter from National Grid Gas Delivery Cos. to FERC, JA___.

[4]   Letter from New York Public Service Commission to FERC (Oct. 31, 2012), ADD137-50. Citations to "ADD" refer to pages of the Addendum being submitted with Constitution's Brief.

STP's argument suggests a short-sighted approach where FERC is prohibited from authorizing projects that could increase capacity within the interstate pipeline network until such time as other projects are constructed. Such a short-sighted approach is inconsistent with the NGA, which authorizes FERC to approve a project if it "is or **will be** required by the present or **future** public convenience and necessity." 15 U.S.C. § 717f(e) (emphasis added). Here, FERC appropriately found "that the public convenience and necessity requires approval of" the Project. R.2628, Certificate Order, P 29, JA___.

STP ignores the evidence that conflicts with its position. Even one of the third-party reports upon which STP heavily relies recognizes the functionality of the Project, yet STP fails to acknowledge the point. The Levitan report, quoted in STP's brief and heavily-cited in Anne Marie Garti's "analysis" of project need, points out that Iroquois' "ability to transport Marcellus gas to Long Island" is contingent on the Project. R.2303, Attachment 1, at 22, JA___. The Levitan report further acknowledges that the Project would allow Iroquois "to tap into a **lower cost gas supply**." *Id.* at 29, JA___ (emphasis added).

This highlights the flaw in STP's analysis. STP focuses on one factor, contending that the Project would not alleviate system constraints ("the Iroquois and Tennessee pipelines … are already full of gas"), but ignores other factors, such as the price of Marcellus gas versus gas transported from other areas of the country and

31

world.  *See* R.2851, Rehearing Order, PP 19 n.26, 95, 102, JA___, ___, ___; R.2609, FEIS, at 1-2, 3-3, JA___, ___ (identifying project purpose as optimizing existing systems and creating a more competitive market).  FERC explained that "existing shippers on Tennessee and Iroquois can take title to the gas transported on Constitution at the interconnect and use their existing capacity rights to transport natural gas from the terminus of the Constitution pipeline, ***rather than transporting other gas supplies***."  R.2851, Rehearing Order, P 19 n.26, JA___ (emphasis added).  Thus, shippers with subscribed capacity on these lines that currently rely on more expensive sources of gas from Canada and elsewhere will be able to replace those existing supplies with cheaper gas from Pennsylvania – a result that is in the public interest.

A major flaw in STP's argument is that it disputes the Project's need by focusing almost exclusively on a few statements in the draft and final environmental impact statements and associated resource reports while ignoring the rest of the record.  STP complains that the "only materials prepared by FERC on which the public could comment are a few pages in the DEIS."  STP ignores the multitude of materials submitted in support of the Project and available on the FERC docket and in the record, particularly to intervenors.  18 C.F.R. § 157.10.  Despite its access to a FERC record that contains thousands of documents, STP largely bases its arguments regarding project need on an "analysis" prepared by its attorney.

32

In the end, STP's objections come down to the fact that it simply disagrees with FERC's determination that the public convenience and necessity requires approval of the Project. Simple disagreement, however, is not enough to overturn FERC's thoughtful and reasoned conclusions. The interstate natural gas pipeline network is a complex system with multiple variables, and evaluating these variables lies at the heart of FERC's specialized expertise. *See Minisink*, 762 F.3d at 111. "[T]he Commission brings to bear its considerable expertise about the natural gas industry." *ExxonMobil Gas Mktg. Co. v. FERC*, 297 F.3d 1071, 1084 (D.C. Cir. 2002). A "presumption of validity attaches" to FERC's decisions, and "those who would overturn its judgment have a heavy burden of making a convincing showing that" FERC acted arbitrarily and capriciously. *Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1029 (D.C. Cir. 1977). FERC's determination that the public convenience and necessity requires approval of the Project is supported by substantial evidence, and STP has failed to establish otherwise.

## POINT IV

### FERC Did Not Violate the CWA By Issuing the Certificate Order Prior to Constitution's Receipt of a Section 401 Certification from New York

Petitioners' argument that FERC purportedly violated the CWA by issuing the Certificate Order prior to New York's issuance of a water quality certification pursuant to Section 401 of the CWA ("Section 401 Certification") was recently rejected in a strikingly similar case by the United States Court of Appeals for the

33

Third Circuit. *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, No. 15-2122, 2016 WL 4174045 (3d Cir. Aug. 8, 2016). Likewise, Petitioners' argument here should be rejected because:

(1) Petitioners seek to avoid Congress' mandate to federalize regulation of interstate natural gas transmission by giving states the ultimate decision-making power over whether a pipeline would be permitted;

(2) The Certificate Order is not an authorization for construction activities that results in a discharge into navigable waters and does not trigger, by itself, the CWA's requirements for a Section 401 Certification;

(3) The Certificate Order is not a "license" or "permit" as those terms are used in Section 401 of the CWA; and

(4) Petitioners have not suffered any harm as a result of the sequence and timing of the issuance of FERC's Certificate Order.

## I.   Petitioners' Proposed Framework Contravenes Congress' Intent to Federalize Regulation of Interstate Natural Gas Facilities under the NGA

Under the NGA, FERC determines the need for, and the location of, interstate gas transmission facilities. Petitioners' framework would undermine FERC's exclusive authority to determine the route of an interstate natural gas pipeline, "[a]llowing all the sites and all the specifics to be regulated by agencies with only local constituencies." *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*, 894 F.2d 571, 579 (2d Cir. 1990); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 305,

34

308 (1988); *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1600 (2015) (citing

*Schneidewind* for the proposition that "'the control of . . . facilities of natural gas

companies'" is one of the areas "'over which FERC has comprehensive authority'").

Petitioners' proposed framework – that a state's Section 401 Certification must come

before FERC is authorized to issue a certificate of public convenience and necessity

– contravenes Congress' clear intent to federalize the regulation of interstate natural

gas facilities under the NGA. *See Islander E. Pipeline Co., LLC v. Conn. Dep't of

Envtl. Prot.*, 482 F.3d 79, 90 (2d Cir. 2006). Petitioners' proposal would elevate a

state's asserted interest in water quality above all other environmental and public

interests, ignoring FERC's statutory mandate to balance the public's need for a

project and the environmental effect, accounting for mitigation through imposition

of extensive environmental conditions. While protection of the environment is "*a

public interest*," it is not the *only* public interest. *Amoco Prod. Co. v. Vill. of

Gambell, Alaska*, 480 U.S. 531, 545-46 (1987) (emphasis in original) (rejecting

notion that environmental considerations "supersede all other interests," including

natural resource development).

## II. The Certificate Order is Not an Authorization for Construction Activities That Results in a Discharge Into Navigable Waters

Petitioners' argument that issuance of the Certificate Order prior to issuance

of a Section 401 Certification violates the CWA is similar to an argument recently

rejected by the Third Circuit in another interstate pipeline project. *See Del.*

*Riverkeeper Network*, 2016 WL 4174045.  In *Delaware Riverkeeper*, the petitioners

argued that the felling of trees without a Section 401 Certification was improper, and

the Third Circuit rejected that argument because the activity did not "trigger" the

certification requirements of the CWA:

> Moreover, the Riverkeeper is incorrect in assuming that tree-clearing is implicated by PADEP's substantive water quality determinations:  the Army Corps of Engineers stated that the tree-clearing activity for which Transco sought authorization would not trigger the need for permits under the Clean Water Act.  FERC designated the tree-clearing activity as a "pre-construction activity," while FERC's certificate requires a Water Quality Certification only for "construction activity."

*Id.* at *16.

The Certificate Order here does not in and of itself trigger the certification

requirements of the CWA because it does not authorize any construction activity

constituting a "discharge" into navigable waters prior to receipt of all applicable

authorizations required under federal law.  R.2628, Certificate Order, at 46, JA____

(conditioning Certificate Order on, among other things, Constitution's compliance

with environmental conditions); R.2628, Certificate Order, Appendix

(Environmental Conditions), P 8, JA____; *see also Gunpowder Riverkeeper*, 807

F.3d at 279 (Rogers, J., concurring in relevant part) (noting that there are "no

activities authorized by the conditional certificate itself that may result in such

discharge prior to the state approval and the Commission's issuance of a Notice to

36

Proceed"); *see also Del. Dep't of Nat. Res. and Envtl. Control v. FERC*, 558 F.3d 575, 577 (D.C. Cir. 2009) (FERC order conditionally approving application to construct liquid natural gas terminal did not authorize construction absent additional approvals).

The CWA states that any applicant for a federal Section 404 permit[5] to construct or operate a facility that ***may result in a discharge to navigable waters*** needs to obtain "a [Section 401] certification from the State in which the discharge originates . . . that any such discharge will comply with" applicable state water quality standards. 33 U.S.C. § 1341(a)(1). Section 401 of the CWA provides that a state water quality certification must precede any federal "*license or permit* to conduct any activity . . . which may result in any discharge into the navigable waters . . . ." *Id.* (emphasis added). ***The Section 404 permit triggers the requirement to obtain a Section 401 Certification, not the Certificate Order*** issued by FERC, since the Certificate Order is not a license or a permit that authorizes activity that could result in a discharge into the navigable waters of the United States.

As the Third Circuit held in *Delaware Riverkeeper*, there must be an activity that may result in a discharge to navigable waters to trigger the CWA's Section 401 certification requirements. The Certificate Order does not trigger the Section 401

---

[5]     Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States.

37

Certification; rather, it is the Section 404 permit from the Army Corps, which Constitution has not received yet, that triggers the requirement. Petitioners' argument cannot prevail because they overstate the reach of the CWA's certification requirements.

STP speculates that the conditions of a Section 401 Certification could "negate activities that FERC authorizes" between the time when FERC issues a Certificate Order and a state issues a Section 401 Certification (STP's Br. at 22). This speculation is unfounded because one of the standard conditions of a certificate of public convenience and necessity is that the project applicant must file documentation that they have received all applicable authorizations required under federal law (or evidence of waiver thereof) before commencing construction of project facilities. *See, e.g.*, R.2628, Certificate Order, Appendix (Environmental Conditions), P 8, JA____; *Transcontinental Gas Pipe Line Co., LLC*, 149 FERC ¶ 61, 258 (Dec. 18, 2014), Appendix B (Environmental Conditions), P 9; *Tennessee Gas Pipeline Co., L.L.C.*, 139 FERC ¶ 61,161 (May 29, 2012), Appendix B (Environmental Conditions), P 8. Under Section 401(d) of the CWA, any limitations or monitoring prescribed in the Section 401 Certification to ensure that the applicant will comply with federal or approved state water quality standards under the CWA shall become conditions of the federal license or permit (the Army Corps' 404 permit) and thus control the construction and operation of the project. *See* 33 U.S.C.

38

§ 1341(d); R.2851, Rehearing Order, P 68, JA___. For this reason, FERC's issuance of the Certificate Order prior to receipt of a Section 401 Certification does not prevent any later-adopted conditions to a Section 401 Certification from applying to a project. *See* R.2851, Rehearing Order, P 68, JA___.

## III. The Certificate Order is Not a License or Permit Under the CWA

Petitioners' argument that FERC violated the CWA by issuing its Certificate Order before NYSDEC issued its Section 401 Certification also presumes, incorrectly, that a FERC Certificate Order is a "license or permit." Petitioners' argument distorts the language from Section 401 of the CWA referencing only a "license or permit" to include certificates, such as the FERC Certificate Order at issue here:

> Any applicant for a Federal **license or permit** to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the **licensing or permitting** agency a certification from the State in which the discharge originates ....

33 U.S.C. § 1341(a)(1) (emphasis added).

There is no case that supports Petitioners' tortured construction of the plain meaning language of "license or permit." The cases Petitioners rely upon simply do not apply to the issuance of certificates by FERC under the NGA. *United States v. Puerto Rico*, 721 F.2d 832 (1st Cir. 1983) involved the United States Navy's use of an island and its surrounding coastal waters to stage training exercises. *Id.* at

833. The requirement to obtain a Section 401 Certification was triggered by the Navy's application for a National Pollution Discharge Elimination System permit to authorize the dropping of ordnances into coastal waters. *Id.* The other cases cited by Petitioners pertain to FERC's explicit authority to *license* hydroelectric projects under the Federal Power Act. These cases are inapposite because FERC does not issue licenses pursuant to the NGA. FERC only issues *licenses* for hydroelectric facilities under the Federal Power Act, 16 U.S.C. § 797(e).

While FERC did not discuss this distinction in the Rehearing Order,[6] under the NGA, FERC issues *certificates* of public convenience and necessity. 15 U.S.C. § 717f(c); *Gunpowder Riverkeeper*, 807 F.3d at 270. A certificate of public convenience and necessity is neither a license nor a permit. The Certificate Order *certifies* that that the Project is in the public convenience and necessity. R.2628, Certificate Order, P 29, JA____.

---

[6] Application of the rule that limits judicial review to reasons advanced by an agency (commonly referred to as the *Chenery* doctrine) is limited to situations where courts are reviewing determinations of issues that are exclusively reserved to that agency alone based on the agency's specialized expertise and administrative experience. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 207 (1947); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *Pechatsko v. Comm'r of Soc. Sec.*, 369 F. Supp. 2d 909, 913 (N.D. Ohio 2004). ***Case law authorizes a reviewing court to affirm an agency decision on grounds not advanced by the agency in the narrow situation where that agency, here FERC, is not administering the CWA.*** *See Am. Rivers, Inc.* 129 F.3d at 107; *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168 (2d Cir. 2001); *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963, 972 (D.C. Cir. 2011).

Federal regulations, likewise, refute Petitioners' argument. EPA, the federal agency charged with administering the CWA, 33 U.S.C. § 1251(d), defines the term "license or permit" to mean "any license or permit granted by an agency of the Federal Government to conduct any activity which may result in any discharge into the navigable waters of the United States." 40 C.F.R. § 121.1(a). The terms "license or permit" should not be interpreted to include anything broader, such as a certificate of public convenience and necessity, which does not by itself authorize any activity that may result in a discharge. To interpret this language otherwise would violate two foundational semantic canons: (1) the omitted-case canon, *casus omissus pro omisso habendus est*, which represents "[t]he principle that a matter not covered is not covered," or in other words, that "[n]othing is to be added to what the text states or reasonably implies"; and (2) the negative-implication canon, *expressio unius est exclusio alterius*, that "[t]he expression of one thing implies the exclusion of others." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93-100, 107-11 (2012); *Iselin v. United States*, 270 U.S. 245, 251 (1926) ("To supply omissions transcends the judicial function.") (Brandeis, J.); *Mfrs. Hanover Trust Co. v. C. I. R.*, 431 F.2d 664, 668 (2d Cir. 1970) (same). This Court has applied the *expressio unius* canon to regulatory definitions under the CWA, and it should do so here with respect to the terms "license or permit." *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 221 (2d Cir. 2009).

41

EPA's CWA Section 401 Water Quality Certification Handbook further supports this point, relying upon *S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370, 386 (2006). EPA's Handbook identifies examples of federal licenses and permits subject to Section 401 certification, ***but only FERC licenses, not certificates of public convenience and necessity, are included***:

> [F]ederal licenses and permits subject to §401 certification include CWA §402 NPDES permits in states where EPA administers the permitting program, CWA §404 permits for discharge of dredged or fill material issued by the Army Corps of Engineers (Corps), Federal Energy Regulatory Commission (FERC) hydropower licenses, and Rivers and Harbors Act §9 and §10 permits for activities that have a potential discharge in navigable waters issued by the Corps.

CLEAN WATER ACT SECTION 401 WATER QUALITY CERTIFICATION: A WATER QUALITY PROTECTION TOOL FOR STATES AND TRIBES, April 2010, at 1-2, ADD45-46.

FERC's regulations are congruent with this statutory framework, since the only regulations that reference FERC's role as a *licensing agency* are set forth in the Federal Power Act regulations, 18 C.F.R. Part 4, and are limited in scope to hydroelectric license applications. 52 Fed. Reg. 5446-01 (Feb. 23, 1987). There are no comparable provisions referencing licensing under the NGA.

Nothing in the holdings of *S.D. Warren Co. v. Maine Board of Environmental Protection*, 547 U.S. 370 (2006) or *PUD No. 1 of Jefferson County v. Washington*

42

*Department of Ecology*, 511 U.S. 700 (1994) contradict that a certificate of public convenience and necessity is neither a license nor a permit. The holding in *S.D. Warren* is that "hydroelectric dams require § 401 state certifications." 547 U.S. at 384 n.8. The Court in *PUD No. 1* held that a state may include minimum stream flow requirements in a Section 401 certification regarding a hydroelectric project insofar as necessary to enforce approved state water quality standards. 511 U.S. at 723. The Court in *PUD No. 1* articulated certain licenses and permits requiring state certification, mentioning, for example, a permit from the Army Corps for the discharge of dredged or fill material. *Id.* at 722-23. Notably absent from this articulation was any mention of a certificate of public convenience and necessity from FERC.

## IV. Petitioners Failed to Demonstrate That They Suffered Any Harm As a Result of the Issuance of the Certificate Order Prior to Constitution's Receipt of a Section 401 Certification from New York

Petitioners assert that FERC's issuance of the Certificate Order prior to Constitution's receipt of a Section 401 Certification from New York allowed three purportedly damaging activities to occur: (1) the use of eminent domain to acquire rights-of-way; (2) the felling of trees in Pennsylvania; and (3) the removal of trees by landowners and third parties within the right-of-way in New York. None of these, however, constitute harms caused by FERC's issuance of the Certificate Order prior to New York's action on the Section 401 Certification. Petitioners' failure to

43

demonstrate prejudice or harm stemming from the Certificate Order defeats their claims. *See Del. Riverkeeper Network*, 2016 WL 4174045, at *8, *15.

### A. Lawful Use of Eminent Domain to Guarantee Survey Access

Without a Certificate Order from FERC, Constitution would not be guaranteed survey access—in part due to STP's efforts to discourage landowners from voluntarily providing such access—and sufficient survey access is a prerequisite for certain federal authorizations required by FERC before it will issue a Notice to Proceed with construction.[7] *See* R.2851, Rehearing Order, P 49, JA___. Thus, without the Certificate Order and/or sufficient survey access, the permitting process would reach an inevitable impasse, contrary to the express purposes of the NGA and the Energy Policy Act of 2005, which are designed to avoid subjecting project applicants to "death by a thousand cuts" via multiple inconsistent approval review processes. *Islander E.*, 482 F.3d at 85 (citing, *inter alia*, Natural Gas Symposium: Symposium Before the S. Comm. On Energy & Natural Res., 109th Cong. 41 (2005)).

---

[7]   *See, e.g.*, http://www.stopthepipeline.org/take-action-now/critical-information-on-ferce28099s-conditions/downloadable-version-of-the-critical-information-on-ferce28099s-conditions/ ("Many of these conditions [in the Order] are within the landowners' control. If you do NOT allow access to your property, these conditions cannot be met, and construction cannot begin."). Indeed, STP both discouraged landowners from allowing survey access on their properties while also complaining that 24% of the properties crossed by the pipeline had not been surveyed at the time the DEIS was issued.

The regulatory process is not designed to operate in the facially unworkable manner asserted by Petitioners. Infrastructure projects of this nature involve coordinating multiple authorizations from different agencies. Consistent with Congress' mandate in passing the Energy Policy Act of 2005, coordinated consideration of these authorizations is required with FERC serving as the lead agency.[8]

### B. Pre-Construction Tree Felling in Pennsylvania and Allegations of Tree Removal in New York by Landowners and Third Parties

STP argues that allowing tree felling[9] to occur in *Pennsylvania*, which had issued a Section 401 Certification, prior to receipt of a Section 401 certification from *NYSDEC*, when no tree felling occurred in New York, violates the CWA and the

---

[8]   *See* 18 C.F.R. § 157.22 ("For an application under section 3 or 7 of the Natural Gas Act that requires a Federal authorization—*i.e.*, a permit, special use authorization, certification, opinion, or other approval—from a Federal agency or officer, or State agency or officer acting pursuant to delegated Federal authority, a final decision on a request for a Federal authorization is due no later than 90 days after the Commission issues its final environmental document, unless a schedule is otherwise established by Federal law.").

[9]   STP refers to this activity as "clear-cutting," which is a defined term under *New York's* environmental regulations governing freshwater wetlands permits, 6 NYCRR 633.2. The activity referenced by STP occurred in *Pennsylvania* and is referred to as "tree felling," as opposed to "tree clearing." "Tree felling" is a term that describes non-mechanized felling of trees and vegetation above the ground surface by hand rotary cutting and chain sawing, which does not substantially disturb the root system nor involve mechanized pushing, dragging, or re-deposition of soil material.

45

terms of the Certificate Order.  This argument fails because STP has not suffered any harm.

STP chose not to seek rehearing of FERC's January 29, 2016 Letter Order granting a Notice to Proceed for Constitution to perform tree felling in Pennsylvania, thereby failing to preserve this argument on appeal.  15 U.S.C. § 717r(b); *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) ("[C]ourts should not topple over administrative decisions unless the administrative body not only has erred, *but has erred against objection made at the time appropriate under its practice*." ) (emphasis in original) (internal citations and marks omitted).

Even assuming that STP preserved this issue, tree felling is not subject to regulation under the CWA because it does not result in a "discharge."  *Del. Riverkeeper Network*, 2016 WL 4174045, at *2, *16.  The Army Corps explicitly acknowledged this fact in a letter to Constitution which FERC relied upon in authorizing tree felling activities in Pennsylvania.  R.2852, Jan. 29, 2016 Letter Order, at 1-2, JA___; R.2833, Jan. 14, 2016 letter from Constitution to FERC attaching Jan. 14, 2016 letter from Army Corps to Constitution, at 1, JA___.  Not only did the Army Corps expressly state that Constitution did not need a Section 404 permit to perform tree felling activities, the Pennsylvania Department of Environmental Protection ("PADEP") had already issued a Section 401 Certification for the Project on September 5, 2014, long before Constitution began tree felling

46

activities in February 2016. R.2598, Pennsylvania Section 401 Certification, at 1-5, JA____.

The Third Circuit rejected an identical argument in *Delaware Riverkeeper Network*, ruling that the petitioner "has not demonstrated prejudice from [the] alleged errors [in the Certification issuance]" and "has failed to demonstrate that it suffered harm from the sequence of PADEP's permitting actions." *Del. Riverkeeper Network*, 2016 WL 4174045, at *15. Here, motions to stop tree felling for the Project were filed before FERC and this Court, and both FERC and this Court denied those motions. In denying the motion for stay, FERC specifically ruled that the petitioners had failed to demonstrate that they would suffer irreparable harm absent a stay. *See Constitution Pipeline Company, LLC*, 154 FERC ¶ 61,092, P 10 (2016). FERC, this Court, and other courts have reached similar conclusions in other projects and denied requests for stay of pre-construction and construction activities that are based on generalized *ipse dixit* claims of harm. *See Transcontinental Gas Pipe Line Co., LLC*, 150 FERC ¶ 61,183, P 13 (2015) (rejecting "unsupported allegations" of irreparable harm in denying motion for stay); *Millennium Pipeline Co., L.L.C.*, 141 FERC ¶ 61,022, PP 14-17 (2012) (rejecting request for stay based on claims that tree cutting would cause irreparable harm to local residents, including injury to endangered species and reduced property values); *Ruby Pipeline, L.L.C.*, 134 FERC ¶ 61,103, PP 18-20 (2011) and 134 FERC ¶ 61,020, PP 15-23 (2011) (allegations of

47

environmental harm did not support grant of a stay); *Coal. for Responsible Growth and Res. Conservation v. FERC*, No. 12-566 (2d Cir. Feb. 28, 2012) (order denying motion for stay); *In Re The Delaware Riverkeeper Network*, No. 15-1052 (D.C. Cir. Mar. 19, 2015) (order dissolving administrative stay); *Minisink Residents for Envtl. Preservation and Safety v. FERC*, No. 12-1481 (D.C. Cir. Mar. 5, 2013) (order denying motion for stay); *Feighner v. FERC*, No. 13-1016 (D.C. Cir. Feb. 8, 2013) (order denying motion for stay); *Del. Riverkeeper Network v. FERC*, No. 13-1015 (D.C. Cir. Feb. 6, 2013) (order denying motion for stay); *In re Minisink Residents for Envtl. Preservation and Safety*, No. 12-1390 (D.C. Cir. Oct. 11, 2012) (order denying petition for stay); *Defenders of Wildlife v. FERC*, No. 10-1407 (D.C. Cir. Feb. 22, 2011) (order denying motion for stay); *Summit Lake Paiute Indian Tribe v. FERC*, No. 10-1389 (D.C. Cir. Jan. 28, 2011) (order denying motion for stay). STP cannot demonstrate that it suffered any harm as a result of the tree felling in Pennsylvania or that FERC's authorization of the tree felling violated the CWA.

The only harm alleged by Catskill Petitioners is the cutting of trees by landowners and third parties in New York (***not by Constitution***) after issuance of the Certificate Order. Catskill Petitioners base this generalized allegation of harm on a

complaint filed by the New York Attorney General's Office with FERC,[10] which is currently under administrative review and not ripe for judicial review in this proceeding. *See Constitution Pipeline Company, LLC*, 156 FERC ¶ 61,035 (July 13, 2016), ADD90-95.[11]

## POINT V

### FERC Did Not Violate the Due Process Clause of the Fifth Amendment by Issuing the Tolling Order

STP argues that FERC violated the NGA and Due Process Clause of the Fifth Amendment by issuing the Tolling Order because it purportedly "blocked" STP from obtaining any judicial review of the validity of the Certificate Order or the

---

[10]    Complaint and Petition by the Office of the New York Attorney General, FERC Docket No. CP13-499, Accession No. 20160516-5191, P 48 (May 13, 2016).

[11]    FERC found in an Order dated July 13, 2016, that the complaint "does not include any specific facts to support such allegations, but instead relies upon speculation that Constitution had a role in the land clearing that has occurred within its right of way," and "provides no authority for [its] theory of vicarious liability" that a certificate holder has a duty to ensure that others do not cause violations of the certificate order within the pipeline right of way once it knows of those activities. *Id.* PP 10-11, ADD92-93. FERC concluded that the complaint may constitute a valid request for investigation and referred the matter "to Commission staff for further examination and inquiry as may be appropriate." *Id.* P 12, ADD93. Constitution vigorously denies the allegations that Constitution expressly or tacitly authorized, encouraged, and/or condoned the alleged tree and vegetation cutting and clear-cutting, and other ground disturbance activities. *See* Answer of Constitution Pipeline Company, LLC to Complaint and Petition by the Office of the New York State Attorney General, FERC Docket No. CP13-499, Accession No. 20160602-5387 (June 2, 2016).

public need for the Project prior to Constitution initiating eminent domain proceedings against certain of STP's members. STP's argument fails because (1) STP and its members have been provided more than adequate due process and ample opportunity to be heard with respect to the validity of the Certificate Order, along with any eminent domain actions, and (2) STP and its members have not been deprived of any protectable property interest.

Although the Tolling Order may have delayed STP's cause of action to challenge the validity of the Certificate Order, STP's cause of action was not extinguished so there is no deprivation of a property right. Further, STP and its members have no protectable interest in the procedures for review of the Certificate Order.

## I. STP and Its Members Were Provided More Than Adequate Due Process and Opportunity to be Heard as to the Validity of the Certificate Order

STP and its members were afforded more than adequate due process and the opportunity to be heard as to the validity of the Certificate Order and its public purpose. By enacting the NGA, Congress concluded that the construction of interstate natural gas pipelines is a public use and FERC's review of proposed pipeline projects under the NGA is an exercise in deciding whether, after balancing all the interests at stake and potential impacts, a project is required by the public interest. *See* 15 U.S.C. § 717(a); *Equitrans, L.P. v. 0.56 Acres*, 145 F. Supp. 3d 622, 631 (N.D. W.Va. 2015); *see generally* FERC's Certificate Policy Statement,

50

*Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 1999 WL 718975 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further certified*, 92 FERC ¶ 61,094 (2000).

### A. STP and Its Members Were Provided Sufficient Due Process in the FERC Proceedings

STP and its members had ample notice and opportunity to be heard in the FERC proceedings as to the public purpose of the Project. Prior to issuance of the Certificate Order, STP and/or its members (if they were affected landowners) received the following notices:

- Notice of Intent to Prepare an Environmental Impact Statement for the Planned Constitution Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings, September 7, 2012 (ADD96-108);

- Notice of Public Scoping Meeting and Extension of Scoping Period for the Planned Constitution Pipeline Project, October 9, 2012 (ADD109-11);

- Notice of Application, June 26, 2013 (R.15, JA___);

- Notice of Schedule for Environmental Review of the Constitution Pipeline and Wright Interconnect Projects, December 13, 2013 (R.1543, JA____);

51

- Notice of Availability of the Draft Environmental Impact Statement and Public Comment Meetings for the Proposed Constitution Pipeline and Wright Interconnect Projects, February 12, 2014 (R.1559, JA_____);

- Notice of Revised Schedule for Environmental Review of the Constitution Pipeline and Wright Interconnect Projects, August 18, 2014 (R.2594, JA_____); and

- Notice of Availability of the Final Environmental Impact Statement for the Proposed Constitution Pipeline and Wright Interconnect Projects, October 24, 2014 (R.2608, JA_____).

These notices invited comments regarding the Project, provided notice of public meetings regarding the Project, identified the procedure to intervene and explained that only intervenors could seek judicial review of FERC orders.

These public comment and intervention procedures provided STP and its members with ample notice and opportunity to challenge the public purpose of the Project prior to issuance of the Certificate Order. *See* R.2609, FEIS, at § 1.3, JA___. FERC received comments regarding the public purpose and need for the Project, including comments from STP. R.2609, FEIS, at 1-3, 1-4, §1.3, JA___, ___, ___. After considering the comments and reviewing the written record, FERC applied its

Certificate Policy Statement to determine that the Project was required by the public convenience and necessity. R.2628, Certificate Order, PP 27-29, JA___.

As examples, each of the members of STP who submitted affidavits in support of STP's Brief – Glenn T., Laura J. and Russell E. Bertrand; Daniel Joseph and LauraJean Oliva Brignoli; Robert J. Lidsky and Beverly Travis; Robert and Anne G. Stack; and Mark P. Pezzati – availed themselves of the opportunity to be heard in the FERC proceedings. Each filed motions to intervene to preserve their appeal rights, though none of them filed appeals. R.405, JA____ (Bertrands); R.201, 207, JA___, ___ (Brignolis); R.84, 516, JA___, ___ (Lidsky/Travis); R.130, JA____ (Pezzati); R.192, 196, JA___, ___ (Stacks). They also submitted multiple comments to FERC at various times throughout the FERC proceedings:

- The Bertrands submitted four (4) comments between September 29, 2012 and June 18, 2014 (R.2259, 2566, JA___, ___; ADD112-17;

- The Brignolis submitted seven (7) comments between February 10, 2013 and April 5, 2014 (R.1090, 1599, 1624, 1656, 1703, 2223, JA___, ___, ____, ____, ____, ____; ADD118-20;

- Lidsky/Travis submitted thirteen (13) comments between October 18, 2012 and April 5, 2014 (R.1092, 1104, 1609, 1647, 1701, 1702, 1717, 1726, 1983, 2224, JA___, ___, ___, ___, ___, ___, ___, ___, ___, ___; ADD121-26;

53

- Pezzati submitted nine (9) comments between August 12, 2012 and April 7, 2014 (R.1592, 1678, 1922, 2231, 2342, 2354, 2359, JA___, ___, ___, ___, ___, ___, ___; ADD127-130; and

- The Stacks submitted five (5) comments between August 9, 2012 and April 6, 2014 (R.2230, 2237, 2239, JA___, ___, ___; ADD131-36.

The comments filed with FERC by STP members who submitted affidavits in support of STP's brief demonstrate that they had the opportunity to be heard on a wide range of issues in the FERC proceedings, including the use of eminent domain and the public purpose and need for the Project. The Bertrands, Stacks, Lidsky/Travis and Pezzati all submitted comments questioning the public need for the Project and/or whether it would serve a public purpose. R.1647, 2237, 2239, 2259, JA___, ___, ___, ___; ADD121, 127. The Bertrands, Stacks and Lidsky/Travis submitted comments about the use of eminent domain by Constitution. R.1609, 1726, 1983, 2224, 2230, 2259, JA___, ___, ___, ___, ___, ___. The Brignolis, Stacks, Lidsky/Travis and Pezzati indicated that they attended public meetings intended to allow further opportunity to comment on the Project. R.1922, 1983, 2223, 2237, JA___, ___, ___, ___.

Due process does not require an adjudicatory hearing prior to issuance of the Certificate Order because STP and its members were provided notice and the opportunity to raise objections to the Project (including whether it served a public

purpose) through written comments in the FERC proceedings. FERC is granted broad discretion in determining how best to order its proceedings – including whether to provide for a paper hearing or a formal, in-person, evidentiary hearing. *See Minisink*, 762 F.3d at 114; *see also Mobil Oil Expl. & Prod. Serv. v. United Dist. Cos.*, 498 U.S. 211, 230-31 (1991).[12] When the paper record provides a sufficient basis for resolving issues, as it did here, FERC's long-standing practice is to provide for a paper hearing. *Dominion Cove Point LNG, LP, et al.*, 118 FERC ¶ 61,007, PP 33-34 (2007) (order vacated in part by *Wash. Gas Light Co. v. FERC*, 532 F.3d 928 (D.C. Cir. 2008)). Because the NGA does not require an in-person evidentiary hearing, the mere fact that FERC issued the Certificate Order after a paper hearing does not mean that STP and its members were denied the opportunity to be heard prior to the issuance of the Certificate Order.

Even after the Certificate Order was issued and Constitution acquired eminent domain authority under the NGA as the holder of a certificate of public convenience and necessity, intervenors, including STP, the Bertrands, the Brignolis, Lidsky/Travis, the Stacks and Pezzati, had the right to file a Request for Rehearing

---

[12] Courts have recognized that an evidentiary hearing is only required when there are material factual issues in dispute that cannot be resolved on the basis of the written record. *CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1293 (D.C. Cir. 1994); *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993); *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1426 (10th Cir. 1992); *see also E. Tenn. Natural Gas Co.*, 71 FERC ¶ 61,007 (1995).

55

with FERC, followed by a Petition for Review with the Court of Appeals if the Request for Rehearing is denied. 15 U.S.C. § 717r(a),(b). Only STP exercised this right. Although the filing of a Request for Rehearing or a Petition for Review does not act as an automatic stay of the Certificate Order (*see* 15 U.S.C. § 717r(c)), STP also had the option of seeking a stay or other injunctive relief from FERC or the Court of Appeals. In fact, STP twice sought such relief, which was denied each time. *See* R.2822, STP's Motion, at 1, JA___; R.2851, Rehearing Order, PP 13-14 (denying stay), JA___; March 27, 2015 Petition for Writ of Mandamus to Second Circuit in Case No. 15-926; April 21, 2015 Order denying mandamus in Case No. 15-926.

## B. The NGA, Due Process, and Eminent Domain

STP acknowledges that it is not seeking to impose any additional burdens on the government to provide due process, because they are "merely asking this Court to enforce existing procedures, not add new ones" and seeking "the judicial review already required under the NGA." STP's Br. at 36-37. STP's acknowledgment effectively concedes that the due process afforded by the judicial review procedures in the NGA are adequate, and their only objection is that the Tolling Order purportedly prevented that judicial review from taking place prior to the commencement of eminent domain procedures.

The judicial review procedures set forth in the NGA do not prohibit the exercise of eminent domain while such reviews are pending, and Constitution was free to initiate eminent domain proceedings prior to judicial review of the Certificate Order with or without the Tolling Order. Indeed, Congress expressly provided in the NGA that the filing of a request for rehearing shall not operate as a stay of the Certificate Order unless specifically ordered by FERC, and that the filing of a petition for review with the Circuit Court shall not operate as a stay of the Certificate Order unless specifically ordered by the court. 15 U.S.C. § 717r(c). Although STP argues that judicial review of the Certificate Order should take place before eminent domain proceedings are completed, that is not required by the NGA.

Further, the eminent domain proceedings are not completed and STP's claims that title has passed from property owners to Constitution in the eminent domain actions are incorrect.[13] The unchallenged court orders referenced by STP in its brief (*see* STP's Br. at 25; R.2822, STP's Motion, Ex. 2, JA___) only granted Constitution

---

[13] The pleadings and filings in the condemnation actions – including the Notices of Condemnation, Orders to Show Cause, briefs of the parties and the court's decisions – are matters of public record that are subject to judicial notice under Fed. R. Evid. 201. The pleadings and filings from the condemnation proceedings involving the STP members who were subject to condemnation and submitted affidavits in support of STP's Brief are available through the U.S. District Court for the Northern District of New York at Docket Nos. 3:14-CV-2071 (Bertrand), 3:14-CV-2004 (Brignoli), 3:14-CV-2049 (Lidsky/Travis) and 3:14-CV-2039 (Stack).

57

access to and possession of the easements being condemned. *Title will not pass unless and until the parties reach an agreement or Constitution pays compensation as determined by the court*. Accordingly, for those eminent domain actions involving STP members, this Court's judicial review of the Certificate Order is taking place prior to Constitution taking title.

### 1. Pre-Deprivation Review is Not Required Because the Takings Clause of the Fifth Amendment Provides Adequate Procedural Safeguards

The due process provided in the eminent domain proceedings is not at issue here. Those actions are still pending and the district court-ordered possession orders[14] were not challenged. Here, the Court is reviewing the Certificate Order and may "affirm, modify, or set aside" that Order. 15 U.S.C. § 717r(b). The relief STP seeks – to rescind easement agreements and nullify the district court's possession orders[15] – is not available. Nonetheless, due process does not require a pre-deprivation hearing in eminent domain proceedings because of the safeguards provided by the Takings Clause of the Fifth Amendment. *See Bailey v. Anderson*, 326 U.S. 203, 205 (1945); *N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 284 (1925); *Georgia v. City of Chattanooga,* 264 U.S. 472, 483 (1924); *Joslin Mfg. Co.*

---

[14]    *See* Orders referenced in STP's Br. at 25; R.2822, STP's Motion, Ex. 2, JA___.

[15]    *See* STP's Br. at 9, 59.

*v. City of Providence*, 262 U.S. 668, 678-79 (1923); *Presley v. City of Charlottesville*, 464 F.3d 480, 489-90 (4th Cir. 2006); *Montgomery v. Carter Cty.*, 226 F.3d 758, 768-69 (6th Cir. 2000); *United States v. 131.68 Acres of Land*, 695 F.2d 872, 876 (5th Cir. 1983); *Fulcher v. United States*, 604 F.2d 295, 297 (4th Cir. 1979), *on reh'g*, 632 F.2d 278 (4th Cir. 1980); *Whittaker v. Cty. of Lawrence*, 674 F. Supp. 2d 668, 696 (W.D. Pa. 2009). In fact, the Third Circuit recently affirmed the right of a pipeline company to exercise eminent domain based on a blanket certificate of public convenience and necessity that had been issued 30 years earlier to cover routine activities, and in that case, FERC did not review the proposed route for the pipeline replacement project at issue and there was no pre-deprivation hearing at FERC. *Columbia Gas Transmission, LLC v. 1.01 Acres*, 768 F.3d 300, 304, 314 (3d Cir. 2014) (holding that "a certificate of public convenience and necessity gives its holder the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner defendant will receive in return for the easement").

When the intended use is public, such as an interstate natural gas pipeline, the need and timing of the taking are legislative questions and a hearing on those issues is not essential to due process. *See Bragg v. Weaver*, 251 U.S. 57, 58 (1919); *see also Fulcher*, 604 F.2d at 297; *Rex Realty Co. v. City of Cedar Rapids*, No. C99-103 MJM, 2000 WL 34031483, *2-*3 (N.D. Iowa Feb. 16, 2000). Due process only

59

requires that reasonable notice and the opportunity to be heard is provided in the compensation proceedings. *Bragg*, 251 U.S. at 59; *Fulcher*, 604 F.2d at 297.

Despite these precedents and the fact that Congress elected not to establish an automatic stay or prohibition of eminent domain proceedings while a certificate of public convenience and necessity is under review, STP argues that judicial review of the Certificate Order is required prior to Constitution's initiation of eminent domain proceedings. STP relies on this Court's decision in *Brody v. Village of Port Chester*, 434 F.3d 121 (2d Cir. 2005), for its argument that a pre-deprivation judicial hearing is required, but its reliance is misplaced. In *Brody*, this Court held that it employs the *Mathews* test to determine whether due process is satisfied with respect to both when a hearing is required and what kind of procedure is due. Because the plaintiff in *Brody* had the opportunity for a pre-deprivation hearing, the *Brody* court did not need to consider whether or not a pre-deprivation hearing was required and did not reach any holding on that issue. *Id.* at 134-35.

In *Brody*, this Court held that the plaintiff had no due process right to participate in the Village's initial decision to exercise its eminent domain authority and that the post-determination review procedure provided by New York's eminent domain law satisfied due process. *Id.* at 129, 131, 133. This Court held that "where, as here, a condemnor provides an exclusive procedure for challenging a public use determination, it must also provide notice" of that procedure. *Id.* at 129. Here, STP

60

is not challenging the adequacy or content of any notice, and does not claim to have
been unaware of the judicial review procedures available under the NGA.

The *Brody* court also recognized that its role in determining public use is "an
extremely narrow one." *Id.* at 133 (quoting *Berman v. Parker*, 348 U.S. 26, 32
(1954)); *see also Kelo v. City of New London*, 545 U.S. 469, 483 (2005) ("For more
than a century, [the Supreme Court's] public use jurisprudence has widely eschewed
rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude
in determining what public needs justify the use of the takings power.").  As this
Court explained:

> The role of the judiciary, however narrow, in setting the
> outer boundaries of public use is an important
> constitutional limitation.  To say that no right to notice or
> a hearing attaches to the public use requirement would be
> to render meaningless the court's role as an arbiter of a
> constitutional limitation on the sovereign's power to seize
> private property.

*Brody*, 434 F.3d  at 129.  Accordingly, this Court did not hold that a hearing on
public use must take place prior to the commencement of eminent domain
proceedings.

STP correctly cites *Mathews* for the three factors to consider in assessing the
adequacy of procedures for due process purposes.  *Id.* at 134-35.  A balancing of the
*Mathews* factors to a challenge of the public nature of a taking weighs against the
necessity for a pre-deprivation hearing because the risk of erroneous deprivation is

61

so slight, given that there is rarely a dispute as to the public purpose. *See Rex Realty Co. v. City of Cedar Rapids*, 322 F.3d 526, 531 (8th Cir. 2003) (Bye, J., concurring). This Court likewise recognized that the risk of erroneous deprivation and the marginal benefit of additional procedures are low because of the narrow scope of issues that courts can review and the broad deference to determinations of public use. *Brody*, 434 F.3d at 135. Further, "the government's heightened interest in eminent domain and the unique safeguards surrounding takings necessarily affect any procedural due process analysis." *Presley*, 464 F.3d at 489; *see also Brody*, 434 F.3d at 136 ("[T]he government clearly has a strong interest not only in completing projects necessary for public use, but in completing them in a timely and efficient manner . . . The wisdom or advisability of a public project is not reasonably subject to the adversarial adjudicative process.").

There is minimal risk of erroneous deprivation and minimal benefit from additional procedures because of the broad latitude afforded in determining what constitutes a public use and the additional safeguards provided in eminent domain proceedings. There also is a strong government interest in completing the Project – which FERC determined was required by the public convenience and necessity – in a timely manner. R.2628, Certificate Order, at Ordering Paragraph (E), JA___. These factors weigh against judicial review of the Certificate Order prior to the initiation of eminent domain proceedings, and bolster Congress' decision not to

prohibit the exercise of eminent domain authority under the NGA while requests for rehearing or petitions for review are pending.

Although STP claims that there have been erroneous deprivations of real property because NYSDEC denied the Section 401 Certification, the denial of the Section 401 Certification – which is the subject of a separate appeal – does not render the Certificate Order invalid or establish that there was not a public purpose for the Project. Rather, it simply means that Constitution has not yet satisfied one of the conditions of the Certificate Order. As the United States District Court for the Northern District of New York repeatedly held in the eminent domain actions related to the Project, Constitution had the right to exercise eminent domain authority regardless of whether it obtained the Section 401 Certification. *E.g.*, *Constitution Pipeline Co. v. A Permanent Easement for 1.80 Acres and Temporary Easement for 2.09 Acres*, No. 3:14-CV-2049 (NAM/RFT), 2015 WL 1638250, at *3 (N.D.N.Y. Feb. 23, 2015); *Constitution Pipeline Co. v. A Permanent Easement for 1.23 Acres and Temporary Easements for 1.52 Acres*, No. 3:14-CV-2036 (NAM/RFT), 2015 WL 1637976, at *2 (N.D.N.Y. Feb. 21, 2015). Accordingly, the denial of the Section 401 Certification does not render the Certificate Order or the condemnations invalid.

Should this Court or the United States Supreme Court issue a final order that vacates or otherwise reverses the Certificate Order, Constitution would no longer be the holder of a certificate of public convenience and necessity and would no longer

be able to construct the Project. 15 U.S.C. § 717f(c)(1)(A). The district court orders granting possession to Constitution based only on the Certificate Order would be subject to further compensation proceedings to determine the compensation due for the period of time that the district court orders remained effective. The safeguards provided by the Takings Clause would still require that Constitution pay compensation to landowners for the property rights that were temporarily acquired.

Given (a) the various notices and opportunities for comment prior to the issuance of the Certificate Order, (b) the judicial review procedures provided by the NGA, (c) the procedural safeguards afforded in eminent domain proceedings, (d) Congress' determination that interstate natural gas pipelines serve a public purpose, (e) the limited scope of judicial review of public purpose, (f) the considerable deference given to public purpose determinations, and (g) the minimal risk of erroneous deprivation and the substantial government interest in completing the Project in a timely manner, the *Mathews* factors weigh against the need for judicial review of the Certificate Order prior to the initiation of eminent domain proceedings. Accordingly, the review procedures set forth in the NGA provide sufficient due process to STP and its members.

## 2. Congress Has Determined that Interstate Natural Gas Pipeline Projects Serve a Public Purpose

As to the question of whether a taking is for a public use, the Supreme Court has held that "it is the function of Congress to decide what type of taking is for a

64

public use and that the agency authorized to do the taking may do so to the full extent of its statutory authority." *United States ex rel. TVA v. Welch*, 327 U.S. 546, 551-52 (1946). Accordingly, when Congress has "spoken on [the] subject" of whether a taking is for a public use, "[i]ts decision is entitled to deference until it is shown to involve an impossibility." *Id.* at 552 (internal quotations and citations omitted).

By enacting the NGA, Congress determined that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that federal regulation in matters relating to the transportation [and sale] of natural gas . . . is necessary in the public interest." 15 U.S.C. § 717(a). Further, Congress has "spoken on the subject" whether takings for interstate natural gas pipeline projects is a public purpose by delegating the right of eminent domain to pipeline companies as part of its regulation of the transportation and sale of natural gas under the NGA. *See* 15 U.S.C.A. § 717f(h); *Equitrans*, 145 F. Supp. 3d at 631; *see also Klemic v. Dominion Transmission, Inc.*, 138 F. Supp. 3d 673, 693 (W.D. Va. 2015) (holding that state statute allowing survey access to pipeline companies prior to issuance of certificate of public convenience and necessity satisfied the public use requirement of the Takings Clause because Congress had declared that the transportation and sale of natural gas is affected with a public interest and the surveys were needed to obtain a certificate of public convenience and necessity).

65

In an early challenge to the NGA, the Fifth Circuit held that this grant of eminent domain authority in the NGA is constitutional because it is a regulation of interstate commerce by Congress. *Thatcher v. Tenn. Gas Transmission Co.*, 180 F.2d 644, 647-48 (5th Cir. 1950). As explained in *Thatcher*, "[t]here is no novelty in the proposition that Congress in furtherance of its power to regulate commerce may delegate the power of eminent domain to a corporation, which though a private one, is yet, because of the nature and utility of the business functions it discharges, a public utility, and consequently subject to regulation by the Sovereign." *Id.* at 647. In its regulation of interstate commerce through the NGA, Congress conditioned the right to exercise eminent domain authority only on the issuance of a certificate of public convenience and necessity, which in turn requires notice and a hearing by FERC to determine that a project is required by the public convenience and necessity. *See* 15 U.S.C. §§ 717f(c)(1)(B), 717f(h). The FERC certification process weighs the benefits of a proposed project against the potential consequences, and focuses on whether there is a need for the proposed project and whether it will serve the public interest. *See* Certificate Policy Statement, *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227, 1999 WL 718975 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further certified*, 92 FERC ¶ 61,094 (2000) (identifying the factors considered by FERC in determining whether a project is required by the public convenience and necessity); *see also* 15 U.S.C. § 717f(e).

66

## II. STP and Its Members Were Not Deprived of Any Protected Property Interest by Issuance of the Tolling Order

STP correctly states that it has a property interest in its appeal of the validity of the Certificate Order. *See Logan*, 455 U.S. at 428; *Polk v. Kramarsky*, 711 F.2d 505, 508-09 (2d Cir. 1983). However, STP and its members have not been deprived of that property interest by the issuance of the Tolling Order because STP's cause of action has not been extinguished. To the contrary, STP's cause of action is now before this Court to be decided on its merits.

### A. The Tolling Order Did Not Dismiss STP's Appeal or Prevent the Appeal from Being Heard on the Merits

This Court has repeatedly held that there is not a deprivation of property for due process purposes unless a cause of action is extinguished. *See Polk*, 711 F.2d at 509; *Rosu v. City of N.Y.*, 742 F.3d 523, 526 (2d Cir. 2014); *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001) (hereafter "*NOW*"). Delays in the adjudication of a claim do not amount to a deprivation of property, especially where STP has not even alleged that its likelihood of prevailing on its appeal of the Certificate Order was prejudiced by the delay.[16] Accordingly, STP and its members

---

[16] Even if STP had claimed that a deprivation occurred because its cause of action suffered actual prejudice as a result of the alleged delay, this Court has previously expressed strong misgivings as to whether that can constitute a property deprivation, where the cause of action is not actually extinguished. *See NOW*, 261 F.3d at 166-67. The *NOW* Court did not need to decide whether administrative delays which caused actual prejudice to a cause of action was a deprivation of property because it determined that adequate

were not deprived of any protected property interest by the issuance of the Tolling Order and there can be no due process violation.

In *Logan,* the Supreme Court found a due process violation because the plaintiff was prevented – as opposed to merely delayed – from using state adjudicatory procedures for a discrimination claim. As the *Logan* Court explained, "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan*, 455 U.S. at 434 (citing *Bell v. Burson*, 402 U.S. 535, 542 (1971)).

Unlike in *Logan* where the cause of action was dismissed instead of being heard on the merits because of procedural delays, STP's cause of action has not been finally destroyed by the Tolling Order. The Tolling Order did not serve to dismiss STP's appeal, and STP is having the merits of its appeal heard. Accordingly, STP and its members have not been deprived of their property interest in their cause of action to challenge the validity of the Certificate Order.

---

process was provided anyway. Nonetheless, this Court strongly doubted such delays would constitute a deprivation because (1) plaintiffs are masters of their own claims and responsible for preserving evidence to avoid prejudice; and (2) the only courts to adopt such a formulation involved defendants who were prejudiced by delays in receiving notice of proceedings (as opposed to delays in actually litigating), which denied them the opportunity to preserve evidence and prepare a meaningful defense. *Id.*

**B.     STP and Its Members Do Not Have a Property Right in the Procedures for Review of a Certificate Order**

Relying solely on *Logan*, STP also argues that it was deprived of a property interest because the Tolling Order delayed their opportunity to raise this appeal – their access to an adjudicatory procedure – until after Constitution had initiated eminent domain proceedings.  STP's reliance on *Logan* is misplaced because STP and its members do not have any property interest in the review procedures provided under the NGA (*see Shvartsman v. Apfel*, 138 F.3d 1196, 1199 (7th Cir. 1998); *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 495 (D.C. Cir. 1988)), so there can be no due process violation based on STP's access to those review procedures allegedly being delayed by FERC's issuance of the Tolling Order.  This Court has previously distinguished *Logan* and held that the property right at issue in *Logan* was not a right to a certain procedure (a hearing within 120 days); instead, it was the plaintiff's underlying right of action under the statute.  *Polk*, 711 F.2d at 509.

In *Polk*, this Court rejected broad reading of *Logan*, holding that "*Logan* thus stands for the proposition that if the state creates a statutory entitlement, due process concerns require that the entitlement not be destroyed without some opportunity for a hearing."  *Id.* at 508.  This Court concluded that *Logan* was distinguishable because the plaintiff's right of action survived, even though it was long delayed (more than seven years), and the plaintiff was not deprived of the opportunity to obtain a favorable disposition on his claim.  Because the state did not finally destroy a

69

property interest – the underlying discrimination claim – by its delay, this Court held that there was no violation of due process rights. *Id.* at 509.

Here, STP's cause of action survived after the issuance of the Tolling Order, even if it was allegedly delayed. Just as the plaintiff in *Polk* was not deprived of the opportunity to obtain a favorable disposition of his claim by the more than seven year delay in his discrimination claim, STP has not been deprived of the opportunity to prevail in this appeal by the issuance of the Tolling Order. Accordingly, there is no due process violation from the issuance of the Tolling Order.

Other Courts of Appeals have likewise distinguished *Logan* and recognized that it does not stand for the proposition that there can be a property right in procedures that allow for a fair opportunity to adjudicate an underlying claim. *See Shvartsman*, 138 F.3d at 1199 ("[T]he reason that there is a right of access to adjudicatory procedures is not because litigants have property interests in the procedures themselves. . . . In short, the property interest in *Logan* was the underlying discrimination claim; the adjudicatory process constituted the process that was due in connection with the deprivation of that property interest."); *Griffith*, 842 F.2d at 495 (rejecting claim that plaintiff had a constitutional right to use certain adjudicatory procedures, explaining that property interest protected in *Logan* was the substantive cause of action, not the procedural specifications, and recognizing that procedural safeguards cannot create a property interest for due process

70

purposes).[17]  As the Seventh Circuit held, "defining access to procedures as a protectable interest would eliminate the distinction between property and the procedures that are constitutionally required to protect it."  *Shvartsman*, 138 F.3d at 1199.  Moreover, to hold that such procedures create property rights would make the scope of the Due Process Clause virtually boundless, and would mean that a person may not be deprived of a hearing without having a hearing.  *See id.* at 1199-1200.

The *Logan* decision does not, as STP suggests, stand for the proposition that STP and its members have a property interest in a statutory right to an adjudicatory hearing.  To the contrary, they only have a property right in the underlying cause of action – their challenge to the validity of the Certificate Order.  The procedures which protect STP's interest in the underlying action – the statutory time periods under the NGA for deciding requests for rehearing and filing appeals to this Court – are not themselves property interests.  Accordingly, the alleged deprivation of such procedures cannot form the basis of a due process claim.

---

[17]  The Supreme Court has repeatedly made the same distinction between substance and procedure when faced with claims of property entitlement to a set of procedures.  *See*, *e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures.  The categories of substance and procedure are distinct."); *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.").

71

## **CONCLUSION**

For the reasons stated, this Court should affirm FERC's orders and deny the

petitions for review in their entirety.

Respectfully submitted,

By:     */s/ John F. Stoviak*     

Pamela S. Goodwin            John F. Stoviak
Saul Ewing LLP                  Saul Ewing LLP
650 College Road East, Suite 4000    Centre Square West
Princeton, NJ  08540-6603         1500 Market Street, 38th Floor
Phone:  (609) 452-3109           Philadelphia, PA  19102-2186
Fax:  (609) 452-3129             Phone:  (215) 972-1095
pgoodwin@saul.com             Fax:  (215) 972-1921
                                jstoviak@saul.com

Elizabeth U. Witmer
Saul Ewing LLP
1200 Liberty Ridge Drive, Suite 200
Wayne, PA  19087-5569
Phone:  (610) 251-5062
Fax:  (610) 408-4400
ewitmer@saul.com

*Counsel for Intervenor Constitution Pipeline Company, LLC*

Dated:  September 12, 2016

72

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of the Court's March 11, 2016 Order because it contains 17,023 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  September 12, 2016

*/s/ John F. Stoviak*
John F. Stoviak
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA  19102-2186
Phone:  (215) 972-1095
Fax:  (215) 972-1921
jstoviak@saul.com

*Counsel for Intervenor Constitution Pipeline Company, LLC*

ADDENDUM

# TABLE OF CONTENTS

**Page**

**Statutes and Regulations**

I.     Natural Gas Act, 15 U.S.C. § 717(a) ................................ ADD1

II.    Natural Gas Act, 15 U.S.C. § 717f ................................ ADD1

III.   Natural Gas Act, 15 U.S.C. § 717r ................................ ADD5

IV.   Federal Power Act, 16 U.S.C. § 797(e) ........................ ADD8

V.    Clean Water Act, 33 U.S.C. § 1251(d) ........................ ADD9

VI.   Clean Water Act, 33 U.S.C. § 1341 ............................ ADD9

VII.  Public Health and Welfare, 42 U.S.C. § 4370m-6 ...................... ADD13

VIII. Conservation of Power and Water Resources, 18 C.F.R. § 157.10 ...................... ADD16

IX.   Conservation of Power and Water Resources, 18 C.F.R. § 157.22 ...................... ADD18

X.    Conservation of Power and Water Resources, 18 C.F.R. § 380.12 ...................... ADD18

XI.   Protection of Environment, 40 C.F.R. § 121.1(a) ...................... ADD40

XII.  Protection of Environment, 40 C.F.R. § 1502.7 ...................... ADD40

XIII. Protection of Environment, 40 C.F.R. § 1508.25(c) ................... ADD40

**Other Materials Included for the Convenience of the Court**

XIV. Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool For States and Tribes, April 2010 ...................... ADD41

XV.  *Constitution Pipeline Company, LLC*, 156 FERC ¶ 61,035 (July 13, 2016) ...................... ADD90

XVI.  Notice of Intent to Prepare an Environmental Impact Statement
for the Planned Constitution Pipeline Project, Request for
Comments on Environmental Issues, and Notice of Public
Scoping Meetings, September 7, 2012 ......................................... ADD96

XVII. Notice of Public Scoping Meeting and Extension of Scoping
Period for the Planned Constitution Pipeline Project, October 9,
2012 ............................................................................................. ADD109

XVIII.Comments filed in the FERC's pre-filing docket, PF12-9, by
STP members who submitted affidavits in support of STP's
Brief (Bertrand, Brignoli, Lidsky/Travis, Pezzati, Stack)............ ADD112

XIX.  Letter from New York Public Service Commission to FERC
(Oct. 31, 2012).............................................................................. ADD137

## I.  Natural Gas Act, 15 U.S.C. § 717(a)

### § 717(a) Necessity of Regulation in Public Interest

As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

## II.  Natural Gas Act, 15 U.S.C. § 717f

### § 717f Construction, Extension, or Abandonment of Facilities

### (a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

### (b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is

unwarranted, or that the present or future public convenience or necessity permit such abandonment.

**(c) Certificate of public convenience and necessity**

**(1)**

**(A)** No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

**(B)** In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

**(2)** The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

    **(A)** natural gas sold by the producer to such person; and

    **(B)** natural gas produced by such person.

## (d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

## (e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c) (1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

## (f) Determination of service area; jurisdiction of transportation to ultimate consumers

**(1)** The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities

ADD3

for the purpose of supplying increased market demands in such service area without further authorization; and

**(2)** If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

## (g) Certificate of public convenience and necessity for service of area already being served

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

## (h) Right of eminent domain for construction of pipelines, etc.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

## III.     Natural Gas Act, 15 U.S.C. § 717r

**§ 717r Rehearing and Review**

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**(b) Review of Commission order**

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the

ADD5

application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

**(c) Stay of Commission order**

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**(d) Judicial review**

**(1) In general**

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

**(2) Agency delay**

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

**(3) Court action**

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title , the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

**(4) Commission action**

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

**(5) Expedited review**

The Court shall set any action brought under this subsection for expedited consideration.

ADD7

## IV.   Federal Power Act, 16 U.S.C. § 797(e)

**§ 797(e) General Powers of Commission**

**(e) Issue of licenses for construction, etc., of dams, conduits, reservoirs, etc.**

To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided: *Provided*, That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation: The license applicant and any party to the proceeding shall be entitled to a determination on the record, after opportunity for an agency trial-type hearing of no more than 90 days, on any disputed issues of material fact with respect to such conditions. All disputed issues of material fact raised by any party shall be determined in a single trial-type hearing to be conducted by the relevant resource agency in accordance with the regulations promulgated under this subsection and within the time frame established by the Commission for each license proceeding. Within 90 days of August 8, 2005, the Secretaries of the Interior, Commerce, and Agriculture shall establish jointly, by rule, the procedures for such expedited trial-type hearing, including the opportunity to undertake discovery and cross-examine witnesses, in consultation with the Federal Energy Regulatory Commission.  *Provided further*, That no license affecting the navigable capacity of any navigable waters of the United States shall be issued until the plans of the dam or other structures affecting the navigation have been approved by the Chief of Engineers and the Secretary of the Army. Whenever the contemplated improvement is, in the judgment of the Commission, desirable and justified in the public interest for the purpose of improving or developing a waterway or

waterways for the use or benefit of interstate or foreign commerce, a finding to that effect shall be made by the Commission and shall become a part of the records of the Commission: *Provided further*, That in case the Commission shall find that any Government dam may be advantageously used by the United States for public purposes in addition to navigation, no license therefor shall be issued until two years after it shall have reported to Congress the facts and conditions relating thereto, except that this provision shall not apply to any Government dam constructed prior to June 10, 1920: *And provided further*, that upon the filing of any application for a license which has not been preceded by a preliminary permit under subsection (f) of this section, notice shall be given and published as required by the proviso of said subsection. In deciding whether to issue any license under this subchapter for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

## V.   Clean Water Act, 33 U.S.C. § 1251(d)

### § 1251(d) Administrator of Environmental Protection Agency to Administer Chapter

Except as otherwise expressly provided in this chapter, the Administrator of the Environmental Protection Agency (hereinafter in this chapter called "Administrator") shall administer this chapter.

## VI.   Clean Water Act, 33 U.S.C. § 1341

### § 1341 Permits and Licenses

(a) Compliance with applicable requirements; application; procedures; license suspension

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate

water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such a hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator,

and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 1311, 1312, 1313, 1316, or 1317 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will

ADD11

violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 1311, 1312, 1313, 1316, or 1317 of this title.

(6) Except with respect to a permit issued under section 1342 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

(b) Compliance with other provisions of law setting applicable water quality requirements

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

(d) Limitations and monitoring requirements of certification

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

## VII.   Public Health and Welfare, 42 U.S.C. § 4370m-6

### § 4370m-6 Litigation, Judicial Review, and Savings Provision

(a) Limitations on claims

(1) In general

Notwithstanding any other provision of law, a claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project shall be barred unless--

(A) the action is filed not later than 2 years after the date of publication in the Federal Register of the final record of decision or approval or denial of a permit, unless a shorter time is specified in the Federal law under which judicial review is allowed; and

(B) in the case of an action pertaining to an environmental review conducted under NEPA--

(i) the action is filed by a party that submitted a comment during the environmental review; and

(ii) any commenter filed a sufficiently detailed comment so as to put the lead agency on notice of the issue on which the party seeks judicial review, or the lead agency did not provide a reasonable opportunity for such a comment on that issue.

(2) New information

(A) In general

The head of a lead agency or participating agency shall consider new information received after the close of a comment period if the information satisfies the requirements under regulations implementing NEPA.

(B) Separate action

If Federal law requires the preparation of a supplemental environmental impact statement or other supplemental environmental document, the preparation of such document shall be considered a separate final agency action and the deadline for filing a claim for judicial review of the agency action shall be 2 years after the date on which a notice announcing the final agency action is published in the Federal Register, unless a shorter time is specified in the Federal law under which judicial review is allowed.

(3) Rule of construction

Nothing in this subsection creates a right to judicial review or places any limit on filing a claim that a person has violated the terms of an authorization.

(b) Preliminary injunctive relief

In addition to considering any other applicable equitable factors, in any action seeking a temporary restraining order or preliminary injunction against an agency

or a project sponsor in connection with review or authorization of a covered project, the court shall--

> (1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and

> (2) not presume that the harms described in paragraph (1) are reparable.

(c) Judicial review

Except as provided in subsection (a), nothing in this subchapter affects the reviewability of any final Federal agency action in a court of competent jurisdiction.

(d) Savings clause

Nothing in this subchapter--

> (1) supersedes, amends, or modifies any Federal statute or affects the responsibility of any Federal officer to comply with or enforce any statute; or

> (2) creates a presumption that a covered project will be approved or favorably reviewed by any agency.

(e) Limitations

Nothing in this section preempts, limits, or interferes with--

> (1) any practice of seeking, considering, or responding to public comment; or

> (2) any power, jurisdiction, responsibility, or authority that a Federal, State, or local governmental agency, metropolitan planning organization, Indian tribe, or project sponsor has with respect to carrying out a project or any other provisions of law applicable to any project, plan, or program.

ADD15

VIII.    Conservation of Power and Water Resources, 18 C.F.R.
§ 157.10

## § 18 C.F.R. 157.10 Interventions and Protests

(a) Notices of applications, as provided by § 157.9, will fix the time within which any person desiring to participate in the proceeding may file a petition to intervene, and within which any interested regulatory agency, as provided by § 385.214 of this chapter, desiring to intervene may file its notice of intervention.

(1) Any person filing a petition to intervene or notice of intervention shall state specifically whether he seeks formal hearing on the application.

(2) Any person may file to intervene on environmental grounds based on the draft environmental impact statement as stated at § 380.10(a)(1)(i) of this chapter. In accordance with that section, such intervention will be deemed timely as long as it is filed within the comment period for the draft environmental impact statement.

(3) Failure to make timely filing will constitute grounds for denial of participation in the absence of extraordinary circumstances or good cause shown.

(4) Protests may be filed in accordance with § 385.211 of this chapter within the time permitted by any person who does not seek to participate in the proceeding.

(b) A copy of each application, supplement and amendment thereto, including exhibits required by §§ 157.14, 157.16, and 157.18, shall upon request be promptly supplied by the applicant to anyone who has filed a petition for leave to intervene or given notice of intervention.

(1) An applicant is not required to serve voluminous or difficult to reproduce material, such as copies of certain environmental information, to all parties, as long as such material is publicly available in an accessible central location in each county throughout the project area.

(2) An applicant shall make a good faith effort to place the materials in a public location that provides maximum accessibility to the public.

(c) Complete copies of the application must be available in accessible central locations in each county throughout the project area, either in paper or electronic format, within three business days of the date a filing is issued a docket number. Within five business days of receiving a request for a complete copy from any party, the applicant must serve a full copy of any filing on the requesting party. Such copy may exclude voluminous or difficult to reproduce material that is publicly available. Pipelines must keep all voluminous material on file with the Commission and make such information available for inspection at buildings with public access preferably with evening and weekend business hours, such as libraries located in central locations in each county throughout the project area.

(d) Critical Energy Infrastructure Information.

> (1) If this section requires an applicant to reveal Critical Energy Infrastructure Information (CEII), as defined in § 388.113(c) of this chapter, to the public, the applicant shall omit the CEII from the information made available and insert the following in its place:

> > (i) A statement that CEII is being withheld;

> > (ii) A brief description of the omitted information that does not reveal any CEII; and

> > (iii) This statement: "Procedures for obtaining access to Critical Energy Infrastructure Information (CEII) may be found at 18 CFR 388.113. Requests for access to CEII should be made to the Commission's CEII Coordinator."

> (2) The applicant, in determining whether information constitutes CEII, shall treat the information in a manner consistent with any filings that applicant has made with the Commission and shall to the extent practicable adhere to any previous determinations by the Commission or the CEII Coordinator involving the same or like information.

> (3) The procedures contained in §§ 388.112 and 388.113 of this chapter regarding designation of, and access to, CEII, shall apply in the event of a challenge to a CEII designation or a request for access to CEII. If it is determined that information is not CEII or that a requester should be granted access to CEII, the applicant will be directed to make the information available to the requester.

(4) Nothing in this section shall be construed to prohibit any persons from voluntarily reaching arrangements or agreements calling for the disclosure of CEII.

### IX.   Conservation of Power and Water Resources, 18 C.F.R. § 157.22

**§ 157.22 Schedule for Final Decisions on a Request for a Federal Authorization**

For an application under section 3 or 7 of the Natural Gas Act that requires a Federal authorization—i.e., a permit, special use authorization, certification, opinion, or other approval—from a Federal agency or officer, or State agency or officer acting pursuant to delegated Federal authority, a final decision on a request for a Federal authorization is due no later than 90 days after the Commission issues its final environmental document, unless a schedule is otherwise established by Federal law.

### X.   Conservation of Power and Water Resources, 18 C.F.R. § 380.12

**§ 380.12 Environmental Reports for Natural Gas Act Applications**

(a) Introduction.

(1) The applicant must submit an environmental report with any application that proposes the construction, operation, or abandonment of any facility identified in § 380.3(c)(2)(i). The environmental report shall consist of the thirteen resource reports and related material described in this section.

(2) The detail of each resource report must be commensurate with the complexity of the proposal and its potential for environmental impact. Each topic in each resource report shall be addressed or its omission justified, unless the resource report description indicates that the data is not required for that type of proposal. If material required for one resource report is provided in another resource report or in another exhibit, it may be incorporated by reference. If any resource report topic is required for a particular project but is not provided at the time the application is filed, the

ADD18

environmental report shall explain why it is missing and when the applicant anticipates it will be filed.

(3) The appendix to this part contains a checklist of the minimum filing requirements for an environmental report. Failure to provide at least the applicable checklist items will result in rejection of the application unless the Director of the Office of Energy Projects determines that the applicant has provided an acceptable reason for the item's absence and an acceptable schedule for filing it. Failure to file within the accepted schedule will result in rejection of the application.

(b) General requirements. As appropriate, each resource report shall:

(1) Address conditions or resources that might be directly or indirectly affected by the project;

(2) Identify significant environmental effects expected to occur as a result of the project;

(3) Identify the effects of construction, operation (including maintenance and malfunctions), and termination of the project, as well as cumulative effects resulting from existing or reasonably foreseeable projects;

(4) Identify measures proposed to enhance the environment or to avoid, mitigate, or compensate for adverse effects of the project;

(5) Provide a list of publications, reports, and other literature or communications, including agency contacts, that were cited or relied upon to prepare each report. This list should include the name and title of the person contacted, their affiliations, and telephone number;

(6) Whenever this section refers to "mileposts" the applicant may substitute "survey centerline stationing" if so desired. However, whatever method is chosen should be used consistently throughout the resource reports.

(c) Resource Report 1—General project description. This report is required for all applications. It will describe facilities associated with the project, special construction and operation procedures, construction timetables, future plans for related construction, compliance with regulations and codes, and permits that must be obtained. Resource Report 1 must:

ADD19

(1) Describe and provide location maps of all jurisdictional facilities, including all aboveground facilities associated with the project (such as: meter stations, pig launchers/receivers, valves), to be constructed, modified, abandoned, replaced, or removed, including related construction and operational support activities and areas such as maintenance bases, staging areas, communications towers, power lines, and new access roads (roads to be built or modified). As relevant, the report must describe the length and diameter of the pipeline, the types of aboveground facilities that would be installed, and associated land requirements. It must also identify other companies that must construct jurisdictional facilities related to the project, where the facilities would be located, and where they are in the Commission's approval process.

(2) Identify and describe all nonjurisdictional facilities, including auxiliary facilities, that will be built in association with the project, including facilities to be built by other companies.

    (i) Provide the following information:

        (A) A brief description of each facility, including as appropriate: Ownership, land requirements, gas consumption, megawatt size, construction status, and an update of the latest status of Federal, state, and local permits/approvals;

        (B) The length and diameter of any interconnecting pipeline;

        (C) Current 1:24,000/1:25,000 scale topographic maps showing the location of the facilities;

        (D) Correspondence with the appropriate State Historic Preservation Officer (SHPO) or duly authorized Tribal Historic Preservation Officer (THPO) for tribal lands regarding whether properties eligible for listing on the National Register of Historic Places (NRHP) would be affected;

        (E) Correspondence with the U.S. Fish and Wildlife Service (and National Marine Fisheries Service, if appropriate) regarding potential impacts of the proposed facility on federally listed threatened and endangered species; and

ADD20

(F) For facilities within a designated coastal zone management area, a consistency determination or evidence that the owner has requested a consistency determination from the state's coastal zone management program.

(ii) Address each of the following factors and indicate which ones, if any, appear to indicate the need for the Commission to do an environmental review of project-related nonjurisdictional facilities.

(A) Whether or not the regulated activity comprises "merely a link" in a corridor type project (e.g., a transportation or utility transmission project).

(B) Whether there are aspects of the nonjurisdictional facility in the immediate vicinity of the regulated activity which uniquely determine the location and configuration of the regulated activity.

(C) The extent to which the entire project will be within the Commission's jurisdiction.

(D) The extent of cumulative Federal control and responsibility.

(3) Provide the following maps and photos:

(i) Current, original United States Geological Survey (USGS) 7.5–minute series topographic maps or maps of equivalent detail, covering at least a 0.5–mile–wide corridor centered on the pipeline, with integer mileposts identified, showing the location of rights-of-way, new access roads, other linear construction areas, compressor stations, and pipe storage areas. Show nonlinear construction areas on maps at a scale of 1:3,600 or larger keyed graphically and by milepost to the right-of-way maps.

(ii) Original aerial images or photographs or photo-based alignment sheets based on these sources, not more than 1 year old (unless older ones accurately depict current land use and development) and with a scale of 1:6,000 or larger, showing the proposed pipeline route and location of major aboveground facilities, covering at least a 0.5 mile–

wide corridor, and including mileposts. Older images/photographs/alignment sheets should be modified to show any residences not depicted in the original. Alternative formats (e.g., blue-line prints of acceptable resolution) need prior approval by the environmental staff of the Office of Energy Projects.

(iii) In addition to the copy required under § 157.6(a)(2) of this chapter, applicant should send two additional copies of topographic maps and aerial images/photographs directly to the environmental staff of the Office of Energy Projects.

(4) When new or additional compression is proposed, include large scale (1:3,600 or greater) plot plans of each compressor station. The plot plan should reference a readily identifiable point(s) on the USGS maps required in paragraph (c)(3) of this section. The maps and plot plans must identify the location of the nearest noise-sensitive areas (schools, hospitals, or residences) within 1 mile of the compressor station, existing and proposed compressor and auxiliary buildings, access roads, and the limits of areas that would be permanently disturbed.

(5)

(i) Identify facilities to be abandoned, and state how they would be abandoned, how the site would be restored, who would own the site or right-of-way after abandonment, and who would be responsible for any facilities abandoned in place.

(ii) When the right-of-way or the easement would be abandoned, identify whether landowners were given the opportunity to request that the facilities on their property, including foundations and below ground components, be removed. Identify any landowners whose preferences the company does not intend to honor, and the reasons therefore.

(6) Describe and identify by milepost, proposed construction and restoration methods to be used in areas of rugged topography, residential areas, active croplands, sites where the pipeline would be located parallel to and under roads, and sites where explosives are likely to be used.

(7) Unless provided in response to Resource Report 5, describe estimated workforce requirements, including the number of pipeline construction

spreads, average workforce requirements for each construction spread and meter or compressor station, estimated duration of construction from initial clearing to final restoration, and number of personnel to be hired to operate the proposed project.

(8) Describe reasonably foreseeable plans for future expansion of facilities, including additional land requirements and the compatibility of those plans with the current proposal.

(9) Describe all authorizations required to complete the proposed action and the status of applications for such authorizations. Identify environmental mitigation requirements specified in any permit or proposed in any permit application to the extent not specified elsewhere in this section.

(10) Provide the names and mailing addresses of all affected landowners specified in § 157.6(d) and certify that all affected landowners will be notified as required in § 157.6(d).

(d) Resource Report 2—Water use and quality. This report is required for all applications, except those which involve only facilities within the areas of an existing compressor, meter, or regulator station that were disturbed by construction of the existing facilities, no wetlands or waterbodies are on the site and there would not be a significant increase in water use. The report must describe water quality and provide data sufficient to determine the expected impact of the project and the effectiveness of mitigative, enhancement, or protective measures. Resource Report 2 must:

(1) Identify and describe by milepost perennial waterbodies and municipal water supply or watershed areas, specially designated surface water protection areas and sensitive waterbodies, and wetlands that would be crossed. For each waterbody crossing, identify the approximate width, state water quality classifications, any known potential pollutants present in the water or sediments, and any potable water intake sources within 3 miles downstream.

(2) Compare proposed mitigation measures with the staff's current "Wetland and Waterbody Construction and Mitigation Procedures," which are available from the Commission Internet home page or the Commission staff, describe what proposed alternative mitigation would provide equivalent or greater protection to the environment, and provide a description of site-

specific construction techniques that would be used at each major waterbody crossing.

(3) Describe typical staging area requirements at waterbody and wetland crossings. Also, identify and describe waterbodies and wetlands where staging areas are likely to be more extensive.

(4) Include National Wetland Inventory (NWI) maps. If NWI maps are not available, provide the appropriate state wetland maps. Identify for each crossing, the milepost, the wetland classification specified by the U.S. Fish and Wildlife Service, and the length of the crossing. Include two copies of the NWI maps (or the substitutes, if NWI maps are not available) clearly showing the proposed route and mileposts directed to the environmental staff. Describe by milepost, wetland crossings as determined by field delineations using the current Federal methodology.

(5) Identify aquifers within excavation depth in the project area, including the depth of the aquifer, current and projected use, water quality and average yield, and known or suspected contamination problems.

(6) Describe specific locations, the quantity required, and the method and rate of withdrawal and discharge of hydrostatic test water. Describe suspended or dissolved material likely to be present in the water as a result of contact with the pipeline, particularly if an existing pipeline is being retested. Describe chemical or physical treatment of the pipeline or hydrostatic test water. Discuss waste products generated and disposal methods.

(7) If underground storage of natural gas is proposed:

    (i) Identify how water produced from the storage field will be disposed of, and

    (ii) For salt caverns, identify the source locations, the quantity required, and the method and rate of withdrawal of water for creating salt cavern(s), as well as the means of disposal of brine resulting from cavern leaching.

(8) Discuss proposed mitigation measures to reduce the potential for adverse impacts to surface water, wetlands, or groundwater quality to the extent they

are not described in response to paragraph (d)(2) of this section. Discuss the potential for blasting to affect water wells, springs, and wetlands, and measures to be taken to detect and remedy such effects.

(9) Identify the location of known public and private groundwater supply wells or springs within 150 feet of proposed construction areas. Identify locations of EPA or state-designated sole-source aquifers and wellhead protection areas crossed by the proposed pipeline facilities.

(e) Resource Report 3—Fish, wildlife, and vegetation. This report is required for all applications, except those involving only facilities within the improved area of an existing compressor, meter, or regulator station. It must describe aquatic life, wildlife, and vegetation in the vicinity of the proposed project; expected impacts on these resources including potential effects on biodiversity; and proposed mitigation, enhancement or protection measures. Resource Report 3 must:

(1) Describe commercial and recreational warmwater, coldwater, and saltwater fisheries in the affected area and associated significant habitats such as spawning or rearing areas and estuaries.

(2) Describe terrestrial habitats, including wetlands, typical wildlife habitats, and rare, unique, or otherwise significant habitats that might be affected by the proposed action. Describe typical species that have commercial, recreational, or aesthetic value.

(3) Describe and provide the acreage of vegetation cover types that would be affected, including unique ecosystems or communities such as remnant prairie or old-growth forest, or significant individual plants, such as old-growth specimen trees.

(4) Describe the impact of construction and operation on aquatic and terrestrial species and their habitats, including the possibility of a major alteration to ecosystems or biodiversity, and any potential impact on state-listed endangered or threatened species. Describe the impact of maintenance, clearing and treatment of the project area on fish, wildlife, and vegetation. Surveys may be required to determine specific areas of significant habitats or communities of species of special concern to state or local agencies.

(5) Identify all federally listed or proposed endangered or threatened species and critical habitat that potentially occur in the vicinity of the project.

ADD25

Discuss the results of the consultation requirements listed in § 380.13(b) at least through § 380.13(b)(5)(i) and include any written correspondence that resulted from the consultation. The initial application must include the results of any required surveys unless seasonal considerations make this impractical. If species surveys are impractical, there must be field surveys to determine the presence of suitable habitat unless the entire project area is suitable habitat.

(6) Identify all federally listed essential fish habitat (EFH) that potentially occurs in the vicinity of the project. Provide information on all EFH, as identified by the pertinent Federal fishery management plans, that may be adversely affected by the project and the results of abbreviated consultations with NMFS, and any resulting EFH assessments.

(7) Describe site-specific mitigation measures to minimize impacts on fisheries, wildlife, and vegetation.

(8) Include copies of correspondence not provided pursuant to paragraph (e)(5) of this section, containing recommendations from appropriate Federal and state fish and wildlife agencies to avoid or limit impact on wildlife, fisheries, and vegetation, and the applicant's response to the recommendations.

(f) Resource Report 4—Cultural resources. This report is required for all applications. In preparing this report, the applicant must follow the principles in § 380.14 of this part. Guidance on the content and the format for the documentation listed below, as well as professional qualifications of preparers, is detailed in "Office of Energy Projects' (OEP) Guidelines for Reporting on Cultural Resources Investigations," which is available from the Commission Internet home page or from the Commission staff.

(1) Resource Report 4 must contain:

(i) Documentation of the applicant's initial cultural resources consultation, including consultations with Native Americans and other interested persons (if appropriate);

(ii) Overview and Survey Reports, as appropriate;

(iii) Evaluation Report, as appropriate;

ADD26

(iv) Treatment Plan, as appropriate; and

(v) Written comments from State Historic Preservation Officer(s) (SHPO), Tribal Historic Preservation Officers (THPO), as appropriate, and applicable land-managing agencies on the reports in paragraphs (f)(1)(i)–(iv) of this section.

(2) Initial filing requirements. The initial application must include the documentation of initial cultural resource consultation, the Overview and Survey Reports, if required, and written comments from SHPOs, THPOs and land-managing agencies, if available. The initial cultural resources consultations should establish the need for surveys. If surveys are deemed necessary by the consultation with the SHPO/THPO, the survey report must be filed with the application.

(i) If the comments of the SHPOs, THPOs, or land-management agencies are not available at the time the application is filed, they may be filed separately, but they must be filed before a final certificate is issued.

(ii) If landowners deny access to private property and certain areas are not surveyed, the unsurveyed area must be identified by mileposts, and supplemental surveys or evaluations shall be conducted after access is granted. In such circumstances, reports, and treatment plans, if necessary, for those inaccessible lands may be filed after a certificate is issued.

(3) The Evaluation Report and Treatment Plan, if required, for the entire project must be filed before a final certificate is issued.

(i) The Evaluation Report may be combined in a single synthetic report with the Overview and Survey Reports if the SHPOs, THPOs, and land-management agencies allow and if it is available at the time the application is filed.

(ii) In preparing the Treatment Plan, the applicant must consult with the Commission staff, the SHPO, and any applicable THPO and land-management agencies.

ADD27

(iii) Authorization to implement the Treatment Plan will occur only after the final certificate is issued.

(4) Applicant must request privileged treatment for all material filed with the Commission containing location, character, and ownership information about cultural resources in accordance with § 388.112 of this chapter. The cover and relevant pages or portions of the report should be clearly labeled in bold lettering: "CONTAINS PRIVILEGED INFORMATION—DO NOT RELEASE."

(5) Except as specified in a final Commission order, or by the Director of the Office of Energy Projects, construction may not begin until all cultural resource reports and plans have been approved.

(g) Resource Report 5—Socioeconomics. This report is required only for applications involving significant aboveground facilities, including, among others, conditioning or liquefied natural gas (LNG) plants. It must identify and quantify the impacts of constructing and operating the proposed project on factors affecting towns and counties in the vicinity of the project. Resource Report 5 must:

(1) Describe the socioeconomic impact area.

(2) Evaluate the impact of any substantial immigration of people on governmental facilities and services and plans to reduce the impact on the local infrastructure.

(3) Describe on-site manpower requirements and payroll during construction and operation, including the number of construction personnel who currently reside within the impact area, would commute daily to the site from outside the impact area, or would relocate temporarily within the impact area.

(4) Determine whether existing housing within the impact area is sufficient to meet the needs of the additional population.

(5) Describe the number and types of residences and businesses that would be displaced by the project, procedures to be used to acquire these properties, and types and amounts of relocation assistance payments.

(6) Conduct a fiscal impact analysis evaluating incremental local government expenditures in relation to incremental local government

ADD28

revenues that would result from construction of the project. Incremental expenditures include, but are not limited to, school operating costs, road maintenance and repair, public safety, and public utility costs.

(h) Resource Report 6—Geological resources. This report is required for applications involving LNG facilities and all other applications, except those involving only facilities within the boundaries of existing aboveground facilities, such as a compressor, meter, or regulator station. It must describe geological resources and hazards in the project area that might be directly or indirectly affected by the proposed action or that could place the proposed facilities at risk, the potential effects of those hazards on the facility, and methods proposed to reduce the effects or risks. Resource Report 6 must:

(1) Describe, by milepost, mineral resources that are currently or potentially exploitable;

(2) Describe, by milepost, existing and potential geological hazards and areas of nonroutine geotechnical concern, such as high seismicity areas, active faults, and areas susceptible to soil liquefaction; planned, active, and abandoned mines; karst terrain; and areas of potential ground failure, such as subsidence, slumping, and landsliding. Discuss the hazards posed to the facility from each one.

(3) Describe how the project would be located or designed to avoid or minimize adverse effects to the resources or risk to itself, including geotechnical investigations and monitoring that would be conducted before, during, and after construction. Discuss also the potential for blasting to affect structures, and the measures to be taken to remedy such effects.

(4) Specify methods to be used to prevent project-induced contamination from surface mines or from mine tailings along the right-of-way and whether the project would hinder mine reclamation or expansion efforts.

(5) If the application involves an LNG facility located in zones 2, 3, or 4 of the Uniform Building Code's Seismic Risk Map, or where there is potential for surface faulting or liquefaction, prepare a report on earthquake hazards and engineering in conformance with "Data Requirements for the Seismic Review of LNG Facilities," NBSIR 84–2833. This document may be obtained from the Commission staff.

(6) If the application is for underground storage facilities:

(i) Describe how the applicant would control and monitor the drilling activity of others within the field and buffer zone;

(ii) Describe how the applicant would monitor potential effects of the operation of adjacent storage or production facilities on the proposed facility, and vice versa;

(iii) Describe measures taken to locate and determine the condition of old wells within the field and buffer zone and how the applicant would reduce risk from failure of known and undiscovered wells; and

(iv) Identify and discuss safety and environmental safeguards required by state and Federal drilling regulations.

(i) Resource Report 7—Soils. This report is required for all applications except those not involving soil disturbance. It must describe the soils that would be affected by the proposed project, the effect on those soils, and measures proposed to minimize or avoid impact. Resource Report 7 must:

(1) List, by milepost, the soil associations that would be crossed and describe the erosion potential, fertility, and drainage characteristics of each association.

(2) If an aboveground facility site is greater than 5 acres:

(i) List the soil series within the property and the percentage of the property comprised of each series;

(ii) List the percentage of each series which would be permanently disturbed;

(iii) Describe the characteristics of each soil series; and

(iv) Indicate which are classified as prime or unique farmland by the U.S. Department of Agriculture, Natural Resources Conservation Service.

ADD30

(3) Identify, by milepost, potential impact from: Soil erosion due to water, wind, or loss of vegetation; soil compaction and damage to soil structure resulting from movement of construction vehicles; wet soils and soils with poor drainage that are especially prone to structural damage; damage to drainage tile systems due to movement of construction vehicles and trenching activities; and interference with the operation of agricultural equipment due to the probability of large stones or blasted rock occurring on or near the surface as a result of construction.

(4) Identify, by milepost, cropland and residential areas where loss of soil fertility due to trenching and backfilling could occur.

(5) Describe proposed mitigation measures to reduce the potential for adverse impact to soils or agricultural productivity. Compare proposed mitigation measures with the staff's current "Upland Erosion Control, Revegetation and Maintenance Plan," which is available from the Commission Internet home page or from the Commission staff, and explain how proposed mitigation measures provide equivalent or greater protections to the environment.

(j) Resource Report 8—Land use, recreation and aesthetics. This report is required for all applications except those involving only facilities which are of comparable use at existing compressor, meter, and regulator stations. It must describe the existing uses of land on, and (where specified) within 0.25 mile of, the proposed project and changes to those land uses that would occur if the project is approved. The report shall discuss proposed mitigation measures, including protection and enhancement of existing land use. Resource Report 8 must:

(1) Describe the width and acreage requirements of all construction and permanent rights-of-way and the acreage required for each proposed plant and operational site, including injection or withdrawal wells.

(i) List, by milepost, locations where the proposed right-of-way would be adjacent to existing rights-of-way of any kind.

(ii) Identify, preferably by diagrams, existing rights-of-way that would be used for a portion of the construction or operational right-of-way, the overlap and how much additional width would be required.

ADD31

(iii) Identify the total amount of land to be purchased or leased for each aboveground facility, the amount of land that would be disturbed for construction and operation of the facility, and the use of the remaining land not required for project operation.

(iv) Identify the size of typical staging areas and expanded work areas, such as those at railroad, road, and waterbody crossings, and the size and location of all pipe storage yards and access roads.

(2) Identify, by milepost, the existing use of lands crossed by the proposed pipeline, or on or adjacent to each proposed plant and operational site.

(3) Describe planned development on land crossed or within 0.25 mile of proposed facilities, the time frame (if available) for such development, and proposed coordination to minimize impacts on land use. Planned development means development which is included in a master plan or is on file with the local planning board or the county.

(4) Identify, by milepost and length of crossing, the area of direct effect of each proposed facility and operational site on sugar maple stands, orchards and nurseries, landfills, operating mines, hazardous waste sites, state wild and scenic rivers, state or local designated trails, nature preserves, game management areas, remnant prairie, old-growth forest, national or state forests, parks, golf courses, designated natural, recreational or scenic areas, or registered natural landmarks, Native American religious sites and traditional cultural properties to the extent they are known to the public at large, and reservations, lands identified under the Special Area Management Plan of the Office of Coastal Zone Management, National Oceanic and Atmospheric Administration, and lands owned or controlled by Federal or state agencies or private preservation groups. Also identify if any of those areas are located within 0.25 mile of any proposed facility.

(5) Identify, by milepost, all residences and buildings within 50 feet of the proposed pipeline construction right-of-way and the distance of the residence or building from the right-of- way. Provide survey drawings or alignment sheets to illustrate the location of the facilities in relation to the buildings.

(6) Describe any areas crossed by or within 0.25 mile of the proposed pipeline or plant and operational sites which are included in, or are

ADD32

designated for study for inclusion in: The National Wild and Scenic Rivers System (16 U.S.C. 1271); The National Trails System (16 U.S.C. 1241); or a wilderness area designated under the Wilderness Act (16 U.S.C. 1132).

(7) For facilities within a designated coastal zone management area, provide a consistency determination or evidence that the applicant has requested a consistency determination from the state's coastal zone management program.

(8) Describe the impact the project will have on present uses of the affected area as identified above, including commercial uses, mineral resources, recreational areas, public health and safety, and the aesthetic value of the land and its features. Describe any temporary or permanent restrictions on land use resulting from the project.

(9) Describe mitigation measures intended for all special use areas identified under paragraphs (j)(2) through (6) of this section.

(10) Describe proposed typical mitigation measures for each residence that is within 50 feet of the edge of the pipeline construction right-of-way, as well as any proposed residence-specific mitigation. Describe how residential property, including for example, fences, driveways, stone walls, sidewalks, water supply, and septic systems, would be restored. Describe compensation plans for temporary and permanent rights-of-way and the eminent domain process for the affected areas.

(11) Describe measures proposed to mitigate the aesthetic impact of the facilities especially for aboveground facilities such as compressor or meter stations.

(12) Demonstrate that applications for rights-of-way or other proposed land use have been or soon will be filed with Federal land-management agencies with jurisdiction over land that would be affected by the project.

(k) Resource Report 9—Air and noise quality. This report is required for applications involving compressor facilities at new or existing stations, and for all new LNG facilities. It must identify the effects of the project on the existing air quality and noise environment and describe proposed measures to mitigate the effects. Resource Report 9 must:

(1) Describe the existing air quality, including background levels of nitrogen dioxide and other criteria pollutants which may be emitted above EPA–identified significance levels.

(2) Quantitatively describe existing noise levels at noise-sensitive areas, such as schools, hospitals, or residences and include any areas covered by relevant state or local noise ordinances.

> (i) Report existing noise levels as the Leq (day), Leq (night), and Ldn and include the basis for the data or estimates.

> (ii) For existing compressor stations, include the results of a sound level survey at the site property line and nearby noise-sensitive areas while the compressors are operated at full load.

> (iii) For proposed new compressor station sites, measure or estimate the existing ambient sound environment based on current land uses and activities.

> (iv) Include a plot plan that identifies the locations and duration of noise measurements, the time of day, weather conditions, wind speed and direction, engine load, and other noise sources present during each measurement.

(3) Estimate the impact of the project on air quality, including how existing regulatory standards would be met.

> (i) Provide the emission rate of nitrogen oxides from existing and proposed facilities, expressed in pounds per hour and tons per year for maximum operating conditions, include supporting calculations, emission factors, fuel consumption rates, and annual hours of operation.

> (ii) For major sources of air emissions (as defined by the Environmental Protection Agency), provide copies of applications for permits to construct (and operate, if applicable) or for applicability determinations under regulations for the prevention of significant air quality deterioration and subsequent determinations.

ADD34

(4) Provide a quantitative estimate of the impact of the project on noise levels at noise-sensitive areas, such as schools, hospitals, or residences.

(i) Include step-by-step supporting calculations or identify the computer program used to model the noise levels, the input and raw output data and all assumptions made when running the model, far-field sound level data for maximum facility operation, and the source of the data.

(ii) Include sound pressure levels for unmuffled engine inlets and exhausts, engine casings, and cooling equipment; dynamic insertion loss for all mufflers; sound transmission loss for all compressor building components, including walls, roof, doors, windows and ventilation openings; sound attenuation from the station to nearby noise-sensitive areas; the manufacturer's name, the model number, the performance rating; and a description of each noise source and noise control component to be employed at the proposed compressor station. For proposed compressors the initial filing must include at least the proposed horsepower, type of compression, and energy source for the compressor.

(iii) Far-field sound level data measured from similar units in service elsewhere, when available, may be substituted for manufacturer's far-field sound level data.

(iv) If specific noise control equipment has not been chosen, include a schedule for submitting the data prior to certification.

(v) The estimate must demonstrate that the project will comply with applicable noise regulations and show how the facility will meet the following requirements:

(A) The noise attributable to any new compressor station, compression added to an existing station, or any modification, upgrade or update of an existing station, must not exceed a day-night sound level (Ldn) of 55 dBA at any pre-existing noise-sensitive area (such as schools, hospitals, or residences).

(B) New compressor stations or modifications of existing stations shall not result in a perceptible increase in vibration at any noise-sensitive area.

(5) Describe measures and manufacturer's specifications for equipment proposed to mitigate impact to air and noise quality, including emission control systems, installation of filters, mufflers, or insulation of piping and buildings, and orientation of equipment away from noise-sensitive areas.

(l) Resource Report 10—Alternatives. This report is required for all applications. It must describe alternatives to the project and compare the environmental impacts of such alternatives to those of the proposal. The discussion must demonstrate how environmental benefits and costs were weighed against economic benefits and costs, and technological and procedural constraints. The potential for each alternative to meet project deadlines and the environmental consequences of each alternative shall be discussed. Resource Report 10 must:

(1) Discuss the "no action" alternative and the potential for accomplishing the proposed objectives through the use of other systems and/or energy conservation. Provide an analysis of the relative environmental benefits and costs for each alternative.

(2) Describe alternative routes or locations considered for each facility during the initial screening for the project.

(i) For alternative routes considered in the initial screening for the project but eliminated, describe the environmental characteristics of each route or site, and the reasons for rejecting it. Identify the location of such alternatives on maps of sufficient scale to depict their location and relationship to the proposed action, and the relationship of the pipeline to existing rights-of-way.

(ii) For alternative routes or locations considered for more in-depth consideration, describe the environmental characteristics of each route or site and the reasons for rejecting it. Provide comparative tables showing the differences in environmental characteristics for the alternative and proposed action. The location of any alternatives in this paragraph shall be provided on maps equivalent to those required in paragraph (c)(2) of this section.

(m) Resource Report 11—Reliability and safety. This report is required for applications involving new or recommissioned LNG facilities. Information previously filed with the Commission need not be refiled if the applicant verifies its continued validity. This report shall address the potential hazard to the public from failure of facility components resulting from accidents or natural catastrophes, how these events would affect reliability, and what procedures and design features have been used to reduce potential hazards. Resource Report 11 must:

> (1) Describe measures proposed to protect the public from failure of the proposed facilities (including coordination with local agencies).

> (2) Discuss hazards, the environmental impact, and service interruptions which could reasonably ensue from failure of the proposed facilities.

> (3) Discuss design and operational measures to avoid or reduce risk.

> (4) Discuss contingency plans for maintaining service or reducing downtime.

> (5) Describe measures used to exclude the public from hazardous areas. Discuss measures used to minimize problems arising from malfunctions and accidents (with estimates of probability of occurrence) and identify standard procedures for protecting services and public safety during maintenance and breakdowns.

(n) Resource Report 12—PCB contamination. This report is required for applications involving the replacement, abandonment by removal, or abandonment in place of pipeline facilities determined to have polychlorinated biphenyls (PCBs) in excess of 50 ppm in pipeline liquids. Resource Report 12 must:

> (1) Provide a statement that activities would comply with an approved EPA disposal permit, with the dates of issuance and expiration specified, or with the requirements of the Toxic Substances Control Act.

> (2) For compressor station modifications on sites that have been determined to have soils contaminated with PCBs, describe the status of remediation efforts completed to date.

(o) Resource Report 13—Engineering and design material. This report is required for construction of new liquefied natural gas (LNG) facilities, or the recommissioning of existing LNG facilities. If the recommissioned facility is existing and is not being replaced, relocated, or significantly altered, resubmittal of information already on file with the Commission is unnecessary. Resource Report 13 must:

(1) Provide a detailed plot plan showing the location of all major components to be installed, including compression, pretreatment, liquefaction, storage, transfer piping, vaporization, truck loading/unloading, vent stacks, pumps, and auxiliary or appurtenant service facilities.

(2) Provide a detailed layout of the fire protection system showing the location of fire water pumps, piping, hydrants, hose reels, dry chemical systems, high expansion foam systems, and auxiliary or appurtenant service facilities.

(3) Provide a layout of the hazard detection system showing the location of combustible-gas detectors, fire detectors, heat detectors, smoke or combustion product detectors, and low temperature detectors. Identify those detectors that activate automatic shutdowns and the equipment that would shut down. Include all safety provisions incorporated in the plant design, including automatic and manually activated emergency shutdown systems.

(4) Provide a detailed layout of the spill containment system showing the location of impoundments, sumps, subdikes, channels, and water removal systems.

(5) Provide manufacturer's specifications, drawings, and literature on the fail-safe shut-off valve for each loading area at a marine terminal (if applicable).

(6) Provide a detailed layout of the fuel gas system showing all taps with process components.

(7) Provide copies of company, engineering firm, or consultant studies of a conceptual nature that show the engineering planning or design approach to the construction of new facilities or plants.

(8) Provide engineering information on major process components related to the first six items above, which include (as applicable) function, capacity, type, manufacturer, drive system (horsepower, voltage), operating pressure, and temperature.

(9) Provide manuals and construction drawings for LNG storage tank(s).

(10) Provide up-to-date piping and instrumentation diagrams. Include a description of the instrumentation and control philosophy, type of instrumentation (pneumatic, electronic), use of computer technology, and control room display and operation. Also, provide an overall schematic diagram of the entire process flow system, including maps, materials, and energy balances.

(11) Provide engineering information on the plant's electrical power generation system, distribution system, emergency power system, uninterruptible power system, and battery backup system.

(12) Identify all codes and standards under which the plant (and marine terminal, if applicable) will be designed, and any special considerations or safety provisions that were applied to the design of plant components.

(13) Provide a list of all permits or approvals from local, state, Federal, or Native American groups or Indian agencies required prior to and during construction of the plant, and the status of each, including the date filed, the date issued, and any known obstacles to approval. Include a description of data records required for submission to such agencies and transcripts of any public hearings by such agencies. Also provide copies of any correspondence relating to the actions by all, or any, of these agencies regarding all required approvals.

(14) Identify how each applicable requirement will comply with 49 CFR part 193 and the National Fire Protection Association 59A LNG Standards. For new facilities, the siting requirements of 49 CFR part 193, subpart B, must be given special attention. If applicable, vapor dispersion calculations from LNG spills over water should also be presented to ensure compliance with the U.S. Coast Guard's LNG regulations in 33 CFR part 127.

(15) Provide seismic information specified in Data Requirements for the Seismic Review of LNG facilities (NBSIR 84–2833, available from FERC staff) for facilities that would be located in zone 2, 3, or 4 of the Uniform Building Code Seismic Map of the United States.

## XI.    Protection of Environment, 40 C.F.R. § 121.1(a)

### § 121.1(a) Definitions

As used in this part, the following terms shall have the meanings indicated below:

(a) License or permit means any license or permit granted by an agency of the Federal Government to conduct any activity which may result in any discharge into the navigable waters of the United States.

## XII.    Protection of Environment, 40 C.F.R. § 1502.7

### § 1502.7 Page Limits

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

## XIII.    Protection of Environment, 40 C.F.R. § 1508.25(c)

### § 1508.25(c) Scope

Scope consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(c) Impacts, which may be:

      (1) Direct;

      (2) indirect;

      (3) cumulative.



2010

# Clean Water Act Section 401
## Water Quality Certification:
### A Water Quality Protection Tool
### For States and Tribes



U.S. Environmental Protection Agency
Office of Wetlands, Oceans, and Watersheds

ADD41

# Background and Purpose

Based on two decades of case law and state and tribal program experience, the Environmental Protection Agency has substantially updated its handbook on Clean Water Act (CWA) §401 water quality certification and how states can use §401 certification to protect wetlands and other aquatic resources.

This new handbook, "Clean Water Act Section 401 Water Quality Certification: A Water Quality Protection Tool For States and Tribes", describes CWA §401 certification authorities, the way different state and tribal programs use certification, and how state and tribal certification programs leverage available resources to operate their certification programs.

While this new handbook is not a rule and does not create any legal requirements or set policy, it provides a wide-ranging description of §401 certification provisions and practices which may be helpful to states and tribes interested in using §401 as an effective water resource protection tool. This document does not substitute for CWA section 401 itself, or the relevant EPA (and other federal or state/tribal) implementing regulations. States, tribes, and federal licensing/permitting agencies may consider other approaches consistent with the CWA and those regulations. EPA retains the discretion to revise this handbook in the future.

April 2010 Interim

# Table of Contents

**Background and Purpose** ................................................................... **i**

**I. Introduction** ...........................................................................................**1**

**II. Threshold Issues Regarding Clean Water Act §401 Certification**................**3**

    **A. When CWA §401 Certification Applies** ............................................... **3**

        **1. "Federal" Permit or License** ....................................................... **3**

        **2. Discharge** ................................................................................. **4**

        **3. Waters of the U.S. and Waters of the State or Tribe**......................... **5**

        **4. Point Sources** ........................................................................... **5**

    **B. When Jurisdictions Have §401 Certification Authority** ....................... **6**

        **1. States and Authorized Tribes** ...................................................... **6**

        **2. States or Tribes Where a Discharge Originates** .............................. **7**

        **3. Other Affected States and Tribes** ................................................. **8**

    **C. CWA Section 401 Certification Options** ............................................. **9**

        **1. Grant** ..................................................................................... **10**

        **2. Grant with Conditions** ............................................................. **10**

        **3. Deny**...................................................................................... **10**

        **4. Waive** .................................................................................... **11**

**III. The CWA 401 Certification Process** ...............................................**12**

    **A. Timeframes and Opportunities for Review** ...................................... **12**

        **1. When More Time is Needed** ....................................................... **13**

        **2. Certification Timeframe for Permits to Construct and Operate Facilities** ............... **13**

    **B. Start of the 401 Certification Process** .............................................. **15**

    **C. Scope of Analysis For §401 Certification Decisions** ............................ **16**

        **1. Basis for Certification Decisions – Generally** ............................... **18**

        **2. 401 Certification Consideration: Consistency With Water Quality Standards**........ **19**

        **3. 401 Certification Considerations:  Effluent Guidelines, New Source Performance Standards and Toxics** ............... **20**

        **4. 401 Certification Considerations:  Consistency With Other Appropriate Requirements of State and Tribal Law** ............... **20**

    **D. Conditioning Federal Licenses and Permits Through §401 Certification** ................... **21**

        **1. Appropriate Conditions** ........................................................... **22**

        **2. Role of Monitoring and Mitigation** ............................................ **23**

        **3. State and Tribal Laws and Certification Conditions**...................... **24**

    **E. Certification Process** .................................................................... **25**

        **1. Regulations Describing §401 Certification** .................................. **25**

        **2. Certification Practices Viewed as Effective by States or Tribes**................ **26**

    **F. Issues Raised by General Permits, After-the-Fact Permits, and Provisional Permits.** **29**

    **G. Resolution of §401 Certification-Related Disputes** ............................ **31**

    **H. Enforcement of §401 Certifications**................................................ **32**

    **I. Suspension of §401 Certifications** ................................................... **33**

**IV. Leveraging Available Resources** ...................................................**35**

    **A. Funding and Permit Fees** .............................................................. **35**

    **B. Staffing Sources**.......................................................................... **36**

ii

April 2010 Interim

**C. Data Sources** ................................................................................ **37**
    **1. The Applicant** ....................................................................... **38**
    **2. Other State, Tribal or Local Agencies** ................................ **38**
    **3. Federal Information Tools** .................................................. **38**
    **4. Professional Societies and Private Sector Tools** ................ **41**
**Appendix A: Clean Water Act Section 401** ........................................ **43**

**Table of Figures**

Figure 1. Certification Agency by Discharge Location ................................ 8
Figure 2. Downstream Agency Coordination……………………………………….9
Figure 3. The Water Quality Certification Process ................................... 15
Figure 4. The Water Quality Standards Benchmark ................................ 18
Figure 5. Courts of Review for §401 Certifications ................................. 32

iii

ADD44

April 2010 Interim

# I. Introduction

Clean Water Act (CWA) §401 water quality certification provides states and authorized tribes[1] with an effective tool to help protect water quality, by providing them an opportunity to address the aquatic resource impacts of federally issued permits and licenses. This handbook explains the applicability and scope of §401, and provides practical examples drawn from state and tribal experiences about how §401 certification has been used to achieve their water quality goals.

Under §401, a federal agency cannot issue a permit or license for an activity that may result in a discharge to waters of the U.S. until the state or tribe where the discharge would originate has granted or waived §401 certification. The central feature of CWA §401 is the state or tribe's ability to grant, grant with conditions, deny or waive certification. Granting certification, with or without conditions, allows the federal permit or license to be issued consistent with any conditions of the certification.[2] Denying certification prohibits the federal permit or license from being issued.[3] Waiver allows the permit or license to be issued without state or tribal comment. States and Tribes make their decisions to deny, certify, or condition permits or licenses based in part on the proposed project's compliance with EPA-approved water quality standards. In addition, states and tribes consider whether the activity leading to the discharge will comply with any applicable effluent limitations guidelines, new source performance standards, toxic pollutant restrictions, and other appropriate requirements of state or tribal law.[4]

---

**U.S. Supreme Court in *S. D. Warren Co. v. Maine Board of Environmental Protection***

"State certifications under § 401 are essential in the scheme to preserve state authority to address the broad range of pollution, as Senator Muskie explained on the floor when what is now § 401 was first proposed:

> 'No polluter will be able to hide behind a Federal license or permit as an excuse for a violation of water quality standard[s]. No polluter will be able to make major investments in facilities under a Federal license or permit without providing assurance that the facility will comply with water quality standards. No State water pollution control agency will be confronted with a fait accompli by an industry that has built a plant without consideration of water quality requirements.' 116 Cong. Rec. 8984 (1970).

These are the very reasons that Congress provided the States with power to enforce 'any other appropriate requirement of State law,' 33 U.S.C. § 1341(d), by imposing conditions on federal licenses for activities that may result in a discharge,"[5]

---

Examples of federal licenses and permits subject to §401 certification include CWA §402 NPDES permits in states where EPA administers the permitting program, CWA §404 permits for discharge of dredged or fill material issued by the Army Corps of Engineers (Corps), Federal

---

[1] Tribes may receive §401 certification authority when they receive Treatment As a State (TAS) status which is often at the same time as EPA approval of their water quality standards, as further discussed in *II.B.1. States and Authorized Tribe* below.

[2] CWA §401(a)(1); 33 USC1341(a)(1).

[3] CWA §401(a)(1); .33 USC § 1341(a)(1).

[4] CWA §401(d);.33 USC 1341(d).

[5] *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006). [Quote from the unanimous U.S. Supreme Court decision affirming the State of Maine's certification authority over a Federal Energy Regulatory Commission dam relicensing.]

1

April 2010 Interim

Energy Regulatory Commission (FERC) hydropower licenses, and Rivers and Harbors Act §9 and §10 permits for activities that have a potential discharge in navigable waters issued by the Corps. Many states and tribes rely on §401 certification to ensure that discharges of dredge or fill material into a water of the U.S. do not cause unacceptable environmental impacts and, more generally, as their primary regulatory tool for protecting wetlands and other aquatic resources.[6] In addition, §401 certification is often a state or tribe's only opportunity to review and appropriately condition or object to the federal permitting or licensing of a hydroelectric project.

Although §401 certification can be an effective tool for protecting water quality, it is limited in scope and application to situations involving federally-permitted or licensed activities that may result in a discharge to a water of the U.S. If a federal permit or license is not required, or would authorize impacts only to waters that are not waters of the U.S., the activity is not subject to CWA §401. Although §401 certification by itself is not a comprehensive water quality program for states and tribes, it can nevertheless be an effective water quality protection tool.

---

[6] *State Wetland Program Evaluation*: Phase I, Environmental Law Institute, 2005; *State Wetland Program Evaluation*: Phase II, Environmental Law Institute, 2006.

2

April 2010 Interim

## II. Threshold Issues Regarding Clean Water Act §401 Certification

This chapter discusses a number of threshold issues regarding §401 certification. Section 401 certification does not apply to all permits or licenses associated with any aquatic resource, and this chapter clarifies the circumstances when §401 certification applies. The chapter also discusses which government agency may exercise §401 certification authority, and the ways in which concerns of downstream jurisdictions are taken into account during the §401 certification process.

### A. When CWA §401 Certification Applies

The language of §401(a)(1) is written very broadly with respect to the activities it covers. It states:

> Any applicant for a Federal license or permit to conduct *any* activity including, but not limited to, the construction or operation of facilities, which *may* result in *any discharge* into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates.[7] [emphasis added]

As the statutory language indicates and courts have held, the permit or license must: (a) be issued by a federal agency, (b) for an activity that has the potential to discharge, (c) into a water of the United States, (d) from a point source[8]. This section will discuss each of these terms.

#### 1. "Federal" Permit or License

In order for a §401 water quality certification to be required, the activity causing the discharge must be authorized by a permit or license issued by a federal agency.[9] Federal licenses and permits most frequently subject to §401 water quality certification include CWA §402 (NPDES) permits issued by EPA[10], §404 (dredge and fill) permits issued by the Corps, Federal Energy Regulatory Commission (FERC) hydropower licenses, and Rivers and Harbors Act (RHA) §9 and §10 permits issued by the Corps.

Temporary or "annual licenses" in effect while an application for permit renewal is under review might not require §401 certification where issuance of such temporary licenses is a "ministerial and nondiscretionary act."[11] The most common example of such a license is the annual license renewals issued by FERC while existing hydroelectric dam license renewals are under review.[12] Where interim or other types of permits and licenses are involved, interested

---

[7] CWA §401(a)(1);.33 USC 1341(a)(1).

[8] The Ninth Circuit Court of Appeals has interpreted §401 in light of its broader CWA context and has concluded the discharge must be from a point source to trigger §401. See Section II.A.4 below for more information.

[9] General EPA regulations define a license or permit for the purposes of §401 as, "any license or permit granted by an agency of the Federal Government to conduct any activity which may result in any discharge into …waters of the United States." 40 CFR § 121.1(a).

[10] As of March 2010, states in which EPA administers the §402 NPDES permit program include New Hampshire, Massachusetts, Idaho, and New Mexico.

[11] *California Trout, Inc. v. FERC*, 313 F.3d 1131, 1134, 1136 (9th Cir. 2002), cert denied, 1245 S.Ct. 85 (2003).

[12] Handbook for Hydroelectric Project Licensing and 5 MW Exemptions from Licensing. Federal Energy Regulatory Commission. Appendix A: Federal Power Act, Part 1. Washington, DC. April 2004. pg A-20; Compliance Handbook. Division of Hydropower and Administrative Compliance. Federal Energy Regulatory Commission. March 2004. pg 89.

3

April 2010 Interim

parties should consult with EPA, the state or tribal agency, and the federal permitting or licensing agency to determine whether §401 certification applies.

State or tribal implementation of a state permit program in lieu of the federal program does not "federalize" the resulting permits or licenses for purposes for §401. For example, when a state or tribe is approved to administer the §402 or §404 program, permitting authority resides with the state or tribe, not a federal agency, and 401 certification does not apply to those authorizations issued by the state or tribe. The CWA anticipates that states and tribes issuing those permits will ensure consistency with CWA provisions and other appropriate requirements of state and tribal law as part of their permit application evaluation.[13] In addition, Corps regulations indicate that the Corps will seek 401 certification for Corps' dredging projects involving a discharge into waters of the U.S. even though the Corps is not issuing itself a permit.[14]

## 2. Discharge

Another element required for §401 certification to apply is the potential for a discharge. It is important to note that §401 certification is triggered by the *potential* for a discharge; an actual discharge is not required. There does not have to be an actual discharge or a "discharge of a pollutant." The statute states that, "[a]ny … federal license or permit to conduct any activity … which may result in a discharge."[15] Consequently, the discharge need not be a certainty, only that it "may" occur should the permit or license be granted. However, if no discharge may occur, no water quality certification is required. For example, when a RHA §10 permit is required for the hanging of power lines across a navigable river (RHA §10 water) without a potential discharge to the water, the Corps typically has not sought water quality certification.

In addition, the potential discharge does not need to involve an addition of pollutants. Section 401 certification can be triggered not only where there is discharge of a pollutant (such as would be authorized by §402 or §404 permits), but also where there is a discharge not involving addition of a pollutant, such as water released from the tailrace of a dam.[16] As the U.S. Supreme Court has stated, "[w]hen it applies to water, 'discharge' commonly means a 'flowing or issuing out'"[17] and an addition of a pollutant is not "fundamental to any discharge."[18] A lower court has ruled that allowing more water to flow through a dam's turbines is a discharge for §401 purposes.[19] Two courts have found that a withdrawal of water or reduction in flow does not constitute a discharge.[20]

---

[13] In addition, similar requirements to address the effect of pollutants on downstream jurisdictions exist under CWA §402 and §404 programs when assumed by a State or Tribe. *See, e.g., Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046 (1992).

[14] Under 33 CFR 336.1(a)(1), Corps practice is to seek 401certification for their dredging projects.

[15] CWA §401(a)(1);.33 USC 1341 (a)(1).

[16] *See, e.g., Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 6-7 (9th Cir.(Or.) 1998 *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006).

[17] *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006).

[18] *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006).

[19] *Alabama Rivers Alliance v. Federal Energy Regulatory Commission*, 325 F.3d 290, 295-6 (DC Cir 2003) in the case installing larger turbines in a hydroelectric dam was found to potentially result in a discharge of larger volumes of water through the dam, triggering water quality certification review.

[20] *Great Basin Mine Watch v. Helen Hankins BLM*, 456 F.3d 955, 963 (9th Cir 2006) in the context of the removal of all flow from a stream in Nevada for use in a gold mine; *State of North Carolina v. Federal Energy Regulatory Commission*, 112 F.3d 1175, 1187 (DC Cir 1997) in the context of withdrawing water from a lake for a municipal

ADD48

April 2010 Interim

| | The Regulatory Definition of Waters of the U.S. |

**3. Waters of the U.S. and Waters of the State or Tribe**

The third element required for §401 certification to apply is that the potential discharge must be into a water of the U.S. The term "waters of the U.S." is defined in EPA and Corps regulations, and applies to all CWA programs.  The scope of waters of the U.S. protected under the CWA includes traditionally navigable waters and also extends to include interstate waters, territorial seas, tributaries to navigable waters, adjacent wetlands, and other waters.[22] Since §401 certification only applies where there may be a discharge into waters of the U.S., how states or tribes designate their own waters does not determine whether §401 certification is required. Note, however, that once §401 has been triggered due to a potential discharge into a water of the U.S., additional waters may become a consideration in the certification decision if it is an aquatic resource addressed by "other appropriate provisions of state[tribal] law."[23]

**4. Point Sources**

In addition to the requirements for a federal permit or license and a discharge into a water of the U.S., some courts have indicated that the discharge

---

**The Regulatory Definition of Waters of the U.S.**

"(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a) (1) through (4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1) through (6) of this section;

(8) Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other Federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA. Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States."[21]

---

water supply; the opinion in *Great Basin Mine Watch v. Helen Hankins BLM* also said that states may, but are not required to,  regulate water withdrawals or set minimum stream flow standards in water quality certifications, at 963.

[21] 40 CFR § 230.3(s); 33 CFR § 328.3(a).

[22] *Id.*  For discussion of evolution of the regulatory definition of "waters of the United States," *see*  Downing et al. Clean Water Act Jurisdiction: A Legal Review. Wetlands. Vol. 23. No. 3. 2003. p 477.

[23] *See* CWA §401(d), 33 USC 1341(d).  Note that the Corps may consider a 401 certification as administratively denied where the certification contains conditions that require the Corps to take an action outside its statutory authority or are otherwise unacceptable.  *See, e.g.,* RGL 92-04, "Section 401 Water Quality Certification and Coastal Zone Management Act Conditions for Nationwide Permits."

[24] 40 CFR § 230.3(s); 33 CFR § 328.3(a).

5

ADD49

April 2010 Interim

must be from a point source.[25] The Ninth Circuit Court of Appeals in *ONDA v. Dombeck* held that, "[t]he term "discharge" in §1341 is limited to discharges from point sources."[26] The CWA defines "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel…rolling stock … or vessel…from which pollutants are or may be discharged."[27] Bulldozers and similar equipment are considered point sources[28], as are the tailraces of dams.[29]. While other Circuit Courts of Appeal have not addressed this question, the U.S. in briefs filed before the U.S. Supreme Court suggests that §401 requires the discharge to be from a point source.[30]

**B. When Jurisdictions Have §401 Certification Authority**

Not all jurisdictions whose water may be affected by a federal permit or license have §401(a)(1) certification authority. Only the state or authorized tribe *where the discharge originates* has the authority to directly condition or prevent issuance of a federal permit or license.[31] States and tribes downstream of the jurisdiction where a discharge originates do not have §401 authority. However, CWA §401(a)(2) provides neighboring states or tribes with an opportunity to object to, and make recommendations for, federal licenses and permits.[32]

**1. States and Authorized Tribes**

The CWA directly grants all states §401 certification authority, and currently all states have retained their authority. In addition, U.S. territories are considered "states" under the CWA.[33]

Tribes do not automatically have §401 authority, but may request it when granted 'Treatment in the same manner As a State" (TAS) authority by EPA.[34] This often occurs when a tribe is authorized to administer the water quality standards program and has designated the tribal agency that will administer §401. No separate application is required. If granted, tribes possess the same certification authority and responsibilities as states. As of January 2010, 36 tribes had developed water quality standards approved by EPA and have been granted §401 certification

---

[25] "We hold that certification under § 1341 is not required for grazing permits or other federal licenses that may cause pollution solely from nonpoint sources." *Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 7 (9th Cir.(Or.) 1998).

[26] *Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 5 (9th Cir.(Or.) 1998).

[27] 33 USC 1362(14); CWA §502(14); Case law has indicated that point sources also include bulldozers and similar equipment: *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897, 922 (1983).

[28] *See, e.g., Avoyelles Sportsman's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983).

[29] *Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 6 (9th Cir.(Or.) 1998). Also supported by, *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006). *Jefferson County PUD v. Washington Dept. of Ecology*, 511 U.S. 711 (1994).

[30] *See, e.g., Amicus brief of the United States in S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006), found at 2006 WL 53960 (January 9, 2006).

[31] CWA §401(a)(1); 33 USC 1341(a)(1).

[32] In some cases, such as when the backwater pool area for a reservoir extends into another state or tribe, neighboring states or tribes may comment without being downstream.

[33] CWA §502(3); 33 USC 1362(3): "The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands."

[34] CWA §401(a)(1); 33 USC 1341(a)(1).

6

April 2010 Interim

authority.[35] Courts have held that tribal water quality standards and §401 certification authority extend to non-Indian fee land within a reservation.[36]

Where the discharge originates within a jurisdiction without §401 authority, EPA is the certifying agency. Section 401(a)(1) states, "In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator [EPA]."[37] As a result, EPA typically acts as the certifying authority on tribal lands when the tribe lacks certification authority.

### 2. States or Tribes Where a Discharge Originates

The courts have interpreted §401 to mean that the state or tribe in which a discharge originates has §401 certification authority.[38] When a facility is located within one state but the end of its discharge pipe is located in the waters of another state, the jurisdiction where the discharge enters the waters of the U.S. has certification authority. The state with jurisdiction over the receiving waters has a direct interest in the quality of its resulting water quality, while the state in which the facility is located may have a variety of other concerns not directly related to the waters affected by the discharge. Similarly, the state where the discharge enters a "water of the U.S." is likely better positioned to monitor and inspect for compliance with any 401 certification conditions on the discharger's permit or license.

---

[35] Region 2: Saint Regis Mohawk Tribe. Region 4: Seminole of Florida; Miccosukee Tribe of Indians of Florida; Region 5: Mole Lake Band of the Lake Superior Tribe of the Chippewa Indians, Sokaogon Chippewa Community; The Fond du Lac Band of the Minnesota Chippewa Tribe; Grand Portage Band of the Minnesota Chippewa Tribe. Region 6: Ohkay Owingeh (Pueblo of San Juan); Pueblo of Acoma; Pueblo of Isleta; Pueblo of Nambe; Pueblo of Picuris; Pueblo of Pojoaque; Pueblo of Sandia; Pueblo of Santa Clara; Pueblo of Taos; Pueblo of Tesuque. Region 8: Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation; Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation;. Region 9: Big Pine Paiute Tribe of the Owens Valley; Bishop Paiute Tribe;Hoopa Valley Tribe; Hopi Tribe; Hualapai Tribe; Pyramid Lake Paiute Tribe;White Mountain Apache. Regions 6, 8 and 9: Navajo Nation. Region 10: Confederated Tribes of the Chehalis Reservation; Confederated Tribes of the Colville Reservation; Confederated Tribes of the Umatilla Indian Reservation of Oregon; Confederated Tribes of the Warm Springs Indian Reservation of Oregon; Kalispel Indian Community of the Kalispel Reservation; Lummi Nation; Makah Tribe; Port Gamble S'Klallam Tribe; Puyallup Tribe of Indians; and the Spokane Tribe of Indians.

[36] *See*, e.g., *State of Montana v. United States Environmental Protection Agency*, 137 F.3d 1135, 1141 (9th Cir 1998).

[37] 33 USC 1341(a)(1); CWA §401(a)(1).

[38] "[A] certification from the State in which the discharge originates or will originate" 33 USC 1341(a)(1); CWA §401(a)(1); "[O]nly required to obtain a certification from the state where the discharge originates." *National Wildlife Federation v. Federal Energy Regulatory Commission*, 912 F.2d 1471, 1483-1484 (DC Cir 1990).

ADD51

April 2010 Interim

| **Players in the Water Quality Certification Process** | | |
|---|---|---|
| **Origin of the Discharge** | | **Certifying entity \*** |
| Within the borders of a state with a designated certification authority | → | State certifying agency |
| On tribal land that has been granted TAS and 401 certification authority | → | Tribal certifying agency |
| Within the borders of a state or tribal holdings where no certification authority exists | → | EPA |
| *Other states and tribes may be involved in the certification process through the downstream effects consultation process found in §401(a)(2). | | |

Figure 1. Certification Agency by Discharge Location

### 3. Other Affected States and Tribes

Although §401 certification authority rests with the jurisdiction where the discharge originates, neighboring states and tribes downstream[39] or otherwise potentially affected by the discharge have an opportunity to raise objections to, and comment on, the federal permit or license.[40] The EPA Administrator determines if a discharge subject to §401 certification "may affect" the water quality of other states or tribes, and EPA is required to notify those other jurisdictions whose water quality may be affected.[41] The other jurisdictions are then provided an opportunity to submit their views and objections about the proposed license or permit and associated §401 certification. They may also request that the federal permitting or licensing agency hold a hearing at which, "the [EPA] Administrator shall … submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency."[42] The federal licensing or permitting agency "shall condition such license or permit in such manner as may be necessary to ensure compliance with applicable water quality requirements."[43] Recommendations from neighboring jurisdictions do not have the same force as conditions from a §401 certifying state. While the Federal agency must develop measures to address the downstream jurisdictions' concerns, the agency may develop its own measures and does not need to adopt the downstream state or tribe's specific recommendations without modification, as it would were they from the §401 certifying agency. If the Federal agency "cannot ensure compliance" with the other state or tribe's water quality requirements, it "shall not issue such license or permit."[44]

---

[39] In some cases, such as when the backwater pool area for a reservoir extends into another state or tribe, neighboring states or tribes may comment without being physically downstream.

[40] CWA §401(a)(2), 33 USC 1341. Note that the CWA establishes processes to address the effect of pollutants on downstream stakeholders exist under CWA §§ 402 and 404 programs when assumed by a state or tribe. For example: *Arkansas v. Oklahoma*, 503 U.S. 91, 112 S.Ct. 1046 (1992).

[41] CWA §401(a)(2); 33 USC 1341(a)(2).

[42] CWA §401(a)(2); 33 USC 1341(a)(2)

[43] CWA §401(a)(2); 33 USC 1341(a)(2).

[44] CWA §401(a)(2); 33 USC 1341(a)(2).

8

April 2010 Interim



Figure 2. Downstream Agency Coordination

## C. CWA Section 401 Certification Options

The central component of §401 certification is the state or tribe's decision to grant, condition, deny or waive certification. In essence, the state or authorized tribe[45] agency decides whether the licensed or permitted activity and discharge will be consistent with a number of specifically identified CWA provisions: effluent limitations for conventional and non-conventional pollutants (§301 and §302), water quality standards (§303), new source performance standards (§306), and requirements for toxic pollutants (§307).[46] Section 401(d) requires inclusion of license or permit conditions to ensure compliance with these listed CWA provisions, as well as appropriate requirements of state or tribal law.[47] A state or tribe

---

[45] Tribes authorized to use §401 certification authority have developed water quality standards and designated an agency to administer the certification authority, as further discussed in *II.B.1. States and Authorized Tribes* above.
[46] 33 CWA §401(a)(1); USC 1341(a)(1).
[47] CWA §401(d); 33 USC 1341(d); *S. D. Warren Co. v. Maine Board of Environmental Protection et al,* 547 U.S. 370, 126 S.Ct. 1843 (2006); *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 711 (1994).

9

April 2010 Interim

certification is intended to ensure that all these provisions and requirements will be met. The following four subsections discuss each certification option.

### 1. Grant

The granting of §401 water quality certification to an applicant for a federal license or permit signifies that the state or tribe has determined that the proposed activity and discharge will comply with water quality standards as well as the other identified provisions of the CWA and appropriate requirements of state or tribal law. Granted certifications receive significant weight in the federal permitting or licensing agency's review of the project's potential impacts on water quality.[48] However, certification review and issuance does not fulfill environmental impact review requirements under the National Environmental Policy Act (NEPA), nor does it substitute for a dredged or fill permit from the Corps of Engineers or any other required CWA permit.[49]

### 2. Grant with Conditions

States and tribes may include limitations or conditions in their certifications as necessary to ensure compliance with water quality standards and other provisions of the CWA and appropriate requirements of state or tribal law.[50] Conditions to protect water quality need not focus solely on the potential discharge. Once a potential discharge triggers the requirement for §401, the certifying agency may develop "additional conditions and limitations on the activity as a whole."[51] Conditions placed in §401 water quality certifications must become conditions of the resulting federal permit or license.[52] The federal agency may not select among conditions when deciding which to include and which to reject.[53] If the federal agency chooses not to accept all conditions placed on the certification, then the permit or license may not be issued.[54] Some federal agencies may decide to view the certification as denied, and administratively deny the permit without prejudice, if the conditions are viewed as beyond the agency's authority.[55]

### 3. Deny

---

[48] Water Quality Standards Handbook. Second Edition. US EPA. August 1994. Chapter 7.6.3.

[49] Section 401 certification does not fulfill any requirements under NEPA, *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109, 1125 (DC Cir. 1971); Section 401 certification does not substitute for other CWA permit requirements, *Monongahela Power Company v. John O. Marsh*, 809 F.2d 41, 53 (DC Cir 1987).

[50] 33 USC 1341(d); CWA §401(d); *S. D. Warren Co. v. Maine Board of Environmental Protection et al,* 547 U.S. 370, 126 S.Ct. 1843 (2006). *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 711 (1994).

[51] *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 712 (1994).

[52] CWA 401(d), 33 USC 1341(d).

[53] *American Rivers v. Federal Energy Regulatory Commission,* 129 F.3d 99, 110-111 (2d Cir, 1997).

[54] 33 USC 1341(a)(1); CWA §401(a)(1); *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 110-111 (2nd Cir 1997); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 868 (9th Cir 1993); *Puerto Rico Sun Oil Company v. United States Environmental Protection Agency*, 8 F.3d 73, 74-75 (1st Cir 1993); *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency*, 684 F.2d 1041, 1056 (1st Cir 1982); *US v. Marathon Development Corporation*, 867 F.2d 96, 99 (1st Cir. 1989).

[55] Note that the Corps may consider a 401 certification as administratively denied where the certification contains conditions that require the Corps to take an action outside its statutory authority or are otherwise unacceptable. *See, e.g.,* RGL 92-04, "Section 401 Water Quality Certification and Coastal Zone Management Act Conditions for Nationwide Permits."

10

April 2010 Interim

States and tribes deny certification if the activity and discharge will not comply with the applicable sections of the CWA and appropriate requirements of state and tribal law.[56] The denial of §401 certification by a state or tribe prohibits the federal agency from issuing the permit or license in question.[57]

**4. Waive**

States and tribes are authorized to waive §401 certification, either explicitly, through notification to the applicant, or by the certification agency not taking action. If action is not taken on a certification request, "within a reasonable time (which shall not exceed one year)," the state or authorized tribe has waived the requirement for certification. The amount of time allowed for action on a certification application is determined by the Federal agency issuing the license or permit, while the certifying agency determines what constitutes a "complete application" that starts the timeframe clock.[58] To avoid waiving inadvertently, a state or tribal agency receiving a request for certification should consult with the federal licensing or permitting agency to verify the time available for their certification decision. However, the onus for applying for water quality certification lies with the permit or license applicant, and waiver can not occur without a request for certification.[59]

Under the CWA, waiver does not indicate a state or tribe's substantive opinion regarding the water quality implications of a proposed activity or discharge. A state or tribe may waive certification for a variety of reasons, including a lack of resources to evaluate the application. Waiver merely means the federal permitting or licensing agency may continue with its own application evaluation process and issue the license or permit in the absence of an affirmative state or tribal certification.

> *S. D. Warren Co. v. Maine Board of Environmental Protection et al*
>
> "Section 401 recast pre-existing law and was meant to 'continu[e] the authority of the State ... to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State.' S.Rep. No. 92-414, p. 69 (1971). Its terms have a broad reach, requiring state approval any time a federally licensed activity 'may' result in a discharge ('discharge' of course being without any qualifiers here), 33 U.S.C. § 1341(a)(1), and its object comprehends maintaining state water quality standards."[60]

---

[56] 33 USC 1341(a)(1); CWA §401(a)(1).

[57] CWA 401(a)(1); 33 USC 1341(a)(1).

[58] The Fourth Circuit observed that certification agencies prescribe the required procedure for requesting certification and starting the review or waiver countdown. *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1112 (4th Cir 1989); 33 USC 1341(a)(1); CWA §401(a)(1); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

[59] *State of North Carolina v. FERC*, 112 F.3d 1175, 1184 (D.C. Cir 1997); *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1111-1112 (4th Cir 1989).

[60] *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843, 1851 (2006).

ADD55

April 2010 Interim

## III. The CWA 401 Certification Process

The previous chapter discussed threshold issues affecting when CWA §401 certification applies and what certification options states and tribes have (grant, grant with conditions, deny, or waive). This section discusses some of the details of the §401 certification process, including receipt of an application, review by the state or authorized tribe[61], and enforcement and dispute resolution issues. Where possible, the chapter illustrates its points with examples taken from state and tribal experiences.

### A. Timeframes and Opportunities for Review

The federal permitting or licensing agency may set the certification response time limit to any "reasonable period of time (which shall not exceed one year)."[62] If the certifying agency does not respond within the time limit, §401 certification is waived.[63] As discussed below, federal agencies have established varying timeframes up to one year. An initial step, therefore, is for the certifying agency to verify the amount of time it has for its §401 analysis.

Federal agencies may define what is a "reasonable time" for purposes of §401 certification of their permits or licenses, provided the period is less than one year in duration. For example, some Corps Districts provide a response period of 60 days for a §401 certification associated with a CWA §404 permit. FERC normally allows a full year for states and tribes to develop a §401 certification response. EPA regulations governing the certification of federally-issued CWA §402 NPDES permits allow states and tribes 60 days to issue certification.[64] EPA regulations applicable in other contexts suggest a time limit of six months.[65]

Not all Corps Districts use a 90-day time frame for certification of 404 permits.[66] For example, while the Savannah Army Corps of Engineers (Corps) District has a self-imposed 120 day timeline for making permit decisions, it has placed no limit on receipt of state certification other than the statutory one year. Should Georgia not issue a §401 certification by the 120-day deadline for §404 permit issuance, the District may issue a provisional permit that is not valid unless the conditions listed on the cover page, such as obtaining §401 certification, are met.[67] Shorter certification timeframes apply in other places such as Florida, where the certification time limit is 90 days for individual Corps permits and 30 days for Corps Nationwide General Permits that did not receive categorical certifications.[68] For their part, state and tribal

---

[61] Tribes authorized to use §401 certification authority have received "Treatment as a State" (TAS) status, and have designated an agency to administer the certification authority. As further discussed in *II.B.1. States and Authorized Tribes* above, typically authorized tribes also have developed EPA-approved water quality standards.

[62] CWA §401(a)(1); 33 USC 1341(a)(1).

[63] CWA §401(a)(1); 33 USC 1341(a)(1); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

[64] 40 CFR §124.53(c)(3).

[65] 40 CFR §121.16(b). ("which period shall generally be considered to be 6 months, but in any event shall not exceed 1 year.")

[66] Corps Districts may establish agreements with states or tribes to have longer or shorter timeframes for water quality certification decisions than the 60 days provided in regulations. *See, e.g.*, RGL 87-03.

[67] Savannah Corps District. Provisional permit cover sheet.

[68] CWA Section 404 Nationwide General Permits are certified as a category every five years at reissuance. If categorical certification is denied for any Nationwide permit, each individual project wishing to be authorized under the Nationwide permit would require 401 certification.

12

April 2010 Interim

certification agencies may adopt procedural requirements regarding certification, for example specifying that the receipt of agency certification requests starts the certification review time period.[69]  While such requirements may help ensure that states and tribes have adequate time for their 401 review, it is important that they note the time frame at the time the certification application is received and consult with the Federal licensing or permitting agency early about any concerns.

### 1. When More Time is Needed

In cases where the certifying agency believes it needs more information or time to review the license or permit before issuing a certification, and it has not been able to work out an appropriate time frame with the licensing or permitting Federal agency, states have tended to take two approaches.  Some states on occasion have suggested the applicant withdraw and resubmit its application for certification (restarting the certification clock), as an alternative to denying certification based on gaps in analyses or information. This withdraw-resubmission process potentially gives the applicant and the §401 certifying agency time to produce requested reports, and is intended to give the certifying agency additional time to review the relevant information and issue a certification.  Note that the withdraw-resubmission process can result in the federal agency being unable to act in a timely manner on permit or license applications.  As an alternative approach, some states have denied §401 certification "without prejudice" when they lack data necessary for their analysis, and then encouraged the applicant to resubmit the application with the application fee waived as long as they continue to abide by the standard public notice requirements.[70]

### 2. Certification Timeframe for Permits to Construct and Operate Facilities

Another issue related to timeframes occurs when one federal permit or license is required for the construction of a facility and a separate federal permit or license is required for its operation. Generally, §401 requires certification of the construction permit or license and then only notice of application for a permit or license to operate the new facility, unless construction and operation would be certified by a different state certification authority.[71] Upon receiving notice of application for a permit or license to operate the new facility, the certifying agency has 60 days to determine if;

> [T]here is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 301, 302, 303, 306, and 307 of this [CWA] title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which

---

[69] The Fourth Circuit observed that certification agencies prescribe the required procedure for requesting certification and starting the review or waiver countdown. *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1112 (4th Cir 1989).

[70] This handbook does not endorse either of the two approaches, but emphasizes the need for coordination regarding necessary information early in the certification process in order to avoid denial or withdrawal due to data gaps. FERC believes that both of these approaches can often result in delays and impair FERC's ability to act on hydropower license, relicense, and amendment applications in a timely manner.

[71] CWA §401(a)(3); 33 USC 1341(a)(3);  *Keating v. Federal Energy Regulatory Commission*, 927 F.2d 616, 623 (DC Cir 1991)(The statute allows a state to revoke a prior certification only within a specified time limit and only pursuant to certain defined circumstances.); *State of North Carolina v. FERC*, 112 F.3d 1175, 1184 (D.C. Cir 1997) (Section 401(a)(3) does not, however, require a state with certification rights pertaining only to the operation of a project to assert those rights at the time a construction permit is issued for the project).

ADD57

April 2010 Interim

such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements.[72]

If the certifying agency does not respond within sixty days to the notice, the certification of construction of the facility also serves as certification of operation of the facility.[73] CWA §401 certification of any federal permit or license required for construction of a facility will satisfy §401 certification requirements for federal permits or licenses required for operation of the facility as well, if the certification agency finds the project has not changed in any of the ways laid out in §401(a)(3) discussed above.[74] Note that certification of construction cannot serve as certification of operation if the applicant has failed to provide notice to the certifying agency of: (1) the application for a permit or license to operate the facility, or (2) any proposed changes in the construction or operation of the facility that may result in a violation of effluent limitations (CWA §301), water quality related effluent limitations (CWA §302), water quality standards and implementation plans (CWA §303), national standards of performance (CWA §306), toxic and pretreatment effluent standards (CWA §307) or other appropriate requirements of state or tribal law.[75]

In the case where construction requires a federal permit or license and §401 certification, but operation of the facility does not require a federal permit or license, the facility must provide an opportunity for the §401 certification authority:

[T]o review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated.[76]

If the certifying agency finds that the operation of the facility will violate water quality requirements but will not trigger the review procedure under §401(a)(3) (change in construction, operation, or water quality requirements), the certifying agency notifies the federal agency that issued the permit or license authorizing construction of the facility. Then the "Federal agency may, after public hearing, suspend such license or permit."[77] If suspension is issued, it shall remain in effect until the certifying agency provides notice to the federal agency that the facility will not violate the applicable water quality requirements.[78] To ensure that adequate consideration is given to water quality impacts of facility operation, as well as to minimize the need for such after-the-fact suspensions (which are solely at the discretion of the Federal agency), states should review all such impacts at the time of initial certification, and include conditions in their certifications to address them as appropriate.

---

[72] CWA §401(a)(3); 33 USC 1341(a)(3).

[73] CWA §401(a)(3); 33 USC 1341(a)(3); *Keating v. FERC*, 927 F.2d 616, 623 (DC Cir 1991).

[74] *Keating v. FERC*, 927 F.2d 616, 624 (DC Cir 1991).

[75] *State of North Carolina v. FERC*, 112 F.3d 1175, 1184 (D.C. Cir 1997); *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1111-1112 (4th Cir 1989); CWA §401(a)(3); 33 USC 1341(a)(3); CWA §401(d);33 USC 1341(d).

[76] CWA §401(a)(4); 33 USC 1341(a)(4).

[77] CWA §401(a)(4); 33 USC 1341(a)(4).

[78] CWA §401(a)(4); 33 USC 1341(a)(4).

April 2010 Interim



**Figure 3. The Water Quality Certification Process**

## B. Start of the 401 Certification Process

Section 401 indicates that an application for a federal permit or license that may result in a discharge to waters of the U.S. cannot be considered complete unless accompanied by a grant or waiver of §401 certification.[79] "No license or permit shall be granted until the certification … has been obtained or has been waived."[80],[81] As a result, the applicant is responsible for requesting the necessary §401 certification from the state or tribe.[82]

States and tribes often establish their own specific requirements for a complete application for water quality certification.[83] Generally, the state or tribe's §401 certification review timeframe begins once a request for certification has been made to the certifying agency,

---

[79] 33 USC 1341(a)(1); CWA §401(a)(1); *Puerto Rico Sun Oil Company v. EPA*, 8 F.3d 73, 74 (1st Cir 1993); *US v. Marathon Development Corporation*, 867 F.2d 96 (1st Cir. 1989).

[80] CWA §401(a)(1); 33 USC 1341(a)(1).

[81] Note that the process in practice is not always linear. For example, FERC's licensing regulations indicate that once the Commission determines that the application is complete, it issues a "Ready for Environmental Analysis" notice instructing the license applicant to request water quality certification from the state certifying agency within 60 days of notice issuance.

[82] *State of North Carolina v. FERC*, 112 F.3d 1175, 1184 (D.C. Cir 1997); *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1111-1112 (4th Cir 1989).

[83] *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1112 (4th Cir 1989).

15

April 2010 Interim

accompanied by a complete application. A complete application for §401 certification typically includes the completed application for a federal license or permit, including detailed descriptions of the proposed project and anticipated aquatic resource impacts.[84] At times, the list of components of a complete application can be lengthy. For example, Oregon has identified a complete §401 certification application for a §404 permit as including: the legal name and address of activity owner or operator; legal name and address of the authorized representative; name and addresses of contiguous property owners; complete written description of activity, including maps, diagrams, and other information; names of affected waters, including wetlands and tributary streams; land use compatibility statement; identified steps that will be undertaken to prevent violation of water quality standards; copies of environmental information submitted to the federal licensing or permitting agency; confirm status of waters impacted by the project, including if they are on 303(d) lists or subject to a Total Maximum Daily Load (TMDL) calculation; evaluation of potential water quality standard violations or contribution to violation; and identification of mitigation measures.[85] Oregon also identifies additional information that may be required for projects in wetlands and streams and for hydropower projects.

The advantage of a clear description of components of a complete §401certification application is that applicants know what they must be prepared to provide, and applicant and agencies alike understand when the review timeframe has begun.

### C. Scope of Analysis For §401 Certification Decisions

> **U.S. Supreme Court in *PUD v Washington Department of Ecology*:**
>
> "Section 401(d) thus allows the State to impose 'other limitations' on the project in general to assure compliance with various provisions of the Clean Water Act and with 'any other appropriate requirement of State law'… Section 401(a)(1) identifies the category of activities subject to certification--namely, those with discharges. And §401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied."[88]

When Congress enacted the water quality certification provisions in 1970, it wanted to ensure that no federal license or permit would be issued "for an activity that through inadequate planning or otherwise could in fact become a source of pollution."[86] As incorporated into the 1972 CWA, §401 water quality certification was intended to ensure that no federal license or permits would be issued that would prevent states or tribes from achieving their water quality goals, or that would violate CWA provisions. Specifically, the statute calls for states or tribes to base their certification on a consideration of whether the permit or license would be consistent with a list of CWA authorities including water quality standards and effluent limitations, as well as "any other appropriate requirement of State [or tribal] law set forth in such certification."[87] It is important to note that, while EPA-approved state and tribal water quality standards may be a major consideration driving §401 decision, they are not the only consideration.

---

[84] CWA §401(a)(1,3); 33 USC 1341(a)(1, 3); *State of North Carolina v. FERC,* 112 F.3d 1175, 1184 (D.C. Cir 1997); *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1111-1112 (4th Cir 1989).
[85] OAR 340-048-0020; see also http://www.deq.state.or.us/wq/sec401Cert/process.htm#min.
[86] 115 Cong. Rec. H9030 (April 15, 1969)(House debate); 115 Cong. Rec. S28958-59 (Oct. 7, 1969) (Senate debate).
[87] CWA §401(d); 33 USC 1341(d).

ADD60

April 2010 Interim

        As noted in the previous section, the CWA indicates that §401 certification of a permit or
license for the construction of any facility may fulfill the requirements for certification in
connection with any other federal license or permit required for the operation of such facility.[89]
In other words, certification of a construction permit or license generally also operates as
certification for an operating permit or license.  Thus, it is important for the §401 certification
authority to consider all potential water quality impacts of the project, both direct and indirect,
over the life of the project.[90] For example, certification of a new hydroelectric dam subject to
licensing by FERC would consider water resource implications of both the dam's construction
and operation, for the life of the permit.

        Three exceptions to this general rule of "one certification" exist. First, if the §401
certification of permits for project construction is from a different jurisdiction than where a
potential discharge would originate during facility operation, then the federal operating permit
would require an additional certification from the state or tribe in which the operational
discharge would originate.[91] The second exception exists where there have been unanticipated
changes to the facility, receiving water quality, water quality standards, or other CWA
requirements (see the box below).[92] Third, the general rule does not apply if the applicant failed
to provide notice to the certifying agency, "of any proposed changes in the construction or
operation of the facility with respect to which a construction license or permit has been
granted."[93] In short, certification of a permit or license for the construction of a facility will
fulfill the requirements for certification of any other construction or operation permits or licenses
for the facility as long as the potential impacts from construction and operation are within the
same jurisdiction and there is no change in the facility, the receiving water, water quality
standards or other CWA requirements.

---

**Certification of Construction And Certification of Operation: CWA §401(a)(3)**

"The certification obtained…with respect to the construction of any facility shall fulfill
the…certification…for the operation of such facility unless, after notice to the certifying…
agency…[the certifying] agency…notifies such [federal] agency within sixty days…that there is no
longer reasonable assurance that there will be compliance with the applicable provisions of sections
301, 302, 303, 306, and 307 of this title because of changes since the construction license or permit
certification was issued in (A) the construction or operation of the facility, (B) the characteristics
of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters
or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in
any case where the applicant for such operating license or permit has failed to provide the
certifying…agency… with notice of any proposed changes in the construction or operation of the
facility…which changes may result in violation of section 301, 302, 303, 306, or 307 of this title."

---

[88] *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 712 (1994).
[89] 33 USC 1341(a)(3); CWA §401(a)(3); "The statute allows a state to revoke a prior certification only within a
specified time limit and only pursuant to certain defined circumstances" *Keating v. Federal Energy Regulatory
Commission*, 927 F.2d 616, 623 (DC Cir 1991); "Section 401(a)(3) does not, however, require a state with
certification rights pertaining only to the operation of a project to assert those rights at the time a construction permit
is issued for the project." *State of North Carolina v. FERC*, 112 F.3d 1175, 1184 (D.C. Cir 1997).
[90] In *PUD 1* the court found that, "activities—not merely discharges—must comply with state water quality
standards." *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 712 (1994).
[91] *National Wildlife Federation v. Federal Energy Regulatory Commission*, 912 F.2d 1471, 1483-1484 (DC Cir
1990).
[92] 33 USC 1341(a)(3); CWA §401(a)(3); See also *Keating v. FERC*, 927 F.2d 616, 622 (DC Cir 1991).
[93] 33 USC 1341(a)(3); CWA §401(a)(3).

17

ADD61

April 2010 Interim

Section 401 applies to any federal permit or license for an activity that may discharge into a water of the U.S.  The Ninth Circuit Court of Appeals has ruled that the discharge must be from a point source, and agencies in other jurisdictions have generally adopted the requirement. [94] Once these thresholds are met, the scope of analysis and potential conditions can be quite broad.  As the U.S. Supreme Court has held, once §401 is triggered, the certifying state or tribe may consider and impose conditions on the project activity in general, and not merely on the discharge, if necessary to assure compliance with the CWA and with any other appropriate requirement of state or tribal law. [95]

For example, water quality implications of fertilizer and herbicide use on a subdivision and golf course might be considered as part of a §401 certification analysis of a CWA §404 permit that would authorize discharge of dredged or fill material to construct the subdivision and golf course.   Note that the Corps may decide to consider a certification with conditions it views as beyond its statutory authority as a denial, and not issue the section 404 or section 10 permit. [96]

### 1. Basis for Certification Decisions – Generally

In order to obtain certification of any proposed activity that may result in a discharge to waters of the U.S., an applicant must demonstrate that the proposed activity and discharge will not violate or interfere with the attainment of any limitations or standards identified in §401(a) and (d). Specifically, the statute provides that an applicant for a federal license or permit obtain a certification that the discharge and activity is consistent with state or tribal effluent limitations (CWA §301), water quality related effluent limitations (CWA §302), water quality standards and implementation plans (CWA §303), national standards of performance (CWA §306), toxic and pretreatment effluent standards (CWA §307) and "any other appropriate requirement of State [or Tribal] law set forth in such certification." [97]

> **Water Quality Standards:**
> **A benchmark for water quality protection**
>
> Standards provide the foundation for a broad range of water quality management activities including, but not limited to, monitoring under §§ 305(b) and listing /TMDL development under section 303(d), permitting under §§ 402 and 404, water quality certification under §401, and the control of non-point source pollution under §319. Standards also provide a benchmark for the assessment of wetland impacts. Such standards, however, are not the only consideration during a §401 certification analysis.

**Figure 4. The Water Quality Standards Benchmark**

Certifying agencies often develop procedures and a list of considerations that they deem necessary as part of their certification analysis to ensure compliance with the appropriate CWA provisions and requirements of state or tribal law related to the maintenance, preservation, or enhancement of water quality. For example, North Carolina has developed a list of assessment formulas and general certification conditions relating to project impacts, buffers, violation sites,

---

[94] *Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 5 (9th Cir.(Or.) 1998); *ONDA v. U.S. Forest Service,* 550 F.3d 778 (9th Cir. 2008). Discussions with more than a dozen certification agencies in 2005 did not reveal one case of certification being given or required for federal permits or licenses for non-point source discharges into waters of the U.S.
[95] *Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 711-712 (1994); *S. D. Warren Co. v. Maine Board of Environmental Protection et al,* 547 U.S. 370, 126 S.Ct. 1843 (2006).
[96]*See, e.g.,* RGL 92-04, "Section 401 Water Quality Certification and Coastal Zone Management Act Conditions for Nationwide Permits."
[97] CWA §401(d); 33 USC 1341(d).

18

ADD62

April 2010 Interim

stormwater, surface water classifications, dams and ponds, wetlands and others that are reviewed for applicability to each project, so that all projects are held to the same standards and undergo the appropriate level of scrutiny. In Georgia, coordination between the certifying agency and the state fish and wildlife agencies has led to certification conditions designed to protect state species of concern that are tied to water quality goals in state law. Texas and Virginia certifications both rely on "No Net Loss" goals laid out in statute or regulation when requiring adherence to the avoidance, minimization and mitigation standards found in the CWA §404(b)(1) guidelines.

Whatever the basis of the certifying agency's decision, thorough and clear documentation of the information and rationale used to reach the decision will help to educate the applicant and the public of the importance of water quality protection. Equally important, thorough and clear documentation can help to ensure that the certification is defensible should it be challenged in court or during public comment.

### 2. 401 Certification Consideration: Consistency With Water Quality Standards

As noted above, water quality standards are often the starting point for determining an appropriate response to a §401 certification request. States and tribes adopt EPA-approved water quality standards pursuant to CWA §303, and base those standards on the waters' use and value for ". . . public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation."[98] These water quality standards and the state's and tribe's §401 implementing regulations and guidelines are, perhaps, the most important tools for the implementation of §401. Note that water quality standards adopted by a state or tribe but not yet approved by EPA may still be relevant during the §401 certification process as "other appropriate requirement" of state or tribal law.[99]

Water quality standards consist of designated uses, criteria (narrative and numeric), and an antidegradation policy, which together provide environmental benchmarks for each class of water body. In practice, narrative and numeric criteria are often the clearest benchmarks for assessment of potential project impacts.

Across the country water quality standards have been developed for different open water bodies such as lakes, rivers and estuaries. In most areas of the country, however, water quality standards have not been developed specifically for wetlands. Wetland types vary over a wide gradient of physical, chemical and biological conditions that do not always reflect the characteristics of adjacent open water bodies. Therefore, the application of open water standards to wetlands can present challenges. One way to help ensure comprehensive consideration of wetlands in the §401 certification process is by creating wetland-specific water quality standards. Several states rely on their antidegradation policies for developing certification conditions. South Carolina has developed an implementation manual for applying its antidegradation policy to wetlands which has helped them more comprehensively assess wetlands impacts.[100]

[98] CWA §303(c)(2)(A);.33 USC 1313 (c)(2)(A).
[99] They fall under the, "other appropriate requirement of State law set forth in such certification" requirement of 33 USC 1341(d); CWA §401(d).
[100] Antidegradation Implementation for Water Quality Protection in South Carolina. Department of Health and Environmental Control, Bureau of Water. July 1998. http://www.scdhec.net/environment/water/docs/antideg.pdf

19

ADD63

April 2010 Interim

For more information on water quality standards see the *National Guidance on Water Quality Standards for Wetlands*[101], the *Water Quality Standards Handbook*[102], or Section II of the April 1998 Advance Notice of Proposed Rule Making seeking comments from interested parties on possible revisions to the Water Quality Standards Regulation at 40 CFR Part 131.[103]

### 3. 401 Certification Considerations:  Effluent Guidelines, New Source Performance Standards and Toxics

In addition to water quality standards, §401 certification decisions must reflect consistency with effluent guidelines, New Source Performance Standards (NSPS), the CWA's toxics provisions, and other considerations.[104]

Effluent guidelines are national technology-based effluent limitations for the discharge of pollutants directly to surface waters and to publicly owned treatment works (POTWs).[105] Effluent guidelines are developed for a wide range of specific industrial sectors and discharges -- from manufacturing to agricultural and service industries. As of 2010, effluent guidelines have been issued for 55 industry sectors and subsectors.[106] National effluent guideline regulations typically specify maximum daily allowable concentration and a 30-day average for a pollutant that may be discharged by facilities within the targeted industry, often per unit of production.[107] Regardless of the quality of the receiving water, all permits must include effluent limitations at least as stringent as those called for under the effluent guidelines.[108]  While effluent guidelines serve as a national minimum of pollution control, the CWA requires permitting authorities to develop more stringent water quality-based standards if the effluent guideline requirements are insufficient to meet water quality standards on a particular water body.[109]

NSPS are technology-based discharge limits placed on new facilities. They are developed similarly to effluent guidelines, tailored to specific industrial sectors, and applicable nationwide regardless of the quality of the receiving water.[110] As a general rule, NSPS are more stringent than effluent limitations guidelines placed on existing sources in the same industrial sector.

### 4. 401 Certification Considerations:  Consistency With Other Appropriate Requirements of State and Tribal Law

---

[101] National Guidance: Water Quality Standards for Wetlands. US EPA. July 1990. pvii. as Appendix B to Chapter 2 - General Program Guidance of the Water Quality Standards Handbook, December, 1983.

[102] Water Quality Standards Handbook, Second Edition. US EPA. September 1993.

[103] Found on EPA's website at http://www.epa.gov/waterscience/standards/laws.htm; Federal Register: July 7, 1998 (Volume 63, Number 129), Page 36741-36806, From the Federal Register Online via GPO Access, wais.access.gpo.gov, DOCID:fr07jy98-27.

[104] CWA §404(a)(1);.33 USC 1341(a)(1).

[105] CWA §304(b); 33 USC 1314(b).

[106] *See* CWA section 307(b) and (c); and CWA section 402(a) (1); EPA's Industrial Limitations Guidelines http://www.epa.gov/waterscience/guide/industry.html.

[107] CWA section 307(b) and (c); and CWA section 402(a) (1); 40 CFR §425.01-§620 (effluent guidelines).

[108] Exceptions to this statement include where a facility is eligible for a variance from the effluent guideline limitation, such as under the Fundamentally Different Factors (FDF) variance, CWA §301(n),  33 §USC 1311(n). Similar variances from effluent guidelines can be found at CWA § 301, 33 USC §1311. For a general discussion *see:* Water Quality Standards Handbook. Second Edition. US EPA. August 1994. Chapter7.6.3.

[109] CWA §301(b)(1)(C), §303(e)(3)(A); 33 USC 131(b)(1)(C), 1313(e)(3)(A); 40 CFR 122.44(d).  Effluent guidelines may be insufficient to meet water quality standards in a number of circumstances, such as where a particular waterbody receives discharges from numerous facilities, or flows are low during some times of the year.

[110] CWA §306(b)(1)(B); 33 USC 1316(b)(1)(B).

ADD64

April 2010 Interim

 Water quality certifications under §401 reflect not only that the licensed or permitted activity and discharge will be consistent with the specific CWA provisions identified in sections 401(a) and (d), but also with "any other appropriate requirements of State [and Tribal] law."[111] Some State regulations explicitly identify considerations relevant for §401 certification, while others do not. For example, Ohio's regulations state that certification may be denied if the activity will "result in adverse long or short term impact on water quality."[112] Similarly, river designation under the Wild and Scenic Rivers Act might be a relevant consideration independent of a state or tribe's water quality standards.[113] For example, Georgia considers a suite of other state regulations under its review including compliance with the state Erosion and Sedimentation Act for buffer integrity, construction and post-construction stormwater management, and the adequacy of mitigation. In addition, the Georgia water quality certification authority also coordinates with the Coastal Resources Division to insure project compliance with coastal protection regulations. Another relevant consideration when determining if granting 401 certification would be appropriate is the existence of state or tribal laws protecting threatened and endangered species, particularly where the species plays a role in maintaining water quality or if their presence is an aspect of a designated use. Also relevant may be other state and tribal wildlife laws addressing habitat characteristics necessary for species identified in a waterbody's designated use.

 Similar to the discussion in section *III.C.2. 401 Certification Consideration: Consistency with Water Quality Standards*, protection of the cultural or religious value of waters expressed in state or tribal law can also be relevant to a certification decision, even when not included as part of a water quality standard.[114]

### D. Conditioning Federal Licenses and Permits Through §401 Certification

 States and tribes frequently place conditions on their water quality certifications when such conditions are deemed necessary to ensure compliance with the identified CWA provisions and any other appropriate requirements of state or tribal laws.[115] These §401 certification conditions must be included in the resulting federal permit or license.[116]

 Many state and tribal governments use §401 certification as one of their primary regulatory tools for protecting water quality.[117] Some states frequently grant §401 certification unconditionally, while other states have a set of basic conditions involving Best Management Practices (BMPs) that are attached to most permits or licenses.[118]

---

[111] CWA §404(d);.33 USC §1341(d).

[112] OH ADC 3745-32-05 (B).

[113] 16 USC §1271.

[114] Ceremonial use standards were upheld by the 10th Circuit Court of Appeals in *Albuquerque v. Browner*, 97 F.3d. 415, 423 (1996).

[115] CWA §401(d);.33 USC 1341(d).

[116] CWA §401(d); 33 USC 1341(d). *See also, e.g., American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 107 (2nd Cir 1997); *Department of Interior v. FERC*, 129 P.U.R.4th 632, 952 F.2d 548 (DC Cir 1992).

[117] *State Wetland Program Evaluation*: Phase I, Environmental Law Institute, 2005; *State Wetland Program Evaluation*: Phase II, Environmental Law Institute, 2006.

[118] *State Wetland Program Evaluation*: Phase I, Environmental Law Institute, 2005; *State Wetland Program Evaluation*: Phase II, Environmental Law Institute, 2006.

21

ADD65

April 2010 Interim

In addition to CWA-derived requirements, §401 certification conditions may be based on "any other appropriate requirement of State [or Tribal] law set forth in such certification."[119] The ability to condition §401 certifications has been used by states and tribes to ensure that water quality has been comprehensively addressed in the design and implementation of projects and that unavoidable impacts will be mitigated. For example, North Carolina regulators believe that the mitigation demanded in their §401 certification conditions, specifically the requirement for at least 1:1 restoration or creation for wetland loss, allows the goal of No Net Loss of wetlands to be met at the state level.

As stated earlier, all conditions in a §401 certification must be included in any resulting federal permit or license, and the federal agency must incorporate the conditions without amendment.[120] The U.S. Supreme Court stated in 2006, "[i]t is still the case that, when a State has issued a certification covering a discharge that adds no pollutant, no federal agency will be deemed to have authority under NEPA to 'review' any limitations or the adequacy of the §401 certification."[121] The federal permitting agency does not have authority to review and amend the conditions on a §401 certification. All conditions must be included in the permit or license or the permit or license may not be issued.[122]

As discussed in the dispute resolution section below, federal courts have established that the state or tribal court system is the proper forum to review the substance of certification decisions[123], including the consistency of the conditions with CWA §401 and state or tribal water quality goals.[124] It is advisable that conditions placed on a §401 certification include a reference to the law or regulation that was the impetus for that condition.[125]

### 1. Appropriate Conditions

Section 401 provides that:

Any certification provided under this section [401] shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with [enumerated provisions of the CWA]… and with any other appropriate requirement of State law set forth in such certification.[126]

---

[119] CWA §401(d); 33 USC 1341(d).

[120] *American Rivers, Inc. v. FERC.*, 129 F.3d 99, 107 (2nd Cir 1997).

[121] *S. D. Warren Co. v. Maine Board of Environmental Protection et al,* 547 U.S. 370, 126 S.Ct. 1843 (2006); Also supported by, *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109, 1125 (DC Cir. 1971).

[122] CWA §401(d); 33 USC 1341(d). *American Rivers* at 110-111.

[123] The Supreme Court has at least implied that a remedy may be had in federal court, at least with respect to certifications involving FERC hydro licenses. In *Jefferson County PUD*, 511 U.S. 700 (1994), the Court stated that "[i]f FERC issues a license containing a stream flow condition with which petitioners disagree, they may pursue judicial remedies at that time." Since appeals of FERC licensing orders may be had only in the federal courts of appeals, this statement implies – perhaps confusingly – that the federal courts may examine the merits of conditions contained in a water quality certification in the context of reviewing a FERC order.

[124] *US v. Marathon Development Corporation*, 867 F.2d 96, 102 (1st Cir. 1989); *Roosevelt Campobello International Park Commission v. EPA*, 684 F.2d 1041, 1056 (1st Cir 1982); *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 112 (2nd Cir 1997); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

[125] *See e.g.*, 40 CFR 124.53(e)(2).

[126] 33 USC 1341(d); CWA §401(d).

22

ADD66

April 2010 Interim

Accordingly, a state or tribal certification should incorporate those conditions necessary to ensure a resulting federal license or permit will include effluent limitations at least as stringent as the applicable national technology-based guidelines established under the CWA, and as stringent as needed to attain and maintain water quality standards, including their designated uses and criteria. Under CWA §401(d) the water quality concerns to consider, and the range of potential conditions available to address those concerns, extend to any provision of state or tribal law relating to the aquatic resource.

Considerations can be quite broad so long as they relate to water quality. The U.S. Supreme Court has stated that, once the threshold of a discharge is reached (necessary for §401 certification to be applicable), the conditions and limitations included in the certification may address the permitted activity as a whole.[127] Certification may address concerns related to the integrity of the aquatic resource and need not be specifically tied to a discharge. As the Supreme Court pointed out, "§401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied."[128] For example, the Supreme Court upheld the imposition of minimum stream flows to support spawning salmon in the certification of a proposed hydroelectric dam in Washington State.[129]

> **The U.S. Supreme Court ruled in _PUD v. Washington Department of Ecology_, that:**
>
> "Section 401, however, also contains subsection (d), which expands the State's authority to impose conditions on the certification of a project. Section 401(d) provides that any certification shall set forth "any effluent limitations and other limitations ... necessary to assure that _any applicant_" will comply with various provisions of the Act and appropriate state law requirements. 33 U.S.C. § 1341(d) (emphasis added). The language of this subsection contradicts petitioners' claim that the State may only impose water quality limitations specifically tied to a "discharge." The text refers to the compliance of the applicant, not the discharge. Section 401(d) thus allows the State to impose "other limitations" on the project in general to assure compliance with various provisions of the Clean Water Act and with "any other appropriate requirement of State law." Although the dissent asserts that this interpretation of § 401(d) renders § 401(a)(1) superfluous, _post_, at 1916, we see no such anomaly. Section 401(a)(1) identifies the category of activities subject to certification--namely, those with discharges. And § 401(d) is most reasonably read as authorizing additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge, is satisfied."[130]

### 2. Role of Monitoring and Mitigation

Conditions accompanying §401 certifications may include monitoring requirements and compensatory mitigation if a state or tribe believes them necessary to comply with the CWA or appropriate requirements of state or tribal laws.[131] Several states have included monitoring and reporting requirements as §401 conditions.[132] Such requirements help the state determine whether water quality is being degraded. In addition, monitoring and reporting requirements allow agencies to assess the effect of operational practices and conditions on water quality in order to shape the development of certification decisions and conditions in the future. As an

---

[127] _PUD No. 1 of Jefferson County v. Washington Department of Ecology_, 511 U.S. 700, 712 (1994).
[128] _PUD No. 1 of Jefferson County v. Washington Department of Ecology_, 511 U.S. 700, 712 (1994).
[129] _PUD No. 1 of Jefferson County v. Washington Department of Ecology_, 511 U.S. 700, 712 (1994).
[130] _PUD No. 1 of Jefferson County v. Washington Department of Ecology_, 511 U.S. 700, 711-12 (1994).
[131] CWA §401(d), 33 USC 1341(d).
[132] Missouri, Confederated Tribes of the Warm Springs Reservation, and North Carolina, among others.

23

ADD67

April 2010 Interim

added benefit, monitoring and reporting helps applicants see and understand the impact, or averted impact, on water quality of their permitted actions. Monitoring and reporting helps to educate the regulated community about their impact on water quality and is essential for institutional learning to guide future certification decisions.

Mitigation requirements are often included in certification conditions to set the location, type, and extent of mitigation already required for a §404 dredge and fill permit or other permits. Although state and tribal certification regulations and conditions can require mitigation for any federal permit or license, mitigation is most commonly associated with CWA §404, under which EPA and the Corps follows the mitigation framework set out in the §404(b)(1) guidelines to evaluate applications for §404 dredge and fill permits. Missouri developed mitigation guidelines which regulators have implemented through CWA 401 certifications to increase the mitigation obtained from Corps permits. Some states have also elected to require mitigation in certifications for federal permits and licenses other than under §404, such as for FERC licenses. When mitigation is required for any permit or license, the state or tribe considers whether sufficient assurances should be incorporated into the certification to ensure the long-term functional success of the project. In North Carolina, for example, mitigation projects must be permanently protected by conservation easements or other similar protections.[133]

### 3. State and Tribal Laws and Certification Conditions

State and tribal laws pertaining to water quality are used to guide decision making in the §401 certification process. As discussed above, conditions are developed to ensure compliance with the CWA or other appropriate requirements of state or tribal laws. State or tribal water quality standards, developed under the CWA and approved by EPA, are often the initial standard considered by states and tribes when drafting conditions. Also relevant is any state or tribal law establishing a more stringent standard or goal for water quality. Applicable state and tribal laws may establish quantitative standards, or narrative criteria that set qualitative goals. For example, Virginia has established a "No Net Loss" of wetland acreage and function goal in statute[134] and the state often relies on it when certifying wetlands projects to require avoidance, minimization, and - when necessary - mitigation measures.

Some states have laws that limit their agencies' abilities to impose environmental requirements more stringent than those imposed by federal law, commonly referred to as "No More Stringent" laws. Section 401 certification programs in states with any type of restriction may wish to develop a process that ensures compatibility between their §401 certification and the limitation on stringency. Texas law prevents the state from permitting the discharge of dredged or fill material into waters of the state, but does not limit the state's role in the 401 water quality certification process.[135] However, budget constraints led to a reduction in the resources available for the state's 401 certification review activities. In response, the state developed a two-tiered system of review under a Memorandum of Agreement with the Corps. For projects under the impact thresholds identified as Tier 1, water quality certification is essentially waived by the state if the applicant self-selects one Best Management Practice (BMP) from each of three

---

[133] N.C. Division of Water Quality, Wetlands/401 Unit, Project Specific Condition List, July 2004 (Version 2). 18 pages; For more information on federal regulation, guidance and research on the use and performance of mitigation under the CWA and the Rivers and Harbors Act visit the http://www.epa.gov/wetlandsmitigation/.

[134] Code of Virginia § 62.1-44.15:21; Explained in regulation as "no net loss of wetland acreage and functions or stream functions and water quality benefits" 9VAC25-210-80.B.1(k)(5).

[135] Texas Water Code Title 2. Subtitle D. Chapter 26. Section 26.027(d).

ADD68

April 2010 Interim

classes to become conditions on their Corps permit.[136] While Texas does not individually review Tier 1 projects, it does develop the BMP options and requirements applicants must follow.  Tier 2 projects receive individual state §401 water quality certification review.

### E.  Certification Process

CWA section 401 indicates that an applicant for a federal permit or license must include as part of the application for the federal permit a 401 certification or waiver[137], implying that federal agencies would not evaluate an application for a permit or license until the §401 certification decision is made.  In practice, states and tribes frequently review certification requests while the federal permitting or licensing agency is reviewing the project application.[138]

#### 1.  Regulations Describing §401 Certification

Although regulations or guidelines on implementation of §401 are not required under the CWA, establishing a procedure by which certification decisions are made, and clarifying what information will be used to make those decisions, helps educate and inform applicants and the public about the CWA 401 process and the importance of water quality protection. State and Federal Section 401 certification regulations and guidelines vary in their detail. Some define the specific quantitative and qualitative limitations or standards used to assess aquatic resource impacts, while others merely note where applications for §401 certification should be sent.

States that have developed implementation guidelines for making §401 certification decisions have found them very useful in helping to ensure the project applicant, agency staff, and the general public understand the §401 process and requirements.  Some state and tribal laws and regulations define specific elements of the §401 certification process.  For example, a particularly important component of the 401 process is a state or tribal definition of what constitutes a complete application.  Because the timeframe for 401 certification review starts upon receipt of a complete application[139], inadvertent waiver due to passage of time is less likely where the standard for a complete application is well-defined.

California has defined a complete application as, "an application that includes all information and items and the fee deposit required."  California's regulations identify a detailed list of required application information including: full contact information of applicant; technical description of full activity through the final stage; identification of all federal permits or licenses being sought and all supporting information and correspondence produced for those permits or license(s) both draft and final; the correct certification fee; and a complete project description.[140] The California regulation goes on to clarify that a complete project description identifies receiving waterbody(ies) and impacts, location, mitigation, all avoidance and minimization

---

[136] Memorandum of Agreement Between the U.S. Army Corps of Engineers and the Texas
Natural Resource Conservation Commission on Section 401 Certification Procedures, August 17, 2000.
[137] CWA §401(a)(1); .33 USC §1341(a)(1).
[138] An example of how the process in practice is not always as linear as the CWA suggests is FERC's licensing regulations.  Under those regulations, once the Commission determines that the application is complete, it issues a "Ready for Environmental Analysis" notice instructing the license applicant to request water quality certification from the state certifying agency within 60 days of notice issuance.
[139] The Fourth Circuit observed that certification agencies prescribe the required procedure for requesting certification and starting the review or waiver countdown. *City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1109, 1112 (4th Cir 1989).
[140] CACR Title 23. Division 3. Chapter 28. Article 4. § 3856. Contents of a Complete Application.

ADD69

April 2010 Interim

efforts, and a brief list with the estimated adverse impacts of all projects implemented by the applicant within the last five years (or planned for implementation within the next five years) that are in any way related to the proposed activity or receiving water body(ies).[141]

The state of North Carolina's administrative code identifies the information required in an application for §401 certification, including maps and a description of the receiving waters, the discharge, the activity, and the applicant. In addition, North Carolina regulations reserve the right to request additional information and conduct on site investigations as deemed necessary by North Carolina Department of Environmental Health and Natural Resources.[142]

State implementation guidelines may be codified in statute or regulations, or described in guidance. A description of the §401 certification implementation process typically addresses standard operating procedures (SOPs) and the scope of review in terms of applicable state provisions, effects over the lifetime of the project, and certifying the operation of the facility in the construction certification. In addition, maintaining a list of all of the laws, regulations, and guidance documents referenced during §401 review can help ensure consistent application of standing policies.

### 2. Certification Practices Viewed as Effective by States or Tribes

Certification practices vary across States and Tribes. Some states have explicit procedures calling for comprehensive documentation of the rationale used to make certification decisions, while others adopt a less formal approach.   In general, several states have found that providing comprehensive and detailed information in certifications and guidance on the certification review process and standards of review allows 401 certification to serve as an effective water quality protection tool while minimizing administrative costs and maximizing public transparency.

### a. Substance of Certifications

Although not all federal licenses and permits reviewed under §401 will warrant conditioning, §401 certification is an important (and, sometimes, the only) regulatory opportunity to address water quality in draft federal permits and licenses.  Therefore, when necessary, states and tribes should seek to include conditions that protect against the full range of reasonably possible impacts.

Conditions placed on §401 certifications should be as specific as necessary to ensure that water quality will be protected. Conditions that enumerate "how" to address "what" potential adverse effect from "where" help all parties understand what is being called for.  As a result, conditions that are specific are more likely to be consistent with water quality standards and protect aquatic resources in accordance with the water quality goals of the state or tribe. For example, where protection of sensitive fisheries is a concern, some states and tribes have found it helpful to specify minimum flow volumes or regimes and stocking practices including species, size class, number, frequency and location.

In some circumstances, the provisions states or tribes would wish to see reflected in the permit or license can be achieved through early discussions with the applicants, rather than through formally conditioning the 401 certification. Some states such as North Carolina and

---

[141] CACR Title 23. Division 3. Chapter 28. Article 4. § 3856. Contents of a Complete Application.
[142] 15A NC ADC 2H.0502.

ADD70

April 2010 Interim

Oregon use the comment period when project proponents are developing their applications for Corps and state permits to give applicants the chance to include in the project description the changes that are likely to be required anyway. The use of Best Management Practices (BMPs) and practices needed for Total Maximum Daily Load (TMDL) implementation are often added to projects during this stage. BMPs can include such actions as using constructed wetlands or bioretention areas rather than retention ponds for catching nutrients and sediments. A related action often recommended in Kansas is the creation of a lake protection plan for developments around old watershed dams that were previously used for flood control and agriculture.[143] The lake protection plans emphasize BMPs around the lake and informs the residents that discharges from the water body that cause water quality exceedences downstream may result in violations and enforcement actions. In addition, Kansas has developed a coordination group of most of the state and federal natural resource agencies that meets quarterly and shares information on BMPs, TMDLs, water quality standards, federal and state regulations including mitigation regulations, relevant literature references and similar resources useful to §401 and other programs. The group also works to coordinate technical assistance for permittees (of various programs) needing help understanding and implementing their permit requirements or state expectations.

In addition to carefully crafted and detailed conditions placed on the original permit, re-opener provisions and deed notifications have been used where the state or tribal certifying agency anticipates changes in water quality standards or other considerations. Section 401 certification conditions that call for interaction with the state or tribe when a specified action or condition occurs are often called 'adaptive management" conditions and may help to ensure that water quality goals are met under changing conditions. In the context of hydropower licensing adaptive management is a process in which the licensee and stakeholders collaborate on "fine tuning" required environmental measures within a Commission prescribed range. For example, in response to a 401 certification adaptive management condition, FERC may require in a license a minimum flow between 100 and 500 cubic feet per second to protect a particular resource and within that range of flow the licensee and certifying agency make flow decisions on a reoccurring basis depending on the conditions occurring at the time. Some states have included an adaptive management condition in their 401 certification for FERC hydroelectric licenses that require facility operators to get review and approval of a dredging management plan prior to dredging operations associated with the dam. Adaptive management in general helps to anticipate and address potential future changes in the circumstances used as the basis for the 401 certification decisions. For example, Oregon regularly includes re-opener clauses when certifying Corps permits and under state law may modify the certification, with public comment, if water quality standards change.[144]

Another approach to extend the effect of 401 certification conditions is to require deed notifications to be placed on the land title for all remaining jurisdictional waters (and buffers where applicable). This helps to alert future land owners to permit requirements. As noted in section *III.C.1. Basis for Certification Decisions – Generally* above, North Carolina maintains a list of issues, evaluation tools and standard conditions including re-opener and deed notification provisions that are reviewed during every §401 certification evaluation.[145] In fact, North Carolina

[143] In Kansas this is common for old impoundments.
[144] Oregon Administrative Rules 340-048-0050.
[145] N.C. Division of Water Quality, Wetlands/401 Unit, Project Specific Condition List, July 2004 (Version 2). 18 pages.

27

April 2010 Interim

includes a re-opener clause on almost all certifications issued. North Carolina §401 staff have also noted several applicants who indicated they saw the deed notification and realized they needed a certification.

### b. Procedures used to Minimize the Administrative Burden of Certification

Many states and tribes have adopted procedures that minimize administrative burden by merging their 401 certification application and public notice process with those of the federal licensing or permitting agency. For example, many states and tribes have established joint applications and public notice arrangements with Corps Districts for CWA §404 permits and RHA §9 and §10 permits. Joint procedures help to ensure that all available project information is provided to all parties while simplifying the administrative requirements for applicants. Such procedures ensure that public comments on a project are collected at one time and provided to all relevant agencies. A number of states and tribes use the notice date as the start of the countdown to automatic waiver of certification, provided that they have received a complete application, which can be defined by the state or tribe.[146] A particular benefit of joint application and public notice requirements is that they help improve communication and coordination between the state and tribal agencies and the federal agencies while establishing a standard information requirement for both applications.

Close coordination with the federal permitting or licensing authority can provide certification agencies with valuable access to the applicant prior to the official request for certification. Several states, including Oregon, Georgia, Montana and Kansas, rely heavily on the pre-application consultation process to provide an opportunity to discuss potential water quality concerns and obtain changes to the proposed project prior to official application for a permit or license and certification. Kansas uses pre-application meetings for a variety of purposes. Along with the standard information gathering and dissemination function, Kansas also attempts to use pre-application meetings to discuss low-impact and smart growth design features with the applicant and other agencies involved. In addition, Kansas focuses on communication within affected watersheds to ensure that proposed projects will not disrupt other permitted activities in the watershed such as Public Water Supplies, Waste Water Treatment Plants and other permittees. Kansas has found that assessing a project in regard to the existing impacts and uses of the watershed is especially important when considering changes to channel morphology and other baseline conditions upon which other permittees or users rely. Montana uses pre-application meetings to discuss and distribute copies of their water quality standards, a stormwater / erosion control handbook, and information pertinent to other permits the applicant might need relative to other permitting authorities. Georgia works to have projects 'modified to address concerns' during the application process, so that the main water quality issues are addressed prior to final certification. Oregon provides information to the applicant on BMPs and fact sheets about water quality, including *Stormwater Management Plan Submission Guidelines for Removal/Fill Permit Applications Which Involve Impervious Surfaces.*[147]

---

[146] *See e.g., City of Fredericksburg v. Federal Energy Regulatory Commission*, 876 F.2d 1111-1112 (4th Cir 1989). When invalidating a FERC license issued without a 401 certification, the Fourth Circuit referenced FERC's regulations (18 C.F.R. § 4.38(c)(2)) requiring water quality certification requests be made in compliance with state law. In this instance Virginia's application requirements for 401 certification defined a complete application.

[147] Oregon Department of Environmental Quality, Stormwater Management Plan Submission Guidelines for Removal/Fill Permit Applications Which Involve Impervious Surfaces. (2005).

ADD72

April 2010 Interim

Certification review can also take many forms within a state or tribal government. Some jurisdictions conduct certification review through one office for all projects (e.g. North Carolina, Nebraska, Georgia, Confederated Salish and Kootenai Tribes of the Flathead Reservation, and Pueblo of Sandia). Alternatively, other jurisdictions separate certification review into project type such as FERC license or

> **U.S. v. Marathon Development Corporation:**
>
> "Neither the language nor the history of section 404(e) of the Clean Water Act ('General permits [for dredged or fill material] on State, regional, or nationwide basis'), 33 U.S.C. § 1344(e), suggests that states have any less authority in respect to general permits than they have in respect to individual permits."[148]

Corps permit (e.g. Oregon or Montana). In addition, certification review may be a state or tribe's only regulatory look at a project affecting water quality or it may run parallel to review for other state or tribal permits.

As discussed more fully in the *Resolution of §401 Certification Related Disputes* section below, conditions on a federal permit or license are reviewable in state or tribal courts for consistency with water quality standards and other relevant laws. Certification practices discussed above, such as implementation procedures and evaluation criteria, will help to ensure the documentation of the §401 certification decision is thorough, making internal agency and even external legal review of a 401 certification decision easier.

## F. Issues Raised by General Permits, After-the-Fact Permits, and Provisional Permits

The Clean Water Act authorizes general permits for activities that do not have significant environmental impacts either individually or cumulatively.[149] General Permits allow projects of a specifically defined type of impact or activity to proceed with limited or no individualized review. Some general permits require only notification to the Federal agency issuing the permit about a proposed project; others do not even require notification. General permits may be developed at and apply to a national or a smaller regional geographic scale. General permits are widely used in the Section 402 NPDES and section 404 permit programs.

A general permit may result in a discharge from a point source into a water of the United States, and as such is subject to the same §401 water quality certification requirements as individual permits, but at the point it is being initially issued and not as it is applied to particular projects. When a state or tribal agency is considering whether to provide §401 certification for a proposed general permit, the agency has the same options as it would for an individual permit or license —grant, deny, condition or waive.[150] Nationwide and Regional General Permits issued by the Army Corps of Engineers under CWA §404 are certified at the issuance and re-issuance of the general permit.

When certification is denied for a Nationwide or Regional General Permit, the District offices of the Army Corps of Engineers have responded primarily in two ways. In some instances Districts allow projects to be covered by a general permit provided the project proponent first

---

[148] *US v. Marathon Development Corporation*, 867 F.2d 96, 100 (1st Cir. 1989).

[149] *See, e.g.,* CWA §404(e); 33 USC 1344(e); 33 CFR § 330.1(b), 40 CFR §122.28(b)(2).

[150] Demonstrated in general practice nationwide and supported in the 1st Circuit Court of Appeals; *US v. Marathon Development Corporation*, 867 F.2d 96, 100 (1st Cir. 1989).

ADD73

April 2010 Interim

obtains §401 certification from the state or tribe, for a specific project to be covered by the general permit. The Corps often will issue a provisional authorization that only becomes effective when accompanied by a §401 water quality certification. In other cases, the certifying agency has worked with District to develop a more acceptable General Permit for which the state can provide a certification, that would not need additional certification review when specific projects are covered. When a state or tribe imposes conditions on a Nationwide or Regional General Permit, often the Corps District offices have responded by incorporating the conditions into a state- or tribe-specific version of the Nationwide Permit, or by requiring an individual §401 certification in order to qualify for the General Permit.

EPA-issued CWA §402 general permits are also reviewed by states and tribes under CWA §401. When a state or tribe denies certification the general permit is issued by the Regional Administrator with the notation that the following permit is not valid for that state or tribe's jurisdiction. In addition, if the state or tribe grants certification but imposes conditions on an EPA issued general permit, the conditions are attached to the general permit for application in that area.

If certification has been waived or granted for a general permit, any applicant approved to make use of that general permit faces no further certification review.[151]

Under limited circumstances, agencies have issued permits authorizing a discharge after a discharge has commenced. For example, after-the-fact permits are sometimes issued under CWA §404 for discharge of dredged or fill material into waters of the U.S. A state or tribe's §401 certification considerations for these after-the-fact permits should be conducted in the same manner as for normal pre-discharge permit applications. The burden of proof remains on the applicant to show that the requirements of the CWA have not been and will not be violated as a result of the activity.

Even in the case of after-the-fact permits, the state or tribe has the option of granting, denying, conditioning or waiving certification. If the applicant fails to adequately demonstrate that the fill activity did not and will not violate the CWA sections enumerated in §401 or any appropriate requirement of state or tribal law, certification should be denied. If certification is denied on an after-the-fact permit, the Corps may not issue a permit

---

[151] Further certification review may be applicable as outlined in the certification conditions (if present) or under §401(a)(3) or (a)(4) .

ADD74

April 2010 Interim

---

**_American Rivers v. FERC_:**

"First, applicants for state certification may challenge in courts of appropriate jurisdiction any state-imposed condition that exceeds a state's authority under §401. In so doing, licensees will surely protect themselves against state-imposed *ultra vires* conditions. Second, even assuming that certification applicants will not always challenge *ultra vires* state conditions, the Commission may protect its mandate by refusing to issue a license which, as conditioned, conflicts with the F[ederal]P[ower]A[ct]. In so doing, the Commission will not only protect its mandate but also signal to states and licensees the limits of its tolerance."[152]

---

In some cases the permitting or licensing authority will issue a provisional authorization that only becomes effective when accompanied by a water quality certification. If certification is waived through the passage of time the applicant may then return to the permitting or licensing authority for a final authorization. If a certification is denied, the provisional authorization never becomes valid, and if certification is granted with conditions the provisional authorization is restricted by those conditions (with or without further modification by the permitting or licensing authority). Provisional authorizations are common in the context of Nationwide or Regional General Permits under CWA §404.

## G. Resolution of §401 Certification-Related Disputes

Applicants or others who disagree with the 401 certification, including its conditions, may seek to have the decision reviewed and overturned. Complaints to the federal permitting or licensing agency are unlikely to be effective, since the agencies do not have authority to modify or overturn the state 401 certification. The initial forum for appealing a decision to grant, condition, or deny certification is often a state or tribe's courts or administrative appeals process for which the details are likely to vary among states and tribes. Some jurisdictions have an administrative appeals process that needs to be exhausted prior to proceeding to state or tribal court, while other jurisdictions do not.

---

**Legal Review for §401 Certification**

State or Tribal Courts

- o   Certification decision consistent with water quality standards; other enumerated CWA provisions; and appropriate provisions of state or tribal law

Federal Courts

- o   Timeframe for automatic waiver of certification
- o   Re-certification needed due to changes in circumstances outlined in §401(a)(3)
- o   Whether threshold conditions required for 401 certification to apply are met (i.e., federal permit or license, discharge, water of the U.S.)

**Figure 5.** Courts of Review for §401 Certifications

---

If a permit applicant wishes to challenge conditions included in a certification, the "only recourse is to challenge the state certification in state judicial proceedings."[153] State or tribal

---

[152] *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 112 (2nd Cir 1997).

[153] *US v. Marathon Development Corporation*, 867 F.2d 96, 102 (1st Cir. 1989); *Roosevelt Campobello International Park Commission v. EPA*, 684 F.2d 1041, 1056 (1st Cir 1982); *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 112 (2nd Cir 1997); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

31

ADD75

April 2010 Interim

courts review §401 certification conditions for consistency with state or tribal water quality standards and other provisions of the state judicial proceedings."[154] Review is typically limited to the question of whether the certifying agency's decision is supported by the record and is consistent with applicable law (states and tribes often have a standard for administrative behavior similar to the arbitrary or capricious standard established for federal administrative actions).[155]

Some issues regarding the §401 certification may be heard in federal administrative proceedings and courts.[156] For example, the federal permitting or licensing authority may review the procedural requirements of §401 certification, including whether the proper state or tribe has certified, whether the state or tribe complied with applicable public notice requirements, and whether the certification decision was timely.[157] In instances where federal permits were issued without the required §401 certification or certification conditions have not been enforced, the courts have found challenges under the citizen suit provisions of the CWA permissible on procedural grounds.[158]

## H. Enforcement of §401 Certifications

Enforcement practices for §401 certification vary across the country. Many states and tribes assert they may enforce 401 certification conditions using their water quality standards authority. While authority may be available, states and tribes may face challenges due to programmatic funding and support to carry out enforcement actions. Federal agencies also have the authority to enforce 401 certification conditions once incorporated as conditions in their permit or license.

401 certification conditions may be enforced by a variety of parties. The federal issuing agency may enforce the §401 certification conditions placed on permits or licenses as a mandatory requirement of the permit or license.[159] As discussed above, states and tribes assert they may enforce §401 certification conditions directly. In addition, the general public potentially may enforce 401 certification conditions as well; the 9th Circuit Court of Appeals notes that "nothing in the language of the Clean Water Act, the legislative history, or the implementing regulations restricts citizens from enforcing the same conditions of a certificate or permit that a State may enforce."[160]

A challenge with enforcement of 401 certification conditions arises from the fact that, as authors, the state or tribal certifying agency likely best understands what the condition requires

---

[154] *US v. Marathon Development Corporation*, 867 F.2d 96, 102 (1st Cir. 1989); *Roosevelt Campobello International Park Commission v. EPA*, 684 F.2d 1041, 1056 (1st Cir 1982); *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 112 (2nd Cir 1997); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

[155] *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 112 (2nd Cir 1997).

[156] *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 107, 111-112 (2nd Cir 1997); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 867 (9th Cir 1993)

[157] *American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 99, 110-111 (2nd Cir 1997); *City of Tacoma v. FERC*, 460 F.3d 53, 68 (D.C. Cir. 2006).

[158] *Oregon Natural Desert Association v. Michael P. Dombeck*, 151 F.3d 945, 2 (9th Cir.(Or.) 1998); *Northwest Environmental Advocates v. City of Portland*, 56 F.3d 979, 988 (9th Cir 1995).

[159] *See e.g., American Rivers Inc. v. Federal Energy Regulatory Commission*, 129 F.3d 108 (2nd Cir 1997) ("…§ 401(a)(5) of the CWA, 33 U.S.C. § 1341(a)(5), [FN20] which provides the licensing agency (in this case FERC) with authority to enforce the terms of a license--which pursuant to § 401(d) include a state's § 401 certification conditions--once such a federal license has issued.")

[160] *Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 988 (9th Cir 1995).

ADD76

April 2010 Interim

even though the condition is reflected in a permit or license issued by a federal agency. As a result, some federal agencies are reluctant to enforce 401 certification-derived conditions in their permits. State approaches to 401 certification violations vary. In New Mexico the State will find violations and report them to the Corps for enforcement action. North Carolina enforces violations to their own water quality standards and certification conditions. In Kansas the Corps enforces based on any conditions of the permit that they have jurisdiction over and then hands over the information to state and local authorities for compliance with any independent requirements, and if it is a water quality issue specific to a water quality compliance then enforcement is left to the state. If a Montana Water Quality Act violation occurs related to noncompliance with a 401 Certification condition, Montana's certification program writes the first letter identifying the violation and what needs to be done to reach compliance. If no action is taken the matter is directed to the Department of Environmental Quality Enforcement Division for further action. The Confederated Salish and Kootenai Tribes conduct the initial investigations and the Water Quality Program reports to the Corps, who then works alongside the Tribe on compliance assistance and enforcement when needed.

States and tribes may establish enforcement regulations and programs specifically for §401 certification, or instead simply expand the jurisdiction of existing enforcement programs. The California Water Code establishes civil liability for any person who violates §401 and criminal penalties for any person who knowingly or negligently violates §401, with a penalty chart for each.[161]

### I. Suspension of §401 Certifications

Once a federal permit or license is issued with the required §401 certification, the certification can only be changed under limited circumstances.[162] Certification "may be suspended or revoked by the federal agency…upon the entering of a judgment…that such facility or activity has been operated in violation of the applicable [CWA] provisions."[163] This statutory provision suggests that a certifying agency can not revoke or suspend a certification without the action of the federal permitting or licensing authority. In contrast, if a certified permit or license is modified by the applicant or the federal agency, the certification agency has an opportunity to change conditions, but only those affected by the permit or license modification.[164]

The federal permitting or licensing agency possesses very limited authority to review state or tribal water quality certifications to change final permit or license conditions after certification has been granted, even at the request of the certifying agency. If certification has already been granted for the construction of a facility and the certifying agency wants to either revise the certification of the construction or issue a new certification for the operation of the facility, the federal agency must assess whether the request for revision complies with §401(a)(3). The request for revision of a certification decision must be timely and in response to

---

[161] Porter-Cologne Water Quality Control Act. CAWC. Division 7. Chapter5.5. § 13385 Civil Liability. And § 13387 Criminal Penalties.

[162] *Caribbean Petroleum Corporation v. EPA*, 28 F.3d 232, 235 (1st Cir 1994).

[163] CWA §401(a)(5), 33 USC 1341(a)(5); These provisions include of section 301, 302, 303, 306, and 307.

[164] Under these circumstances the certification agency receives the entire permit for review, even though only the conditions subject to the modification are reopened. *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 867 (9th Cir 1993).

33

April 2010 Interim

changed circumstances since the issuance of the original certification.[165] The authority to review a final certification decision or the substance of conditions has been reserved to the state or tribal court system (as discussed above in the *Resolution of §401 Certification-Related Disputes* section). If the requirements of §401 (a)(3) have not been met, the federal agency may still use the information and recommendations from the certification agency in formulation of the federal permit or license, but they are not bound to follow the advice of the certifying agency.[166]

---

[165] 33 USC 1341(a)(3); CWA §401(a)(3); *Keating v. FERC*, 927 F.2d 616, 621-622 (DC Cir 1991).
[166] 33 USC 1341(a)(3); CWA §401(a)(3); *Puerto Rico Sun Oil Company v. EPA*, 8 F.3d 73, 79 (1st Cir 1993); *Del Ackels v. United States Environmental Protection Agency*, 7 F.3d 862, 867 (9th Cir 1993).

34

April 2010 Interim

# IV. Leveraging Available Resources

A §401 certification program still needs funding and adequate resources to be implemented fully, even with a solid foundation in federal and state or tribal law and an exemplary staff. This section discusses some of the approaches that states and tribes have taken to leverage available funding, staffing, and data sources.

## A. Funding and Permit Fees

States and authorized Tribes[167] vary greatly in their implementation of the program and also in their funding sources which include such diverse sources as general government funds, certification fees, federal grants, and State Departments of Transportation (DOT). Many, but not all, states and tribes augment program budgets with application fees for §401 certification.[168] States and Tribes establish the fee requirements, schedules and final allocation of the funds collected; practices vary across the country.

> **California Water Code §13160.1:**
> **Federal Certificate Fee**
>
> "The state board may establish a reasonable fee schedule to cover the costs incurred…but is not limited to including, the costs incurred in reviewing applications…prescribing terms…and monitoring requirements, enforcing and evaluating compliance…and monitoring requirements, conducting monitoring and modeling, analyzing laboratory samples, reviewing documents…, and administrative costs…The fee schedule may provide for payment of a single fee…or for periodic or annual fees…"[169]

Fees vary amongst states and tribes in at least two respects: revenues return either directly to the 401 certification program or to a general fund, and fees are either based on project size or a flat fee. The state of California's Regional Water Quality Control Boards requires filing fees for §401 certification and related state permits which includes a flat fee based on the activity and a rate per the volume or area of impact.[170] The fee structure allows for part of the cost of the §401 certification program to be recovered through appropriately set fees that are directed to the California Water Rights Fund.[171]

In contrast to California, some other states are authorized to charge 401 certification fees that are remitted back to the program. For example, fees for water quality certification in Ohio go back to the agency's surface water protection budget in accordance with Ohio Revised Code 3745-114 (C). There is a base fee of $200 plus a review fee which is determined by the

---

[167] Tribes authorized to use §401 certification authority have Treatment as State (TAS) authority, and typically have developed water quality standards and designated an agency to administer the certification authority, as further discussed in *II.B.1. States and Authorized Tribes* on page 9.

[168] The CWA is silent on administrative fees for 401 certification, neither encouraging nor discouraging their use. Potential use of fees is more dependent on state and tribal law and custom.

[169] Porter-Cologne Water Quality Control Act. CAWC. Division 7. Chapter 3. Article 4. § 13160.1. Federal certificate fee.

[170] Title 23, Division 3, Chapter 9, Article 1, Sections 2200, 2200.4, 2200.5 And 2200.6 of the California Code of Regulations, for fee calculator see http://www.waterboards.ca.gov/water_issues/programs/cwa401/.

[171] Porter-Cologne Water Quality Control Act. CAWC. Division 7. Chapter 3. Article 4. § 13160.1. Federal certificate fee.

35

April 2010 Interim

magnitude of the impact and the funds go back into the agency budget.[172] Ohio's administrative code also establishes that the state can "require that the applicant perform various environmental quality tests," at any point, "prior to the issuance of the §401 water quality certification or prior to, during, or after the discharge of dredged or fill material."[173]

Missouri charges a flat fee of $75 for any certification request. In contrast, for certification of Corps permits Oregon fees have been based on the amount of removal or fill above set thresholds, unless activities are exempt from fees. Oregon bases application fees for hydroelectric projects on the theoretical horsepower of the proposed project and uses them for the certification program's base funding. In addition, each applicant for hydropower 401 certification must pay for DEQ's costs to review the application and make a decision; these costs are invoiced and are separate from the annual fee.[174]

North Carolina's permit fee for §401 certification is $240 for an impact less than 150 feet of stream or 1 acre of wetlands and $570 for larger impacts; any changes to or renewals of a certification require a new permit fee before processing will begin.[175] North Carolina also offers express permits, stormwater management plan review, and stream origin and perennial or intermittent determinations that are given priority and turned around twice as fast and cost roughly five times as much; permits and plan reviews starting at $1000 and stream determinations starting at $200 for 2 calls per property.[176] In Montana, certification fees are established in regulations as a minimum of $400.00, or 1% of the gross value of the proposed project, not to exceed $20,000.00.[177] Authority for certification fees in Montana is based in statutory authority granting ability to charge a fee sufficient to cover the direct and indirect costs of reviewing an application, conducting compliance inspections, monitoring water quality and preparing water quality rules or guidance documents, however in reality most projects eligible for certification in Montana are reviewed under state §318 authorities and assessed a $250 fee.[178] Many tribal certification programs do not charge any fee for water quality certification.

### B. Staffing Sources

States and tribes vary in staff sizes. States with independent permitting authorities for the aquatic resources covered under §401 and additional waters of the state can have very large staffs and budgets. North Carolina has upwards of 40 people working on §401 certification and their permitting program for aquatic resources not covered under the CWA. In contrast, Nebraska has a staff of one-half a Full Time Equivalent (FTE) to address both 401 water quality

---

[172] Ohio Revised Code 3745-114: $500 per acre of wetland; $5 per linear foot or $200, whichever is greater, for ephemeral streams; $10 per linear foot or $200, whichever is greater, for intermittent streams; $15 per linear foot or $200, whichever is greater, for perennial streams; $3 per cubic yard of dredged or fill material for lakes.
[173] Ohio Revised Code 6111.
[174] Oregon Revised Statute §468.065, (2003).
[175] North Carolina Department of the Environment and Natural Resources, Wetlands/401 Certification Unit, 401 Water Quality Certification Fee Memorandum, http://h2o.enr.state.nc.us/ncwetlands/fees.html (accessed 5/4/06).
[176] NC Division of Water Quality, Wetland Buffer Program Express Review Fees (2004), found at http://h2o.enr.state.nc.us/ncwetlands/express_review.htm.
[177] Administrative Rule of Montana 17.30.201(6).
[178] Administrative Rule of Montana 17.30.201(6).

36

ADD80

April 2010 Interim

certification for discharges into waters of the US and letters of opinion for impacts to waters that are only state waters.[179]

Some agencies that frequently request 401 certification have found it helpful to fund a position in the certification agency dedicated to their project requests. This seems particularly common with State DOTs.[180] Since DOTs are frequent applicants for certification and often involve large complex projects with fragmented impacts that demand significant time and resources to evaluate, they are often very interested in helping speed up the certification review. North Carolina and Oregon have arranged for §401 certification program staff to be funded by their DOT under the conditions that the staff almost exclusively work on DOT projects (ensuring immediate attention and therefore a quicker review turnaround) but answer and report exclusively to the certification program management. In Oregon, the 401 staff for certification of non-hydroelectric projects consists of two to three positions, one of which is periodically DOT funded. In North Carolina the certification program staff is roughly 40 people of which 11 are funded by the DOT. North Carolina also gets funding from other state programs and EPA grants. However resource constraints are handled at the state and tribal agency, the following information may help program staff obtain data and technical resources more easily and perhaps expand the recuperative effect of permit fees.

### C. Data Sources

Certification decisions are based on the potential impacts to water quality goals as specified in water quality standards, other CWA provisions identified in Section *III.C. Scope of Review For §401 Certification Decisions* above, and other appropriate water quality based state or tribal laws and regulations.[181] However, to support a 401 certification decision, the certifying agency may need additional information on the site, associated aquatic resources, or the effect of the potential impacts, than what may have been included in the application materials. The most relevant source of information to the §401 program is the water quality standards and the information used to develop them. Also helpful may be information used to develop or contained in a Total Maximum Daily Load (TMDL). In addition, other state and tribal departments and agencies such as those implementing the CWA §402 National Pollutant Discharge Elimination System program house information that could be applicable to the potential impacts associated with project proposals. Old certifications should also provide insight into not only the type and extent of information used in the past to assess similar projects but also potential sources of information on the resource, the potential impacts or the possible conditions that would mitigate the effects on water quality. Useful and important data may also be found outside the application and state government sources. For example, the professional community

---

[179] The letters of opinion identify that the project as proposed or with the listed changes / additions, likely will not violate title 117 Water Quality Standards, however these letters are not legally binding or directly enforceable.

[180] State DOTs and Port authorities also fund positions at in the US Army Corps of Engineers and other permitting agencies. However, no examples have been identified where private entities have funded state or tribal 401 certification positions.

[181] 33 USC 1341(d); CWA §401(d); *S. D. Warren Co. v. Maine Board of Environmental Protection et al*, 547 U.S. 370, 126 S.Ct. 1843 (2006);*Jefferson County PUD v. Washington Dept. of Ecology,* 511 U.S. 700, 711 (1994).

ADD81

April 2010 Interim

including the federal informational tools, professional societies, academic publications and trade journals contain copious amounts of information. But their usefulness is dependent on the extent to which the user can find the most salient information quickly.

### 1. The Applicant

Information provided by the applicant is the logical first resource to consult when evaluating a proposed project. Since time is often at a premium, the materials received from the applicant can not always be recreated by the certifying agency to ensure accuracy; therefore they must be trusted when verified against the best professional judgment of the staff and outside experts as needed. Several states and Corps Districts have developed lists of consultants and applicants who have established records of accurate submissions, which helps certifying agencies focus their verification efforts on less established or familiar applications and applicants. In some states such as Kansas, applicants must research other permitted impacts and uses in the watershed and alert them to the proposed project, helping to identify and address cumulative and cross project impacts in the watershed.

### 2. Other State, Tribal or Local Agencies

Other state, tribal and local agencies may also house relevant and valuable information for the certification process. Departments of Transportation conduct large studies of cumulative and secondary impacts to aquatic resources which can be a rich source of information on ways to analyze and address large projects with fragmented impacts. State natural resource inventories are often developed by the cooperative extension service and can provide detailed information on the natural resource base and conservation issues facing the region. Local governments may have developed watershed plans that could provide useful site specific data, many local watershed groups and monitoring efforts are registered through EPA's Adopt Your Watershed program and can be found by searching the website.[182] Similarly, looking at the activities and experiences of neighboring state and tribal water quality certification programs, and their analysis could provide valuable information.

State Natural heritage programs are a good place to find detailed information on aquatic resources, plants, animals, communities, land cover and land ownership. The Natural Heritage Programs focus on providing information on the status and distribution of native animals and plants, emphasizing species of concern and high quality habitats such as wetlands. Heritage specialists collect, verify, and disseminate information to a broad community of users for many applications including the listing and delisting of threatened and endangered species and the development of environmental assessments. In addition, NatureServe works with the network of state (and international) natural heritage programs to provide information about rare and endangered species and threatened ecosystems.[183] NatureServe collects and manages detailed local information on plants, animals, and ecosystems, and develops information products, data management tools, and conservation services. NatureServe's publications include an analysis of the biodiversity value of geographically isolated wetlands in all 50 states which may be a useful starting point for assessing the habitat value of potentially impacted wetland resources.[184]

### 3. Federal Information Tools

---

[182] http://cfpub.epa.gov/surf/locate/index.cfm
[183] http://www.natureserve.org/.
[184] http://www.natureserve.org/publications/isolatedwetlands.jsp.

April 2010 Interim

Many federal programs and agencies develop, collect, disseminate and produce informational tools that could provide valuable information to a certification decision. When using databases that may be more historical than current, it is always important to verify that the data remains valid. The United States Geological Survey (USGS) studies and provides information on a variety of topics including biology, geography, hydrology, geology, regional studies, natural hazards, the environment, and wildlife and human health.[185] The National Wetlands Inventory (NWI) produces and provides information on the characteristics, extent, and status of the nation's wetlands and deepwater habitats and other wildlife habitats.[186] The national wetland plant list, status and trends reports, and other reports focusing on national, geographic or resource specific areas are also available from the NWI.

EPA's Watershed Assessment, Tracking and Environmental Results (WATERS) tool unites water quality information from several independent and unconnected databases and displays the information in maps and reports.[187] The EPA programs covered in WATERS are: water quality standards, water quality inventory (§305(b) report), total maximum daily load (TMDL – §303(d) list), water quality monitoring, NPDES permits, safe drinking water, fish consumption advisories, nonpoint source pollution, nutrient criteria, beach program and vessel sewage discharge. One of the tools in WATERS is the EPA's EnviroMapper which provides access to environmental information in a geographic format.

EnviroMapper can display various types of environmental information, including air releases, drinking water, toxic releases, hazardous wastes, water discharge permits, and Superfund sites. EnviroMapper includes: federal, state, and local information about environmental conditions and features, facility and chemical-based information from the Envirofacts Warehouse, information about surface water features and their environmental condition, the Superfund program's National Priorities List sites, results from environmental sampling and monitoring in the New York City area in the aftermath of the events of September 11, 2001, information on demographic characteristics, and areas served by Brownfields Grantees and select brownfield's properties. It combines interactive maps and aerial photography to locate, display and query brownfield grant types and properties addressed by cities, counties, states, and tribes.

The Natural Resource Conservation Service (NRCS) provides technical expertise in such areas as animal husbandry and clean water, ecological sciences, engineering, resource economics, and social sciences. In particular, the NRCS' expertise focuses on soil science and natural resource conditions and trends in the United States, represented in soil surveys and the National Resources Inventory.[188] Technical guides are the primary scientific references for NRCS. They contain technical information about the conservation of soil, water, air, and related plant and animal resources. The technical guides used in each field office are localized so that they apply specifically to the geographic area for which they are prepared and are referred to as Field Office Technical Guides (FOTGs). The electronic FOTGs (eFOTGs) include automated data bases, computer programs, and other electronic-based materials and are broken into five sections of information: general information, soil and site information, conservation management

---

[185] http://www.usgs.gov/science.html.
[186] http://www.nwi.fws.gov/.
[187] http://www.epa.gov/waters/about/index.html.
[188] http://www.nrcs.usda.gov/about/.

39

April 2010 Interim

systems, practice standards, and specifications and conservation effects.[189] The NRCS also provides soil survey information through their online mapping tool the Web Soil Survey.[190] Because 401 certification decisions may require consideration of soil characteristics which can affect the aquatic resource impacts of a proposed project, such as stormwater runoff.

Surf Your Watershed is an EPA web based service that helps to locate, use, and share environmental information about states and watersheds. [191] Information is provided by 8 digit HUC (Hydrologic Unit Code) but can be accessed using stream name, state, city, zip code, tribe or county. Links to United States Census Bureau information and USGS data on stream flow, science, water use and selected abstracts are provided as well as information on the counties, American Heritage Rivers, National Estuary Programs, states, and watersheds upstream and downstream. Surf Your Watershed contains the following databases: Adopt Your Watershed, Wetlands Restoration Projects, American Heritage Rivers Service and SURF-Environmental Websites Database. Adopt Your Watershed is a database of watershed groups throughout the nation. You can search for a group in your area either by state, zip code, group name, keywords or even stream name. Wetlands Restoration Projects includes self reported information about ongoing wetlands projects organized by state and watershed. American Heritage Rivers Services is a multi-agency initiative to help communities find support for their rivers. The database offers a "yellow pages" directory of services to help communities revitalize their rivers environmentally, economically and culturally. SURF-Environmental Websites Database is a directory of websites dedicated to environmental issues and information. It is searchable by keywords, geography, organization, or even by the information medium.

The USGS' National Hydrography Dataset (NHD) is the underlying data maps for surf your watershed and many other geo-referenced programs however it can also be viewed independently of these other applications.[192] The NHD is a comprehensive set of digital spatial data that contains information about surface water features such as lakes, ponds, streams, rivers, springs and wells. Within the NHD, surface water features are combined to form "reaches," which provide the framework for linking water-related data to the NHD surface water drainage network. These linkages enable the analysis and display of water-related data in upstream and downstream order. The NHD Viewer provides direct access to the NHD through an interactive web viewer.[193] In addition to the NHD, the USGS also collects surface water data nationally at thousands of sites. The information varies from historical only to daily values or even real time measurements. The USGS also houses a repository of water quality measurements and assessments taken at surface water monitoring stations and independent locations. Both the surface water and water quality information is available through the USGS's National Water Information System (NWIS) website.[194]

EPA also hosts two data warehouses for water quality information, the Legacy Data Center (LDC), and STORET. The LDC is a static, archived database and STORET is an operational system actively being populated with water quality data. Both systems contain raw

---

[189] http://www.nrcs.usda.gov/technical/efotg/.

[190] http://websoilsurvey.nrcs.usda.gov/app/

[191] http://www.epa.gov/surf/.

[192] http://nhd.usgs.gov/.

[193] http://nhd.usgs.gov/data.html; or directly to the viewer at http://nhdgeo.usgs.gov/viewer.htm.

[194] Surface water monitoring: http://waterdata.usgs.gov/nwis/sw; Water quality monitoring: http://waterdata.usgs.gov/nwis/qw.

ADD84

April 2010 Interim

biological, chemical, and physical data on surface and ground water collected by federal, state and local agencies, Indian Tribes, volunteer groups, academics, and others. All 50 States, territories, and jurisdictions of the U.S. are represented in these systems. Both the LDC and STORET are web-enabled and available to the public.[195]

The Federal Emergency Management Agency (FEMA) publishes flood hazard zone maps which may also be useful in 401 certification assessments. The FEMA Flood Insurance Rate Maps (FIRMs) available online are identified as FIRMette and are free on the Map Service Center website.[196]

Note, the above geographic tools are not complete or definitive sources for location specific information. They have been developed using information reported by local, state and regional governments and non-governmental organizations. The presence or absence of information should be treated as informative but not a definitive indication of conditions on the ground.

### 4. Professional Societies and Private Sector Tools

In addition to state, tribal and federal programs and tools, private industry and professional organizations and their associated journals can provide very detailed information on individual aquatic resource types and impacts. The Society of Wetland Scientists (SWS)[197], American Water Resources Association (AWRA)[198], American Society of Limnology and Oceanography (ASLO)[199], American Fisheries Society (AFS)[200], American Society of Ichthyologists and Herpetologists[201], North American Benthological Society[202], and the American Ornithologists' Union[203] are a few such professional organizations that may provide access to valuable information for certification decisions and condition development. Non-profit organizations dedicated to watershed protection also produce many reports, technical guides, and often review and compare assessment methods focusing on everything from site design to watershed modeling and planning – one such organization is the Center for Watershed Protection[204] and specifically its Stormwater Manager's Resource Center.[205]

The number of internet mapping tools available to the public has grown dramatically in recent years and offers users various types of information and levels of detail. Google Earth and Microsoft's Bing are the most popular examples of desktop mapping tools that are novice user friendly, allow for some integration of information from independent sources, and provide satellite imagery.[206] For more advanced users Geographic Information System (GIS) platforms

[195] http://www.epa.gov/storet/index.html
[196] http://msc.fema.gov/webapp/wcs/stores/servlet/FemaWelcomeView?storeId=10001&catalogId=10001&langId=-1
[197] http://www.sws.org/.
[198] http://www.awra.org/index.html.
[199] http://aslo.org/index.html.
[200] http://www.fisheries.org/html/index.shtml.
[201] http://www.asih.org/.
[202] http://www.benthos.org/index.cfm.
[203] http://www.aou.org/.
[204] http://www.cwp.org/index.html
[205] http://www.stormwatercenter.net/
[206] Microsoft Bing Maps http://www.microsoft.com/maps/; Google Earth http://earth.google.com/.

41

ADD85

April 2010 Interim

allow users to import existing geo-referenced maps and datasets and create new, or manipulate existing, data layers to produce customized maps and geographic analysis.

Note, the use of any private software for official government business may require licensing fees and agreements.

ADD86

April 2010 Interim

# Appendix A: Clean Water Act Section 401

<u>33 USC 1341; CWA §401</u>

**(a) Compliance with applicable requirements; application; procedures; license suspension**

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 301, 302, 303, 306, and 307 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 301(b) and 302 of this title, and there is not an applicable standard under sections 306 and 307 of this title, the State shall so certify, except that any such certification shall not be deemed to satisfy section 511(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

(2) Upon receipt of such application and certification the licensing or permitting agency shall immediately notify the Administrator of such application and certification. Whenever such a discharge may affect, as determined by the Administrator, the quality of the waters of any other State, the Administrator within thirty days of the date of notice of application for such Federal license or permit shall so notify such other State, the licensing or permitting agency, and the applicant. If, within sixty days after receipt of such notification, such other State determines that such discharge will affect the quality of its waters so as to violate any water quality requirements in such State, and within such sixty-day period notifies the Administrator and the licensing or permitting agency in writing of its objection to the issuance of such license or permit and requests a public hearing on such objection, the licensing or permitting agency shall hold such hearing. The Administrator shall at such hearing submit his evaluation and recommendations with respect to any such objection to the licensing or permitting agency. Such agency, based upon the recommendations of such State, the Administrator, and upon any additional evidence, if any, presented to the agency at the hearing, shall condition such license or

43

permit in such manner as may be necessary to insure compliance with applicable water quality requirements. If the imposition of conditions cannot insure such compliance such agency shall not issue such license or permit.

(3) The certification obtained pursuant to paragraph (1) of this subsection with respect to the construction of any facility shall fulfill the requirements of this subsection with respect to certification in connection with any other Federal license or permit required for the operation of such facility unless, after notice to the certifying State, agency, or Administrator, as the case may be, which shall be given by the Federal agency to whom application is made for such operating license or permit, the State, or if appropriate, the interstate agency or the Administrator, notifies such agency within sixty days after receipt of such notice that there is no longer reasonable assurance that there will be compliance with the applicable provisions of sections 301, 302, 303, 306, and 307 of this title because of changes since the construction license or permit certification was issued in (A) the construction or operation of the facility, (B) the characteristics of the waters into which such discharge is made, (C) the water quality criteria applicable to such waters or (D) applicable effluent limitations or other requirements. This paragraph shall be inapplicable in any case where the applicant for such operating license or permit has failed to provide the certifying State, or, if appropriate, the interstate agency or the Administrator, with notice of any proposed changes in the construction or operation of the facility with respect to which a construction license or permit has been granted, which changes may result in violation of section 301, 302, 303, 306, or 307 of this title.

(4) Prior to the initial operation of any federally licensed or permitted facility or activity which may result in any discharge into the navigable waters and with respect to which a certification has been obtained pursuant to paragraph (1) of this subsection, which facility or activity is not subject to a Federal operating license or permit, the licensee or permittee shall provide an opportunity for such certifying State, or, if appropriate, the interstate agency or the Administrator to review the manner in which the facility or activity shall be operated or conducted for the purposes of assuring that applicable effluent limitations or other limitations or other applicable water quality requirements will not be violated. Upon notification by the certifying State, or if appropriate, the interstate agency or the Administrator that the operation of any such federally licensed or permitted facility or activity will violate applicable effluent limitations or other limitations or other water quality requirements such Federal agency may, after public hearing, suspend such license or permit. If such license or permit is suspended, it shall remain suspended until notification is received from the certifying State, agency, or Administrator, as the case may be, that there is reasonable assurance that such facility or activity will not violate the applicable provisions of section 301, 302, 303, 306, or 307 of this title.

(5) Any Federal license or permit with respect to which a certification has been obtained under paragraph (1) of this subsection may be suspended or revoked by the Federal agency issuing such license or permit upon the entering of a judgment under this chapter that such facility or activity has been operated in violation of the applicable provisions of section 301, 302, 303, 306, or 307 of this title.

ADD88

April 2010 Interim

(6) Except with respect to a permit issued under section 402 of this title, in any case where actual construction of a facility has been lawfully commenced prior to April 3, 1970, no certification shall be required under this subsection for a license or permit issued after April 3, 1970, to operate such facility, except that any such license or permit issued without certification shall terminate April 3, 1973, unless prior to such termination date the person having such license or permit submits to the Federal agency which issued such license or permit a certification and otherwise meets the requirements of this section.

**(b) Compliance with other provisions of law setting applicable water quality requirements**

Nothing in this section shall be construed to limit the authority of any department or agency pursuant to any other provision of law to require compliance with any applicable water quality requirements. The Administrator shall, upon the request of any Federal department or agency, or State or interstate agency, or applicant, provide, for the purpose of this section, any relevant information on applicable effluent limitations, or other limitations, standards, regulations, or requirements, or water quality criteria, and shall, when requested by any such department or agency or State or interstate agency, or applicant, comment on any methods to comply with such limitations, standards, regulations, requirements, or criteria.

**(c) Authority of Secretary of the Army to permit use of spoil disposal areas by Federal licensees or permittees**

In order to implement the provisions of this section, the Secretary of the Army, acting through the Chief of Engineers, is authorized, if he deems it to be in the public interest, to permit the use of spoil disposal areas under his jurisdiction by Federal licensees or permittees, and to make an appropriate charge for such use. Moneys received from such licensees or permittees shall be deposited in the Treasury as miscellaneous receipts.

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 301 or 302 of this title, standard of performance under section 306 of this title, or prohibition, effluent standard, or pretreatment standard under section 307 of this title, and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.

ADD89

156 FERC ¶ 61,035
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Norman C. Bay, Chairman;
                        Cheryl A. LaFleur, Tony Clark,
                        and Colette D. Honorable.

Constitution Pipeline Company, LLC                    Docket No. CP13-499-002

ORDER ON MAY 13, 2016 FILING

(Issued July 13, 2016)

1.      On May 13, 2016, the Attorney General for the State of New York made a filing
styled as a complaint and petition (May 13 Filing) against Constitution Pipeline
Company, LLC (Constitution), in which it alleges violations of the Natural Gas Act
(NGA), Commission regulations, and the Commission's December 2, 2014 order issuing
a certificate of public convenience and necessity (Certificate Order).[1]  The May 13 Filing
requests an investigation and requests a related stay of the Certificate Order.

2.      Constitution responded to the May 13 Filing on June 2, 2016.  In that response, it
denied the key factual allegations, challenged certain of the legal arguments, and
requested that the matter be set for a hearing before an Administrative Law Judge.

**Background**

3.      On June 13, 2013, Constitution filed an application, pursuant to section 7(c) of the
NGA and Part 157 of the Commission's regulations, for authorization to construct and
operate an approximately 124-mile-long interstate pipeline and related facilities

---

[1] *Order Issuing Certificates and Approving Abandonment*, 149 FERC ¶ 61,199
(2014), *order on reh'g*, 154 FERC ¶ 61,046 (2016).

ADD90

Docket No. CP13-499-002                                                                    -2-

extending from Susquehanna County, Pennsylvania to Schoharie County, New York. The Commission conditionally granted that request in the December 2, 2014 Certificate Order.[2]

4.      The Certificate Order included a requirement that "[p]rior to receiving written authorization from the Director of OEP [(Office of Energy Projects)] to commence construction of their respective project facilities, the Applicants shall file documentation that they have received all applicable authorizations required under federal law (or evidence of waiver thereof)."[3]

5.      The May 13 Filing alleges that Constitution has failed to obtain a water quality certification from New York State, as is required under section 401 of the Federal Clean Water Act.[4]

6.      The May 13 Filing further alleges that there is "a reasonable basis to conclude that Constitution expressly or tacitly authorized, encouraged and/or condoned the tree and vegetation cutting, clear-cutting, and other ground disturbance activities within the pipeline right of way in New York on which Constitution holds easements for the sole purpose of constructing and operating the pipeline."[5]

7.      The May 13 Filing states that "the NY Attorney General is not requesting and would oppose any enforcement action against the fee landowners on whose property the conduct giving rise to this complaint and petition took place."[6]

---

[2] *See id.*

[3] *Id*. at 51 (emphasis omitted).

[4] 33 U.S.C. § 1341(a)(1) (2014).

[5] May 13, 2016 Filing at 2.

[6] *Id*. at 3.

Docket No. CP13-499-002                                                                -3-

8.      As a procedural matter, the NY Attorney General erred by stylizing the May 13 Filing as a complaint and petition submitted under sections 385.206 and 285.207 of the Commission's regulations.[7]  Based on the substance of the filing, the filing should have been submitted as a request for investigation pursuant to section 1b.8 of the Commission's regulations.[8]

9.      If the Commission were to treat the May 13 Filing as a complaint, it would reject the filing for failure to comply with section 206(b) of the Commission's regulations. Neither the allegations regarding supposed affirmative acts nor those regarding supposed omissions "clearly identify the action or inaction which is alleged to violate applicable statutory standards or regulatory requirements" and "explain how the action or inaction violates applicable statutory standards or regulatory requirements."[9]

10.     As for affirmative acts, the May 13 Filing broadly alleges that Constitution "expressly or tacitly authorized, encouraged, or condoned the tree and vegetation cutting and clear-cutting, and other ground disturbance activities within the pipeline right of way."[10]  However, the May 13 Filing does not include any specific facts to support such allegations, but instead relies upon speculation that Constitution had a role in the land clearing that has occurred within its right of way.  For these reasons, the Commission finds that the May 13 Filing fails to satisfy the Commission's complaint rules.[11]

_____

    [7]  *See* 18 C.F.R. §§ 385.206 & 385.207 (2015).

    [8]  18 C.F.R. § 1b.8 (2015).

    [9]  *See* 18 C.F.R. § 385.206(b)(1) & (b)(2).  Nor did the May 13 Filing include the form of notice of complaint required by 18 C.F.R. § 385.206(b)(10).  There is no indication in the filing that the relief or action sought through petition differed in any way from the relief or action sought through the complaint.  To the degree that the filing was intended as a petition for the Commission to initiate an investigation, such a request is more properly made pursuant to the procedures outlined in 18 C.F.R. § 1b.8 (2015).  *Cf.* 18 C.F.R. §§ 207(a)(5) (2015) (requiring a person to file a petition seeking discretionary action "for which [18 C.F.R. Ch. I] prescribes no other form of pleading").

    [10]  May 13, 2016 Filing at 64.

    [11]  *See, e.g.*, *O'Connor & Hewitt, Ltd*, 122 FERC ¶ 61,103, at PP 19-20 (2008) (quoting 18 C.F.R. § 385.206(b)(1)); *Californians for Renewable Energy, Inc. v. Pac.*

(continued…)

Docket No. CP13-499-002                                                                 -4-

11.     The allegations regarding supposed omissions are also insufficient.  The May 13 Filing claims that Constitution had the duty to force landowners and other third parties to cease ground disturbance activities once it was put on notice of those activities.  This claim relies on the argument that a certificate holder "has the duty to not only to comply with the [Certificate] Order, but to ensure that others do not cause violations of the Order within the pipeline right of way property once it knows of those activities."[12]  The filing provides no authority for such a theory of vicarious liability and, therefore, fails to "[e]xplain how the action or inaction violates applicable statutory standards or regulatory requirements."[13]

12.     While procedurally-deficient as a complaint and petition, the May 13 Filing may constitute a valid request for investigation, pursuant to section 1b.8 of the Commission's regulations, of Constitution's alleged affirmative acts.  Accordingly, the Commission construes it as such and refers this matter to Commission staff for further examination and inquiry as may be appropriate.[14]

13.     To the degree that the request for stay in the May 13 Filing seeks relief beyond an investigation to address potential violations, the filing fails to demonstrate that justice so requires a stay.[15]  Constitution is reminded that it must comply with the NGA, Commission regulations, and all terms of its certificate or face potential sanctions.

---

*Gas & Elec. Co.*, 129 FERC ¶ 61,141, at P 11 (2009) (*CARE*)(quoting *Ill. Mun. Elec. Agency v. Cent. Ill. Pub. Serv. Co.*, 76 FERC ¶ 61,084, at 61,482 (1996)).

[12]  *E.g.*, May 13, 2016 Filing at 80.

[13]  18 C.F.R. § 385.206(b)(2); *see also CARE*, 129 FERC at P 11.

[14]  Because the Commission is construing the May 13 Filing as a request for investigation, it need not rule on Constitution's request to set the complaint for evidentiary hearing before an Administrative Law Judge.

[15]  *See, e.g.*, *Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,236 at P 8 (2016); *Pub. Util. Dist. No. 1 of Pend Oreille County*, 113 FERC ¶ 61,166, at P 6 (2005).

ADD93

20160713-3035 FERC PDF (Unofficial) 07/13/2016

Docket No. CP13-499-002                                                          -5-

The Commission orders:

    Therefore, the Commission refers this matter to Commission staff as discussed
herein.

By the Commission.

( S E A L )


                                   Kimberly D. Bose,
                                     Secretary.

ADD94

20160713-3035 FERC PDF (Unofficial) 07/13/2016

Document Content(s)

CP13-499-002.DOCX....................................................1-5

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Constitution Pipeline Company, LLC                    Docket No. PF12-9-000

NOTICE OF INTENT TO PREPARE AN
ENVIRONMENTAL IMPACT STATEMENT FOR THE PLANNED
**CONSTITUTION PIPELINE PROJECT**,
REQUEST FOR COMMENTS ON ENVIRONMENTAL ISSUES,
AND NOTICE OF PUBLIC SCOPING MEETINGS

(September 7, 2012)

The staff of the Federal Energy Regulatory Commission (FERC or Commission) will prepare an environmental impact statement (EIS) that will address the environmental impacts of the proposed Constitution Pipeline Project (Project) involving construction and operation of facilities by Constitution Pipeline Company, LLC (Constitution) in Susquehanna County, Pennsylvania; and Broome, Chenango, Delaware, and Schoharie Counties, New York. This EIS will be used by the Commission in its decision-making process to determine whether the project is in the public convenience and necessity.

This notice announces the opening of the scoping process that the Commission will use to gather input from the public and interested agencies on the project. Your input will help the Commission staff determine what issues need to be evaluated in the EIS. Please note that the **scoping period will close on October 9, 2012.**

This notice is being sent to the Commission's current environmental mailing list for this project. State and local government representatives are asked to notify their constituents of this planned project and encourage them to comment on their areas of concern. Comments may be submitted in written form or verbally. Further details on how to submit written comments are provided in the "Public Participation" section of this notice. In lieu of or in addition to sending written comments, we[1] invite you to attend the public scoping meetings scheduled as follows:

---

[1] "We", "us", and "our" refer to the environmental staff of the Office of Energy Projects (OEP).

ADD96

Docket No. PF12-9-000                    - 2 -

| Date and Time | Location |
|---|---|
| September 24, 2012<br>Beginning at 7:00-10:00 pm EDT | Afton High School<br>29 Academy Street<br>Afton, New York  13730 |
| September 25, 2012<br>Beginning at 7:00-10:00 pm EDT | Schoharie High School<br>136 Academy Dr.<br>Schoharie, New York  12157<br>(attendees should enter via the main high school<br>office entrance) |
| September 26, 2012<br>Beginning at 7:00-10:00 pm EDT | Blue Ridge High School<br>5058 School Road<br>New Milford, Pennsylvania  18834 |

The public meetings are designed to provide you with an opportunity to offer your comments on the Project.  Constitution representatives will be present one hour before each meeting to describe their proposal, present maps, and answer questions.  Interested groups and individuals are encouraged to attend the meetings and to present comments on the issues they believe should be addressed in the EIS.  A transcript of each meeting will be made so that your comments will be accurately recorded.

If you are a landowner receiving this notice, you may be contacted by a pipeline company representative about the acquisition of an easement to construct, operate, and maintain the planned facilities.  Constitution would seek to negotiate a mutually acceptable agreement.  However, if the Project is approved by the Commission, that approval conveys with it the right of eminent domain.  Therefore, if easement negotiations fail to produce an agreement, Constitution could initiate condemnation proceedings where compensation would be determined in accordance with state law.

A fact sheet prepared by the FERC entitled "An Interstate Natural Gas Facility on My Land? What Do I Need To Know?" is available for viewing on the FERC website (www.ferc.gov).  This fact sheet addresses a number of typically-asked questions, including the use of eminent domain and how to participate in the Commission's proceedings.

ADD97

Docket No. PF12-9-000                    - 3 -

**Summary of the Proposed Project**

Constitution has announced their plan to construct and operate approximately 120.6 miles of new 30-inch-diameter pipeline and associated pipeline facilities in Pennsylvania and New York. The Constitution Pipeline Project would provide about 650,000 dekatherms per day (Dth/d) of natural gas from two receipt points in Susquehanna County, Pennsylvania to two new delivery points with the existing Tennessee Gas Pipeline and the Iroquois Gas Transmission Pipeline in Schoharie County, New York.

The proposed Constitution Pipeline Project would consist of the following:

- construction of approximately 120.6 miles of new 30-inch-diameter pipeline from Susquehanna County, Pennsylvania through Broome, Chenango, Delaware, and Schoharie Counties, New York;

- installation of four new meter and regulation (M&R) stations including:

    - Central M&R Receipt Station – a new M&R receipt station, including pressure regulation, in Susquehanna County, Pennsylvania;

    - Southwestern M&R Receipt Station – a new M&R receipt station, including pressure regulation, in Susquehanna County, Pennsylvania;

    - Tennessee Gas M&R Delivery Station – a new M&R delivery station, including pressure regulation, in Schoharie County, New York; and

    - Iroquois M&R Delivery Station – a new M&R delivery station, including pressure regulation, in Schoharie County, New York.

- construction of a new compressor station:

    - Schoharie Compressor Station – installation of two Solar Mars 100 16,000-horsepower turbines in Schoharie County, New York;

- installation of a pig[2] launcher at MP 0.0 in Susquehanna County, Pennsylvania and installation of a pig receiver at MP 120.6 in Schoharie County, New York; and

---

[2] A pig is a tool that can be used to clean and dry a pipeline and/or to inspect it for damage or corrosion.

Docket No. PF12-9-000 - 4 -

- installation of eight new main line valves assemblies; two in Susquehanna County, Pennsylvania; one in Broome County, New York; two in Delaware County, New York; and three in Schoharie County, New York.

The general location of the proposed project facilities is shown in Appendix 1.[3]

At the request of the FERC, Constitution has developed and further refined an alternative route which generally parallels Interstate 88 for a substantial portion of the route (Alternative M). Alternative M would be partially located in Otsego County, New York, in addition to the counties previously mentioned. Constitution recently mailed information regarding this route to potentially affected landowners. Landowners affected by this alternative are included on our mailing list. Your input on these and other route alternatives is requested.

**Land Requirements for Construction**

Constitution is still in the planning phase for the Project, and workspace requirements have not been finalized. However, construction would disturb approximately 1,530 acres of land for the aboveground facilities and the pipeline. Following construction, about 737 acres would be used for permanent operation of the project's facilities. The remaining acreage would be restored and allowed to revert to former uses.

**The EIS Process**

The National Environmental Policy Act (NEPA) requires the Commission to take into account the environmental impacts that could result from an action whenever it considers the issuance of a Certificate of Public Convenience and Necessity. NEPA also requires us to discover and address concerns the public may have about proposals. This process is referred to as scoping. The main goal of the scoping process is to focus the analysis in the EIS on the important environmental issues. By this notice, the Commission requests public comments on the scope of the issues to address in the EIS. All comments received will be considered during the preparation of the EIS.

---

[3] The appendices referenced in this notice are not being printed in the Federal Register. Copies of appendices were sent to all those receiving this notice in the mail and are available at www.ferc.gov using the link called "eLibrary" or from the Commission's Public Reference Room, 888 First Street, NE, Washington, DC 20426, or call (202) 502-8371. For instructions on connecting to eLibrary, refer to the last page of this notice.

ADD99

Docket No. PF12-9-000                - 5 -

In the EIS we will discuss impacts that could occur as a result of the construction and operation of the Project under these general headings:

- geology and soils;
- land use;
- water resources, fisheries, and wetlands;
- vegetation and wildlife
- endangered and threatened species;
- cultural resources;
- air quality and noise;
- socioeconomics;
- cumulative impacts; and
- public safety.

We will also evaluate reasonable alternatives to the Project or portions of the Project, and make recommendations on how to lessen or avoid impacts on the various resource areas.

Although no formal application has been filed, we have already initiated our NEPA review under the Commission's Pre-filing process. The purpose of the Pre-filing process is to encourage early involvement of interested stakeholders and to identify and resolve issues before an application is filed with the FERC. As part of our Pre-filing review, we have begun to contact some federal and state agencies to discuss their involvement in the scoping process and the preparation of the EIS. In addition, representatives from the FERC participated in public Open House meetings sponsored by Constitution in the project area in July 2012, and will again in September 2012, to explain the environmental review process to interested stakeholders.

Our independent analysis of the issues will be presented in the EIS. The EIS will be published and distributed for public comment. We will consider all timely comments and revise the document, as necessary, before issuing a final EIS. To ensure your comments are considered, please carefully follow the instructions in the "Public Participation" section of this notice.

With this notice, we are asking agencies with jurisdiction and/or special expertise with respect to environmental issues to formally cooperate with us in the preparation of the EIS. These agencies may choose to participate once they have evaluated the proposal relative to their responsibilities. Agencies that would like to request cooperating agency status should follow the instructions for filing comments provided under the "Public Participation" section of this notice.

ADD100

Docket No. PF12-9-000                          - 6 -

## Consultations Under Section 106 of the National Historic Preservation Act

In accordance with the Advisory Council on Historic Preservation's implementing regulations, we are using this notice to solicit the views of the public on the project's potential effects on historic properties.[4] We will document our findings on the impacts on cultural resources and summarize the status of consultations under section 106 of the National Historic Preservation Act in our EIS.

## Currently Identified Environmental Issues

We have already identified several issues and alternatives that we think deserve attention based on a preliminary review of the proposed facilities, comments made to us at Constitution's open houses, preliminary consultations with other agencies, and the environmental information provided by Constitution. This preliminary list of issues and alternatives may be changed based on your comments and our analysis:

- impacts from shallow bedrock and blasting;
- potential effect on federal and state-listed sensitive species (such as Indiana bats and migratory birds);
- impacts to residential areas;
- impacts to areas recently flooded;
- visual and other impacts from forest clearing, including impacts to "greenfield" areas;
- impacts to agriculture;
- effects on the local air quality and noise environment from construction and operation of the proposed facilities;
- assessment of the no action alternative, existing systems and alternative system configurations, and alternative routes to reduce or avoid environmental impacts; and
- assessment of the I-88 Alternative (currently Alternative M) and other alternatives.

## Public Participation

You can make a difference by providing us with your specific comments or concerns about the project. Your comments should focus on the potential environmental effects, reasonable alternatives, and measures to avoid or lessen environmental impact. The more specific your comments, the more useful they will be.

---

[4] The Advisory Council on Historic Preservation's regulations are at Title 36, Code of Federal Regulations, Part 800. Historic properties are defined in those regulations as any prehistoric or historic district, site, building, structure, or object included in or eligible for inclusion in the National Register for Historic Places.

ADD101

Docket No. PF12-9-000                    - 7 -

To ensure that your comments are timely and properly recorded, please send your comments so that they will be received in Washington, DC on or before **October 9, 2012**.

For your convenience, there are three methods you can use to submit your comments to the Commission. In all instances, please reference the project docket number (PF12-9-000) with your submission. The Commission encourages electronic filing of comments and has expert eFiling staff available to assist you at (202) 502-8258 or efiling@ferc.gov.

1)      You may file your comments electronically by using the Quick Comment feature, which is located at www.ferc.gov under the link called "Documents and Filings." A Quick Comment is an easy method for interested persons to submit text-only comments on a project;

2)      You may file your comments electronically by using the "eFiling" feature, that is listed under the "Documents and Filings" link. eFiling involves preparing your submission in the same manner as you would if filing on paper, and then saving the file on your computer's hard drive. You will attach that file to your submission. New eFiling users must first create an account by clicking on the link called "Sign up" or "eRegister." You will be asked to select the type of filing you are making. A comment on a particular project is considered a "Comment on a Filing;" or

3)      You may file a paper copy of your comments at the following address:

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, NE, Room 1A
Washington, DC 20426

**Environmental Mailing List**

The environmental mailing list includes federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; other interested parties; and local libraries and newspapers. This list also includes all affected landowners (as defined in the Commission's regulations) who are potential right-of-way grantors, whose property may be used temporarily for project purposes, or who own homes within certain distances of aboveground facilities, and anyone who submits comments on the project. We will update the environmental mailing list as the analysis proceeds to ensure that we send the

ADD102

Docket No. PF12-9-000                    - 8 -

information related to this environmental review to all individuals, organizations, and government entities interested in and/or potentially affected by the Project.

Copies of the completed draft EIS will be sent to the environmental mailing list for public review and comment. If you would prefer to receive a paper copy of the document instead of the CD version or would like to remove your name from the mailing list, please return the attached Mailing List Form (Appendix 2).

**Becoming an Intervenor**

Once Constitution formally files their application with the Commission, you may want to become an "intervenor," which is an official party to the Commission's proceeding. Intervenors play a more formal role in the process and are able to file briefs, appear at hearings, and be heard by the courts if they choose to appeal the Commission's final ruling. An intervenor formally participates in a Commission proceeding by filing a request to intervene.

Instructions for becoming an intervenor are included in the User's Guide under the "e-filing" link on the Commission's website. Please note that the Commission will not accept requests for intervenor status at this time. You must wait until a formal application for the project is filed with the Commission.

**Additional Information**

Additional information about the project is available from the Commission's Office of External Affairs at **1-866-208-FERC** or on the FERC website (www.ferc.gov) using the "eLibrary" link. Click on the eLibrary link, click on "General Search," and enter the docket number, excluding the last three digits in the Docket Number field (i.e., PF12-9). Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at 1-866-208-3676, or for TTY, contact (202) 502-8659. The eLibrary link on the FERC Internet website also provides access to the texts of formal documents issued by the Commission, such as orders, notices, and rule makings.

In addition, the Commission offers a free service called eSubscription that allows you to keep track of all formal issuances and submittals in specific dockets. This can reduce the amount of time you spend researching proceedings by automatically providing you with notification of these filings, document summaries, and direct links to the documents. Go to www.ferc.gov/esubscribenow.htm.

ADD103

Docket No. PF12-9-000                        - 9 -

    Public meetings or site visits will be posted on the Commission's calendar located at www.ferc.gov/EventCalendar/EventsList.aspx along with other related information.

    Finally Constitution has established an internet website for the Project at www.constitutionpipeline.com.  The website includes a description of the Project, viewing locations for Project materials and maps, frequently asked questions and responses, and links to related documents.  You can also request additional information or provide comments directly to Constitution at 866-455-9103.

Kimberly D. Bose,
Secretary



**Appendix 2**

## MAILING LIST FORM
(Docket No. PF12-9-000)

☐    Please **correct my name/address** on the environmental mailing list for the Constitution Pipeline Project.

    _____
Name

    _____
Affiliation (if applicable)

    _____
Address

    _____
Address (cont'd)

    _____
City                                  State           Zip Code

☐    Please **remove my name** from the environmental mailing list for the Constitution Pipeline Project.

☐    **Please send me a paper copy of the environmental document INSTEAD of an electronic copy**.

(fold on line)

(Staple or Tape Here)

ADD106

20120907-3012 FERC PDF (Unofficial) 09/07/2012

**From:** _____

_____

_____

_____

**ATTN:**     **OEP, Gas 3, PJ-11.3**
             **Federal Energy Regulatory Commission**
             **888 First Street, N.E.**
             **Washington, DC 20426**

*(Docket No. PF12-9-000, Constitution Pipeline Project)*

(Staple or Tape Here)

ADD107

20120907-3012 FERC PDF (Unofficial) 09/07/2012

Document Content(s)

PF12-9-000-9712.DOC..................................................1-12

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Constitution Pipeline Company, LLC                     Docket No. PF12-9-000

NOTICE OF PUBLIC SCOPING MEETING AND EXTENSION OF
SCOPING PERIOD FOR THE PLANNED
CONSTITUTION PIPELINE PROJECT

(October 9, 2012)

On October 24, 2012, the Federal Energy Regulatory Commission (FERC or Commission) will hold an additional public scoping meeting for Constitution Pipeline Company's (Constitution) Constitution Pipeline Project.  This notice also extends the scoping period for the project, which will now close on November 9, 2012**.**  The project would consist of a 120.6-mile-long natural gas pipeline in Susquehanna County, Pennsylvania; and Broome, Chenango, Delaware, and Schoharie Counties, New York. FERC staff will conduct this public scoping meeting as part of our preparation of an environmental impact statement (EIS) for the project.  The scoping meeting is designed to provide the public with an opportunity to offer verbal comments on the project and on the issues they believe should be addressed in the EIS.

More information about this project and the Commission's EIS process is available in the *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Constitution Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* (NOI), issued on September 7, 2012.  The NOI also provides details on how to submit written comments in lieu of or in addition to verbal comments on the project[1].  We ask that you submit your comments so that we receive them by November 9, 2012.

Constitution representatives will be present one hour before the meeting with maps of the potential routes.  The additional public scoping meeting is scheduled as follows:

**Wednesday, October 24, 2012**
**Beginning at 7:00-10:00 pm EDT**
**Foothills Performing Arts & Civic Center Atrium**
**24 Market Street**
**Oneonta, New York  13820**

---

[1] The NOI can be viewed on the Commission's e-Library link under Accession Number  20120907-3012.

ADD109

20121009-3008 FERC PDF (Unofficial) 10/09/2012

Docket No. PF12-9-000          - 2 -

        This and all public meetings will be posted on the Commission's calendar located at www.ferc.gov/EventCalendar/EventsList.aspx along with other related information.

        This notice is being sent to the Commission's current environmental mailing list for this project.  Additional information about the project is available from the Commission's Office of External Affairs, at (**866**) **208-FERC**, or on the FERC website at www.ferc.gov using the "eLibrary" link.  Click on the eLibrary link, click on "General Search" and enter the docket number, excluding the last three digits in the Docket Number field (i.e., PF12-9).  Be sure you have selected an appropriate date range. For assistance, please contact FERC Online Support at FercOnlineSupport@ferc.gov or toll free at (866) 208-3676, or for TTY, contact (202) 502-8659.


                        Kimberly D. Bose,
                        Secretary.

ADD110

20121009-3008 FERC PDF (Unofficial) 10/09/2012

Document Content(s)

PF12-9-000-10912.DOC....................................................1-2

ADD111

Glenn and Laura Bertrand

465 Rose Lane

Davenport, New York

13750

Ms. Kimberly D. Bose                                              09.29.12

Federal Energy Regulatory Commission

888 First Street, NE, Room 1A

Washington, DC 20426

RE: Docket Number PF12-9

Dear Ms. Bose,

We are directly affected landowners in the proposed route of the Constitution Pipeline. The proposed route takes the pipeline approximately 300 feet upslope from our home. We are very concerned for our own safety and that of our children, livestock, and neighbors. We are particularly concerned for the safety of local emergency response personnel if there was a leak. Therefore, we oppose the construction of the pipeline.

We do not believe that the pipeline is safe. There have been two pipeline explosions in our area since 1990. The North Blenheim explosion in 1990 took two lives and destroyed eight homes. The second explosion was in 1994 involving a 6" Texas Eastern pipeline which burned for three days, and was less than a mile from our home. Our son, a volunteer firefighter and paramedic, was one of the first on the scene. The gas that leaked from the pipeline had exploded and caught fire minutes prior to his arrival. Flames were 200' high. The volunteers were completely unaware that a leak had occurred, and to what extent the gas had spread. What would have been the effects of a leak in a 30" pipeline? Volunteers need to know immediately if a leak has occurred, and where the gas would spread.

We have a 20,390,000 gallon pond on our property. The dam impounding this water is a hazard class B structure requiring an Emergency Action Plan, (EAP), in the event of a breach. The plan must be filed with the New York State Department of Environmental Conservation, (DEC). We are also required to provide a "Deluge Map" showing where and in what amounts the water resulting from a dam failure would flow. The EAP must be coordinated with and accepted by local emergency responders and distributed to all appropriate parties pursuant to 6 NYCRR Part 673 ("Dam Safety"). We feel that

ADD112

20121001-5016 FERC PDF (Unofficial) 9/29/2012 3:46:40 PM

considering the volume of gas passing through the proposed pipeline, similar warning and mapping functions should be mandated for the Constitution Pipeline.

The Constitution Pipeline should be required to provide diffusion maps of gas flow resulting from leaks. These maps should be constructed using United States Geological Survey, (USGS), topographic maps and analyzed using fluid dynamic or multi-physics modeling software. Further, maps and models showing blast and thermal effects from the ignition of the gas should be developed. All models and maps should reflect a worst case scenario of leak size, weather, and topographic conditions. Since the most likely failure points in the pipeline are welded seams and/or bolted flanges, maps and models should be developed for each of these along the entire length of the pipeline. The maps and models should be provided to and accepted by, local emergency responders and distributed to all appropriate parties.

We feel that the contents of a 30" diameter by 121 mile long pipeline at 1480 pounds per square inch are potentially more dangerous than our 20,390,000 gallon pond. The Constitution Pipeline should be required to provide at least the same safety information as we are.


Glenn and Laura Bertrand

ADD113

20121001-5016 FERC PDF (Unofficial) 9/29/2012 3:46:40 PM

Document Content(s)

Scope Comment 09.29.12 Docket PF12-9.PDF.............................1-2

Glenn and Laura Bertrand

465 Rose Lane

Davenport, New York

13750

Ms. Kimberly D. Bose                                        10.05.12

Federal Energy Regulatory Commission

888 First Street, NE, Room 1A

Washington, DC 20426

RE: Docket Number PF12-9

Dear Ms. Bose,

We are directly affected landowners in the proposed route of the Constitution Pipeline. The proposed route takes the pipeline approximately 300 feet upslope from our home and cuts a swath through 52 acres of our tree farm. We are opposed to the construction of the pipeline. Building this in the proposed route will cause irreparable damage to our trees, wildlife habitats, and the aesthetics of our property.

In 2006 we commissioned a Landowner Forest Stewardship Plan from the New York State Department of Environmental Conservation, (DEC). Their survey included characterization of the soils and topography of the property. The entire proposed pipeline route crosses an area composed of Halcott and Vly soils. Quoting the report: "This complex of soils and rock is mapped above approximately 1,750' elevation on hillsides with 15% to 35% slope. Due to shallow depths to and exposures of bedrock, and steep slopes, these areas are best suited to woodland and wildlife uses. Steep slopes and shallow depth to bedrock severely limit this soil for most development purposes. A severe erosion hazard exists whenever this soil is disturbed. Grading activities typically require large amounts of cut and fill with costly blasting and removal of bedrock". Obviously, this is no place to run a pipeline.

Located immediately downslope from this area is a parcel that the plan cited as "the most valuable stand from a timber perspective on this property". The eventual goal with this stand is to increase the sugar maple component. What will become of this area if the pipeline is constructed?

ADD115

In addition, the placement of the pipeline will cause irreparable damage to our wells and the numerous springs found on our property. Many of these springs feed wetlands adjacent to our 12 acre pond. Erosion and runoff from pipeline construction will cause sedimentation to occur in these sensitive areas. There is also a classified trout stream on the property. The stewardship plan emphasized the need to protect these natural features.

Williams' policy states that: "disturbed areas are restored, as nearly as possible, to their original contours". How is this in any way possible given the conditions we have described? How is it possible to replace the 125' wide horizontal cut that would be made in a 15% to 35% slope made of bedrock? Will they replace the hundreds of 50-60 year old trees that will be a source of our income?

Construction of this pipeline will forever disfigure the landscape and degrade the quality of our water and wildlife habitats. It will destroy our potential income from timber and maple sugar production. Williams/Cabot should not be allowed to profit from the destruction of peoples land and livelihood. The FERC must not allow this dangerous and unnecessary project to proceed.

Thank you for your consideration.


Glenn and Laura Bertrand

20121009-5118 FERC PDF (Unofficial) 10/6/2012 2:26:15 PM

Document Content(s)

Comment Letter 10.05.12.PDF.........................................1-2

20130220-0006 FERC PDF (Unofficial) 02/19/2013

**COMMENT FOR FERC PROJECT DOCKET # PF12-9-000**

I own property on a proposed route for the *Constitution Pipeline*.
This project poses unacceptable risks to my water supplies and
physical safety, would diminish my property s value and interfere
with my property rights. I do not intend to sign any agreements
for surveys or for easements.

**Date:** 2/10/13

**Name:** Dan Brignoli
LJ Oliva
[print] [signature]

**Address:** 2152 Rathbun Road
Oneonta, NY 13820

ADD118



Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, NE, Room 1A
Washington, DC 20426

|,,|,|]],,,,|,,|,,],),]],,,|],,|

20130220-0006 FERC PDF (Unofficial) 02/19/2013

Document Content(s)

13185131.tif.......................................................1-2

Robert Lidsky, Andes, NY.
Pipelines running through Delaware County, NY represent invitations to frack our lands. Fracking hurts farming and tourism, the two mainstays of our economy. With our sparse population, this gas cannot be used to fuel our homes. Instead it may end up in Louisiana, be compressed and exported at five times the local price here. Pipelines and Fracking won't diminish our dependence on foreign oil.

On the Pennsylvania side of the Southern Tier, while fracking and pipelines are spreading rapidly, housing prices are plummeting, mortgages and homeowner insurance are difficult to get, farmers worry about selling tainted produce, some people are getting sick, and tourism has suffered. Our fragile economy has brought falling real estate values and poor job opportunities. Bringing industrialization here, through Pipelines & Fracking is a formula for more decline. It's the history of extractive industries.

20121018-5060 FERC PDF (Unofficial) 10/18/2012 11:20:02 AM

Document Content(s)

15783.TXT...........................................................1-1

FILED
SECRETARY OF THE
COMMISSION

2013 FEB -4 A 11: 45

FEDERAL ENERGY
REGULATORY COMMISSION

Robert Lidsky & Beverly Travis
622 Ridge Road
Andes NY 13731

ORIGINAL

Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, NE, Room 1A
Washington, DC 20426

**COMMENT FOR FERC PROJECT DOCKET # PF12-9-000**

We own property on the proposed route for the Constitution Pipeline in Davenport NY on
Dutch Hill Road. This project poses unacceptable risks to our water supplies and physical
safety, would seriously diminish our property's value, make it impossible to build our
home, threaten the well being of our animals and interfere with our property rights.
We will not sign any agreements for surveys or for easements.

**Date: January 26, 2013**

**Name:** Robert Lidsky/Beverly Travis

**Signed:**

Robert Lidsky

Beverly Travis

ADD123

20130204-0025 FERC PDF (Unofficial) 02/04/2013

Document Content(s)

13169254.tif.............................................................1-1

Robert Lidsky, Andes, NY.
Robert Lidsky
622 Ridge Road
Andes NY 13731

I own land in Davenport, NY on the proposed route for Constitution Pipeline
Company, LLC's high-pressure interstate gas pipeline.

The projected route would run directly under the only area of my property, which
is buildable. Without being able to build a home, my property becomes
significantly devalued if not worthless. The meager compensation typically paid
for a right of way is insignificant compared to the purchase price of the
property.

This pipeline is open access, and must accept fracked gas along the entire
route, which makes gas drilling probable in Davenport. There will be compressor
stations, perhaps on my land. They create a constant source of loud noise,
bright light and noxious air pollution, and carry the risk of fire and
explosion. Marcellus gas contains high levels of radon, creating a possible
health hazard for my family and me.

The pipeline corridor fragments habitat, creates a loss of my privacy, can be
accessed at any time, day or night, is maintained with the use of toxic
chemicals used to inhibit vegetation, creating danger to me, domestic animals
and wildlife.

I would face possible injury, loss of life, increase in medical costs, loss of
homeowners and liability insurance, loss of property value, increased & costly
difficulties in obtaining real estate financing.

A gas pipeline running the length of Davenport will result in considerably lower
property values on or near the route. It will inhibit potential property buyers
should I try to sell.

I will not personally benefit from the use of gas to heat my homes, as
Constitution will not make gas available to me.

I advocate for the preservation and enhancement of the rural character of
Davenport; a safe, quiet, and scenic environment; a non-industrial agricultural
and tourist based economy.

Therefore I oppose the Constitution Pipeline

Signed: Robert Lidsky

ADD125

20130226-5044 FERC PDF (Unofficial) 2/26/2013 10:23:47 AM

Document Content(s)

16349.TXT...........................................................1-1

As a resident of Delaware County New York I write with concerns over the proposed Williams/Cabot Constitution Pipeline.

After hearing the ideas of my neighbors and other residents throughout the county as well as researching this issue myself it seems obvious that this pipeline project is completely unnecessary. A map of existing pipelines in the northeast makes it obvious that if the objective of Williams/Cabot is to supply residents and businesses in Boston and New York City with shale gas then a pipeline originating in Brooklyn Pennsylvania could more easily serve those communities if it were co-located along the easements of a number of existing pipelines. These pipelines include: the Millenium, the Tennessee, the Dominion, and the Transcontinental. In some cases (the Millenium for example) the distance traveled to NYC would be much shorter then the proposed Constitution route which actually travels AWAY from NYC for most of it's length.

An even less intrusive and seemingly less costly option might be for Cabot to simply send it's Pennsylvania shale gas through the existing pipelines (mentioned above) and for Williams not to even bother constructing yet another pipeline in the northwest.

FERC needs to understand that a great number of people in Delaware County understand the above points and because of this the residents of Delaware County are overwhelmingly opposed to the construction of the Constitution pipeline.

Thank you for considering these comments.

ADD127

20120813-5009 FERC PDF (Unofficial) 8/12/2012 9:55:53 PM

Document Content(s)

14933.TXT.........................................................1-1

I am writing in regards to the just announced locations of the FERC Scoping Meetings for the proposed "Constitution" Pipeline.

In FERC's September 7th, "Notice of intent to prepare an environmental impact statement" Secretary Kimberly Bose writes that, "The public meetings are designed to provide you with an opportunity to offer your comments on the Project."

As a Delaware County resident it concerns me that contrary to the claim that "an opportunity" to comment is being provided, in fact not one Scoping Meeting is scheduled for Delaware County. This is especially egregious considering that of the five impacted counties, Delaware County would be burdened with the longest portion of the proposed main pipeline route. Chenango County by comparison, where one Scoping Meeting is planned, would have just 9 miles of this route.

It appears that FERC has gone out of it's way to make it difficult for Delaware County residents to attend, voice their concerns, and provide input that would, "help the Commission staff determine what issues need to be evaluated in the EIS."

Furthermore, it takes no stretch of the imagination to believe that excluding Delaware County residents from this process is intentional on the part of FERC since residents here have made it clear that they are overwhelmingly opposed to any and all "Constitution" routes. The people of Delaware County (where 72% of residents oppose fracking) understand that the purpose of this proposed pipeline is to provide fracking infrastructure. They also understand that this pipeline project is unnecessary, does not benefit citizens or landowners of this region in any substantive way, and is certainly not a "public convenience."

If FERC were not intimidated by the facts as stated above a Scoping Meeting would have been scheduled for Delaware County. For a government agency that is mandated to "gather input from the public" the behavior of your commission on this matter is transparently deficient.

20120910-5016 FERC PDF (Unofficial) 9/9/2012 11:37:31 AM

Document Content(s)

15230.TXT..........................................................1-1

PF12-9

On Thu, Aug 9, 2012 at 11:08 PM, Reanne Stack <reanne100@yahoo.com>wrote:

Rear
reanne

To:
Mr. Charles Brown
FERC Environmental Project Manager

Dear Mr. Brown:

I am writing to you as a follow-up to a recent conversation I had with our home builder, Mr. Clark Sanders. Mr. Sanders said he spoke with you at the Constitution Pipeline gathering in Franklin, NY on July 25th regarding building our home on Coe Hill Road, Davenport NY.

My husband, Robert Stack, and I have been working with Mr. Sanders for the past six years, planning on having him build our retirement home on land we purchased eight years ago. In 2011 we had an engineer design and site where our septic system should be placed. Based on this, we were going to begin working with Mr. Sanders this fall to design and locate our house in proximity to the proposed septic site.

In April of this year we sold our home here in Reno, NV, and shipped our household belongings to a storage unit back east. It has been our dream and our plan to move to Davenport this fall to begin the process of building our home. Then, in May, we received a letter from the Constitution Pipeline requesting permission to survey our land. The route for their proposed pipeline goes directly through the field where we are planning to build our home.

We are strongly opposed to this pipeline being constructed anywhere at all, in particular through our home site. Although we have 96.7 acres of property, our buildable lot is essentially limited to the field that we chose for our home site – the same location they have chosen for their pipeline. The bulk of our land is land locked by properties owned by multiple other landowners. Construction of this pipeline will effectively render our property un-buildable. In addition, any value associated with the property will plummet as a consequence.

Enclosed for your review are documents from Alverson Engineering, Delhi, NY concerning the proposed location of the septic system. They show clearly the same area as the proposed pipeline. We greatly appreciate your consideration of the detrimental impact the pipeline would have on us should it be permitted to be constructed.

We are anticipating arriving in New York to live in early September of this year, but will no longer be able to proceed with our building plans if there is even a remote possibility of pipeline construction occurring through our property. We will absolutely not give permission for surveying and will oppose this pipeline in every way we can. We appreciate your consideration of our situation and hope that it can be viewed as one more reason why the construction of the proposed Constitution Pipeline should be prevented. If you have any questions for us, we can be reached by cell phone ████████████████████████████████

Sincerely,

Anne G. Stack
2536 Coe Hill Road*
Davenport, NY 13820

*address as of September 4, 2012

Click here to Reply or Forward

0% full
Using 0.2 GB of your 25 GB

©2012 Google - Terms of Service -Privacy Policy - Program Policies
Powered by Google

Last account activity. 46 minutes ago
Details

ADD131

20120813-0057 FERC PDF (Unofficial) 08/09/2012

Document Content(s)

13045429.tif...........................................................1-1

ADD132

**COMMENT FOR FERC PROJECT DOCKET # PF12-9-000**

We

I own property on a proposed route for the Constitution Pipeline. This project poses unacceptable risks to my water supplies and physical safety, would diminish my property s value and interfere with my property rights. I do not intend to sign any agreements for surveys or for easements.

Date: 2/1/13

Robert STACK

Name: _Anne G Stack_
[print]

[signature]

Address: 2536 Coe Hill Rd

Oneonta, NY 13820

Property located on Coe Hill Rd, Davenport NY
NY-OE-130.000

ADD133

20130206-0011 FERC PDF (Unofficial) 02/06/2013

Ms. Bose,

Please see enclosed copy of
letter we have sent to
Constitution Pipeline Company.

Thank you.

32 Cent
Stamp

**Kimberly D. Bose, Secretary**
**Federal Energy Regulatory Commission**
**888 First Street, NE, Room 1A**
**Washington, DC 20426**

ADD134

Robert and Anne G. Stack
2536 Coe Hill Road
Oneonta, NY 13820

January 31, 2013


Via Certified Mail, Return Receipt

Constitution Pipeline Company
PO Box 14139
Albany, NY 12212


Re: Denying Property Access
PF12-9.000


As the owners of the property located on <u>Coe Hill Road, Davenport (NY-DE-130.000)</u>,
we are **denying permission** to the Constitution Pipeline Company, its representatives,
contractors, sub-contractors, or associates *to enter our land to perform surveys, or for any
other purpose. Any physical entry onto our property will be considered unauthorized, and
treated as trespass.*


Robert Stack
Anne G. Stack

cc: Dennis Valente, Town Supervisor, Davenport NY
    Kimberly D. Bose, Secretary, FERC, Washington DC


ADD135

20130206-0011 FERC PDF (Unofficial) 02/06/2013

Document Content(s)

13170953.tif...........................................................1-3

# STATE OF NEW YORK DEPARTMENT OF PUBLIC SERVICE
### THREE EMPIRE STATE PLAZA, ALBANY, NY 12223-1350
www.NYPSC.ny.gov

**PUBLIC SERVICE COMMISSION**

**GARRY A. BROWN**
*Chairman*
**PATRICIA L. ACAMPORA**
**MAUREEN F. HARRIS**
**JAMES L. LAROCCA**
**GREGG C. SAYRE**
*Commissioners*



**PETER McGOWAN**
*General Counsel*

**JACLYN A. BRILLING**
*Secretary*

October 31, 2012

Ms. Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

Re:  Constitution Pipeline Company, LLC
     Docket No. PF12-9-000

Dear Ms. Bose:

    Attached please find the Comments of the New York Public
Service Commission in the pre-filing proceeding of the
Constitution Pipeline Company, LLC.

    Should you have any questions, please contact me at (518)
474-1585.

Very truly yours,

Alan T. Michaels
Assistant Counsel

Attachment

ADD137

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

Constitution Pipeline          )          Docket No. PF12-9-000
Company, LLC                   )

COMMENTS OF THE
NEW YORK PUBLIC SERVICE COMMISSION

The following are comments from the New York Public Service
Commission ("NYPSC") regarding the proposed Constitution
pipeline and associated facilities to be constructed and
operated in New York State.  Our comments seek to address areas
of interest to NYPSC, including:  co-location of pipeline
facilities with other utility facilities;  protection of
critical utility infrastructure; pipeline integrity; potential
expansion of gas service in Chenango, Delaware and Otsego County
areas; and potential construction impacts on public water supply
and other resources.

INTRODUCTION

NYPSC has oversight responsibilities for the safe and
reliable operation of utility infrastructure in New York State,
including acting as the agent for United States Department of
Transportation ("USDOT"), Pipeline and Hazardous Materials
Safety Administration, for fuel gas transmission pipeline and
hazardous liquids safety requirements.  NYPSC also has extensive
experience in siting, construction, operation and long-term

-2-

ADD138

maintenance aspects of utility infrastructure, including gas and electric transmission facilities, co-location issues, and environmental impact evaluation, avoidance and mitigation. NYPSC and its Departmental Staff have direct responsibilities for utility siting and construction for intra-state gas transmission pipelines pursuant to New York State Public Service Law under Article VII. NYPSC offers the following comments on the proposed scope of studies for the Environmental Impact Statement ("EIS") for the Constitution Pipeline, to be developed pursuant to the National Environmental Policy Act.

BACKGROUND

On September 7, 2012, the Federal Energy Regulatory Commission ("FERC" or the "Commission") issued a Notice of Intent to Prepare an Environmental Impact Statement for the Planned Constitution Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings (the Notice and Request). The Notice provides basic information about the Constitution Pipeline proposal, which includes the proposed development of: a 120 mile long, 30-inch diameter pipeline from Susquehanna County, Pennsylvania, to Schoharie County, New York; a new compressor station with two 16,000-horsepower turbines at a station in Schoharie County; a pig receiver in Schoharie County; and proposed eight main line valve assemblies, including six at various locations in New York State. The proposed scope invites comments on routing

-3-

ADD139

alternatives, and also identifies broad categories of impact issues that would be addressed in the Environmental Impact Statement (EIS), including: geology and soils; land use; water resources, fisheries and wetlands; vegetation and wildlife; endangered and threatened species; cultural resources; air quality and noise; socioeconomics; cumulative impacts; and public safety.

DISCUSSION

**Land Use Impacts, and Co-location with Utility Infrastructure**

The analysis of land use impacts should take special consideration where the pipeline is proposed to be co-located on utility rights-of-way. NYPSC acknowledges that with proper planning and coordination with utility owners-operators, co-location of major gas transmission facilities in close proximity to electric transmission facilities can accommodate the unique operating characteristics of both facilities. However, with the designation of electric transmission lines as critical infrastructure, and the reliance on the safe and continued operation of electric transmission lines for providing public utility service, full consideration of utility rights-of-way as an important land use must be provided in the EIS analysis.

The analysis of land use should not be equivalent to the analysis of land cover type, as is frequently done in environmental analyses. Utility right-of-way ("ROW") is not

-4-

"vacant land" as it has been characterized in other EIS documents.[1] Electric transmission facilities on a right-of-way include features other than the above-ground structures easily observed. For example, in areas prone to lightning strikes, as on ridge-top locations, electric facility protection equipment includes buried grounding systems (counterpoise) that may extend considerable distances away from the above-ground structures. This is particularly the case in areas of shallow depth to bedrock, as are notably common along the proposed route of the Constitution Pipeline. While underground and overhead transmission facilities, including gas transmission lines, generally support a limited range of other surface land uses,[2] rights-of-way for major overhead electric transmission facilities are generally fully-occupied with infrastructure that represents the primary land use of that corridor.

The analysis of land use of the proposed Constitution Pipeline should include consideration of the specific characteristics of the electric transmission lines where co-location is proposed. The extent of co-location includes several miles of facilities coincident with transmission lines operating at 115, 230 or 345 kV, which are all considered critical infrastructure for New York State grid operation. With proper planning and coordination with operating utilities,

---

[1] *See, e.g.*, the Millennium Pipeline Company, L.L.C., Docket No. CP98-150-000 et. al.)

[2] These additional surface land uses include: agricultural activities, "open space", some recreational, and surface transportation uses.

ADD141

identification of additional opportunities for co-location along electric transmission lines within the broader study corridor may address other routing constraints. NYPSC will closely review potential impacts of co-location in the EIS that will be developed in this proceeding.

The analysis of land use should also address the potential location of main-line valve facilities, which typically further limit the secondary surface land uses that may occur over the underground pipeline components. Valve locations near high voltage overhead electric transmission lines present additional engineering considerations: appropriate offset distances to resolve co-location problems may involve increased separation of valve facilities from high voltage electric lines, and thus involve additional land use considerations.

**Pipeline Integrity and Public Safety**

Proposed co-location of gas transmission facilities along electric transmission facilities warrant further engineering analysis and consideration of induced voltages on the gas pipeline from the electric facilities. Effects on overhead electric lines counterpoise, as discussed above in Land Use comments, also need to be addressed in the EIS.

Proposed primary and alternative routing throughout central and northeastern Schoharie County potentially involves areas of karst terrain including potential for solution caves, sinkholes and similar features. These terrain features should be

-6-

addressed as potential issues in evaluation of pipeline integrity and public safety. Karst terrain also warrants further evaluation in the Geology and Soils heading of the EIS.

The location of Alternate route C along the Enterprise Products Operating LLC ("EPCO") propane pipeline for a distance of approximately 16 miles in Schoharie County presents significant concerns for the integrity of that facility. Construction disturbances for an additional major pipeline in the vicinity of the existing pipeline must be carefully evaluated, given the constraints along that right-of-way, and the operating and maintenance history of the propane pipeline. Efforts should be made to avoid any non-essential disturbance of the EPCO pipeline. If any construction is planned to take place in the vicinity of the propane pipeline, EPCO must be notified of any plans, and should have an opportunity to consult and provide input.

**Co-Location with other proposed infrastructure**

The proposed entry point from Pennsylvania into New York State corresponds precisely with the location proposed by the Bluestone Pipeline Project.[3] The location of the Bluestone Pipeline Project has been under evaluation and modification with input from landowners and New York State agencies; it has been carefully sited to minimize impacts on natural resources, land

---

[3]   The Bluestone Pipeline Project was recently certificated by the NYPSC in
      Case 11-T-0401.

ADD143

uses, and to avoid significant visual contrasts with the
forested slopes along New York State Route 17/Interstate-86.
The Bluestone Pipeline Project and its siting should be taken
into consideration in the development of the Constitution
Pipeline and its EIS.

Specifically, the Constitution preferred route and
alternate Route B enter New York State adjacent to the Bluestone
Pipeline Project's sited location.  After entry into New York,
the Constitution preferred route would then cross the Bluestone
Pipeline three times within three miles.  The location of both
lines is further illustrated on an attached map, noted as
Exhibit A.  Should co-location take place with the Bluestone
Pipeline and any other facilities, consideration must be given
to all cathodic protection systems to ensure the protection of
both facilities.

The primary and alternate routing proposed by Constitution
Pipeline within the Town of Sanford, Broome County, does not
appear to take into consideration steep slope avoidance or
visual effects of forest clearing.  An evaluation of co-location
of all or part of the pipeline should be performed in the
analysis of routing and environmental impacts.

**Construction Considerations**

While a full evaluation of the routing proposals has not
been made, a general observation is that the proposed
Constitution Pipeline route involves extensive areas of steep

-8-

ADD144

slopes, side slopes and areas of shallow depth to bedrock, and significant soils limitations. Construction in these conditions will involve the need for wide construction rights-of-way, and much additional access from off-ROW to the pipeline route. Side-slope conditions require extensive grading to provide stable work surfaces, generally requiring additional ROW width, additional areas of construction disturbance, forest clearing, and habitat loss.

The proposed pipeline alignment is located in reasonably close proximity to public water supply sources, including both sub-surface and surface water supplies. The EIS should specifically address potential impacts to these water supply sources, including appropriate protection mechanisms for assuring water quality during and following construction activities. Surface water supply sources located downslope of the proposed construction zone in areas of steep slopes, areas of shallow depth to bedrock, and wet or highly erodible soils present significant constraints to maintaining integrity of those water supply sources, and should be carefully analyzed.

**Geology and Soils**

The evaluation of geology and soils should provide more than the typical EIS listing of bedrock and soils types in the project area, or along the proposed pipeline route. Specific evaluation of characteristics and limitations, such as depth to bedrock, soils wetness and depth to saturated zones, areas of

ADD145

highly-erodible soils, hydric soils, prime soils, and similar characteristics, should be performed in both graphic and written analyses. Maps showing <u>all</u> soils types are generally overwhelming (and may not reveal much useful information). However, maps showing specific characteristics, such as areas of shallow depth to bedrock, or areas of seasonally saturated soils, can be used to provide useful analytic information and characterization of impacts from siting or construction. They also may indicate areas where special construction methods or scheduling would be appropriate mitigation measures, or even areas that should be avoided when factored into comparisons or assessed in relation to other resources.

As indicated above in the <u>Pipeline Integrity</u> section, the proposed primary and alternative routing throughout central and northeastern Schoharie County potentially involves areas of karst terrain including potential for solution caves, sinkholes and similar features. These terrain features should be addressed as potential issues in siting, and in identification of appropriate construction and restoration requirements, as well as evaluation of pipeline integrity and public safety.

**Gas Supply Considerations**

The proposed Constitution Pipeline presents an opportunity to expand natural gas service franchises in areas currently not served by gas utilities. Analysis of routing alternatives should address the potential to provide gas to unserved municipalities,

-10-

ADD146

and the extent of secondary pipeline spurs needed to reach areas of potential use, such as villages or industrial areas not presently served by natural gas utilities.

Additional impacts from the potential increased gas supply in the region should be addressed within the EIS. These considerations include the environmental benefits in the nature of reduced greenhouse gas emissions related to fuel switching from oil to gas. The EIS should also consider the economic benefits in the nature of lower prices for heating or industrial process fuels by switching from oil to gas. Economic development opportunities related to expansion of potential gas service areas should also be identified in the EIS.

**Gas Quality Considerations**

Experience in New York State has shown that there are risks to end-use equipment associated with moisture content in Marcellus Shale gas. The EIS should address how the transmission facility will be protected from well-field moisture; identify where dehydration and separation equipment will be located; identify how pipelines will be monitored for moisture content; and identify content, volumes, and disposal methods of any emissions or waste products generated by operation of gas treatment or dehydration facilities.

ADD147

CONCLUSION

Based on the foregoing, the NYPSC respectfully requests that the Commission take into consideration all of the concerns and potential issues noted above, and those concerns addressed in other submitted public comments, during the pre-filing review and when addressing the Environmental Impact Statement for the proposed pipeline.

Respectfully submitted,

Alan T. Michaels
Assistant Counsel
Public Service Commission
   of the State of New York
3 Empire State Plaza
Albany, NY 12223
(518) 474-1585

-12-

ADD148

20121031-5092 FERC PDF (Unofficial) 10/31/2012 10:44:12 AM

EXHIBIT A

Millennium Pipeline

S A N F O R D                    S A N F O R

Constitution Pipeline Preferred

Bluestone - Case 11-T-0401

NEW YORK

Proposed Constitution Pipeline
in Relation to
Route of Bluestone Pipeline
Town of Sanford
Broome County, New York

N
W        E
S

0   0.25  0.5        1 Miles



ADD149

20121031-5092 FERC PDF (Unofficial) 10/31/2012 10:44:12 AM

Document Content(s)

NYPSC Comments to Constitution pre-filing  w map.PDF.................1-13

<u>CERTIFICATE OF FILING AND SERVICE</u>

I, Robyn Cocho, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

September 12, 2016 the foregoing Page Proof Brief of Intervenor Constitution

Pipeline Company, LLC was filed through the CM/ECF system and served

electronically on parties in the case:

MONEEN SUSAN NASMITH, ESQUIRE
CHRISTINE ERNST, ESQUIRE
DEBORAH GOLDBERG, ESQUIRE
EARTHJUSTICE
48 Wall Street
New York, NY 10005
*Attorneys for Petitioners Catskill*
*Mountainkeeper, Inc.; Clean Air*
*Council; Delaware-Otsego Audubon*
*Society, Inc.; Riverkeeper, Inc.; and*
*Sierra Club*

KARL S. COPLAN, Esquire
TODD D. OMMEN, Esquire
ANNE MARIE GARTI, VOLUNTEER ATTORNEY
PACE ENVIRONMENTAL LITIGATION CLINIC, INC.
78 North Broadway
White Plains, New York 10603
*Attorneys for Petitioner Stop the Pipeline*

ROBERT HARRIS SOLOMON, ESQUIRE
HOLLY E. CAFER, ESQUIRE
KARIN L. LARSON, ESQUIRE
FEDERAL ENERGY REGULATORY COMMISSION
Office of the Attorney General
888 1st Street, NE
9A-01
Washington, DC 20426
*Attorneys for Respondent Federal Energy Regulatory Commission*

MARY LISANNE CROWLEY, ESQUIRE
KURT HAZLETT JACOBS, ESQUIRE
TROUTMAN SANDERS LLP
401 9th Street, NW
Washington, DC 20004
*Attorneys for Intervenor Iroquois Gas Transmission System, L.P.*

JOHN LONGSTRETH, ESQUIRE
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
*Attorney for Intervenor Natural Gas Supply Association*

KENNETH T. KRISTL, ESQUIRE
WIDENER ENVIRONMENTAL CLINIC
4601 Concord Pike
Wilmington, DE 19803
*Attorney for Movant The Environmental & Natural Resources Law Clinic of Delaware Law School*

In addition, 6 paper copies have been hand delivered to the court on the same date as above.


/s/ Robyn Cocho
Robyn Cocho